POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Court-Appointed Lead Plaintiff*
*William Baker, Additional Plaintiffs*
*Mohammed Thaseen and Jill Sligay,*
*and Co-Lead Counsel for the Proposed Class*

[additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| WILLIAM BAKER, MOHAMMED THASEEN, JILL SLIGAY, LENARD ROQUE, and AMOLKUMAR VAIDYA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC., JACK DORSEY, NED SEGAL, PARAG AGRAWAL, VIJAYA GADDE, and KAYVON BEYKPOUR,<br><br>Defendants. | Case No. 2:22-cv-06525-MCS-E<br><br>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Judge:  Mark C. Scarsi<br>Date:  May 22, 2023<br>Time:  9:00 a.m.<br>Place:  Courtroom 7C |

# TABLE OF CONTENTS

I.    INTRODUCTION ..............................................................................................1

II.   FACTS ............................................................................................................3

    A.   A Rudimentary Hack Turns Into a Month-Long Ordeal Because Twitter Grants Employees Too Much Access. ...............................................3

    B.   Twitter Hires Zatko. ...........................................................................3

    C.   Zatko Learns Defendants Concealed a State Misinformation Campaign. ...........................................................................................4

    D.   Zatko Learns Defendants Knew Twitter Could Not Comply with the Consent Order. .................................................................................4

    E.   Zatko Learns Twitter Violates Intellectual Property Rights and Misleads the FTC About It. .............................................................5

    F.   Zatko Learns Defendants Knew Every Twitter Engineer Had Access to All Customer Data and Reports Other Alarming Information. ...............5

    G.   Zatko Learns Defendants Had Been Lying to Twitter's Board for Years About Cybersecurity. ...............................................................6

    H.   Zatko Tells Defendants Twitter Is Vulnerable To State Actors. ..................7

    I.   Despite Zatko's Warnings, Defendants Violate the Consent Order By Knowingly Failing to Adopt Reasonable Cybersecurity Steps. ....................7

    J.   Defendants Attempt To Prevent Zatko From Whistleblowing. ...................8

    K.   Defendants Publish Misleading mDAU Metrics. .........................................9

III.   THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY. ............................11

    A.   The Court Should Credit Facts Attributed to Zatko and Musk. ..................11

    B.   The Complaint Is No Puzzle. ........................................................14

    C.   Defendants Made False Statements. .......................................................15

i

1.    Twitter "does not do [what Defendants] claim[]." ..........................15

2.    Defendants Misleadingly Asserted Twitter's Cybersecurity Was Improving.....................................................................................16

3.    Defendants' Statements Gave Investors the Misleading Impression that Twitter Could Respect Users' Privacy Choices......17

4.    Defendants' Statements Gave Investors the Misleading Impression that Twitter Could Address Misinformation.................19

5.    Defendants Misleadingly Told Investors mDAU Only Included Users Who Generated Revenue for Twitter......................................19

6.    Defendants Misleadingly Counted Suspended Accounts.................20

7.    Defendants Misleadingly Touted mDAU Growth Despite Declining User Engagement. ...........................................................20

8.    Defendants Misrepresented the Number of Bots on Twitter...........21

9.    Defendants Misrepresented The Number of Bots in mDAU and the Basis of Their Calculation............................................................21

10.    Defendants' "Cautionary" Statements Were Actionably Misleading...................................................................................21

11.    Defendants' Statements Are Not Protected By the PSLRA Safe Harbor Because They Are Not Forward-Looking. ...........................23

IV.    THE COMPLAINT ALLEGES SCIENTER. ........................................................23

A.    Defendants Received and Had Access to Contemporaneous Reports Contradicting Their Statements.................................................................24

B.    The Misstatements' Specificity Supports Scienter. ...................................26

C.    Defendants' Concealment Supports Scienter.............................................28

D.    The Core Operations Doctrine Supports the Inference of Scienter. ...........28

V.    THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION. ...........29

VI.    THE COMPLAINT ALLEGES DAMAGES. .......................................................31

ii

A.    Mr. Baker Suffered Damages.................................................................31

B.    Other Plaintiffs Suffered Damages. ..........................................................32

VII.  THE COMPLAINT ALLEGES A SECTION 20(a) CLAIM............................33

VIII. CONCLUSION.................................................................................33

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ...............................................................................32

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................11

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ......................................................................19, 28

*Curry v. Yelp Inc.*,
   875 F.3d 1219 (9th Cir. 2017) ..........................................................................13

*Flynn v. Sientra, Inc.*,
   2016 WL 3360676 (C.D. Cal. June 9, 2016)...............................................14, 15

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ...............................................................11, 21, 22

*Green v. Occidental Petroleum Corp.*,
   541 F.2d 1335 (9th Cir. 1976) .....................................................................31, 32

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
   2017 WL 114401 (C.D. Cal. Jan. 9, 2017).......................................................17

*Hershewe v. JOYY Inc.*,
   2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) ....................................................13

*Hunt v. Bloom Energy Corp.*,
   2021 WL 1110260 (N.D. Cal. Mar. 23, 2021) ..................................................32

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ...............................................................................24

*In re Am. Apparel, Inc. S'holder Litig.*,
   855 F. Supp. 2d 1043 (C.D. Cal. 2012).............................................................17

*In re Banc of California Sec. Litig.*,
   2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ......................................................11

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
   851 F. Supp. 2d 746 (S.D.N.Y. 2012) ................................................................13

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ................................................................29, 30, 31

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   934 F. Supp. 2d 1219 (C.D. Cal. 2013) ..............................................................13

*In re ECOtality, Inc. Sec. Litig.*,
   2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ....................................................26

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) ................................................................22

*In re Fibrogen, Inc.*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022) ......................................................28

*In re Flowers Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ....................................................28

*In re Herbalife, Ltd. Sec. Litig.*,
   2015 WL 12734014 (C.D. Cal. July 28, 2015) ....................................................31

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) ............................................................14, 17

*In re IsoRay, Inc. Sec. Litig.*,
   189 F. Supp. 3d 1057 (E.D. Wash. 2016) ..........................................................30

*In re Lantronix, Inc.*,
   2003 WL 23198818 (C.D. Cal. Dec. 31, 2003) ..................................................32

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..............................................................12

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
   2021 WL 5530949 (D. Or. Nov. 24, 2021) ..........................................................13

v

*In re Mattel, Inc. Sec. Litig.*,
　2021 WL 1259405 (C.D. Cal. Jan. 26, 2021) ....................................11, 12, 26, 30

*In re Mego Fin. Corp. Sec. Litig.*,
　213 F.3d 454 (9th Cir. 2000) .........................................................................31

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
　78 F. Supp. 3d 1215 (N.D. Cal. 2015).............................................................33

*In re New Century*,
　588 F. Supp. 2d 1206 (C.D. Cal. 2008) ......................................................12, 17

*In re Quality Sys., Inc. Sec. Litig.*,
　865 F.3d 1130 (9th Cir. 2017) ....................................................................16, 23

*In re QuantumScape Sec. Class Action Litig.*,
　580 F. Supp. 3d 714 (N.D. Cal. 2022).........................................................19, 20

*In re Rigel Pharms., Inc. Sec. Litig.*,
　697 F.3d 869 (9th Cir. 2012) ......................................................................19, 20

*In re Twitter, Inc. Sec. Litig.*,
　2021 WL 4166725 (N.D. Cal. Sept. 14, 2021).....................................................23

*In re Van der Moolen Holding N.V. Sec. Litig.*,
　405 F. Supp. 2d 388 (S.D.N.Y. 2005) ...............................................................22

*In re VeriFone Holdings, Inc. Sec. Litig.*,
　704 F.3d 694 (9th Cir. 2012) ......................................................................12, 13

*Khoja v. Orexigen Therapeutics, Inc.*,
　899 F.3d 988 (9th Cir. 2018) ......................................................................11, 16

*Lako v. LoanDepot, Inc.*,
　2023 WL 444151 (C.D. Cal. Jan. 24, 2023)........................................................12

*Luna v. Marvell Tech. Grp., Ltd.*,
　2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) .....................................................32

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011)......................................................................................21

vi

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS    Case No. 2:22-cv-06525-MCS-E

*McElyea v. Babbitt*,
    833 F.2d 196 (9th Cir. 1987) ............................................................................... 13

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .......................................................................... 30

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) .............................................................. 33

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ............................................................................... 29

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................ 23

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................... 17

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................................. 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ............................................................................................. 18

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ............................................................................... 31

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ....................................................................... 16, 17

*Primo v. Pac. Biosciences of California, Inc.*,
    940 F. Supp. 2d 1105 (N.D. Cal. 2013) ............................................................... 21

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .......................................................................... 26, 27

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) ............................................................... 15

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017), .................................................... 12, 30

vii

*S. Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ................................................................26

*Sanders v. Realreal, Inc.,*
    2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ....................................18

*Shenwick v. Twitter, Inc.,*
    282 F. Supp. 3d 1115 (N.D. Cal. 2017).........................................*passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)....................................................................11, 23

*Weston Fam. P'ship LLLP v. Twitter, Inc.,*
    29 F.4th 611 (9th Cir. 2022) ................................................................16

*Yanek v. Staar Surgical Co.,*
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..............................................11

**Statutes**

15 U.S.C. §78u-4(e)(2) ................................................................................32

**Rules**

Fed. R. Civ. P. 9(b) ......................................................................................11

Fed. R. Civ. P. 12 ........................................................................................29

# I.    INTRODUCTION[1]

In the summer of 2020, just before the Class Period, the world watched in amazement as a teenager unlawfully obtained administrator privileges in an amateurish hack that took down parts of Twitter for days. Weeks later, Twitter announced that the FTC had served a draft complaint charging it with violating a 9-year-old Consent Order requiring Twitter to take certain actions on privacy and cybersecurity.

Twitter's PR machine went into overdrive. Executives reassured investors that Twitter addressed the hack by limiting access to user data, monitoring attempts to access data, and conducting detailed privacy analyses prior to launching product. Most of all, Twitter hired Peiter Zatko, a cybersecurity superstar, to head its security division.

Zatko discovered that Twitter's cybersecurity problems were so much worse than even skeptical observers would have feared. These privacy protections Twitter bragged about? They didn't exist. All Twitter engineers had access to all user data and Twitter didn't monitor what they did with it. And Defendants knew as much: they had discussed it in board meetings. More, as Defendants knew because it was also discussed at board and executive meetings, Twitter had lost control over user data by copying it to vast unmanaged pools that accounted for 80% of its data. Twitter's problems also extended to the sordid. It was concealing a brutal Indian army misinformation campaign to earn influence with the Indian government, per an executive decision made shortly before telling investors they disclosed all such campaigns. These are mere examples.

Defendants also concealed Twitter's flatlining commercial prospects. They told investors to judge Twitter's future prospects by the number of and increases in its monetizable Daily Active Users, or mDAU. Though they told investors that all mDAU

---

[1] Citations to "¶" are to the operative Complaint, Dkt. No. 81. Citations to "Ind.Df.Br." and "Tw.Br." are to the Memoranda of Points and Authorities in support of the Individual Defendants' and Twitter's motions to dismiss, respectively, Dkt. Nos. 86, 87. Citations to "Weber Decl." and "Park Decl." are to the Declarations of Whitney B. Weber, Dkt. No. 88, and Jonathan D. Park, filed herewith. Unless otherwise noted, all emphases are added and all internal quotations and citations are omitted.

1

saw ads, by Q1 2021 nearly a third mDAU didn't, and they were generating $0 in revenue for Twitter. And Defendants' claims that increases in mDAU presaged a bright future contradicted internal metrics of user engagement that Defendants scrutinized but did not disclose. Those metrics showed that Twitter earned almost half its revenues from 7% of its users ***and these users were losing interest***, while Twitter's new mDAU were low-quality and generated no or few revenues.

The statements about state influence campaigns, cyberattacks, and mDAU are so obviously actionable that Defendants deny the Complaint alleges what it plainly does, including literal quotes of Defendants' statements. For example: Defendants say they never told investors they disclosed all state influence campaigns. It's right there in ¶230: "we've been very, very transparent about ***any***" such campaigns. They say their statement that Twitter was subject to cyberattacks that might, in the future, lead to breaches and incidents, was accurate. Let's consult ¶¶72 & 74: ***in 2020 alone***, Twitter concealed 40 incidents that exposed the data of 200 million users and 20,000 employees and contractors. They say they never said all accounts included in mDAU saw ads. Let's look at ¶174: "[o]ur mDAU are not comparable to current disclosures from other companies, many of whom share a more expansive metric that includes people who are not seeing ads."

Defendants' misstatements harmed investors. In April 2022, Twitter agreed to sell itself to Elon Musk. Musk soured on the deal in May when he discovered and disclosed that Twitter's mDAU measurements did not match what it had told investors. He cancelled the deal in July. Twitter's stock price fell on both occasions. Zatko filed a whistleblower complaint which was publicly revealed in August 2022, causing Twitter's stock price to fall yet again.

The Complaint states a claim.

2

## II.   FACTS

### A.   A Rudimentary Hack Turns Into a Month-Long Ordeal Because Twitter Grants Employees Too Much Access.

In 2011, Twitter entered into a 20-year consent order with the FTC ("Consent Order") requiring it to, among other things, adopt industry-standard data protection. ¶¶46-48. The Consent Order also mandated that Twitter "(a) prevent unauthorized access to nonpublic consumer information; [and] (b) honor the privacy choices exercised by users". ¶47.

In July 2020, a teenager hacked Twitter by calling a few employees and asking for their passwords. ¶54. Because Twitter *still* granted employees far more access than necessary, these credentials gave the hacker the ability to tweet from any account. *Id*. He used it to fraudulently solicit bitcoin from celebrities' accounts. ¶51. To address the hack, Twitter had to shut down system access to its employees for days and manually re-enter every employee. ¶53. It risked significant penalties: Facebook was fined $5 billion for violating a privacy consent order. ¶50.

### B.   Twitter Hires Zatko.

In November 2020, Twitter hired Peiter Zatko, an expert once offered the position of Chief Information Officer of the United States, as Head of Security to oversee its cybersecurity, data privacy, and other areas. ¶¶39, 57.

Zatko learned that Twitter's cybersecurity situation was dire. Since the Consent Order, Twitter had made little progress on basic security, integrity, and privacy systems. ¶¶66-67. Zatko's reports told him that Twitter had never been in compliance with the Consent Order and was not on track to *ever* fully comply. ¶68.

Zatko discovered violations that contradicted Defendants' specific public statements. Defendants shrugged because they already knew the problems.

**C.      Zatko Learns Defendants Concealed a State Misinformation Campaign.**

In or around August 2020, Twitter had learned that the Indian Army unit responsible for Kashmir was running a brutal influence operation on Twitter that, among other things, targeted journalists. ¶¶155-56. Twitter's executives had contemporaneously decided not to disclose the operation to gain favor with India's ruling party. ¶155. Later, during the Class Period, Agrawal falsely told investors Twitter has "been *very, very transparent* about *any* attempt that we've seen from state actors to manipulate the conversation on Twitter[.]". ¶230.

**D.      Zatko Learns Defendants Knew Twitter Could Not Comply with the Consent Order.**

Twitter discovered in 2017 that it had vast unmanaged data pools. ¶167. These pools accounted for about 80% of Twitter's data. ¶168. Though Defendants did not index their contents, they knew from searches that the pools contained users' personally identifiable information. *Id.* The pools and resulting problems were discussed at board and senior executive levels in the years before the Class Period. *Id.*

The data in the pools caused Twitter to repeatedly violate the Consent Order. ¶¶55, 169. Employees kept finding user data sets in the unmanaged pools and using it in violation of the users' consent. ¶55. Even though the FTC served Twitter with a draft complaint in July 2020 alleging that it had not honored privacy choices by using data users had submitted for a limited purpose to advertise to them, *id.*, Twitter did *exactly the same thing* in mid-2021. ¶104. A Twitter executive remarked "[s]o we only started to address the problem, and then got side tracked and forgot about it." *Id.*

Twitter also misled the FTC when it asked Twitter whether it deleted cancelling users' data. ¶¶168-69. It doesn't: the data lives on in Twitter's data pools. ¶168. Because "yes" was an outright lie, Twitter misleadingly responded that the accounts were "deactivated". ¶169. Internally, Twitter calculated that it could face hundreds of millions of dollars in fines because of this misconduct. *Id.*

4

During the Class Period, explaining Twitter's compliance with privacy requirements, Defendant Segal told investors that "we try to be really thoughtful and transparent and demonstrate the choices [users] have"—though Twitter could not respect user choices. ¶227. Twitter also declared when it settled the July 2020 draft complaint's charges that the issue "was addressed as of September 17, 2019," though it was still unresolved in January 2022 when Zatko left Twitter. ¶242.

**E.    Zatko Learns Twitter Violates Intellectual Property Rights and Misleads the FTC About It.**

Twitter senior leadership knew for years that Twitter had never held licenses to the data sets and software used to build its key machine learning model. ¶165. When the FTC inquired about training material for those models, Twitter misleadingly provided the FTC with the few models that did not violate intellectual property. ¶266. In early 2022, a senior privacy officer at Twitter told Zatko that Twitter planned to use the same trick against Irish and French regulators. ¶273.

**F.    Zatko Learns Defendants Knew Every Twitter Engineer Had Access to All Customer Data and Reports Other Alarming Information.**

Upon his November 2020 appointment, Zatko conducted a two-month investigation into Twitter's cybersecurity. He presented some of his findings at a February 2021 senior executive meeting attended by at least Defendants Agrawal and Dorsey, and at least reviewed by Gadde. ¶70.

He started with "***you should be alarmed.***" ¶70. And no wonder. Twitter did not know what software had been installed on 90% of its devices. ¶78. It did not have a separate development environment, so it could neither segregate production nor safely integrate new code and application updates. ¶¶79-80. Employees were sure to get away with improperly obtaining user data because Twitter did not centrally log their access attempts. ¶85. In 2020 alone, through 40 incidents, a significant majority caused by overbroad access, Twitter exposed personal data of 200 million users, and 20,000

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS          Case No. 2:22-cv-06525-MCS-E

employees and contractors. ¶¶72, 75.

Yet Defendants already knew much of the information Zatko raised. Zatko's notes for the meeting show that he reported that Twitter gave all its engineers, some 2,662 of them, access to its full production system, including full source code and customer data, but that the issue "***ha[d] been raised to the board before***." ¶¶81, 83. Indeed, early in his tenure, Zatko had heard Defendant Agrawal tell the executive team that "Twitter has 10 years of unpaid security bills." ¶68.

Defendant Agrawal nonetheless assured *Wired* in November 2020 that "[t]he amount of access, the amount of trust granted to individuals with access to these tools, is substantially lower today" than at the time of the hack. ¶¶57, 244. Twitter also told investors its cybersecurity "tools are constantly being improved." ¶232.

**G.    Zatko Learns Defendants Had Been Lying to Twitter's Board for Years About Cybersecurity.**

In its initial attempts to comply with the Consent Order, Twitter decided to create a Software Development Life Cycle plan ("SDLC"). ¶99. SDLCs are all-but-mandatory plans that systematically ensure software is developed to, among other things, meet security standards and be easy to upgrade when new vulnerabilities are found. *Id.* SDLCs segregate development and production, an essential component of cybersecurity that Twitter lacked. *Id.*

On or around May 2021, Zatko reported to a Board Committee that Twitter's SDLC did not include any of the important technology controls and had only been applied to 8-12% of projects. ¶101. Board Chair Patrick Pichette upbraided Defendants, stating they had been telling Twitter's Board "for years" (well before the Class Period) that "the [SDLC] effort was getting closer to being complete." ¶102. After the meeting, a Twitter executive harangued Zatko for disclosing the truth to the Board, invoking Agrawal's name. ¶103.

Though it had no SDLC, Defendants told investors during the Class Period that

6

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS                    Case No. 2:22-cv-06525-MCS-E

"[i]f a project could have significant privacy impacts, we conduct a detailed impact assessment to make sure we're taking appropriate measures before we launch it." ¶238.

### H.      Zatko Tells Defendants Twitter Is Vulnerable To State Actors.

In a November 2020 post, Twitter stated it had "a dedicated site integrity team and [made] continuous investment in technology to detect, understand and neutralize [misinformation] campaigns as quickly and robustly as possible." ¶240. In early 2021, Zatko hired consulting firm, Alethea Group, to evaluate Twitter's capacity to fight misinformation. ¶96. A draft report, delivered in or around May or June 2021, concluded that Twitter "operate[d] in a constant state of crisis", that its software was inadequate, that it could not operate in the languages Twitter's users employed, and that its Site Integrity team could not monitor threats in real time. ¶97.

Twitter knowingly harbored spies. Before the Class Period two Twitter employees were charged with spying for the Saudi government. ¶146. On or before July 20, 2021, Twitter learned that it had two Indian government spies on its payroll and **declined to fire them**. ¶151. In a July 20 text to Defendant Segal, Zatko mentioned the spies and explained that "[w]e are handing the keys to a surveillance apparatus that is intending on using our platform [to] [s]ilenc[e] and target[] and undermin[e] the public conversation." *Id.* In January 2022, Zatko learned Twitter had been warned it employed a Chinese intelligence agent. ¶163.

### I.      Despite Zatko's Warnings, Defendants Violate the Consent Order By Knowingly Failing to Adopt Reasonable Cybersecurity Steps.

Throughout the Class Period, Defendants regularly ignored security violations that the Consent Order required them to address. In or around August 2021, Zatko told Agrawal that Twitter's engineer login system was recording an alarming number of failed logins, a red flag that hackers may be targeting it. ¶¶106-08. Agrawal refused to investigate. ¶109.

In or around Q3 or Q4 2021, Zatko learned that employees' computers were not

being backed up because its backup system had failed. ¶117. Rather than fix it, Twitter executives terminated it. The consequence—that Twitter could not determine, even in an after-the-fact investigation, whether employees accessed data without authorization—was, in one executive's words, "a good thing because it means [Twitter] cannot comply with [legal requests] and ha[s] less exposure." *Id.*

In May 2022, Defendants stated in a post that "we have aligned with the [FTC] on operational updates and program enhancements to ensure that people's personal data *remains secure and their privacy protected.*" ¶242.

### J.    Defendants Attempt To Prevent Zatko From Whistleblowing.

Defendants prevented Zatko from raising his concerns with the Board.

After the February 2021 meeting, Gadde instructed Zatko not to send Twitter's Board a detailed written report of his findings. ¶88.

Though Zatko had ultimate authority over global content moderation (¶65), the subject of Alethea's report, Defendants ordered Alethea to run its report by a law firm to sanitize it before Zatko's review. ¶98. The goal, Twitter's counsel confirmed, was to hide the findings. *Id.* The seasoned professionals at Alethea told Zatko "[t]his does not feel right to us what's going on." *Id.*

Defendants' campaign to conceal Zatko's warnings from the Board ended with his firing. In December 2021, Zatko learned that another executive would present misleadingly optimistic information about cybersecurity to Twitter's Board. ¶120. Zatko raised his concerns to Agrawal, which are set out below and were later communicated to the Board. ¶¶123-24. Agrawal allowed the misleading presentation and ordered Zatko not to send written materials correcting it. ¶¶133-34.

After several unsuccessful attempts to discuss the matter with Agrawal, Zatko wrote in an email that the representations to the Board may amount to "fraud", triggering an internal investigation. ¶138. The investigation team agreed and asked Zatko to write a report. *Id.* But within hours of providing notice that his report was almost complete,

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS          Case No. 2:22-cv-06525-MCS-E

Zatko received an angry phone call from Agrawal. ¶139. The next day, Agrawal fired Zatko. ¶141.

Zatko nonetheless created a report advising the Board that the problems he had raised in February 2021 had not gone away, but worsened. ¶143. 51% of Twitter's employees had access to its full source code and customer data, compared to 46% in 2021. ¶143(a). 68% of Twitter's servers' operating systems were out of date, compared to 53% in February 2021. ¶143(b). At least 40% of Twitter's laptops had critical vulnerabilities that violated Twitter security requirements. ¶143(d). There were 50 security incidents in 2021—10 more than in 2020—11 had to be reported to the FTC, and 80% were caused by access control. ¶143(c). And Twitter still did not have an SDLC. ¶143(e).

On February 16, 2022, Twitter filed its 2021 10-K, stating that "we strive to comply with applicable privacy and data protection laws and regulations", a month after firing Zatko for attempting to do just that. ¶216.

## K.     Defendants Publish Misleading mDAU Metrics.

In late 2018, after three straight quarters of declining monthly active users (MAU), Twitter adopted mDAU (monetizable daily active users) as its "key metric." ¶171. It claimed "mDAU, and its related growth, are the best ways to measure our success against our objectives and to show the size of our audience and engagement going forward." *Id.*

Defendants were clear that mDAU only includes users who see ads. They explained that "[o]ur mDAU are not comparable to current disclosures from other companies, many of whom share a more expansive metric ***that includes people who are not seeing ads***[.]" ¶174.

Defendants acknowledged that mDAU may include a few fake, spam, or bot accounts. ¶182. But they assured investors that more than 95% of mDAU accounts were real, a proportion that did not change at any point during the Class Period. *Id.*

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS            Case No. 2:22-cv-06525-MCS-E

Defendants' statements were false. First, many mDAU—29% in Q1 2022—never saw any ads. ¶177. The proportion of unmonetized mDAU was increasing: its growth accounted for more than half the total user growth in 2021. ¶177.

Second, Twitter inflated mDAU by knowingly including users it had already decided were fake. Twitter removed fake accounts from future mDAU counts but *included* them in the quarter during which it determined they were fake. ¶184. Nearly 5 million accounts suspended as spam in Q1 2021 were included in mDAU for that quarter, boosting mDAU by 2.5%. ¶186. The number and proportion soared during the Class Period, reaching 13 million in Q4 2021 (6.2% of mDAU) and 15 million in Q1 2022 (6.9% of mDAU). *Id.*

Third, Defendants could not reliably estimate Twitter's bots. In early 2021, Zatko asked the Site Integrity team to calculate how many accounts were bots. ¶191. They said "we don't really know," noting senior management's desire not to measure the proportion so it could not leak. ¶191. Indeed, at a Q3 2021 Board meeting, Zatko heard an executive say Twitter "intentionally and knowingly deprioritized" platform health, such as bot removal, to focus on growing mDAU. ¶193. And Twitter's 5% metric was calculated from a sample of *100 accounts*, far too few to produce a reliable estimate. ¶187.

More, contrary to their public statements, Defendants did not particularly rely on mDAU. Twitter derives almost half of its revenues from just 7% of its users. ¶178. The behavior of these power users, and not mDAU, drives Twitter's future profitability. *Id.* So Twitter executives used the total number of daily user active minutes ("UAM") to evaluate engagement. ¶199. And Defendants fretted that this and related metrics were stagnant or declining. *Id.* On January 25, 2022, Defendant Agrawal described the declining UAM figures to Twitter's head of data science, who was responsible for Twitter's mDAU forecast model, as "concerning". *Id.* He responded that "the UAM decline is very concerning" and that other engagement metrics had been "declining in

10

concert [] for the engaged user segment for the last 18 months." *Id.*

## III.   THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY.

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), draws all reasonable inferences in Plaintiffs' favor, *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1120 (C.D. Cal. 2005), and upholds the Complaint if it states a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs meet Rule 9(b) by "stat[ing] with particularity the circumstances constituting fraud or mistake" and "identify[ing] the 'who, what, when, where, and how' of the fraudulent misconduct, 'as well as what is false or misleading about' it, and 'why it is false.'" *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *4 (C.D. Cal. Jan. 26, 2021).

Defendants challenge three elements of Plaintiffs' Section 10(b) claim, that they (1) made a misstatement or omission of material fact ("falsity") (2) with scienter (3) causing Plaintiffs' losses. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018).

### A.   The Court Should Credit Facts Attributed to Zatko and Musk.

If Plaintiffs refused to disclose Zatko's name, the Court would have to credit allegations the Complaint attributes to him. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 768-69 (9th Cir. 2023). Likewise if he had published them after taking a short position in Twitter's stock. *In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *7 (C.D. Cal. Sept. 6, 2017). Yet, citing two cases in which plaintiffs attempted to rely on legal conclusions in complaints, Tw.Br. 5, Defendants maintain that the Court should discount Zatko's allegations because he made them in Congressional testimony and a whistleblower disclosure to the SEC, FTC, and DOJ, subject to stiff criminal penalties for false statements. *E.g.*, SEC Whistleblower Form TCR (https://www.sec.gov/about/forms/formtcr.pdf) (requiring that information be submitted under penalty of perjury).

11

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS                    Case No. 2:22-cv-06525-MCS-E

Defendants' argument contravenes controlling precedent: in *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706-07 (9th Cir. 2012), the Ninth Circuit credited allegations drawn from an SEC complaint. That's because on a motion to dismiss, courts consider witnesses and documents if they are "reliable." *In re New Century*, 588 F. Supp. 2d 1206, 1221 (C.D. Cal. 2008) (allegations drawn from a Bankruptcy Examiner's Report); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1256 (N.D. Cal. 2008) (whistleblower). Zatko is clearly reliable: he is a leading cybersecurity expert, which is why Twitter hired him to head its cybersecurity department, he disclosed his identity, and speaks under penalty of perjury from first-hand knowledge. *Mattel*, 2021 WL 1259405, at *8 (witness reliable because of "disclosed identity, elevated position, and first-hand knowledge of many pertinent events"); *see also LDK*, 584 F. Supp. 2d at 1254 (whistleblower reliable because defendants hired him to examine subject matter). One of Defendants' cases recognizes the distinction. *Rok v. Identiv, Inc.*, 2017 WL 35496, at *13 (N.D. Cal. Jan. 4, 2017), *aff'd sub nom*. 716 F. App'x 663 (9th Cir. 2018) (evaluating whether to consider third-party complaint based on whether plaintiff had sufficient personal knowledge for complaint to be reliable).

Nor did Plaintiffs need to speak with Zatko; the *LDK* plaintiffs didn't. *See LDK*, 584 F. Supp. 2d at 1238-1240, 1254-1256. And, in any event, Plaintiffs meet the most stringent test courts have applied by relying on the 48 documents Zatko submitted with his report, Complaint at 2 n.1, confirming its accuracy with his lawyer and consulting former Twitter employees, Complaint at 1, and checking the reports against Zatko's sworn testimony. *Lako v. LoanDepot, Inc.*, 2023 WL 444151, at *6 (C.D. Cal. Jan. 24, 2023) (considering allegations from insider complaint where plaintiffs' attorney contacted insider's attorney to confirm allegations and it was supported by documentary evidence). *See also* Park Decl. ¶¶3-4.

The Complaint also properly relies on Musk's specific allegations. His complaint

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS          Case No. 2:22-cv-06525-MCS-E

alleges the precise number of Twitter users who were power users or unmonetized and the proportion of revenue derived therefrom. Musk also quotes email exchanges and refers to specific conversations. Musk is plainly quoting Twitter's internal documents. Further, Musk set these allegations out in a verified complaint, the functional equivalent of an affidavit. *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987); Park Decl., Ex. 1-3. The allegations attributed to Musk are reliable.

Individual Defendants draw sweeping conclusions from cases addressing discrete factual issues. *Curry v. Yelp Inc.*, 875 F.3d 1219, 1227 (9th Cir. 2017), addressed whether vague customer complaints amounting to one out of 26,500 reviews could reveal defendants' fraud, not whether the court could rely on facts drawn from complaints. In *In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *7-9 (D. Or. Nov. 24, 2021), the plaintiffs attempted to establish that a publicly-traded lending company had a widespread practice of usury and harassment by citing four anonymous online complaints, one of which miscalculated the applicable interest rate. In *Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *5 (C.D. Cal. Nov. 5, 2021), the plaintiffs relied on a report the court determined was written by a confidential witness, yet they did not describe how the source would have access to the information reported. Musk's complaint is verified and he is quoting internal documents. At least as applied to verified complaints, cases like *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013) are not consistent with *Verifone*, 704 F.3d at 706-07. The cases relied on a doctrine from the Southern District of New York which that District later abandoned because "[i]t makes little sense to say that information [on] which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012).

Nor does Musk's settlement undermine the allegations. Litigants settle for all sorts

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS          Case No. 2:22-cv-06525-MCS-E

of reasons that have nothing to do with whether they can prove their allegations. Musk may not have been able to prove reliance, an element of his claim which is presumed in this case. While Musk may have believed he would win at trial, he would have to buy Twitter if he lost, and may have worried that continued litigation reduced Twitter's value. Having already had pages of his text messages publicly released, Musk may have worried that a trial would publicize even more embarrassing information. The Court cannot infer, on a motion to dismiss, that Musk chose to settle because his verified allegations were false.

Finally, the Individual Defendants' motion, which Twitter does not join, alleges that Musk's allegations are unreliable. Ind.Df.Br. 6-8. That's because Musk now owns Twitter. Even if the Court does not credit Musk's allegations as to the Individual Defendants, it should credit them as to Twitter. Musk made his verified allegations; let him live with them.

## B. The Complaint Is No Puzzle.

A puzzle pleading fails to put defendants "on notice of the true substance of the claims against them." *In re Intuitive Surgical Sec. Litig.,* 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014). The Complaint alleges the true facts contradicting Defendants' statements in the section that Defendants misleadingly label "Background". In the next section, it alleges the misstatements, highlighting them if they appear in larger excerpts, and explains why they are false.[2] The Complaint in *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *9 (C.D. Cal. June 9, 2016), was not a puzzle pleading because it did the same.

If Defendants' requirements were implemented, plaintiffs would have to repeat the facts in full after each statement, rather than alleging them just once and then explaining in summary why the statements were false. To no purpose: Defendants managed to draft

---

[2] The Complaint inadvertently reversed the beginnings of ¶214 and ¶216. ¶214 appeared in the Q2 2020 10-Q alone, ¶216 appeared in all Twitter's Class Period Forms 10-K and 10-Q.

14

their motion to dismiss.

### C.     Defendants Made False Statements.

#### 1.     Twitter "does not do [what Defendants] claim[]."

Two months after the widely publicized July 2020 hack, Defendants described Twitter's security practices in detailed and unequivocal terms: "access is limited and is only granted for valid business reasons (*i.e.*, ensuring an account holder can get support if they are locked out of their account)", ¶232; "[we] require specific justifications for customer data to be accessed", *id.*; Twitter was "expanding our detection and response efforts to include suspicious authentication and access activity", *id.*; "[i]f a project could have significant privacy impacts, we conduct a detailed assessment to make sure we're taking appropriate measures before we launch it." ¶238. These statements described in detail policies that did not exist. Every Twitter engineer could access user data at any time without justification and with confidence because Twitter did not monitor employee access. Twitter also did not have an SDLC so it did not always (or usually) conduct privacy assessments. Defendants' statements were false because Twitter "does not do [what] it claims to do." *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1029 (N.D. Cal. 2016).

The Complaint alleges other instances of Twitter "not do[ing] [what] it claims to do." In November 2020, Twitter reminded investors that "in 2018, Twitter committed to disclose publicly, any state-backed information operations." ¶240. It had broken the promise: in August 2020, Defendants had determined that the Indian Army Corp responsible for operations in Kashmir was engaged in a brutal misinformation campaign, but let it slide to appease India's ruling party. ¶155. Yet the statement continues: "Twitter has now disclosed over 35 separate state-backed information operations designed to nefariously shape and manipulate public opinion online." ¶240. A reasonable investor would take the misleading impression that Twitter had kept its promise: the 35 operations were all there were to disclose. Agrawal was even more direct, telling investors that "been *very*, *very transparent* about *any* attempt that we've seen from state

15

actors to manipulate the conversation on Twitter[.]". ¶230. Defendants represented they had disclosed *all* campaigns, falsely, because Twitter had concealed at least one.

Defendants' arguments to the contrary lack merit. They declare that the Complaint does not allege what it plainly does. *Compare* Tw.Br. 10 with ¶81 (all engineers have access to all customer data at all times); ¶¶99-102, 234 (no SDLC); ¶236-37 (tabletop exercises meaningless without red team). Defendants' disclosures that security was evolving and some had expressed concerns about Twitter's privacy is irrelevant because Twitter misstated the then-current state of each. In *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022), the statements accurately described the current state of affairs and were equivocal about the future.

2.    *Defendants Misleadingly Asserted Twitter's Cybersecurity Was Improving.*

"[O]nce defendants [choose] to tout positive information[], they [must] do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018). Defendants said Twitter's cybersecurity was "constantly being improved, even since [the July 2020] incident", and "we have strict principles around who is allowed access to which tools and at what time, and require specific justifications for customer data to be accessed." ¶232. Yet Twitter's cybersecurity had stagnated for a decade, ¶68, and all engineers could access all customer data for any reason.

Defendants argue that statements are puffery because they include trigger words—"improved" and "strict" in the examples above. Tw.Br. 7. **Statements** are puffery, not individual words. "New" lacks content in a car ad but not in a patent. Thus, "general statements of optimism[] may form a basis for a securities fraud claim" when those statements address specific operations that are performing poorly. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) ("deep" deal pipeline). Defendants'

16

cases confirm as much. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("uncontroversial" that "general statements of optimism, when taken in context, may form a basis for a securities fraud claim."); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1067 (C.D. Cal. 2012) ("makes diligent efforts" not puffery).

In *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 951 (N.D. Cal. 2014), defendants touted "significant quality improvements" after a negative FDA inspection. The statements were not puffery because their context falsely implied that the defendant had worked—not even necessarily successfully—to address the FDA's warning. *Id.* at 967*; see also New Century*, 588 F. Supp. 2d at 1225 ("strict underwriting" not puffery).

Here, Defendants described Twitter's cybersecurity as "constantly being improved" and its access controls as "strict" in the immediate wake of the July 2020 hack and the draft FTC complaint, both resulting from overbroad access. "Strict" and "improved" controls meant at least that they had gotten better since the Consent Order and that Twitter was in the ballpark of compliance.

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *9 (C.D. Cal. Jan. 9, 2017) makes Plaintiffs' point. The court dismissed because "plaintiff does not allege, what 'enhanced' and 'more efficient' ***are understood to mean***[.]" In *Intuitive Surgical*, the plaintiffs alleged the defendants' optimistic statements concealed several risks; they were puffery because, unlike here, the risks were known to the market. 759 F.3d at 1060.

      3.     *Defendants' Statements Gave Investors the Misleading Impression that Twitter Could Respect Users' Privacy Choices.*

Twitter asked users to specify how their data would be used. Defendants told investors Twitter would honor the requests by "giv[ing] people the ability to [] make choices about their data privacy." ¶218. *See also* ¶225 ("We want [users] to have choice on whether we use [] their data"; ¶227 ("We also feel like we've built up a lot of trust

17

with the people who use our service" around user privacy.)

Yet users could not prevent their data from going into Twitter's vast data pools and engineers had full unmonitored access to user data. Twitter employed known foreign agents and its employees installed malware which Defendants did not even try to find. So Twitter could not honor users' demands, failing again and again at the task. ¶¶55, 104. Similarly, it was misleading when Defendants said Twitter "wants" users choices because it can't honor them or that it's "built up [] trust" because users haven't yet realized the trust is unwarranted.

Defendants' failure to disclose that they could not protect user data made their statements misleading. "[P]ure statements of opinion" are misleading if the facts conflict with investors' impression of the statement's basis. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 188-89 (2015). A reasonable investor would assume from Defendants' boasts about respecting user requests that Twitter actually honored them.

Opinions are also misleading if their basis "conflict[s] with what a reasonable investor would take from the statement itself." *Id.* at 189. A company stating it believes its conduct is lawful misleads if its lawyer disagrees. *Id.* at 188-89. Reasonable investors assume that executives do not boast of their company's ability to protect data while their cybersecurity chief is telling them they "should be alarmed" at how unprotected it is. ¶71.

Objectively verifiable statements are not puffery. *Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *9-10 (N.D. Cal. Mar. 31, 2021). The Consent Order requires that Twitter "honor the privacy choices exercised by users." ¶47. This is an objective standard: hundreds of millions of dollars ride on the answer. ¶56.

18

### 4. Defendants' Statements Gave Investors the Misleading Impression that Twitter Could Address Misinformation.

In March 2021, Defendant Segal told investors that Twitter was "very careful [to prevent misinformation] around an election, whether it's in the United States or another part of the world." ¶223. If that election occurred in Japan (Twitter's second largest market) or many other places in which Twitter operates, it could not, having very few or no language speakers. ¶97. Site Integrity had only one Russian speaker, making misleading Agrawal's later boast that Twitter could address, of all things, a Russian disinformation campaign about Ukraine, whose second most popular language is Russian. ¶230. Even as to elections conducted entirely in English, Twitter's anti-misinformation team used "outdated", unsophisticated tools that lacked real-time monitoring ability and relied on other Twitter employees they could not control. ¶97.

Because they boasted that Twitter had all the tools to address misinformation, Segal and Agrawal did not need to specifically mention language capacity to mislead investors. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (including projects subject to stop-work orders in "backlog" misled investors without mentioning specific contracts or stoppage).

### 5. Defendants Misleadingly Told Investors mDAU Only Included users who generated revenue for Twitter.

Defendants told investors mDAU only included users who saw ads: they said investors should not compare mDAU with other companies' disclosures, because, those companies use "a more expansive metric that" unlike mDAU "***includes people who are not seeing ads.***" ¶174. And "we are able to do X" commonly means "we do X"; "we are able to recognize revenue upon delivery" means "we recognize revenue upon delivery." Here, there is no apparent reason Twitter would not show ads when it could. Thus, the Complaint alleges that Defendants "told the market [Twitter] used one method when it in fact used another" to calculate mDAU. *In re QuantumScape Sec. Class Action Litig.*, 580

F. Supp. 3d 714, 735 (N.D. Cal. 2022) (distinguishing *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012)).

>    6.      *Defendants Misleadingly Counted Suspended Accounts.*

2.5% of the mDAU Defendants reported in Q1 2021, rising to 6.2% in Q4 and 6.9% in Q1 2022, were accounts Twitter had already determined were spam. ¶186. Contradicting the Complaint's allegations, Defendants speculate that the accounts might instead have violated terms and conditions unrelated to spam. Tw.Br. at 15. That is a question for the factfinder. Defendants do not even quantify how many accounts were suspended for reasons "that have nothing to do with bots." *Id.* In any case, a suspended account is not monetizable, no matter why it was suspended.

>    7.      *Defendants Misleadingly Touted mDAU Growth Despite Declining User Engagement.*

Defendants touted mDAU growth, told investors that mDAU was the "best way" to measure's Twitter success, and told investors mDAU growth was the "foundation" of revenue growth. ¶¶250-251, 262-263. Yet Twitter earned almost half its revenues from its top 7% of users and almost nothing from the bottom 70%. ¶178. mDAU growth during the Class Period was heavily concentrated on these low-quality users, with only 1% coming from power users. *Id.*

Even as mDAU grew by adding low-quality users, Twitter's measures of user engagement, including UAM, were steadily declining for the 18 months leading to January 2022, a trend Agrawal pronounced "concerning." ¶199. Twitter previously committed fraud by citing growth in one metric to support optimist predictions belied by declines in more meaningful metrics. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1137 (N.D. Cal. 2017). They repeated history by using low-quality mDAU growth to conceal declines in UAM and other metrics.

Defendants' statement that revenue might not increase even if mDAU did (Tw.Br. at 14) is trivially true, since Twitter, like all companies, might earn less money from

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS        Case No. 2:22-cv-06525-MCS-E

existing customers even as it adds new ones. And though Statements 19 and 20 are framed as beliefs, they were false because Twitter actually preferred other user engagement metrics. In addition, they were misleading because Defendants omitted facts about declining user engagement and the deficiencies of the mDAU metric.

### 8.    Defendants Misrepresented the Number of Bots on Twitter.

Defendants stated on Twitter's official account that "only around 5% of accounts"—not mDAU, accounts—"on Twitter are bots." ¶¶267-68. The statement was outright false: Defendants had no idea how many bots there were because they did not want Twitter to calculate the number, lest it leak out and warn advertisers their dollars did not have the impact Twitter claimed.[3] ¶191. When Musk publicly stated that spam was more prevalent than Defendants' estimates, they falsely reassured investors that they "remove[d] as much spam as possible" and were "incentivized" to do so, even though they internally admitted to "intentionally and knowingly deprioritiz[ing]" platform health. ¶270.

### 9.    Defendants Misrepresented the Number of Bots in mDAU and the Basis of Their Calculation.

Defendants also misrepresented the number of bots included in mDAU, which they claimed was less than 5% of mDAU, ¶255-56, and even "*well under* 5%," Weber Decl. Ex. 11 at 3-4. They calculated mDAU from a facially unreasonable sample size of 100 accounts. Reasonable investors would think a 100-account sample was insufficient, making misleading Defendants' claim that they "based [mDAU] on what we believe to be reasonable estimates for the applicable period of measurement". ¶254.

### 10.    Defendants' "Cautionary" Statements Were Actionably Misleading.

"[C]ompanies can control what they have to disclose [] by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). "Risk

---

[3] This case is unlike *Primo v. Pac. Biosciences of California, Inc.*, 940 F. Supp. 2d 1105, 1115 (N.D. Cal. 2013). There, **plaintiffs** conflated two measures; here, **Defendants** do.

21

disclosures can be misleading to investors when they 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[ ] the reader that some of these risks may already have come to fruition.'" *Glazer*, 63 F.4th at 781.

Defendants warned investors that Twitter faced cyber***attacks***. But an attack is only an incident if it succeeds, and Defendants misleadingly suggested that Twitter was blocking them: "[T]he risk of a cybersecurity incident ***potentially occurring*** is increasing." ¶213. Indeed, they said Twitter "cannot provide assurances [its] preventative efforts will be successful." *Id.* Yet Twitter knew its preventative efforts had spectacularly failed: it experienced 40 undisclosed incidents in 2020 (20 of which were breaches) and 50 in 2021 (Twitter "disclosed" the July 2020 hack because it was already public). ¶¶72, 143(c). The 2020 incidents alone exposed the data of 200 million customers and 20,000 employees and contractors. ¶143. Thus, Defendants' purportedly cautionary statements concealed that cybersecurity incidents occurred weekly.

Twitter told investors that it "cannot be sure" that it complied with intellectual property rights. ¶272. Defendants acknowledged internally that Twitter had violated intellectual property to create its machine learning models and misled the FTC to conceal its violations. ¶¶164-65. In *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005), the company's warnings that it faced potential legal and regulatory risks were misleading because it was currently violating NYSE rules. Defendants' expression that Twitter merely ***could be*** violating intellectual property rights were misleading because they were quite sure that it did.

The *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019), defendants did not mislead investors by not volunteering doubts about Facebook's compliance with an FTC order when they said it had tried to comply. Defendants could have done the same, but instead they misleadingly implied they were not aware of any specific violations of intellectual property.

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS          Case No. 2:22-cv-06525-MCS-E

*11.    Defendants' Statements Are Not Protected By the PSLRA Safe Harbor Because They Are Not Forward-Looking.*

"[A] defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements." *Quality*, 865 F.3d at 1141. Defendants assert without explanation that 11 statements are protected by the safe harbor, yet none are even forward-looking. Statements 2, 3, 13, 14 and 16 describe actions Twitter has already taken or is taking. "[W]e will *continue* to advocate", Statement 5, has a present-tense component just as "we will continue to make profits" is misleading if the company is presently losing money. Twitter's present-tense descriptions of its user metrics, as in statements 20 and 29, are no more forward-looking in this action than they were the last time Twitter misled investors about such metrics. *In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *3 (N.D. Cal. Sept. 14, 2021). Statements 25 and 26 are present-tense statements that Twitter is "continually seeking to improve" spam account detection. Statement 34 is a present-tense statement of Twitter's legal compliance.

## IV.    THE COMPLAINT ALLEGES SCIENTER.

A complaint adequately alleges scienter if, accepting all factual allegations and consider the complaint holistically, the inference of scienter is as compelling as any non-culpable inference. *Tellabs*, 551 U.S. at 314. Scienter may be pled by alleging "knowledge of the falsity [or] 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (*quoting No. 84 Emp.- Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003)).

The "absence of a motive allegation is not fatal [to scienter]" and "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Tellabs*, 551 U.S. at 325; *see also Twitter*, 282 F. Supp. 3d at 1149

(drawing no inference from absence of stock sales since theory of the case was that defendants felt pressure to live up to targets, not that they sought personal financial gain) (citing cases). Here, Defendants had to put the July 2020 hack behind them, had lied to the FTC, had promised user engagement growth they could not deliver, and had broken their earnest promise to disclose foreign influence campaign. *Id.*

The Individual Defendants' scienter is imputed to Twitter. *See In re Alphabet*, *Inc. Sec. Litig.,* 1 F.4th 687, 705 (9th Cir. 2021).

### A.    Defendants Received and Had Access to Contemporaneous Reports Contradicting Their Statements.

"The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir. 2004).

*Agrawal* and *Dorsey* attended the February 2021 meeting at which Zatko explained in depth Twitter's cybersecurity problems, including that it gave all of its engineers complete access to customer data. ¶70. *Gadde* knew of the contents of Zatko's presentation. *Id. Beykpour* frequently attended such meetings (*id.*) and, because this was a high-level executive meeting to prepare for a Board meeting, Twitter CFO *Segal* likely attended too.

*All Defendants* already knew some, if not all, the information Zatko provided: Zatko's notes indicate that the plenary access to customer data issue had been discussed at earlier board meetings. ¶83. Similarly, Twitter's purported SDLC had been discussed at Board meetings for years. ¶102. *All Defendants* knew Twitter concealed at least some influence campaigns, because in or shortly after August 2020, Twitter's executives decided to conceal one. ¶155. Twitter's data pools and their consequences were discussed at executive and board meetings years before the Class Period, so *all Defendants* knew that Twitter could not delete user data, could not restrict its use, and

did not know what it held. ¶¶168-169. Twitter's Chief Privacy Officer told Twitter's executives and Board a few years before Zatko started that Twitter's machine learning models violated intellectual property rights, so *all Defendants* knew of this, too. ¶¶165-66.

*All Defendants* knew the facts contained in Zatko's 2022 memorandum because it was submitted to the Board and, given that it charged a Twitter executive with fraud, would have been widely distributed to executives. ¶¶142-144. The executives who instructed Alethea not to send its report to Zatko necessarily outranked him, so *Agrawal*, *Dorsey*, or *Segal*, would have known of its contents. Because an outside law firm was involved, so would *Gadde*.

*Agrawal*, in addition to the allegations above, acknowledged Twitter's "10 years of unpaid security bills." ¶68. Zatko told him Twitter had a such large amount of failed logins it was a security risk, but he refused to do anything. ¶¶106-110. He held bi-weekly one-on-one meetings with Zatko beginning mid-2021 to discuss Twitter's cybersecurity problems, ¶94, knew and condoned an executive's misleading the Board, and fired Zatko for speaking up just as the latter was finishing his report on fraudulent representations to Twitter's Board. ¶¶118-41.

*Segal* received a July 20, 2021 text from Zatko stating that "[a]ny engineer could…[obtain customer information]" and warning him that foreign governments could exploit Twitter to silence adversaries and the Indian government had already planted an agent within Twitter. ¶¶ 87 n.6, 151.

So, before the Class Period, Defendants—all of them—knew Twitter could not honor users' privacy requests and that there were no limitation on engineers' access to information. Before stating that Twitter revealed all state influence campaigns, all Defendants knew that Twitter was concealing the Indian Army's. All Defendants knew Twitter violated third-party copyright. During the February 2021 meeting, among other things, Zatko told Defendant the exact number of Twitter employees who had complete

access to customer information and that Twitter experienced frequent cybersecurity incidents and breaches, not just attacks. Defendants "had access to"—indeed, they were authoritatively ***told***—"the disputed information." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).

That these problems were longstanding ("10 years of unpaid security bills"; Twitter had never complied with the Consent Order) supports scienter. *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014), *overruled on other grounds* 856 F.3d 605 (9th Cir. 2017).

Defendants' denial of Zatko's account is irrelevant on a motion to dismiss. *Mattel*, 2021 WL 1259405, at *8. Defendants misstate the facts of *In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014). There, defendants optimistically ***predicted*** they would complete a government project by the end of the year. *Id.* at *10. The government's contrary view—which had not even been communicated to defendants—did not render defendants' forward-looking statements false. *Id.* at *11.

As explained at Section III.C.10, above, the risk disclosures that Defendants claim negate scienter ***were themselves misleading***, so they cannot cut against the inference of scienter. And none of the cases that Defendants cite concern generic and uninformative disclosures. Tw.Br. at 18.

**B.     The Misstatements' Specificity Supports Scienter.**

The specificity of many of the misstatements supports the inference that Defendants made them with scienter. *Reese,* 747 F.3d at 572 (addressing "corrosion rate data specifically, render[ed] it unlikely that [defendant] was not aware of it or the concerning aspects of the company's findings"); *see also Twitter*, 282 F. Supp. 3d at 1147 ("assertion that [d]efendants were unaware of an alleged issue can be directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]").

In his *September 2020 statements*, Agrawal stated the cause of the hack—Twitter's access "controls" were overpermissive—and declared that "the amount of

26

access [] is substantially lower today." ¶244. Twitter explained **specifically** what it had purportedly done: restricted access to business necessity, monitored access, and conducted detailed privacy assessments. ¶¶232, 234, 236, 238. These descriptions of actions Twitter was **not** taking support scienter. Moreover, because Defendants made them "in the wake of a crisis that has the potential to repeat itself [they] had every reason to review" the true facts. *Reese*, 747 F.3d at 571.

In November 2020, Twitter asserted it disclosed "any"—all—foreign influence campaigns (¶240) and Agrawal said in March 2022 that Twitter had been "**very**, **very** transparent" in disclosing "any". ¶230. The Indian Army campaign they were concealing was top of mind. The first statement came months after Twitter's executive decision to conceal the campaign. ¶155 And Twitter was closely monitoring the campaign, or it would not have been able to release a 1,198-account dataset the day after Zatko's report disclosed its existence. ¶156.

After Twitter settled with the FTC, Defendants stated on Twitter's blog that the issue "was addressed as of September 17, 2019." ¶242. Twitter's false claim that it had fixed the problem on a specific day more than two years earlier though the problem persisted supports scienter. Scienter is more plausible because Twitter's misconduct had already repeated itself in mid-2021. *Reese*, 747 F.3d at 571.

Defendants touted mDAU's superiority because it did not "include[] people who are not seeing ads" (¶174), claimed they removed accounts identified as spam (¶182), gave a specific percentage for the purported proportion of bots (*e.g.* ¶255), and touted mDAU growth "directly driven by product improvements" (Weber Decl. Ex. 10 at 6). When Musk called out inaccuracies in the mDAU count, and after expressing "concern" in January 2022 that more meaningful metrics were declining, Agrawal purportedly gave "data, facts, and context" about how Twitter identified and quantified bots. Weber Decl. Ex. 11 at 1-3. Agrawal's familiarity with the issue supports scienter. *Twitter*, 282 F. Supp. 3d at 1147.

27

### C.    Defendants' Concealment Supports Scienter.

Courts may infer defendants' scienter when they conceal the relevant information from other actors. *In re Fibrogen, Inc.*, 2022 WL 2793032, at *21 (N.D. Cal. July 15, 2022) (concealing information from FDA probative of scienter); *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *13 (M.D. Ga. Mar. 23, 2018) (allegations that superiors told employee to they would "find another accountant" and to "pipe down" when he expressed concerns contributed to inference of scienter). Defendants concealed Zatko's concerns from the Board and then fired him (¶¶ 61, 70, 88, 101-103, 118-141), Alethea's report from Zatko (¶¶96-98), and their misconduct from the FTC (¶¶164-169). Defendants' deception to contain the information showing their statements were false supports an inference of scienter.

### D.    The Core Operations Doctrine Supports the Inference of Scienter.

An inference of scienter arises when the concealed information is sufficiently prominent that "it would be absurd to suggest that top management was unaware." *Berson*, 527 F.3d at 989. Here, it is absurd to suggest that the Individual Defendants were not aware that ***every single Twitter engineer had access to customer data*** because Twitter ***did not have a separate development environment***. Defendants could determine this simply by logging on to Twitter's system or speaking with any engineer about how they did their job. More, Agrawal worked in engineering positions at Twitter from 2011 to October 2017 and as Chief Technology Officer until becoming CEO. It is not plausible, and vastly less plausible than a culpable inference, that Agrawal managed to never learn that Twitter had no separate development environment.

On weaker facts, Judge Tigar held it would be "absurd to suggest" that Twitter's executives were not aware of trends in user engagement. *Twitter*, 282 F. Supp. 3d at 1145-46. There, like here, defendants were struggling to live up to outsize promises of user engagement growth. *Id.* at 1146, 1149. There, as here, defendants emphasized one metric among others to tout increased engagement, while concealing that a more

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS        Case No. 2:22-cv-06525-MCS-E

meaningful metric showed flat or declining engagement. *Id.* at 1146. Though they did not (as here) say either was *the* key metric, the court still found scienter on core operations.

The Complaint makes allegations *Twitter* lacked. Quarter after quarter, Defendants touted mDAU growth and boasted that less than 5% was spam. Asked to discuss other metrics, Beykpour refused, because while "we are capable of measuring" other metrics, "[t]he most important one we look at is mDAU." Weber Decl. Ex. 10 at 63-64. Defendant Segal told investors mDAU was "the *foundation* of any revenue opportunity that [Twitter] ha[d]." ¶173. So if the *Twitter* allegations sufficed, so do Plaintiffs'.

# V.    THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION.

Loss causation imposes a minimal burden to provide "notice of plaintiffs' [] theory" and "some assurance that the theory has some basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). "There are an 'infinite variety' of ways for a tort to cause a loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).

On May 13-16 and July 8-11, Musk announced that he was taking steps to back out of acquiring Twitter. Each time, Musk blamed Defendants' mDAU misstatements. Just as concealed commercial risks can materialize in inexplicably poor earnings, Musk's attempts to withdraw from the agreement was the materialization of the risk concealed by Defendants' false statements concerning mDAU. *Mineworkers*, 881 F.3d at 753.

Plaintiffs may also allege loss causation by showing that a corrective disclosure revealed the concealed facts. *Mineworkers*, 881 F.3d at 754. The disclosure can come from any source, need not reveal the entire fraud, and need only reveal some facts that show some aspect of defendants' statements were false or misleading. *BofI*, 977 F.3d at 790. In his announcements, Musk revealed that more than 5% of mDAU were bots and

that Twitter used a 100-account sample to calculate the proportion. The stock price fell, and "conclusively deciding reasons for the market's reaction is premature, and reasonable theories concerning that reaction do not warrant Rule 12 dismissal." *Mattel*, 2021 WL 1259405, at *12.

Defendants maintain that Plaintiffs admit the news Musk disclosed—that mDAU was overstated—was "old", apparently referencing a *Washington Post* article published with the July disclosures mentioned a "debate" on the issue. A "debate" would not negate loss causation unless those claiming Defendants' count was false presented evidence with an "intensity and credibility [sufficient] to effectively counterbalance the misleading impressions created by [Defendants'] representations." *In re IsoRay, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016) (*citing Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996)). The *Washington Post* does not cite examples of this debate, and neither do Defendants. In any case, outsiders who, unlike Musk, did not have access to Twitter's internal data and management could not counterbalance Defendants' clear and repeated statements.

Defendants argue that investors would take Musk's statements with a "healthy grain of salt", analogizing them to reports by short-sellers who profit from stock price declines. But it took many problems with the *BofI* short-seller to raise reasonable skepticism. The short-sellers were anonymous and disclaimed the accuracy of their representations. 977 F.3d at 797. Neither applies here.

On April 28, 2022, Defendants restated prior mDAU figures. That the reduction was immaterial—in Defendants' own words, Ind.Def.Br. at 11 n.7—explains why Twitter's stock price did not fall then. That investors knew some problems with mDAU calculations did not prevent them from reacting when they learned the more serious problems that more than 5% of mDAU consisted of bots and that the number was unreliable. *Cf. Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013) (presentation explicitly based only on publicly reported facts did not include new news); *Rok*, 2017

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS   Case No. 2:22-cv-06525-MCS-E

WL 35496, at *18 (similar). Moreover, even if the restatement were material, fraud can be revealed through a *series* of corrective disclosures. *BofI*, 977 F.3d at 790. The stock price fell more than 10% in response to each of the May and July corrective disclosures. ¶¶285, 287, 289, 291.

On August 23, the *Washington Post* published an article titled " [Zatko] claims Twitter buried 'egregious deficiencies'". ¶292. It also **published Zatko's report**. *Id.* Zatko's report "reveals new facts that [] render some aspect of the defendant's prior statements false or misleading," *BofI,* 977 F.3d at 790, because it is the centerpiece of this case.

Defendants cite cases where plaintiffs alleged an information dump of unrelated information was a corrective disclosure. Tw.Br. at 20-21. In *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 609 (9th Cir. 2014), plaintiffs alleged that a government report revealed a systemic industry practice, but failed to show what the report revealed about the company. In *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12734014, at *6 (C.D. Cal. July 28, 2015), plaintiffs alleged that an earnings release which did not mention fraud revealed it but did not explain what the new information was.

## VI.    THE COMPLAINT ALLEGES DAMAGES.

### A.    Mr. Baker Suffered Damages.

Defrauded investors may recover their out-of-pocket loss, "the difference between the purchase price and the value of the stock **at the date of purchase**." *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1346 (9th Cir. 1976) (Sneed, J., concurring); *accord In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (adopting the *Green* concurrence). Plaintiffs bought Twitter stock for more than it was worth because Defendants' false statements artificially inflated its price; they suffered damages. *Green*, 541 F.2d at 1335.

That Mr. Baker later sold Twitter stock for more than he bought it is irrelevant.

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS          Case No. 2:22-cv-06525-MCS-E

"The out-of-pocket measure of damages [] permits a recovery by purchasers who sold for a price greater than they paid for the stock." *Id.* at 1346. Despite all intervening legal changes, it is still the law that "***[l]ater market gains unrelated to the fraud do not wipe out losses that resulted from the fraud***." *Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at *3 (N.D. Cal. Oct. 27, 2017).

After the final corrective disclosure, plaintiffs face a new investment decision: sell or hold their shares. *Green*, 541 F.2d at 1346; *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012). Profits from this new investment decision, if any, do not extinguish their claims or defendants would "appropriate[] a portion of each purchaser's investment gains". *Green*, 541 F. 2d at 1346; *Acticon*, 692 F.3d at 41 ("If we credit an unrelated gain against the plaintiff's recovery for the inflated purchase price, [] he does not have the opportunity to profit (or suffer losses) from 'a second investment decision unrelated to his initial decision to purchase the stock.'").

The PSLRA limits damages, where plaintiffs sell their shares within 90 days of the last corrective disclosure, to the average trading price beginning on the day of the corrective disclosure and ending on the day of the sale—here, Musk's acquisition of Twitter. 15 U.S.C. §78u-4(e)(2). That price is $44.99, lower than all of Baker's purchases.

**B.    Other Plaintiffs Suffered Damages.**

"[N]othing in the PSLRA requires court approval for the addition of additional named plaintiffs by the Lead Plaintiff." *Hunt v. Bloom Energy Corp.*, 2021 WL 1110260, at *1 (N.D. Cal. Mar. 23, 2021). Defendants' sole case, a 20-year-old outlier, still ***allowed*** the addition. *In re Lantronix, Inc.*, 2003 WL 23198818, at *11 (C.D. Cal. Dec. 31, 2003). And while Defendants assert that Jill Sligay and Amolkumar Vaidya did not lose money overall, their certifications appropriately listed only Class Period transactions. Plaintiffs will prove in discovery that they lost money because ***they sold their shares before the merger***.

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS             Case No. 2:22-cv-06525-MCS-E

## VII.    THE COMPLAINT ALLEGES A SECTION 20(a) CLAIM.

Control "is an intensely factual question[.]" *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015). "[C]ourts have found general allegations concerning an individual's title and responsibilities [] sufficient to establish control." *Id.*

Each Defendant was provided with ample information showing all the problems with Twitter's cybersecurity and privacy controls, among other things. Had any of the Defendants—Twitter's CEOs, CTO, head of legal, and senior executive in charge of mDAU—objected, the false statements would not have been made. And each Individual Defendant was present for at least some others' false statements and could have corrected them. *See, e.g.*, ¶¶177, 220, 263, and Weber. Decl., Ex. 10.

In all but one of Defendants' cases, the courts dismissed the control person claims either because they found no primary violation or because the allegations of control were conclusory and unparticularized. In *Middlesex*, the court **upheld** Section 20(a) claims except as to the lowest-ranking defendant. *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007).

## VIII.   CONCLUSION

Defendants' motions should be denied.

Dated: April 21, 2023                              Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**          **POMERANTZ LLP**

By: *s/ Laurence M. Rosen*              Jeremy A. Lieberman (*pro hac vice*
Laurence M. Rosen (SBN 219683)          forthcoming)
355 South Grand Avenue, Suite 2450      Jonathan D. Park (*pro hac vice*)
Los Angeles, CA 90071                   600 Third Avenue, 20th Floor
Telephone: (213) 785-2610               New York, New York 10016
Facsimile: (213) 226-4684               Telephone: (212) 661-1100

33

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS          Case No. 2:22-cv-06525-MCS-E

Email: lrosen@rosenlegal.com

Jonathan Horne (*pro hac vice*)
Brian B. Alexander (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
jhorne@rosenlegal.com
balexander@rosenlegal.com


*Counsel for Court-Appointed Lead Plaintiff William Baker, Additional Plaintiffs Lenard Roque and Amolkumar Vaidya, and Co-Lead Counsel for the Class*

Facsimile: (212) 661-8665
jalieberman@pomlaw.com
jpark@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (212) 661-8665
jpafiti@pomlaw.com


*Counsel for Court-Appointed Lead Plaintiff William Baker, Additional Plaintiffs Mohammed Thaseen and Jill Sligay, and Co-Lead Counsel for the Class*


**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Counsel for Additional Plaintiff Mohammed Thaseen*

34

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this memorandum of points and authorities contains 10,419 words, which complies with the Court's order (Dkt. No. 97).


Dated: April 21, 2023                                    *s/ Laurence M. Rosen*
                                                         Laurence M. Rosen

---

35

PLAINTIFFS' MP&A IN OPPOSITION TO MOTIONS TO DISMISS          Case No. 2:22-cv-06525-MCS-E