# EXHIBIT 1

**EFiled:  Oct 04 2022 05:19PM EDT**
**Transaction ID 68212996**
**Case No. 2022-0613-KSJM**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TWITTER, INC., | ) |
| | ) |
|     Plaintiff and | ) |
|     Counterclaim-Defendant, | ) **PUBLIC VERSION -** |
| | ) **Filed October 4, 2022** |
|     v. | ) C.A. No. 2022-0613-KSJM |
| | ) |
| ELON R. MUSK, X HOLDINGS I, INC., | ) |
| and X HOLDINGS II, INC., | ) |
| | ) |
|     Defendants and | ) |
|     Counterclaim-Plaintiffs. | ) |

## DEFENDANTS' VERIFIED SECOND AMENDED COUNTERCLAIMS, ANSWER, AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S VERIFIED COMPLAINT

Defendants and Counterclaim-Plaintiffs Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc. (each a "Defendant" and together, "Defendants" or the "Musk Parties"), by and through their undersigned counsel, hereby submit Defendants' Verified Second Amended Counterclaims, Answer, and Affirmative Defenses to the Verified Complaint (the "Complaint") of Plaintiff and Counterclaim-Defendant Twitter, Inc. ("Plaintiff" or "Twitter").

All admissions made in the Second Amended Counterclaims and Defendants' Answer and Affirmative Defenses to the Complaint (the "Answer") are made as of the date of this filing, unless otherwise stated.  Defendants reserve the right to amend and/or supplement the Second Amended Counterclaims and Answer.

## <u>VERIFIED SECOND AMENDED COUNTERCLAIMS</u>

Defendants/Counterclaim-Plaintiffs allege for their Counterclaims herein against Plaintiff/Counterclaim-Defendant Twitter, Inc., upon personal knowledge as to themselves and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. The Musk Parties' original Counterclaims explained that Twitter has been systematically misrepresenting its "key metric," monetizable daily active users ("mDAU"), by understating the number of false and spam accounts included in mDAU and falsely claiming that mDAU was the best way to measure engagement and revenue growth. Stunning events over the last week, however, have revealed that the misrepresentations regarding mDAU were only one component of a broader conspiracy among Twitter executives to deceive the public, its investors, and the government about the dysfunction at the heart of the company. In what can only be described as one of the most significant whistleblower complaints in recent history, a widely respected security expert and former Twitter Chief Security Officer, Peiter "Mudge" Zatko, has submitted an 84-page whistleblower report to Congress, the FTC, the SEC, and the DOJ, outlining a series of explosive disclosures regarding misconduct within Twitter (the "Zatko Complaint"). According to the Zatko Complaint, Twitter suffers from serious information security vulnerabilities; depends critically on algorithms that infringe intellectual property rights; and is

2

flouting a 2011 FTC consent decree the ("Consent Order"), as well as other privacy and cybersecurity regulations. Those previously concealed problems are, according to Zatko, so severe that Zatko—who President Biden had asked to lead a national cybersecurity review—concluded that they threaten U.S. national security and democracy itself.

2. Confronted with Zatko's devastating analysis, Twitter did exactly what it did to Elon Musk when he started raising questions about the false and spam accounts and mDAU: Ignored the problems and attacked the messenger. Indeed, Zatko alleges he was summarily fired by CEO Parag Agrawal, who had fought to prevent Twitter's Board of Directors from ever seeing Zatko's comprehensive explanation for his concerns. As for Musk, Twitter stonewalled his information requests, violating his rights under the Merger Agreement, and then launched this meritless lawsuit after he justifiably terminated the deal. Both episodes reveal the vast and unlawful lengths that Twitter will go to avoid disclosing the true state of the company—its "key" financial metrics, security infrastructure, intellectual property infringement, and legal compliance—to the public. And indeed, discovery in this case has already unearthed proof that Twitter executives expressed a completely different view of the proper userbase metrics in private than what they have been telling investors for years.

3

3.    Needless to say, the newest revelations make undeniably clear that the Musk Parties have the full right to walk away from the Merger Agreement—for numerous independently sufficient reasons.  In short, the Musk Parties and Twitter's many other investors were sold a different company than the Twitter that actually exists—one that was more valuable, more popular, more secure, and more compliant with governing law.

4.    The Zatko Complaint reveals that Twitter is in material noncompliance with both its obligations under the Consent Order, as well as its general obligations under data privacy, cybersecurity, consumer protection, and false advertising laws. For example, while the Consent Order requires Twitter to maintain an information security program designed to protect its users' private data and mitigate the risk of future security breaches, the Zatko Complaint notes that Twitter has done almost nothing the Consent Order requires.  Instead, for years, Twitter has allowed a whopping *50% of Twitter's full-time employees to have access to sensitive systems*—a number that begs for security breaches in a company with over 7,000 employees. Zatko has further disclosed that Twitter has refused to implement basic security industry practices to ensure its software is free of malicious code and to ensure that user data is adequately protected.  As a result, Twitter had a "near continuous number of security and privacy incidents" in 2021. Nearly two-thirds of

4

these incidents were caused by serious access control issues, the **exact same** root cause that led to the Consent Order, conclusively resolving any claims of compliance with the Consent Order. Remarkably, Zatko disclosed that Agrawal has not only known about these issues, but has intentionally deep-sixed them to serve his own ends.

5.      The Zatko Complaint exposes Twitter to massive liability: Twitter recently paid a $150 million fine for breaches of this Consent Order (for a small subset of the issues identified in the Zatko Complaint), and Facebook recently paid $5 billion for violating a FTC consent order.

6.      The Zatko Complaint also describes Twitter's unique vulnerability, as compared to its peers, to massive security risks, including systemic disruption resulting from malicious actors or data center failures. Twitter holds vast amounts of personal data for millions of users, but roughly half of Twitter's servers run materially deficient security software, and Twitter's disaster recovery plans are so broken that routine data center failures could cause the entire platform to shut down for an unknown period that would likely stretch for weeks or months.

7.      Perhaps most alarming, Zatko also claims that *Twitter does not even own or license some of the core code on which its operations rely.* Instead, Twitter developed this code through software and data sets that it never bothered to acquire

licenses for. This means that the owners of this intellectual property effectively have the right to either shut down much of Twitter's business through an injunction or to demand substantial damages. According to Zatko, Twitter's senior leadership was aware of this problem, yet Twitter nonetheless represented to Defendants that Twitter's business conduct does not violate any person's intellectual property rights.

8. Finally, Zatko alleges that when confronted with pressure from Indian government officials, Twitter buckled: Twitter hired Indian government agents and provided them with access to Twitter's user information, raising significant questions regarding Twitter's representations regarding its compliance with the law.

9. This alarming information demonstrates that, contrary to Twitter's representations in both the Merger Agreement and in its SEC filings that:

- Twitter is in breach of both the Consent Order and other applicable laws;

- Twitter is materially infringing on certain third-party's intellectual property rights;

- Twitter faces realized, not hypothetical, data security threats;

- Twitter has not instituted a functioning disaster-response program; and

- Twitter has failed to disclose that its executives have committed fraud on the Company's board.

10. The consequences from the revelations of the Zatko Complaint have been swift and severe. Twitter's stock price fell over 7% on August 23, 2022 upon

6

the revelations of Zatko's allegations as investors learned of the serious undisclosed risks that are likely to result in a material adverse effect and therefore warrant termination of the Merger.

11. The very next day, recognizing the seriousness of the allegations, the Senate Judiciary Committee announced a hearing to investigate Zatko's allegations. As Ranking Member Senator Chuck Grassley aptly observed, if you "take a tech platform that collects massive amounts of user data, combine it with what appears to be an incredibly weak security infrastructure and infuse it with foreign state actors with an agenda, and you've got a recipe for disaster. The claims I've received from a Twitter whistleblower raise serious national security concerns as well as privacy issues, and they must be investigated further." Data privacy authorities in Ireland and France have also announced that they are initiating investigations into the allegations in the Zatko Complaint.

12. Twitter never revealed the facts underlying these allegations to Defendants. This did not result from Defendants' failure to ask. During post-signing diligence, Defendants requested that Twitter provide information on the company's "tech debt", and "strategy for data centers." None of Zatko's allegations—including those in his February 2022 internal report—were provided in response. The Zatko Complaint itself—which Zatko filed with the SEC, FTC, and Department of Justice

7

on July 6, 2022—was never disclosed to the Musk Parties prior to their July 8, 2022 termination notice. Nor did the Musk Parties receive any information regarding Zatko's complaints in discovery. During the discovery process, Defendants asked Twitter to collect and produce documents from Zatko that would have touched on many of the issues Zatko cites in his whistleblower complaint. Twitter refused, telling Defendants (and the Court) that Zatko ***had no involvement in Twitter's effort to mitigate spam.*** Dkt. 147 at 15. Thus, facts were actively obscured from the Musk Parties and the Court until news broke six days ago regarding Zatko's allegations.

13. On September 3, 2022 Twitter disclosed, for the first time, that on June 28, 2022, Twitter paid Zatko $7.75 million in "severance in connection with his termination." Twitter did not seek Defendants' consent before making this termination payment.

14. Twitter's conduct in obscuring Zatko's complaints only represents the latest chapter in Twitter's ongoing efforts to bury the truth from shareholders, the Musk Parties, and now the Court.

15. Zatko's recent disclosures reveal that the specific misrepresentations that precipitated the original Counterclaims were part of a broader effort by Twitter to conceal from investors, including the Musk Parties, the true state of the company.

8

Those misrepresentations concerned the "key metric" Twitter uses to convince investors that the Company is financially healthy. While the Musk Parties negotiated for representations as to the truth of Twitter's SEC disclosures, relying on their accuracy, the statements in these SEC disclosures were far from true as to Twitter's mDAU metric. But when the Musk Parties began to suspect these representations might be false—post-signing and pre-closing—Twitter rebuffed every attempt they made to discern the truth.

16.    In fact, that has been Twitter's strategy all along: to distract from and obfuscate the truth about its disclosures—first from its investors and then from the Musk Parties when they began to discern the truth. Following the adage "trust but verify," the Musk Parties negotiated not only for representations and warranties about the truthfulness of Twitter's SEC filings, but also for significant information rights entitling them to access to the company's books and records. They fully expected that Twitter would hide nothing from its would-be owner, including about the magnitude of its false or spam account problem. Instead, the opposite happened. Twitter played a months-long game of hide-and-seek to attempt to run out the clock before the Musk Parties could discern the truth about these representations, which they needed to close. The more Twitter evaded even simple inquiries, the more the Musk Parties grew to suspect that Twitter had misled them.

9

17.  In its disclosures, Twitter claims to have nearly 238 million mDAU who participate on the platform, and tells its investors that this userbase metric is a bellwether for its ability to generate revenue and the "best way to measure [Twitter's] success . . . ."  As the Musk Parties began to peel the onion of false and spam accounts, two things became abundantly clear.  *First,* Twitter was miscounting the number of false and spam accounts on its platform, as part of its scheme to mislead investors about the company's prospects by focusing on its purported hundreds of millions of mDAU.  *Second,* while Twitter has repeatedly touted mDAU as a "key metric" for revenue growth, mDAU is not as closely tied to revenue as Twitter leads the public to believe.

18.  Musk is an avid Twitter user who believes in free speech and open debate, and he appreciates Twitter's role as the world's town hall.  Musk, who has owned and founded several successful companies, including PayPal, Tesla, and SpaceX, invests only in companies that make products he uses and enjoys.  Thus, when Musk decided to identify another public company in which to invest, Twitter was a natural option.

19.  While Musk actively uses Twitter, he has grown increasingly concerned in recent years with the company's direction and poor user experience, given the flood of misinformation, scams, and other undesirable content he regularly

10

sees. Twitter has attempted to solve issues like these through aggressive content moderation and suspension of accounts that propagate misinformation. But to Musk, and many others, eliminating free speech is a cure worse than the disease, and that open discourse is essential to a functioning democracy.

20. Musk believes that a key issue for Twitter is the elimination of false and spam accounts and discerning who Twitter's verifiable, real users are. Musk believes that by verifying who is real, and eliminating false and spam accounts—accounts that bad actors employ to manipulate public discourse or propagate scams on a global scale—Twitter would be able to flourish.

21. Musk's thesis for Twitter was simple—false and spam accounts have an outsized effect on public discourse, and are often amplified by Twitter's timeline algorithm—the algorithm that determines what posts users see on their feed. Together, both problems detract from Twitter's user experience, which Twitter has deprioritized in service of focusing all of its efforts on growing mDAU.

22. At the same time, Musk believed Twitter was over-reliant on advertising revenue, with over 90% of its revenue generated by ads. When he signed the deal, Musk believed he could kill two birds with one stone: by implementing certain changes, such as requiring effective verification of all users, he could eliminate what he thought—based on what Twitter misrepresented—was a less-

11

than-5% false or spam account problem. Musk could then better engage the over 220 million mDAU that Twitter represented were real, monetizable users, to create greater engagement and subscription revenue.

23. After signing the Merger Agreement, however, the Musk Parties learned troubling facts that have called into serious doubt Twitter's representations. Just three days after signing the Agreement, Twitter restated three years of its mDAU figures because it had been double-counting certain users. Twitter failed to advise the Musk Parties that the restatement was coming before they signed the Merger Agreement.

24. Shortly thereafter, at a May 6, 2022 introductory meeting, Musk began asking questions, expecting to be reassured that Twitter's SEC filings were the product of a thoughtful, robust process. Musk wanted to understand Twitter's mDAU figure, Twitter's representations that less than 5% of that figure is comprised of false or spam accounts, and the processes Twitter used to reach those figures.

25. But at that meeting, Musk was astonished to learn just how meager Twitter's processes were. Human reviewers (not AI) apply unidentified standards to somehow conclude every quarter for nearly three years that fewer than 5% of Twitter users were false or spam on the basis of a sample of just 100 accounts per day (less than 0.00005% of daily users). Even worse, Twitter's CEO and CFO were

12

unable to explain both how those 100 accounts per day were selected to ensure a representative sample or what criteria were applied other than a reviewer's gut judgment. Unlike other platforms, Twitter did not send email, text, or other push notifications to users to verify them. Musk realized that, at best, Twitter's reliance on and touting of its process was reckless; at worst, it was intentionally misleading.

26. Since then, Twitter's disclosures have slowly unraveled, with Twitter frantically closing the gates on information in a desperate bid to prevent the Musk Parties from uncovering its fraud. Twitter's delay tactics have been two-fold: it has dragged its feet in responding to the Musk Parties' data requests and has repeatedly provided sanitized, incomplete information that it admits does not answer the Musk Parties' most basic questions. Moreover, Twitter continues to refuse to explain which accounts it includes in mDAU and why, what criteria it tells its human reviewers to apply, and how often it overrides those reviewers' determinations.

27. What limited information has come to light proves Twitter's disclosures about the number of false or spam accounts are false. Notwithstanding Twitter's stonewalling, preliminary expert estimates of the false or spam accounts in Twitter's mDAU population, based on the data Twitter has provided and using a

13

publicly available machine learning algorithm, yield findings that are shocking.[1] They show that in early July fully one-third of visible accounts may have been false or spam accounts—resulting in a conservative floor of at least twice as many false or spam accounts as the 5% that Twitter discloses for the entire mDAU population.[2]

28. The high number of false and spam accounts is no accident. Documents produced in this litigation demonstrate that, in an effort to increase the number of mDAU, Twitter executives removed restrictions created to combat spam in India, Nigeria, and Indonesia. According to the Zatko Complaint, these restrictions had a false positive rate of less than 1 percent, yet Twitter executives repeatedly discussed removing these restrictions in order to increase mDAU.

29. Moreover, Twitter's own post-signing disclosures indicate that those false or spam accounts most likely formed a disproportionate portion of monetized users (those that actually see ads). Twitter even admitted on diligence calls with the Musk Parties that, contrary to Twitter's disclosures that they remove false or spam

---

[1] The results of this analysis are preliminary in nature and may change, due at least in part to Twitter's failure to disclose critical data required for both sampling and analysis and the Musk Parties' resulting inability (based on insufficient data and time) to undertake a complete analysis.

[2] Accounts that publicly tweet, re-tweet, or "like" tweets are "visible accounts" on Twitter's Firehose and make up approximately 30% of the accounts Twitter counts in its mDAU figures. Other accounts that Twitter counts in mDAU cannot be evaluated without data that Twitter continues to withhold.

14

accounts from mDAU figures once they are suspended, millions of accounts suspended in any given quarter (including for spam) are nevertheless included in the mDAU calculations of that same quarter.

30.   Most concerning of all, the Musk Parties' investigation revealed that Twitter's misrepresentations run far deeper than simply providing incorrect numbers of false or spam accounts.   In fact, while Twitter represents that mDAU—a proprietary metric[3] that only Twitter uses and is first among its "Key Metrics"—is "*critical* to [Twitter's] success" and is determinative of "long-term financial performance," that is misleading.   Twitter's own disclosures to the Musk Parties show that although Twitter touts having 238 million "monetizable daily active users," those users who actually see ads (and thus, would reasonably be considered "monetizable") is about **65 *million lower*** than what Twitter represents.   Moreover, mDAU is not by itself a useful metric to forecast revenue growth, despite Twitter's public statements to the contrary, because while mDAU has grown, Twitter relies on advertising revenue, and users that see zero or almost zero ads account for almost all of the growth in mDAU.   Thus, many users who are counted as "monetizable" do

---

[3]   Twitter has further disclosed that "[o]ur mDAU are not comparable to current disclosures from other companies, many of whom share a more expansive metric that includes people who are not seeing ads." Q4 2018 Fiscal Year Letter to Shareholders.

not bear on Twitter's long-term financial success, as Twitter represents. In fact, the majority of ads are served to less than *16 million users*—a mere fraction of the 238 million mDAU figure that Twitter misleadingly touts to the market.

31.    The Musk Parties' investigation has determined that, contrary to what Twitter leads investors to believe, mDAU's relationship with financial performance is much more indirect and nuanced. While other social media platforms provide investors with markers of daily engagement beyond mDAU, Twitter continues to push mDAU as "the *best way* to measure" performance. However, despite Twitter's claim that mDAU—which was increasing—is "the best way to measure" performance, including engagement, Twitter's internal documents demonstrate that Twitter measures its performance and engagement using different metrics altogether. Internally, for example, Twitter's executives and directors measure engagement by calculating the total number of daily user active minutes ("UAM") and the total number of daily user active minutes per mDAU ("UAM/mDAU"). And throughout 2021, those figures were, at best, stagnant, and, at worst, declining. Twitter's internal documents reveal that these metrics declined, in large part, due to declines in engagement from Twitter's "most engaged" or "heaviest" users, i.e., the ones who drive a disproportionate amount of Twitter's revenues.

16

32.     These declining metrics were well-known within Twitter.  Indeed, on January 25, 2022, Twitter's CEO, Parag Agrawal wrote to Twitter's head of data science—who was responsible for building Twitter's mDAU forecast model—and described the declining UAM figures as "concerning."  Twitter's head of data science responded that "the UAM decline is very concerning" and that other measures of engagement had been "declining in concert with UAM per mDAU for the engaged user segment for the last 18 months."

33.     Yet, despite knowledge of these concerning trends, Twitter continued to represent that mDAU was the "best way to measure" engagement.  This was a deliberate attempt by Twitter to convince investors that engagement—which was critical to Twitter's success—was increasing, while it knew internally that engagement was down.  Indeed, a key purpose of Twitter's mDAU metric was to deceive investors regarding the health of Twitter's business.

34.     Twitter concocted the mDAU metric after three straight quarters of declining numbers of monthly active users ("MAUs")—its previous "key metric," and one that is widely used in the social media industry.  Twitter also ties mDAU goals to executive compensation.  In 2020 Twitter based its executives' cash bonus pool on revenue, operating income, and adjusted EBITDA.  After Twitter missed those targets in 2020, and only 32% of the cash bonus pool was funded, Twitter

17

determined that mDAU (a highly manipulable number) should be considered in determining whether executives received these bonuses. Following that change, in 2021, 100% of this executive bonus pool was funded. And since Twitter's adoption of mDAU over MAU, it has reported ten straight quarters of "growth" despite stagnant financial results.

35. The Musk Parties' preliminary analysis shed light as to why Twitter has stonewalled—Twitter did not want the Musk Parties (or the market) to discover that Twitter has been misleading investors regarding its "key metric." As a long bull market was coming to a close, and the tide was going out, Twitter knew that providing the Musk Parties the information they were requesting would reveal that Twitter had been swimming naked.

36. These obfuscations and misrepresentations are not Twitter's only sins. Since the Merger Agreement was signed, Twitter has also made significant changes to its business without obtaining the consent required by the Merger Agreement. Twitter has terminated its product lead and another key executive, retained a board member whose reelection was rejected by stockholders, instituted a hiring freeze, and disobeyed orders from and initiated risky litigation against the Indian government—thereby placing Twitter's third largest market at risk.

\* \* \*

18

37.    In sum, Twitter's misrepresentations and contractual breaches foreclose an order of specific performance and entitle the Musk Parties to walk away. *First,* Twitter has breached sections 4.5, 4.6, 4.8, 4.11, and 4.14 of the Merger Agreement based on the information revealed during post-signing due diligence, in discovery in this action, and in the Zatko Complaint. *Second,* Twitter has breached its information sharing obligations under the Merger Agreement by failing to reasonably respond to the Musk Parties' information requests. *Third,* Twitter is reasonably likely to experience a material adverse effect as defined in the Merger Agreement. *Fourth,* Twitter has failed to operate in the ordinary course of business. *Finally,* Twitter's misrepresentations and omissions constitute fraud and warrant recission.

## PARTIES

38.    Defendant and Counterclaim-Plaintiff Elon R. Musk is a Texas citizen. Musk is the CEO of Tesla, Inc., the world's most valuable automobile manufacturer and fifth largest company by market capitalization in the world. Tesla has revolutionized electric cars and helped accelerate the world's move to sustainable energy, preventing tens of millions of metric tons of carbon from entering the atmosphere. Musk also founded and leads SpaceX, which works with NASA and the International Space Station to both launch satellites into orbit and to send astronauts into space. SpaceX also provides "Starlink," a satellite system that

19

provides internet access to dozens of countries. Indeed, when Russia disrupted internet service in Ukraine during its invasion of that country, Ukrainian officials reached out to Musk on Twitter and worked to bring Starlink to Ukraine, providing crucial internet access in under 11 hours.[4]

39.    Defendant and Counterclaim-Plaintiff X Holdings I, Inc. ("Parent"), is a Delaware corporation. Parent is wholly owned and controlled by Musk.

40.    Defendant and Counterclaim-Plaintiff X Holdings II, Inc. ("Acquisition Sub" and together with Parent "Buyers"), is a Delaware corporation. Acquisition Sub is wholly owned and controlled by Parent.

41.    Plaintiff and Counterclaim-Defendant Twitter is a publicly traded Delaware corporation with its principal place of business in San Francisco, California. Twitter operates a microblogging social network on which users write and share short messages, or "tweets."

---

[4]    Minda Zeltin, *Here's The Untold Story Of How A Single Tweet To Elon Musk Changed History*, Inc. (Mar. 26, 2022), available at https://www.inc.com/minda - zetlin/elon-musk-starlink-ukraine-mykhailo-fedorov-tweet-twitter.html.

## FACTUAL ALLEGATIONS

**A.    Twitter's Business**

42.    Twitter was founded in March 2006 by Jack Dorsey, Noah Glass, Biz Stone, and Evan Williams. Twitter's primary business is operating a microblogging social media network where users share 280 character messages called "tweets."

43.    Twitter is free to use for most users and generates the vast majority of its revenue through advertising.[5] For example, for the fiscal year ending December 31, 2021, Twitter reported revenue of just over $5 billion. Of that, $4.5 billion was generated through advertising services. For the fiscal year ending December 31, 2020, Twitter reported $3.7 billion in revenue, with $3.2 billion generated through advertising services.

44.    Twitter uses the site's mDAU count to induce investors to purchase Twitter securities. This wasn't always the case. Until late 2018, Twitter told investors that its key metric was MAU—a widely accepted metric in the social media industry. But after three straight quarters of decreasing MAUs, Twitter developed a new proprietary "key" metric—mDAU—that conveniently resulted in ten straight quarters of "growth." In its disclosure replacing MAU with mDAU Twitter noted

---

[5]    Under the recently-launched Twitter Blue feature, a small number of users pay subscription fees of $9.99 per month for premium features such as data feeds. In Q2 2022 Twitter recognized $101 million in revenue from subscription and other services, compared to $1.18 billion from advertisements.

21

that "we believe that mDAU, and its related growth, are the best ways to measure our success against our objectives and to show the size of our audience and engagement going forward, so we will discontinue disclosing MAU after the first quarter of 2019," clearly implying that mDAU predicted future revenue better than MAU. Twitter went on to stress that "*[o]ur mDAU and their level of engagement with advertising are critical to our success and our long-term financial performance* will continue to be significantly determined by our success in increasing the growth rate of our mDAU as well as the number of ad engagements" and that "*our revenue growth is primarily driven by increases in the number of our mDAUs*, increases in ad pricing or number of ads shown driven by strong advertiser demand, increases in our clickthrough rate, as well as other factors."

45.    Twitter defines mDAU in its 2021 10-K as "people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions."[6] Twitter calculates the average mDAU for a period as "the number of mDAU on each day of such period divided by the number of days for such period." The average mDAU figure was 217 million

---

[6]    Some users can log into twitter through platforms that do not allow the showing of ads, and are thus purportedly excluded from the mDAU count. Platforms that are included in the mDAU count include Twitter for iPhone, iPad, and Android.

for the fourth quarter of 2021, 229 million for the first quarter of 2022, and 238 million for the second quarter of 2022.

46.    Twitter represents that mDAU reflects how many Twitter users access the site on a daily basis, reflects the population that is being exposed to advertisements, is crucial to understanding Twitter's total audience for advertisers, and thus is the central metric to understand in estimating future revenue growth. As such, Twitter prominently touts mDAU as its first "Key Metric[]" in its SEC disclosures:

> **Key Metrics**
>
> We review a number of metrics, including the key metrics discussed below, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.
>
> *Monetizable Daily Active Usage or Users (mDAU).* We define mDAU as people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions[2].
>
> We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement. Average mDAU for a period represents the number of mDAU on each day of such period divided by the number of days for such period. Changes in mDAU are a measure of changes in the size of our daily logged in or otherwise authenticated active total accounts. To calculate the year-over-year change in mDAU, we subtract the average mDAU for the three months ended in the previous year from the average mDAU for the same three months ended in the current year and divide the result by the average mDAU for the three months ended in the previous year. Additionally, our calculation of mDAU is not based on any standardized industry methodology and is not necessarily calculated in the same manner or comparable to similarly titled measures presented by other companies.
>
> In the three months ended December 31, 2021, we had 217 million average mDAU, which represents an increase of 13% from the three months ended December 31, 2020. The increase was driven by product improvements, as well as global conversation around current events. In the three months ended December 31, 2021, we had 38 million average mDAU in the United States and 179 million average mDAU in the rest of the world, which represent increases of 2% and 15%, respectively, from the three months ended December 31, 2020.

47.    Twitter's only other Key Metric—ad engagements—is itself a metric that Twitter links with mDAU, noting that "[w]e believe that ***mDAU***, and its related growth, ***is the best way to measure our success*** against our objectives ***and to show the size of our audience and engagement***." Similarly, during earnings calls, Twitter

touts its mDAU growth alongside its revenue numbers as the most important information for investors.[7]

**B.     Musk's Relationship With Twitter**

48.     Musk is an active Twitter user with over 100 million Twitter followers, making his the sixth most followed account on the site.  Musk tweets frequently and enjoys the direct interaction he can have with his followers on the site.  He has previously stated that he prefers communicating over Twitter to more traditional mediums, such as press releases or interviews.

49.     Despite his growing concerns with the company's direction, he still believed in Twitter as a product—one that provided a necessary public good while still offering significant untapped opportunity for monetization.  He thus invested in the company in early 2022 by buying common stock in the market.

50.     In late March 2022, Dorsey and other members of Twitter's board approached Musk to ask him to join the board.  Musk was hesitant at first, but listened to their pitches over the next couple weeks.  During that time, he had several conversations with Twitter CEO Parag Agrawal about his views of free speech on

---

[7]    Twitter, Twitter Q4 2021 Earnings Report, Twitter Investor Relations (February 10, 2022), available at: https://s22.q4cdn.com/826641620/files/doc_financials/2021/q4/Q4_2021_Twitter_Earnings_Transcript.pdf

24

the platform, ideas for improving Twitter's algorithm, and the need to improve user experience by removing bots. Specifically, Musk places tremendous importance on the value of free speech and believes that it is "the bedrock of a functioning democracy." He considers Twitter to be "the digital town square where matters vital to the future of humanity are debated," and therefore believes that open discourse on Twitter must be protected. Over time, Musk began growing concerned that Twitter's content moderation policies were leading to a chilling effect on debate and public discourse. Given the importance of Twitter as a public platform, this chilling effect could not only drive users away from Twitter, harming the company's finances, but also have a broader detrimental impact on the free speech climate. Among other things, Musk believed that a better way to protect the platform from abuse was through greater transparency and more robust user verification: by limiting discourse to actual humans, truth and good ideas can defeat misinformation and hateful content—rather than getting drowned out by false and spam accounts that have an outsized impact in relation to actual humans. For example, on April 8, 2022, Musk sent Agrawal an example of a scam tweet from a spam account, stating "I am so sick of stuff like this." Agrawal replied, acknowledging "[w]e should be catching this."

25



51.    Musk eventually realized that Twitter's current management was not up to the task of fixing Twitter as it needed to be fixed. He determined that to do the job right, he would need more than a single board seat. Musk thus rejected Twitter's offer to join the board on April 9, 2022, and instead, notified Agrawal of his intent to submit an acquisition offer.

52.    On April 13, 2022, Musk sent Twitter's board an offer to purchase all outstanding shares of the company at $54.20 per share—a total acquisition price of

26

about $44 billion. Twitter's stock closed at a trading at a price of $44.48 the day before the offer. Musk's offer price was based on a financial model prepared by his bankers at Morgan Stanley, which relied, in significant part, on Twitter's representations that mDAU was "the best way to measure [Twitter's] success" and only a small group comprising less than 5% of mDAU were non-monetizable false or spam accounts. Indeed, a model that Musk relied on directly ties Twitter's revenue growth to its mDAU growth.

53.    In response to Musk's offer, Twitter's board formed a transaction committee and hired J.P. Morgan, Goldman Sachs, and Allen & Co. as financial advisors. On April 15, 2022, the board adopted a poison pill to try to make it harder for Musk to purchase the Company.

54.    Musk's thesis for Twitter is based on two principal concepts. *First*, he believes that Twitter's approach to combatting false or spam accounts is flawed. Instead of suspending or banning accounts that violate Twitter's rules, which keeps the company a step behind spammers and stifles the open exchange of ideas, Twitter should instead require users to be effectively authenticated at the front end. This would prevent false or spam accounts from being created in the first instance and requires less subjective and unevenly applied content moderation. He further believes that solving Twitter's false or spam account problem through effective

27

authentication would make the platform more attractive to use, driving further engagement by existing users and attracting new active users.

55.    Musk's Twitter feed has long been plagued by an ever-present swarm of false or spam accounts that incessantly reply to tweets with scams and misinformation.[8] But, like any reasonable public company investor, Musk relied on Twitter's SEC filings for the truth. In those filings, he saw that the company represented that it had a constantly growing mDAU population, that this growth was the "best way to measure our success against our objectives," and that no more than 5% of its mDAU was comprised of false or spam accounts. Musk thus assumed that his own experience was unique because of his high profile and that spam accounts were simply disproportionately visible to him.

56.    Musk also believes that Twitter's algorithm is fundamentally flawed in a way that compounds the false or spam account problem. Twitter allows a user's feed to sort others' posts by chronology, but the default setting is for the algorithm to provide a generated list of "Home Tweets." Twitter notes that "Home serves Tweets from accounts and Topics you follow as well as recommended

---

[8]    For example, a Newsweek investigation using SparkToro's fake follower audit tool found that 70.2% of the accounts that follow Musk's Twitter are fake. *See* Darragh Roche, *Half of Joe Biden's Twitter Followers Are Fake, Audit Reveals* (May. 17, 2022), available at https://www.newsweek.com/half-joe-biden-twitter-followers-are-fake-audit-elon-musk-1707244.

28

Tweets." Thus, if a user frequently interacts with tweets regarding a certain topic, Twitter will push more tweets about that topic onto one's feed, regardless of whether the user follows that account. The Home Tweets algorithm boosts tweets with high engagement, regardless of whether they are generated by real humans or false or spam accounts. This results in Russian propaganda accounts like the now-banned @ten_GOP account going viral by posting misinformation. Musk has previously spoken out about the problems with this algorithm and how it amplifies false or spam accounts.



**Elon Musk** ✔
@elonmusk

Replying to @elonmusk and @WholeMarsBlog

That is why we must clear out bots, spam & scams. Is something actually public opinion or just someone operating 100k fake accounts? Right now, you can't tell.

And algorithms must be open source, with any human intervention clearly identified.

Then, trust will be deserved.

12:18 PM · May 3, 2022 · Twitter for iPhone

**7,528** Retweets    **804** Quote Tweets    **46.3K** Likes

57.     *Second*, Musk believes that Twitter's ad-based revenue model is dated. Prior to the Merger Agreement, Musk believed he could unlock Twitter's true

29

potential by shifting away from an advertising-only model (in Q2 2022, advertising made up over 90% of Twitter's revenue) to other forms of revenue, like a hybrid subscription-based model for verified users and enabling payments and creator monetization tools. Because these additional business models require legitimate users, the Musk Parties calculated their purchase price with reference to Twitter's mDAU figures, in accordance with the company's representations as to the mDAU figure's accuracy and the reliability of that measure in predicting revenue.

58.    This thesis makes his investment in Twitter distinctly vulnerable to any misstatements about how many mDAU were *actually* real, monetizable users. First, misrepresentations regarding the number of active users on Twitter would, according to Twitter, impact Twitter's advertising revenue because it discloses that "[o]ur advertising revenue growth is primarily driven by increases in mDAU" and other factors. As explained further below at *infra* ¶¶151-79, contrary to Twitter's representations, a total mDAU figure does not accurately reflect Twitter's revenue generation capacity. But, separately, Musk understood that each mDAU represented an active Twitter user who could potentially be convinced to pay a nominal monthly subscription fee for the service. If that number were inflated, then the number of potential subscribers would drop in tandem, endangering the viability of Musk's proposed subscription model.

30

59.    Thus, both principles of Musk's investment thesis were supported by Twitter's disclosures, which represented that Twitter had over 220 million mDAU (with that number consistently growing), that mDAU was an approximate measure of the users who used Twitter enough to see ads each day, that mDAU was a "key" metric for assessing growth, and that the false or spam account problem, while truly frustrating, was a relatively contained, fixable issue.  And while he believed there would be some pain in shedding user counts through removing false or spam accounts and requiring verification, he believed that in the long run, this would attract more users and provide more diverse revenue streams for the Company, all while supporting his vision of Twitter as the public square.

60.    Musk announced on April 21, 2022, that he had secured financing sufficient to fund his $54.20 per share offer.  On April 23, 2022, he communicated to Twitter that he was unwilling to increase his offer, and that he was willing to take the offer directly to Twitter's stockholders if the board rejected it.  He reiterated that promise on April 24, 2022, and his counsel delivered a draft merger agreement to Twitter shortly thereafter.  The parties negotiated a merger agreement on April 24 and April 25, 2022.

31

61. On April 25, 2022, Goldman Sachs and J.P. Morgan delivered opinions that Musk's $54.20 offer was fair to Twitter's shareholders, and Twitter's board formally voted to approve the merger.

## C.    The Merger

62. On April 25, 2022, the Musk Parties entered into the agreement to purchase Twitter. From the start, consistent with his goals to promote free speech and verify users, Musk announced his intent to "defeat" the "bots" that plague the platform and degrade the user experience.

63. The acquisition, if completed, would be funded with two financing streams. First, Musk (along with certain co-investors) would provide equity funding of $33.5 billion (as memorialized in a May 24, 2022 Equity Commitment Letter). Second, a syndicate of banks, led by Morgan Stanley, would provide debt financing of $13 billion under a Debt Commitment Letter.[9] The Debt Commitment Letter expires on April 25, 2023.

---

[9] Musk's original financing offer comprised only $21 billion of equity financing, with an additional $12.5 billion in margin loan commitments. Those margin loan commitments subsequently expired and Musk increased the equity commitment to $33.5 billion.

64.    Musk also agreed to a Limited Guarantee setting forth the limited circumstances under which he may be liable for certain fees in connection with the Merger Agreement.

### i.    Conditions to Closing

65.    The conditions to closing the merger appear in Article VII of the Merger Agreement. Section 7.2(b) requires that all representations and warranties be "true and correct as of the Closing Date" and does not require Buyers to close if a representation is false and the result is a material adverse effect. More broadly, under Section 7.3(c) the occurrence of a "Company Material Adverse Effect" relieves Buyers of their obligation to close.

66.    Company Material Adverse Effect ("MAE") is defined, in relevant part, as "any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole," subject to certain carveouts.

67.    Section 7.2(a) requires that Twitter "shall have performed or complied, *in all material respects*, with its obligations required under this Agreement . . . ." (the "Covenant Condition") (emphasis added). The Covenant Condition contains no MAE qualifier.

33

### ii.    Termination

68.    Under Section 8.1, the parties can terminate the Merger Agreement at any time by mutual consent.

69.    Buyers may also unilaterally terminate if the transaction does not close before October 24, 2022, although that termination date automatically extends under Section 9.9(c) if either party is seeking an order of specific performance to enforce the terms of the Merger Agreement.

70.    The Musk Parties are not obligated to close if (a) the Company has not materially performed the covenants; (b) its representations and warranties are inaccurate and cause an MAE; or, (c) an MAE has occurred and is continuing. *See* Merger Agreement § 7.2.

71.    Following a thirty-day cure period commencing upon notice of a covenant breach or the inaccuracy of a representation, the Musk Parties may terminate the Merger Agreement (a) due to a material covenant breach or (b) if any of the representations and warranties are untrue as of the closing date and have or will be reasonably expected to result in an MAE. *See id.* § 8.1(d)(i).

72.    If the Company terminates because Buyers have breached their representations and warranties or have not complied with their covenants such that a closing condition has failed, then Buyers are required to pay $1 billion (the

34

"Termination Fee").[10]  If Buyers terminate because the Company's board has recommended against the deal or if Twitter enters into a different merger agreement, then Twitter must pay Buyers a $1 billion Termination Fee.  The parties agreed the Termination Fee is the sole and exclusive remedy for damages resulting from a failure to close.

### iii.    Twitter's Covenants

73.    The Merger Agreement contains several covenants, and a material breach of these covenants may excuse closing.  In Section 6.1, Twitter covenanted to "use its commercially reasonable efforts to conduct the business of the Company and its Subsidiaries in the ordinary course of business" between the date of the Merger Agreement and closing.  While there is a carve-out for actions taken in response to COVID-19, there is no carve-out related to executive and employee departures.

74.    As part of the merger negotiation Defendants, explicitly negotiated for the ability to control any severance or termination payment made outside the ordinary course.

---

[10]  Musk signed a Limited Guarantee under which he guarantees payment of this fee.

35

75.    Specifically, Defendants negotiated for Section 6.1(e) provides that Twitter shall not "grant or provide *any severance or termination payments* or benefits to any Company Service Provider other than the payment of severance amounts or benefits in the ordinary course of business consistent with past practice and subject to the execution and non-revocation of a release of claims in favor of the Company and its Subsidiaries." Company Service Provider is defined to include former Twitter employees. In other words, Defendants negotiated for the consent rights over any severance of termination payment to past or present employees that were made outside the ordinary course and inconsistent with past practices.

76.    Twitter attempted to narrow this provision by proposing that Section 6.1(e) contain carveouts, as reflected in separate schedules, that would allow the company significant freedom to offer severance packages for its executives and employees without having to first seek Defendants' consent. Defendants *rejected these proposed additions*, evidencing their belief that a core deal term was the requirement that Twitter seek their consent for all severance payments made to current or former employees.

77.    Twitter attempted to insert additional flexibility into Section 6.1 by including express language allowing Twitter to adopt employee retention plans without seeking consent. Once again, the Musk Parties rejected those attempts. The

36

signed Merger Agreement contains neither a carveout to the ordinary course covenant nor any other express provision authorizing Twitter to make material personnel and compensation changes without consent.

78.    The Merger Agreement also contains an information covenant, requiring Twitter to "furnish promptly to [The Musk Parties] all information concerning the business, properties and personnel of the Company and its Subsidiaries . . . for **any reasonable business purpose related to the consummation of the transactions** contemplated by this Agreement . . . ." Merger Agreement § 6.4 (emphasis added).  Similarly, Twitter must provide information relevant to obtaining financing. *Id.* § 6.11.  Twitter can only decline to provide this information if it reasonably determines doing so would "cause significant competitive harm to the Company or its Subsidiaries . . . violate applicable Law or the provisions of any agreement to which the Company or any of its Subsidiaries is a party, or (iii) jeopardize any attorney-client or other legal privilege." *Id.* § 6.4.

79.    Buyers covenanted in Section 6.10 to take necessary action to obtain the requisite financing to consummate the transaction.  If financing becomes unavailable, Buyers must "use their respective reasonable best efforts to arrange and obtain, as promptly as practicable . . . and to negotiate and enter into definitive

37

agreements with respect to alternative financing . . . not less favorable" to the terms of the extant financing.

80. In turn, the Company covenanted in Section 6.11 to use its "commercially reasonable best efforts" to assist Buyers in securing financing, including by providing information related to the efforts to secure financing.

### iv.    Twitter's Representations And Warranties

81. Believing that due diligence processes can be costly and inefficient, the Musk Parties instead focused on bargaining for contractual representations that the information they relied upon in deciding to acquire Twitter is accurate.

82. If these representations cannot be "brought down" at Closing, they may excuse a party from closing if the failure to bring such representations down results in an MAE.

### a.  Twitter's Representations That Its SEC Filings Are True

83. In Section 4.6(a), the Musk Parties secured a representation from Twitter that its SEC filings—and thus its userbase disclosures and identification of mDAU as a key metric—are accurate. Twitter represented that "none of the Company SEC Documents at the time it was filed . . . contained any untrue statement of a material fact" or omitted facts necessary to make the statements included misleading. The Musk Parties relied on this representation—and Twitter's SEC disclosures—to sign the deal.

38

84. Importantly, this representation encompasses Twitter's disclosures regarding its mDAU, including what share of its mDAU calculation is comprised of genuine accounts and spam accounts. In substance, this representation means that Twitter's representations in its SEC filings regarding mDAU and false accounts must be true to comply with the Merger Agreement.

85. Twitter makes numerous representations regarding mDAU in its 2021 10-K, published on February 16, 2022, including:

- "We have performed an internal review of a sample of accounts and estimate that the average of *false or spam accounts during the fourth quarter of 2021 represented fewer than 5% of our mDAU* during the quarter." (emphasis added).

- "In making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated."

- "We are continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU, and have made improvements in our spam detection capabilities that have resulted in the suspension of a large number of spam, malicious automation, and fake accounts. We intend to continue to make such improvements."

- "After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics."

- "Our advertising revenue growth is primarily driven by increases in mDAU, increases in ad pricing or number of ads shown and increases in our clickthrough rate."

86. Twitter consistently discusses its risk factors in terms of mDAU:

- *"If we fail to increase our mDAU, ad engagement or other general engagement* on our platform, *our revenue, business and operating results may be harmed;"* "If we are not able to compete effectively for audience, content and platform partners, *our mDAU* and engagement *would decline and our business and operating results would be materially and adversely impacted;"* (emphasis added).

- *"Our mDAU and their level of engagement with advertising are critical to our success and our long-term financial performance will continue to be significantly determined by our success in increasing the growth rate of our mDAU* as well as the number of ad engagements." (emphasis added).

- "Our content and platform partners may choose to publish content on, or develop applications for, other platforms, and if they cease to utilize our platform or decrease their use of our platform, *then mDAU*, engagement, and advertising revenue *may decline;"* "If we are not able to compete effectively for advertiser spend, *our mDAU* and engagement *would decline and our business and operating results would be materially and adversely impacted;"* (emphasis added).

- *"If we make a sudden improvement* in one of the algorithms we use to detect spammy or suspicious behavior, *we may remove a larger number of accounts as a result* and *impact the year-over-year average of mDAU growth."* (emphasis added).

87.     Twitter broadly touts its mDAU metric to the investing public.  Indeed, Twitter's CFO has said "[w]hen we look at other markets, we've been really pleased with the DAU growth, *which is the foundation of any revenue opportunity that we have.*"[11]  Similarly, Twitter's former head of its consumer division told analysts that "[u]ltimately, we measure our long term success through our ability to grow

---

[11]  Citi Global Technology Conference 2019, New York, New York (September 4, 2019) (Ned Segal) at p. 6.  When Twitter adopted its mDAU metric it frequently interchangeably referred to mDAU and DAU.

40

monetizable daily active usage (mDAU)," and that while "there are a variety of metrics that help us gauge whether our product solutions are working, [] in [the] aggregate *the best way* to measure our success is mDAU."[12]

88.    Twitter's 2021 10-K also contains disclosures regarding user privacy, data protection, and cybersecurity, including:

- Twitter "strive[s] to comply with applicable laws and regulations relating to privacy, data protection, and cybersecurity;" and

- "[C]oncerns related to . . . privacy, data protection, safety, [and] cybersecurity" "could potentially negatively affect mDAU growth and engagement."

- "[t]here may be intellectual property or other rights held by others, including issued or pending patents, that cover significant aspects of our products and services, and we cannot be sure that we are not infringing or violating, and have                not                  infringed                or violated, any third-party intellectual property rights or that we will not be held to have done so or be accused of doing so in the future . . . In addition, we may have to seek a license to continue practices found to be in violation of a third-party's rights."

89.    Pages 20 and 158 of the July 26, 2022 definitive proxy disclose that "Twitter stands behind the accuracy of its public disclosures, including with respect to its estimates of false and spam accounts."

90.    Section 4.7 represents that "[n]one of the information supplied or to be supplied by or on behalf of the Company or any of its Subsidiaries expressly for inclusion or incorporation by reference in the proxy statement relating to the matters

---

[12]  Twitter, Inc. Feb. 25, 2021 Analyst Day Tr. at 14.

41

to be submitted to the Company's stockholders at the Company Stockholders' Meeting (such proxy statement and any amendments or supplements thereto, the 'Proxy Statement') shall, at the time the Proxy Statement is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading at such applicable time . . . ." Twitter's proxy incorporates its 2021 10-K and Q-2 2022 10-Q by reference.

### b. Twitter's Other Representations

91.    The Merger Agreement also contains several other representations and warranties. Section 4.5(b) represents that "Neither the Company nor any of its Subsidiaries is in default or violation of any Law applicable to the Company, any of its Subsidiaries or by which any of their respective properties or assets are bound, except for any such defaults or violations that would not have a Company Material Adverse Effect."

Company Material Adverse Effect ("MAE") is defined, in relevant part, as "any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a

42

material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole . . . ." There are certain carveouts from this provision, but there is no carve-out applicable to an MAE resulting from the impact of the market's discovery that Twitter's mDAU calculations are materially misleading and there is no carve-out addressing Twitter's regulatory compliance, its data security efforts, nor its intellectual property liabilities.

92.    Section 4.8 represents that Twitter "has disclosed, based on its most recent evaluation of the Company's internal control over financial reporting prior to the date of this Agreement, to the Company's auditors and the audit committee of the Company Board . . . (ii) any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." Parag Agrawal, who signs Twitter's SEC disclosures as CEO, has a significant role in Twitter's financial reporting.

93.    Section 4.9 represents that "Since January 1, 2022 and until the date of this Agreement, (a) the businesses of the Company and its Subsidiaries have been conducted in the ordinary course of business (other than as a result of COVID-19 and COVID-19 Measures or with respect to the Existing 2030 Notes or the

43

transactions contemplated hereby) and (b) there has not been any adverse change, event, development or state of circumstances that has had a Company Material Adverse Effect."

94.    In Section 4.11, Twitter represents that as the date of the agreement, there "is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing" or any "investigation by any Governmental Authority involving the Company or any of its Subsidiaries" that would lead to an MAE.

95.    Additionally, in Section 4.14(b) Twitter represented that "To the knowledge of the Company, the conduct of the business of the Company and its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property Rights of any other Person." That provision further represents that "[t]he Company and its Subsidiaries are in compliance with all applicable Laws, Contracts to which the Company or its Subsidiaries are bound, and internal- and external-facing policies of the Company or its Subsidiaries, in each case, relating to privacy, data protection, and the collection and use of information that constitutes "personal information" under applicable Laws ("Personal Information") collected, used or held for use by the Company or its Subsidiaries." Both representations have an MAE qualifier.

44

**D.    Twitter Restates Its mDAU Figures And Musk Exercises His Information Rights To Investigate Twitter's mDAU Disclosures**

96.    Based on Twitter's representations that mDAU is "the best way to measure [Twitter's] success," Musk relied upon Twitter's calculation of the mDAU figure in making his decision to purchase the company.

97.    One complication in calculating the mDAU metric is that Twitter's platform contains a significant number of accounts that cannot be monetized, including false or spam accounts.

98.    False or spam accounts can engage in a variety of behaviors that would lead them to be counted as mDAU in the ordinary course, for example by logging into Twitter and generating a high volume of tweets, retweets, and replies. But, because they are generally not designed to engage with advertisements and ultimately buy products, false and spam accounts are of no interest to advertisers and would be unlikely to ever pay for subscription services. Additionally, these false or spam accounts often engage in disruptive or abusive behavior—for example by mass replying to a user's account or by attempting to scam real users—that make the Twitter platform less appealing to its legitimate users.

99.    Understanding that many spam accounts would ordinarily be captured in the mDAU metric, but do not represent actually monetizable users, Twitter purports to exclude these accounts from its mDAU calculation. Accordingly,

45

Twitter disclosed that spam accounts "represented fewer than 5% of our mDAU" in its 2021 10-K and Q1 2022 10-Q. Despite extremely volatile social, political, and economic conditions, this less-than-5% figure has been unchanged since Twitter began disclosing the mDAU metric in its 2018 10-K. And Twitter has publicly represented that the figure is actually *far lower* than 5%.

100. But false and spam accounts may not be the only problem. To the extent that Twitter includes within mDAU accounts that are only barely engaged in the platform at all, and yet calls all of these accounts "monetizable," that too is misleading. For instance, if an account does not visit Twitter long enough to see any advertising and does not use the platform enough to indicate the user would ever verify himself, let alone purchase a subscription, that account would not be monetizable.

101. Thus, including accounts in the mDAU count that are not actually "monetizable," whether because they are spam accounts, false accounts, insufficiently engaged with the platform to generate revenues, or nonmonetizable for any other reason, paints a misleading picture to investors.

102. The Musk Parties' advisors at Morgan Stanley based their valuations of Twitter in significant part on the company's mDAU disclosures. Relying on Twitter's disclosure that mDAU is the best way to measure the company's success,

46

Morgan Stanley constructed models supporting a $54.20 per share price by directly tying Twitter's future revenue projections to the Company's mDAU growth. Had the Musk Parties known mDAU's real relationship with the company's business performance, their valuation of Twitter would have been materially different.

103. *Just three days* after the Musk Parties signed the Agreement, Twitter restated its mDAU figures from Q4 2020 to Q4 2021 by approximately 1.4 to 1.9 million per quarter, disclosing in its Q1 earnings release that it had been double counting accounts since the fourth quarter of 2020. By restating its financials, Twitter effectively admitted that changes in mDAU of at least this magnitude are material and portrayed its "estimates" as precise. This imminent restatement was not disclosed to the Musk Parties before the Merger Agreement was signed.

104. Twitter knew that disclosing the upcoming mDAU restatement would have likely caused the Musk Parties to ask further questions that could delay the signing of the Merger Agreement beyond April 25, 2022. Had the parties not reached agreement by April 25, 2022, Twitter would have followed its April 28, 2022 earnings release, which disclosed the mDAU restatement, with an earnings call to answer questions from analysts.[13] By April 28, 2022, Twitter was almost a month into the second quarter, which ultimately proved to be disastrous—Twitter's Q2

---

[13] This call did not occur due to the Musk Parties' announced acquisition.

47

2022 results disclosed a 60% EBITDA miss, and a 10% revenue miss with revenue lower than Q2 2021.  Twitter knew analysts would ask questions not just about Q1 earnings, but about the restatement and about guidance for Q2 and beyond.  Twitter avoided this result by hiding the upcoming mDAU restatement from the Musk Parties and locking in a deal on April 25, 2022.

105.  Once they saw this restatement, the Musk Parties promptly sought to validate Twitter's userbase representations, just as Twitter expected.  Thus, on May 6, 2022, Musk met with Twitter's leadership, including its CEO and CFO to discuss, among other items, how Twitter calculates its spam population.  Contrary to Twitter's narrative, the May 6, 2022 meeting was not requested by the Musk Parties due to any market concerns.  Rather, it was a pre-scheduled introductory meeting in order to verify Twitter's representations and warranties in light of the restatement, plan for the post-closing transition, and aid in securing deal financing.

106.  During this May 6, 2022 meeting, Musk was struck by Twitter executives' inability to answer simple questions about its foundational mDAU metric and how it determines what percentage of mDAU are comprised of legitimate accounts that generate revenue.  Having been denied access to the front-line engineers and reviewers, Musk had expected that Twitter's executives would have

gathered the information necessary for them to be able to engage in a productive conversation with him regarding the Company's key metrics.

107.   Musk was particularly alarmed by revelations that Twitter's CEO and CFO could not explain basic questions about the basis for Twitter's disclosures about its self-professed "key" mDAU metric.  He was also concerned about just how meager Twitter's process was for *counting* the number of false or spam accounts, particularly in light of Twitter's use of separate processes for *removing* false or spam accounts, which rely on more advanced methods.  The Musk Parties had assumed that Twitter employed a rigorous, modern methodology, relying on automation, artificial intelligence, and machine learning to assess the portion of its users that were false or spam, or more generally non-monetizable, with constant backward-looking analysis to ensure it was capturing such accounts promptly, and adjusting where it was not.

108.   Twitter executives revealed that was far from the truth.  Instead, Twitter's process was shockingly thin: human reviewers randomly sampled 100 accounts per day (0.00005% of putative daily users) and applied unidentified subjective standards, rather than objective verification, to somehow conclude every quarter for two years running that far fewer than 5% of Twitter users were false or spam.  That's it.  No automation, no AI, no machine learning, no material checks on

49

the validity of the process or its results, no continuous improvements over time. Twitter executives could not even explain how they selected the 100 account sample, or explain any criteria that were applied other than a reviewer's gut judgment—when a much better verification mechanism would involve sending users an email, text, or other push notification with a CAPTCHA or other challenge-response test that is commonly used by other websites seeking to verify users (and even by Twitter itself, when it is removing false and spam accounts).

109.    As discussed *infra* at ¶126 Twitter executives, including CFO Ned Segal, later revealed that they *knew* that accounts their human reviewers judged to be "real" were later found by Twitter itself to be false or spam, and yet they made the conscious decision not to update mDAU counts to exclude accounts suspended ***within the same quarter*** before publishing quarterly figures, and knowingly failed to disclose this information to investors.

110.    After these discussions, Musk's doubts crystallized regarding whether Twitter's calculations of both its mDAU and the prevalence of spam accounts were accurate. He soon came to believe that Twitter may be dramatically overcounting its monetizable userbase as a result of an inadequate process for calculating mDAU.

**E.    Twitter Stonewalled Musk To Prevent Discovery Of Its Misstatements**

111.    Following the May 6, 2022 meeting, the Musk Parties made it clear to Twitter that understanding how many real users Twitter has and evaluating the

50

truthfulness of Twitter's SEC filings was their top priority. Beginning on May 9, 2022, the Musk Parties promptly exercised their information rights under the Merger Agreement to request that information to, among other things, verify Twitter's representations and warranties which were a condition to closing, plan for the post-closing transition, and aid in securing deal financing.

112.    The Musk Parties made it crystal clear what they were seeking: they wanted to understand how Twitter calculated its mDAU and spam figures, and they wanted the data necessary to test Twitter's calculations given their concerns with the lack of rigor behind Twitter's process. What began as a simple request to understand a simple question resulted in an unending game of cat-and-mouse, with Twitter obfuscating the truth at every turn. Rather than opening its doors to work cooperatively with its presumptive owner, Twitter seized upon the Musk Parties' ignorance of Twitter's internal terminology and forced them to embark on a game of battleship, taking blind guesses at what data sets would be sufficient with little to no guidance from Twitter.

113.    Indeed, one of the Musk Parties' first requests could not have been clearer: "How do you estimate that fewer than 5% of mDAU are false and spam accounts?" Twitter's response was to provide a short, six-page document providing high-level information about how Twitter defines spam accounts, certain factors that

51

Twitter assesses, and an explanation that accounts are reviewed by human reviewers. However, this document contained no explanation of: how the sample population is selected, how human reviewers are selected, the reviewers' incentives, the directions and feedback reviewers receive, how many factors must be present for an account to be determined to be a false or spam account, how the process was developed, how the process is tested, which accounts Twitter counts in mDAU and why, how often Twitter overrides its reviewers' determinations, or why the process does not leverage other automated technology that Twitter already uses to delete spam accounts.

114. Concerned that Twitter's feigned confusion was an attempt to avoid fully responding to their information requests, the Musk Parties requested information with increasing specificity so there could be no doubt as to the information they needed to understand how Twitter calculates mDAU and arrives at the 5% spam figure. Thus, on May 17, 2022 the Musk Parties specifically requested access to the Twitter Firehose[14] showing public tweet and like activity so that they could run their own analysis of false or spam accounts. On May 19, 2022, the Musk Parties enumerated several categories of necessary information, such as how Twitter derives the 5% spam figure; Twitter's key user metrics; Twitter's suspension of users;

---

[14] The Firehose reflects all *public* Tweets and likes, but only approximately 30% of the accounts Twitter counts in mDAU interact with the platform in these ways.

Twitter's accounting for suspended users in its metrics, including mDAU; and information about advertisements rendered to suspended accounts. By May 23, there could be no doubt that Musk sought information to not only understand how Twitter arrived at the 5% figure but also to verify Twitter's key metric independently.

115. But rather than provide real-time, live data, Twitter provided only stale data sets and high-level summaries without providing any actual criteria or tests applied. As Twitter well knows, its userbase is constantly changing, and many accounts active in earlier time periods are no longer visible on the platform. Therefore, stale data was not sufficient to allow the Musk Parties to test Twitter's representations.

116. At the same time, Twitter provided responses to other broad categories of information requests without delay. For example, when the Musk Parties requested documents related to all of Twitter's leases, that information was provided within days. And rather than responding to the Musk Parties' most pressing concerns, Twitter populated the data room with frivolous materials such as a copy of its agreement with the Golden State Warriors for courtside basketball tickets and VIP parking.

117. So the Musk Parties became even more specific. On May 25, 2022, through Morgan Stanley and an accompanying letter, the Musk Parties reiterated

their requests for certain enterprise application programming interfaces ("API"), specifically requesting Twitter's "enterprise firehose," which the Musk Parties clarified was "100% of tweets and favoring activity"; the "Decahose," which provides a 10% random sample of the Firehose; the "favoriting" or "like" Firehose; the compliance Firehose; and the historical PowerTrack, which provides a historical archive of public Twitter data using various filters. On May 31, the Musk Parties again sent requests through Morgan Stanley and an accompanying letter, noting that Twitter had "refused to provide the requested data and information *despite daily requests* since May 9" and—in an attempt to preempt any further delays—reaffirmed the Musk Parties willingness to implement protocols to protect the privacy of Twitter's data.

118. Instead of working cooperatively with the Musk Parties and despite the Musk Parties' increasingly specific requests, Twitter blamed "miscommunication" for its unsatisfactory responses to date, although it knew the Musk Parties' precise goals and knew precisely which information would be responsive. And instead of providing responsive information, Twitter demanded "detailed" explanations regarding the analysis that would be performed on any data set Twitter provided and the steps taken to ensure the data is not used for any "illegal" purpose, and that the

54

Musk Parties sign a "Master License Agreement" that apparently would supersede Musk's obligations under the Merger Agreement.

119. But these requests were pretext—the Musk Parties had previously offered to alleviate concerns about privacy through mechanisms such as third-party review, but Twitter ignored those suggestions. As such, Twitter's belated concerns about the Musk Parties' use of its data rang hollow and appeared to be nothing more than another excuse to delay providing the requested information.

120. So on June 6, 2022, with the closing date bearing down and time running out to perform a proper analysis, the Musk Parties put Twitter on notice that it was in breach of the Merger Agreement by continuing to withhold properly requested information. Notwithstanding this breach, the Musk Parties continued to hope that Twitter would finally be transparent, continued to press for relevant information, and provided further assurances to Twitter that they would preserve the confidentiality of any sensitive information that Twitter provided. Remarkably, even after the Musk Parties put Twitter on notice of its breach, Twitter still did not provide the answers or information it knew the Musk Parties were seeking.

121. Twitter did not respond until June 16, 2022. Twitter repeated the same unsupported assertions as in its June 1, 2022 letter that the Musk Parties were requesting information for an improper purpose, but finally offered to provide the

55

Musk Parties access to certain of the Enterprise APIs the Musk Parties had sought, including the Twitter Firehose and Historical PowerTrack.

122. But Twitter did not provide the true Firehose. Instead, a Twitter engineering team with no day-to-day responsibility for the Firehose or related tools and interfaces created a *different*, partial data set, and misleadingly named that data set "Twttr Firehose Internal." Twitter's engineers configured that mislabeled data set to make machine analysis largely unusable (unlike the true Firehose) and to give Twitter a back door into tracking the Musk Parties' analysis.

123. And instead of providing the mDAU calculations and projections the company uses in the ordinary course, Twitter provided only a limited subset of its daily internal mDAU counts hard-coded in a spreadsheet, without detail regarding how it performs its calculation and thus any insight into how Twitter arrived at those numbers.

124. Twitter proposed subsequent meetings with Musk to discuss its business. But, at the same time, Twitter was refusing to provide information the Musk Parties had properly requested under the Merger Agreement. Musk saw these meetings for what they were—distractions from the important requests his team was making about user data. Musk did not see the use in further meetings because until

56

Twitter could provide data verifying its representations, there was nothing productive to discuss.

125. The Musk Parties wrote to Twitter on June 17, 2022 identifying these issues and providing even more specificity regarding what information they sought. This included requests for the Twitter Firehose and for specifically named Enterprise APIs that Twitter was withholding.

126. Twitter responded on June 20, 2022, once again pretending to have misunderstood what the Musk Parties had been requesting for over six weeks. Twitter admitted it was not giving the Musk Parties the information required to investigate Twitter's representations regarding its mDAU and spam calculations, noting that, while it would finally provide its existing Firehose stream (over a month late), that data would be "insufficient to perform the spam analysis" the Musk Parties sought to conduct, because Twitter still refused to provide the "private data required." Twitter even refused to provide the basic account lists necessary for an analysis based on public information. In other words, while Twitter was happy to tell the Musk Parties the information it was willing to provide was insufficient to allow the Musk Parties to answer the overarching question it had posed since early May— "How do you estimate that fewer than 5% of mDAU are false and spam

57

accounts?"—Twitter never offered or provided information it knew would allow the Musk Parties to answer that question.

127.    So the Musk Parties became even more specific. On June 29, 2022, the Musk Parties again wrote to Twitter asking that the company comply with its contractual obligations and provide the information the Musk Parties had been requesting since May regarding the company's mDAU and spam calculations. This time, the Musk Parties provided a detailed list of mDAU-related requests to prevent any further delay or obfuscation, including: Twitter's historical global daily mDAU count in such a form so as to allow the Musk Parties to understand how many of these mDAU perform tweet actions and how many only view the platform; information regarding how suspended accounts are factored into the mDAU calculation; outputs from Twitter's sampling process for determining the spam portion of the mDAU count; and information regarding Twitter's process of reviewing its mDAU to determine the spam count. The Musk Parties further noted that board and executive level communications regarding the subject matter of these information requests were within the May diligence requests, as well as information regarding Twitter's financial modeling. The Musk Parties also noted that Twitter had been limiting the data analysis the Musk Parties could perform on the

information Twitter had provided, and requested immediate removal of all search caps on that data.

128.    The Musk Parties later determined that the various historical Enterprise APIs and other interfaces to which Twitter provided access excluded tweets from accounts that had since been suspended. That is, it was impossible to analyze these data sets to determine what percentage of users were spam because the data was sanitized of all the spam accounts that Twitter had suspended.

129.    By this point, the only conclusion the Musk Parties could draw from Twitter's obfuscation and delay was that Twitter knew that it had something to hide.

130.    On July 1, 2022 the parties had a phone call to discuss Musk's information requests and Twitter's mDAU calculations. That call laid to rest any lingering hope that Twitter's spam detection process was adequate or that it was providing information in good faith. Shockingly, on the call, Twitter CFO Ned Segal revealed that Twitter knowingly includes *a significant number of accounts that it has already suspended for being false or spam as of the end of the quarter* in its quarterly reported average mDAU. Beyond this revelation, Twitter provided only buzzwords and high-level descriptions, parroting the mantra that its process was robust, while simultaneously refusing to tell the Musk Parties what the process actually entailed. Twitter could not explain who reviews for spam, how those

59

reviewers are trained, the criteria it uses, the process it follows, the standards it applies, or how Twitter verifies the accuracy of the reviewers' results.

131. In sum, despite numerous requests, Twitter still has not provided, among other items: (1) information related to Twitter's process for suspending and removing spam accounts from mDAU, including the global daily mDAU population; (2) information related to Twitter's identification of spam accounts, including the outputs of the sampling process; (3) board materials relating to Twitter's mDAU metric; and (4) information necessary to understand Twitter's current and future financial condition.[15] This refusal to provide the requisite information can only be understood as Twitter attempting to hide evidence of its false and misleading representations.

132. The Musk Parties have sought this information since May, and the Musk Parties informed Twitter on June 6, 2022, that its failure to provide this information breached Sections 6.4 and 6.11 of the Merger Agreement. Twitter had

---

[15] And the information that Twitter did provide often came with strings attached such as to make the information difficult to interpret. For example, when Twitter finally provided access to the developer APIs Musk had requested, it did so with lower data rate limits than it provides to its enterprise customers, thwarting Musk's ability to analyze the data. It also placed a "cap" on the number of queries Musk can run on the APIs, preventing much of the analysis Musk wishes to perform. Twitter only removed the query cap on July 6, despite having been informed of the problems this cap caused on June 29.

thirty days to cure this breach and did not do so. The Musk Parties, therefore, are entitled to terminate the Merger Agreement under Section 8.1(d)(i).

**F.    The Information Twitter Provided Evidences Numerous False And Misleading Representation In Twitter's SEC Filings**

133. The partial information that Twitter did provide only heightened the Musk Parties' concerns that Twitter's mDAU count could not possibly be accurate and that its methodology for calculating mDAU is unreasonable.

134. The Musk Parties' investigation to date has revealed that, as detailed below, Twitter made numerous false and misleading statements and omissions regarding its highly-touted mDAU figure. Twitter's misrepresentations include: (i) understating the extent to which mDAU and revenues were impacted by false or spam accounts by relying on a bad faith process for calculating the prevalence of false or spam accounts; (ii) overstating the extent to which mDAU and its growth was the key proxy for and contributing to increased ad engagement and revenue growth; and (iii) overstating mDAU by double-counting users with multiple accounts. More specifically, the statements detailed below misrepresented or omitted the following information, which rendered them materially false and misleading:

### i.    Twitter's mDAU Was Overstated By Understating False And Spam Accounts

135.    In Twitter's 2021 10-K, Twitter represented that following "an internal review of a sample of accounts" Twitter calculated "that the average of false or spam accounts during the fourth quarter of 2021 represented fewer than 5% of our mDAU during the quarter."

136.    Twitter's 10-K further represented that in the fourth quarter of 2021, it had "217 million average mDAU, which represents an increase of 13% from the three months ended December 31, 2020." The implication of that representation—when combined with Twitter's representation that fewer than 5% of mDAU were false or spam—is that fewer than approximately 10.85 million accounts were false or spam.

137.    In addition to representing the amount of false or spam accounts, Twitter portrays its process of calculating false or spam accounts as a good-faith process. For example, in its 2021 10-K, Twitter represents that it "performed an internal review of a sample of accounts" for which Twitter "applied significant judgment," and that Twitter "continually seek[s] to improve [its] ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU."

138. Twitter's 2021 10-K also discloses that "[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics."

139. The same day Twitter disclosed its mDAU growth for the fourth quarter of 2021, Twitter disclosed that its revenue for the fourth quarter of 2021 was "$1.57 billion, an increase of 22% year over year." Read together, Twitter's disclosures regarding the limited impact of spam or false accounts lead to the logical conclusion that Twitter's revenues were not materially impacted by spam or false accounts.

140. But contrary to Twitter's representations that its business was minimally affected by false or spam accounts, the Musk Parties' preliminary estimates show otherwise.[16] Accordingly, the statements above in ¶¶131-35 were materially false and misleading because, among other reasons:

---

[16] To date, the Musk Parties' analysis has been constrained due to the limited data that Twitter has provided and limited time in which to analyze that incomplete data. The Musk Parties' analysis processed accounts visible on the Firehose using the University of Indiana Botometer tool, which was initially developed with support from the DARPA program and has been improved and honed over the past eight years. The academic developers of the Botometer tool have published numerous articles about their work, including one seminal paper that has received over 1,000 citations in the academic literature. Defendants' experts are continuing their analysis even now and, in anticipation of production of additional data by Twitter (including "private" data that Twitter makes available to its human reviewers and contends is necessary to verify its reported less-than-5% spam and false user rate), intend to conduct a more comprehensive analysis and expect to present updated estimates and findings in expert reports and at trial.

a. Twitter failed to disclose that false or spam accounts represent materially more than 5% of its mDAU;

b. Twitter failed to disclose that false and spam accounts comprised a comparatively larger portion of the mDAU that generate material ad revenue; and,

c. Twitter misrepresented key steps in its process for counting fraud and spam accounts.

141. *Twitter failed to disclose that its false or spam accounts represent materially more than 5% of its mDAU.* An analysis of Firehose data from the first week of July, including processing visible accounts using a publicly-available machine-learning spam detection model, shows that, during that timeframe, false or spam accounts accounted for 33% of visible accounts.

142. While Twitter has not provided any data regarding the approximately 70% of mDAU that are invisible in the Firehose (because they do not perform any public Tweeting or liking activity), even assuming that *every single one* of the invisible accounts is a legitimate user, and not a false or spam account (an assumption as conservative as mathematically possible), these preliminary findings indicate a floor for the prevalence of false or spam accounts among Twitter's mDAU of 10%, rendering Twitter's statements that less than 5% of mDAU is comprised of false or spam accounts materially misleading.

143. Additionally, Twitter's own board materials reference spam "prevalence" reports performed by a third-party. Those reports—produced in

64

discovery in this action—show materially higher spam and false accounts than disclosed in Twitter's 10-K.

144. Accordingly, contrary to the implication in the 2021 10-K that fewer than 10.85 million mDAU were false or spam accounts, preliminary findings suggest that more than 20 million mDAU were false or spam accounts.

145. ***Twitter failed to disclose that false or spam accounts comprised a disproportionate portion of the mDAU that generate material ad revenue.*** Not only does preliminary analysis reveal that Twitter's false or spam accounts exceed 10% of mDAU, the Musk Parties estimate that false and spam accounts make up an even more significant portion of the mDAU that actually see ads based on Twitter's own data regarding ad engagement among its userbase. Specifically, false or spam accounts may have comprised approximately 14% of all mDAU that actually saw any ads, and potentially a larger portion of the power-user mDAU that generate significant ad revenue. Thus, false or spam accounts may have an even bigger impact on revenues than on overall mDAU.

146. If false or spam accounts are disproportionately present in the accounts that see the most ads and generate significant revenue, then a large portion of Twitter's overall revenues are attributable to ads that are not being served to

65

legitimate users. Should advertisers come to realize this, they will take their money elsewhere, making Twitter's failure to disclose that risk false and misleading.

147. ***Twitter misrepresented key steps in its process for counting fraud and spam accounts***. Even taking Twitter's internal methodology at face value, Twitter's disclosures to the Musk Parties reveal that it enables Twitter to include millions of accounts in its quarterly reported mDAU that are suspended for spam ***during that same quarter***—none of which was disclosed to investors.

148. Specifically, information provided by Twitter indicates that Twitter suspends millions of accounts per quarter that it also ***includes in mDAU***. For example, in Q1 2021, Twitter's records indicate that nearly 5 million accounts included in mDAU were suspended that very quarter. And that number has been steadily increasing quarter over quarter, from nearly 5 million in Q1 2021 to over 14 million in Q1 2022.

149. Twitter executive Ned Segal admitted during Twitter's July 1, 2022 call with the Musk Parties that ***the quarter-end average mDAU it reports to investors includes these millions of suspended accounts within it***. And while Twitter has argued that its approach is justified, its contentions defy logic and Twitter's own data regarding suspensions.

66

150.    On that call, Segal speculated that this approach *might be* justified because it *might be* the case that the vast majority of suspended accounts were not engaged in false or spam behavior before their suspension. But he did not represent this to be true, and in other public statements, Twitter has publicly admitted that "[m]ost of the accounts we suspend are suspended because they are spammy, or just plain fake, and they introduce security risks for Twitter and for everyone using Twitter."[17] Any assertion that Twitter may reasonably assume these same suspended accounts were generally legitimate (*i.e.*, not spam or false) prior to suspension is not plausible.

151.    On the same call, Twitter executives also asserted that Twitter is so effective at quickly detecting and suspending spam accounts that their impact on the *average* mDAU for the quarter is presumably trivial. But they again did not assert they knew this to be true, and this assertion appears contradicted by Twitter's own suspension data. For example, the data provided by Twitter indicates that over 13 million accounts suspended in Q4 2021 were counted in mDAU for that quarter and that over 4.7 million of accounts suspended in Q4 2021 were *also* counted in mDAU for Q3 2021. In other words, it appears that millions of suspended accounts were

---

[17]    Twitter Help Center, *About suspended accounts*, https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts (accessed July 28, 2022).

not detected and suspended by Twitter for *at least one quarter*—in stark contrast to Twitter's representation that such accounts are suspended within days of sign up. Not restating previous mDAU calculations to account for these suspensions has resulted in inflated historical mDAU counts.

152. Twitter discloses that "[w]e are continually seeking to improve our ability to estimate the total number of spam accounts . . . and have made improvements in our spam detection capabilities that have resulted in the suspension of a large number of spam, malicious automation, and fake accounts." This implies that improvements in Twitter's spam detection and suspension process lead to improvements in Twitter's process for calculating the number of false or spam accounts. But, this is false. As Twitter has told the Musk Parties, it does not use its spam detection capabilities to assist in its calculation of the number of false or spam accounts.

153. Twitter has provided no explanation for why the automated processes it uses to catch fake accounts is not also used to quantify fake accounts in the mDAU counts, rather than the meager 100-per-day human review Twitter currently employs.

154. Notwithstanding the above, Twitter has turned a blind eye to its flawed methodology, which has enabled Twitter to continue making its false and misleading representation that false or spam accounts represent fewer than 5% of mDAU.

68

### ii.    Twitter Falsely Claims That mDAU Growth Was The Best Proxy For Engagement And Revenue Growth

155.    When Twitter introduced its mDAU metric—after a number of quarters of declines in its prior user metric—Twitter explained in its Q4 2018 and Fiscal Year Letter to Shareholders that "[o]ur mDAU are not comparable to current disclosures from other companies, many of whom share a more expansive metric that includes people who are not seeing ads." Rather than report those broader metrics, Twitter represented that it "want[ed] to align our external stakeholders around one metric that reflects our goal of delivering value to people on Twitter every day and monetizing that usage." The implication of Twitter's mDAU description is that the metric measures actual users who see ads. Certainly, this is what Twitter's disclosures have led the market to understand.[18]

156.    Consistent with that message, Twitter repeatedly represents that mDAU—which Twitter discloses as a "key metric"—is the best proxy for the Company's growth and success. Indeed, Twitter referenced mDAU and its importance nearly 100 times in its 2021 10-K. For example, in Twitter's 2021 10-K, in the section titled "Key Metrics," Twitter represents that "mDAU, and its related

---

[18]    *See, e.g.*, Sheila Dang, "Twitter gears up for most ambitious quarter of user growth – internal meeting," *Reuters* (June 7, 2022), available at https://www.reuters.com/article/twitter-users-idCAKBN2NO1JU (describing "monetizable daily active users" as "users who see advertising").

69

growth, is the ***best way*** to measure our success ***against our objectives and to show the size of our*** audience and ***engagement***." (emphasis added).

157.  Twitter also claims that mDAU growth drives its advertising revenue growth.  For example, Twitter represented in its 2021 10-K that its advertising revenue growth—which represented approximately 95% of Twitter's 2021 revenue growth—"is primarily driven by ***increases in mDAU***, increases in ad pricing or number of ads shown and increases in our clickthrough rate."

158.  Twitter similarly lists its "ability to increase our mDAU" first among its business and operational risk factors.  Indeed, the risk factors in Twitter's 2021 10-K are consistently discussed in terms of its impact on mDAU or other metrics that Twitter represents are best measured by mDAU.  *See supra* ¶81.

159.  Consistent with Twitter's claims regarding the importance of mDAU, Twitter prominently touts its mDAU growth.  For example, in its 2021 10-K, Twitter represents "[a]verage monetizable daily active usage (mDAU) was 217 million for the three months ended December 31, 2021, an increase of 13% year over year." Twitter's 2021 10-K even contains a full-page graphical breakdown of its historical mDAU growth:

For additional information on how we calculate changes in mDAU and factors that can affect this metric, see the section titled "Note Regarding Key Metrics."



Monetizable Daily Active Usage: Worldwide
(quarterly average in millions)*



Monetizable Daily Active Usage: United States
(quarterly average in millions)

Monetizable Daily Active Usage: International
(quarterly average in millions)

\* Please note the sum of average mDAU in the United States and average mDAU in the rest of the world may not equal the total average mDAU indicated due to rounding.

43

160.  And as part of its strategy of touting the importance of mDAU and mDAU growth, Twitter has sought to downplay the importance of other metrics. For example, at Twitter's 2021 analyst day—where mDAU was referenced over 40 times—an analyst at Wells Fargo noted that "[a] number of your peers have given us data points on markers of daily engagement beyond mDAU, in terms of time spent, app opens, or engagements per day." The analyst then asked if Twitter "could give a sense of where you are today, in terms of engagements; maybe some sense of how that's been growing lately."

71

161. Twitter's then-product lead—Kayvon Beykpour, who Twitter terminated without seeking the Musk Parties' consent—responded that "we look at a number of metrics to understand whether our solutions to the customer problems we're focused on are actually working.  And those metrics, you know, are quite different whether you're looking at topics or onboarding flow or product solutions, like spaces are our work on newsletters with review.  But in aggregate, *the best way to sort of measure whether we're solving customer problems is mDAU, which is why we sort of focus on that metric*.  On time spent specifically, we absolutely are capable and do measure time spent and how our product changes impact it.  *We don't think it's a particularly useful single measure to look at in terms of our aggregate performance*."

162. Similarly, during Twitter's Q2 2021 earnings call, an analyst from Morgan Stanley asked:  "Could you just help us understand a little bit what's going on, on time spent per user per day or time spent in the parts of the world that are a little more reopened?  Maybe the engagement trends are more important than the actual number of people [i.e., mDAU]?"

163. In response to this straightforward request, Ned Segal, Twitter's chief financial officer, falsely claimed, "[w]e haven't broken out time spent, Brian.  We don't solve for time spent."  He continued: "So I'm not sure that time spent would

72

help as much—I'd just keep watching the [m]DAU number because as we continue to grow that … that [m]DAU number is going to be the best way to measure success."

164. Twitter provided a similar explanation to Counterclaim-Plaintiffs when they asked Twitter during post-signing due diligence whether Twitter measures UAM. In response to that request—which did not call for any information regarding mDAU—Twitter stated that they "do record UAM internally," but that they "have found that *mDAU is the best measure of* audience and *engagement*."

165. Put simply, Twitter wanted investors and Musk to believe that mDAU was the best way to measure engagement, revenue, and the Company's success because, as touted in Twitter's 2021 10-K, mDAU was purportedly consistently increasing.

166. But contrary to Twitter's representations that mDAU and its growth is the best proxy for engagement and revenue growth, Twitter's internal data and documents tell a different story.

167. Accordingly, the statements above in ¶¶151-62 were materially false and misleading because, among other reasons:

      a. Twitter failed to disclose that nearly a third of its mDAU sees no ads;

      b. Twitter failed to disclose that a minimal portion of users drive a majority of revenue; and,

73

c. Twitter failed to disclose that the vast majority of mDAU growth is not occurring among high-value users.

168. ***Twitter failed to disclose that nearly a third of its mDAU sees no ads.*** Twitter's own internal data demonstrates that more than 65 million mDAU in Q1 2022—nearly a third of the 229 million reported total for that quarter—do not appear to be seeing any ads. This is a shocking revelation. Twitter states that mDAU includes accounts accessing Twitter (a) through ***twitter.com*** or (b) through Twitter applications ***that are able to show ads.***[19] No one reading Twitter's disclosures would think that nearly a third of Twitter's mDAU in fact see no ads and appear to generate no revenue at all.

169. ***Twitter failed to disclose that a minimal portion of users drive a majority of revenue.*** Moreover, despite Twitter's grouping together all "monetizable" users into one "mDAU" population, its disclosures to the Musk Parties have revealed that there are in fact important differences between different users.

170. mDAU can be broken into four groups based on Twitter's internal data. The first group, 29% of mDAU, is that discussed above which sees no ads and

---

[19] In Q4 2021, Twitter "updated our mDAU definition . . . to also include 'paid Twitter products, including subscriptions," however Twitter also represented that "[t]his change had no material impact on the number of mDAU reported in the fourth quarter of 2021, and is unlikely to do so in the near future."

appears to generate no revenue, despite being called "monetizable." The second group, which is 41% of mDAU, sees very few ads and generates little revenue (estimated at roughly $0.38 per user per month, or $107 million per quarter in total, based on data provided by Twitter). The third group, which is 24% of mDAU, sees some ads and generates some revenue (roughly $3.16 per user per month, or $512 million per quarter). The last group of power users, a mere 7% of mDAU, views lots of ads and generates the most revenue per user (roughly $11.55 per user per month, or $527 million per quarter).

171. In short, Twitter's internal data indicates that 70% of its mDAU are worth approximately $0 to $0.01 per day and generate only about 10% of its revenue, while a small group representing 7% of Twitter's mDAU generates more than 50% of its total ad impressions and revenue. Any public disclosure of this stratification of mDAU to investors would have enormous implications. If all mDAU generate similar revenue, then Twitter's strategy of maximizing mDAU growth makes sense. But, if only a small percentage of users are generating significant revenue, then indiscriminately maximizing total mDAU may not grow revenues and it means Twitter's revenues are more susceptible to large declines based on declines in engagement from a small subset of users. Indeed, documents produced in discovery demonstrate that internally Twitter recognized that declines in engagement from

75

Twitter's "most engaged" or "heaviest" users were responsible for engagement declines across the Twitter platform.

172. Specifically, while Twitter represented that the "best way to measure" the engagement of Twitter's user base was by looking at Twitter's mDAU, Twitter's internal documents revealed that Twitter monitored specific engagement metrics, such as UAM and UAM/mDAU and treated those metrics, and not mDAU, as the measurement of Twitter's user engagement.

173. And in contrast to the misleading suggestion that engagement was increasing—the inference created by Twitter's claim that the best way to measure engagement was mDAU and mDAU growth, which were increasing—engagement in 2021 was, at best, stagnant and, at worst, declining.

174. For example, Twitter's own internal documents show that UAM/mDAU declined *every single quarter* in 2021, both relative to the prior quarter and relative to the same quarter a year earlier:



76

175.   In other words, although Twitter was nominally adding new mDAU, mDAU were, on average, less engaged than they had been in prior quarters and years. Notably, Twitter's documents also show that even total UAM—the total amount of time that mDAU were collectively spending on Twitter—was declining or stagnant. In other words, although there were *more* mDAU, the total number of hours spent by that larger universe was either lower or flat relative to prior quarters when the total number of mDAU was *lower*.



|  | 2020 Q4 | 2021 Q1 | 2021 Q2 | 2021 Q3 | 2021 Q4 |
|---|---|---|---|---|---|
|  | 6.40 | 6.30 | 6.12 | 6.18 | 6.14 |
| YoY | 16% | 0% | -13% | -8% | -4% |
| QoQ | -5% | -2% | -3% | 1% | -1% |

176.   Twitter was aware of these negative trends at the time it issued its 10-K and at the time it entered into the Merger Agreement.  In fact, Parag Agrawal wrote to Twitter's head of data science—who was responsible for building Twitter's mDAU forecast model—and described the declining UAM figures as "concerning." Twitter's head of data science responded that "the UAM decline is very concerning"

and that other engagement measured had been "declining in concert with UAM per mDAU for the engaged user segment for the last 18 months."

177. Thus, while Twitter represented that increased engagement was "critical" to the success of Twitter and that decreased engagement could materially harm Twitter's business, Twitter was aware of its negative engagement trends—which it considered "concerning"—but failed to disclose those trends to investors. Instead, Twitter continued to falsely claim that mDAU was the "best way to measure engagement." These undisclosed facts rendered the statements above materially false and misleading.

178. Rather than disclose that Twitter makes almost all its revenues from a small group of users—whose engagement levels were declining—and virtually no revenues from the large majority of users, Twitter portrays a story in which all mDAU are contributing materially to the Company's engagement, ad engagement, and revenues. Indeed, Twitter scoffed at the idea that more specific "engagement" disclosures would be a more meaningful metric despite the fact that Twitter's internal data demonstrated that a small sliver of the most engaged users generate a disproportionate amount of its revenue and that the engagement of that group was declining.

78

179.    *Twitter failed to disclose that the vast majority of mDAU growth is not occurring among high-value users*.    In addition to concealing the highly-concentrated nature of its revenue-driving mDAU, Twitter failed to disclose that the mDAU growth it touted was disproportionately falling *outside* the highly-engaged group responsible for the majority of Twitter's ad engagement and revenues. Specifically, while Twitter touted its mDAU growth in 2021, Twitter failed to disclose that more than *half* of that growth was among the mDAU subpopulation that sees *zero ads*.    Meanwhile, Twitter also failed to disclose that *less than 1%* of the mDAU growth reflected growth within the highly-engaged user group that was responsible for the bulk of Twitter's engagement and revenue.    In other words, while the size of the user group who sees no ads grew at a rate of 27% over the period from Q2 2021 to Q1 2022, the highly-engaged group that sees half of all Twitter ads remained effectively stagnant in size over that same period.    Twitter failed to disclose that while mDAU is growing, the new users added contribute to revenue at significantly lower rates relative to the overall mDAU population.    Twitter, thus, misleadingly failed to disclose that mDAU growth would not fully drive actual revenue growth as the vast majority of its mDAU growth were not engaging with ads in any material way.    In other words, while Twitter was aware of the declining engagement of its user base, Twitter pointed to its increasing mDAU figures as

79

"proof" of increased engagement. But those additional mDAU were themselves *unengaged* users as evidenced by the nominal amount of revenue they drove and the drastic decrease in UAM/mDAU in 2021.

180. Twitter's disappointing second quarter 2022 financial results bear out the consequences of this misleading strategy. In the second quarter of 2022, Twitter grew its mDAU to 237.8 million, 16.6% higher than the second quarter of 2021. Yet, while its mDAU grew by nearly 17%, Twitter's revenue actually fell 1% from the second quarter of 2021. Twitter's decrease in revenue in the face of rapid growth of its "key" metric is further evidence that Twitter's reliance on the metric is a sham.

181. Twitter's risk warnings in the 2021 10-K also gloss over the significant flaws with Twitter's mDAU calculations. For example, the 10-K warns that "[t]o the extent our mDAU growth rate slows or the absolute number of mDAU declines, our revenue growth will become dependent on our ability to increase levels of engagement on Twitter, generate advertiser demand, and increase revenue growth from third-party publishers' websites and applications, data licensing and other offerings."

182. The statements in ¶¶175-77 were materially false and misleading because Twitter failed to disclose that the vast majority of mDAU do not contribute materially to revenue growth and, therefore, Twitter was already dependent on its

ability to increase levels of engagement—which was itself declining—specifically, because less than 1% of mDAU growth was falling within the highly concentrated group of highly-engaged users who saw the majority of ads on Twitter.

183.  In short, Twitter's heavy reliance on mDAU is a sham.  Twitter developed its own proprietary metric—one that it could easily grow without performing the hard work necessary to attract new, returning, highly active, legitimate users—and began promoting it to investors in an attempt to manufacture steady growth in share price even when financial results faltered.

### iii.    Twitter Misrepresented Its mDAU Figures By Double-Counting Accounts

184.  In addition to the false statements above, Twitter falsely represented the number of mDAU by double-counting certain accounts.

185.  Specifically, in its 2021 10-K, Twitter represented that it had 199 million mDAU in Q1 2021, 206 million mDAU in Q2 2021, 211 million mDAU in Q3 2021, and 217 million mDAU in Q4 2021.

186.  This statement was false and misleading because these figures were artificially inflated by Twitter's double-counting of accounts that were linked. Indeed, three days after the Merger Agreement was signed, Twitter restated and publicly disclosed that the mDAU figures in the 2021 10-K were false and that Twitter had overcounted mDAU by up to 1.9 million in each quarter.  By restating

81

its mDAU results, Twitter effectively acknowledged the materiality of its mDAU figures. At the same time, by restating its mDAU results to the decimal point, it conveyed false precision in this metric.

### G.    The Zatko Complaint Is Made Public Demonstrating Further Misrepresentations

187.    In a stunning series of revelations over the past few days, it has also become clear that several of Twitter's disclosures regarding information security and its legal compliance are materially misleading.

188.    Twitter has consistently obscured information regarding Zatko and information security issues. After signing the Merger Agreement, Defendants requested certain information about Twitter's technology and security infrastructure as a part of their pre-closing diligence. For example, through a May 20, 2022 diligence tracker, the Musk Parties requested information regarding Twitter's: "tech debt", "top three software initiatives"; "strategy for datacenters"; and "top three product initiatives." By June 16, 2022 these requests were either listed as "closed," reflecting that Twitter had informed Defendants that it had provided the requested information, or "partial," indicating some information had been provided.

189.    Rather that providing specific information that satisfied these requests, however, Twitter provided only generic information that suggested that all was well. At no point in time did Twitter disclose the explosive claims that it already knew

82

of—that in February 2022, Zatko had detailed a long list of critical information security concerns that had largely been ignored by Twitter. Defendants thus had the understanding that Twitter's security policies were up to par, that its datacenters were industry standard, and certainly that Twitter's software was not infringing on third-party intellectual property rights.

190. In fact, there was a much darker side to the story that Twitter never disclosed to the Musk Parties. On February 14, 2022, Zatko had submitted an internal report to Twitter detailing multiple, mission critical deficiencies regarding Twitter's internal security and its non-compliance with applicable laws and regulations. On July 6, 2022, Zatko filed a whistleblower complaint with the SEC, FTC, and Department of Justice expanding on his allegations in the internal complaint.

191. On July 28, 2022, when the parties were negotiating document custodians, Defendants requested that Twitter collect Zatko's documents. Defendants made this request based on public information that suggested that Zatko played a role in overseeing Twitter's efforts to combat false or spam accounts. Twitter flatly refused, telling Defendants that Twitter's internal files (which Defendants could not see) revealed Zatko to be irrelevant to this case. Twitter

83

doubled down on this claim in an August 11, 2022 filing, advising the Court that Zatko *"had no involvement in Twitter's effort to mitigate spam."* Dkt. 147 at 15.

192.    Twitter's claims regarding Zatko soon proved false when, on August 23, 2022, the Washington Post revealed the bombshell allegations in the Zatko Complaint. These allegations suggest that, Zatko, in fact, has information regarding the presence of spam accounts on Twitter. Twitter's reasons for fighting Defendants' efforts to review Zatko's custodial files soon became clear.

193.    Zatko is one of the most widely respected cybersecurity professionals in the country. Zatko began his computer science career as an ethical, or "white hat" hacker. White hat hackers search for vulnerabilities in the code of companies and government agencies, and then alert those entities about the vulnerabilities so that they can be fixed to prevent bad actors (or, "black hat" hackers) from exploiting the vulnerability. As part of this work Zatko developed a consistent, productive dialogue with the US government, including by testifying in front of the Senate Governmental Affairs Committee in 1998 regarding internet vulnerabilities. In 2000 he met with President Bill Clinton at a cybersecurity summit.

194.    In 2010 Zatko joined the Defense Advanced Research Projects Agency ("DARPA"), the Department of Defense's research and development arm, to help the department better prepare for cyberattacks and cyber espionage. During his time

84

at DARPA he won the Secretary of Defense Exceptional Public Service Award, the highest award the department offers.

195.    After leaving DARPA Zatko did special projects work for Google, Motorola Mobility, and Stripe.  He was recruited to Twitter in 2020 after a hack of Twitter's platform allowed teenagers to gain control of prominent accounts like President Barack Obama, President Joe Biden, Bill Gates, Jeff Bezos, and Elon Musk.  Zatko's official title at Twitter was "Head of Security."  Remarkably, according to Zatko, that incident took place as a result of a relatively simple scheme that involved exploiting the expansive security access available to a whopping 50% of Twitter employees.  Teenagers called Twitter employees pretending to be IT personnel and requested their passwords.  When a few Twitter employees fell for the scheme, those teenagers were able to use "God" controls to gain access to private data for prominent users.

196.    One Twitter insider claimed Zatko was recruited because he is a "hacker legend."  Zatko was charged with broad responsibility at Twitter, including overseeing Twitter's information and corporate security, privacy initiatives, information technology, and certain aspects of its efforts to combat false or spam accounts.  Roughly a year after Zatko joined Twitter, President Biden offered him the role of chief information security officer for the entire federal government.  Zatko

85

rejected this job because he believed improving Twitter's dire security situation was of such critical importance.

197. In his Complaint, Zatko detailed the wrongdoing he observed at Twitter. This Complaint describes Twitter's vulnerability to hackers and other malicious actors obtaining access to Twitter's user data, how Twitter is in material noncompliance with both an existing FTC Consent Order and data privacy, cybersecurity, consumer protection, and false advertising laws, and Twitter's liability to the holders of intellectual property undergirding Twitter's code.

198. Additionally, Zatko corroborates Defendants' allegations that Twitter is intentionally ignoring its issues with false or spam accounts in order to focus on increasing its user numbers and has taken steps to allow spam and false accounts to increase. Those steps have included efforts to disable "ROPO" one of Twitter's most effective anti-spam tools because ROPO incidentally decreased the number of mDAU, which Zatko confirmed had a false positive rate of less than 1%.

199. Indeed, Zatko alleges that "senior management had no appetite to properly measure the prevalence of bot accounts —because as Zatko later learned from a different sensitive source, they were concerned that if accurate measurements ever became public, it would harm the image and valuation of the company."

86

200. The Zatko Complaint also identifies numerous ways in which Twitter is in material non-compliance with its obligations under an FTC Consent Order and likely many other state and international other privacy, cybersecurity, consumer protection, and false advertising laws.

201. In 2010, following a major security breach at Twitter, the FTC filed a complaint against Twitter (the "FTC Complaint"), alleging that Twitter had woefully inadequate securities and privacy practices. The FTC alleged that Twitter's failure to implement reasonable security measures was the direct cause of the hack, which resulted in the intruders being able to "(1) gain unauthorized access to nonpublic tweets and nonpublic user information, and (2) reset any user's password and send unauthorized tweets from any user account." Among the FTC's allegations was that too many Twitter employees could access the Twitter systems that contain sensitive user data.

202. In March of 2011, to settle the FTC Complaint, Twitter entered into the Consent Order, in which Twitter agreed to fix the gaping holes in its security program. As part of the Consent Order, Twitter agreed to, *inter alia*: "establish and implement, and thereafter maintain, a comprehensive information security program that is reasonably designed to protect the security, privacy, confidentiality, and integrity of nonpublic consumer information"; "[identify] reasonably-foreseeable,

87

material risks, both internal and external, that could result in the unauthorized disclosure, misuse, loss, alteration, destruction, or other compromise of nonpublic consumer information or in unauthorized administrative control of the Twitter system"; and "design and implement[] reasonable safeguards to control the risks identified through risk assessment, and regular testing or monitoring of the effectiveness of the safeguards' key controls, systems, and procedures".

203. According to Zatko, Twitter has intentionally and knowingly violated the Consent Order. Indeed, the Zatko Complaint makes clear that Twitter still has systematic access control issues, which was one of the primary issues raised by the FTC in the FTC Complaint as a cause of Twitter's 2010 security incident.

204. The Zatko Complaint alleges that in 2021 (a decade after the Consent Order), *the percent of Twitter full time employees who still have access to sensitive systems at Twitter is still over 50%*. And the problem is getting worse, not better. Given that Twitter has over 7,000 employees, thousands of Twitter employees have access to systems which store sensitive personal user information. If even one of these employees goes rogue, he/she could steal sensitive user information (including user direct messages) or give access to Twitter's systems to other bad actors, who can put national security at risk.

88

205.    This exact situation played out in 2020 when, as noted above, teenage hackers were able to convince employees with access to Twitter systems to hand over effective control of the platform.  This breach thus resulted from the same underlying vulnerabilities that had led to the implementation of Consent Order in the first instance.  This kind of hack would have been much more difficult had Twitter limited the number of employees with this level of access.

206.    According to Zatko, after he was hired, he attempted to implement this fix and limit employees' internal access to the systems that allow engineers to change Twitter's core programming code and access sensitive personal user information. As he attempted to fix the issues he found that "[n]obody knew where data lived or whether it was critical, and all engineers had some form of critical access to the production environment."

207.    Twitter is also not complying with the security program that the FTC ordered that it should create.  For example, the Zatko Complaint states that Twitter's policies require that computer systems have the latest security updates installed, a standard industry practice to ensure that all servers are up to date on security fixes and patches.  ***However, 50% of Twitter's servers are running outdated operating systems and 30% are running outdated software.***  Twitter's non-compliance with

89

the very cybersecurity policies that the FTC has forced it to create has resulted in major security risks for Twitter and its users.

208. Despite being required under the Consent Order to "establish and implement . . . comprehensive information security program," the Zatko Complaint describes Twitter's failure to implement even basic security industry practices, such as code reviews to ensure that software code is free of security issues.

209. Twitter's failure to comply with the Consent Order has not been without consequence. According to the Zatko Complaint, Twitter had a "near continuous number of security and privacy incidents" in 2021, none of which were disclosed in its 2021 10-K. And notably, nearly 63.4% of the security breaches at Twitter were caused by "access control" issues, the exact cause of the 2010 security breach that led to the Consent Order. Thus, according to Zatko, Twitter has flouted the Consent Order and its users are suffering the consequences.

210. On August 5, 2022 Twitter revealed that a data breach occurred in July 2022 that resulted in hackers accessing information from 5.4 million Twitter users. The hackers were able to access this information through a bug in Twitter's system whereby if someone submitted a phone number or email address to Twitter's systems, those systems would respond by telling the hacker with which account that information was associated.

90

211. Even more shockingly, Twitter's non-compliance with the Consent Order does not appear to be the result of simple negligence. Instead, according to the Zatko Complaint, these non-compliance issues have repeatedly put in front of Agrawal, who has intentionally obfuscated and buried these issues in order to focus on increasing mDAU, in an attempt to pump executive bonuses and the share price of the company.

212. Further, the Zatko Complaint explains in minute detail how Twitter's internal security program is materially deficient, with those deficiencies having potentially disastrous consequences for Twitter's business and national security.

213. These deficiencies are myriad. For example, Twitter had no adequate monitoring system to determine if its user data was adequately protected, if its data center servers could be compromised, or if its employees' hardware contained adequate security software.

214. Indeed, thousands of Twitter employees apparently have the ability to compromise the platform as a whole. As described further above, nearly half of Twitters' employees have access to sensitive user data, an issue that caused the FTC to investigate Twitter in 2010 and impose the Consent Order in 2011.

215. According to Zatko, Twitter also does much of its software development and testing on live production data, rather than in a sterile testing

91

environment with test data.   This means that any new software that Twitter deploys that has untested bugs could lead to service disruptions for Twitter, or even worse, loss or unauthorized access to sensitive user data.

216.   Zatko further describes that Twitter does not delete user data after those users delete their accounts, sometimes because Twitter has *simply lost track of the user data*.  Rather than rectify this problem, Twitter instead misleads regulators into believing that it deletes the data it is required to.

217.   Because of these issues, Twitter suffers from far more major security incidents than other, comparable companies.

218.   According to Zatko, he first raised these concerns to Twitter's board in the first quarter of 2021.  Unhappy that a newcomer was detailing issues with the site, some Twitter senior executives (led by Agrawal) began pushing back on Zatko and warned him to not present this information to Twitter's board.  Instead, as Zatko alleges, he was ordered to present misleading, or outright false, information to the board to create a false impression that the company's security situation was adequate.

219.   Perhaps most concerning, the Zatko Complaint alleges that Twitter's data centers are at material risk of being rendered non-operational by Twitter's security issues.  Since Twitter processes enormous amounts of data each day (comprised of the tweets and messages that, for all intents and purposes, make

Twitter "Twitter,") the platform's existence requires a functioning data center infrastructure. An event that materially impacted the operations of these data centers would cause Twitter to cease functioning.

220.  Yet, despite the centrality of data centers to Twitter's operation, Zatko observed that Twitter's data centers were running on such deficient technology that they would be vulnerable to routine issues that other companies would weather. While a widespread data center outage could affect any company, it would impact Twitter far more severely. For example, given Twitter's poorly run data centers and virtually non-existent disaster recovery program, certain routine issues could result in Twitter being shut down for an indefinite time, with a minimum outage estimated to last "weeks to months." These small outages can result from bad software patches, and are thus not uncommon events.

221.  The Zatko Complaint explains that Twitter nearly suffered such a shutdown in 2021. This near-catastrophe was triggered when Twitter's primary data center experienced difficulties such that Twitter's operations were required to be moved elsewhere.  But, rather than a seamless transition (as would occur at companies with appropriately maintained infrastructure) Twitter's other data centers struggled to adjust. This led Twitter's engineering team to warn that all of these data centers would cease operating simultaneously, shutting down Twitter's platform.

93

And, because Twitter does not have adequate processes to reboot these data centers, such a shutdown would have extended for, at a minimum, weeks. Zatko had made Twitter's leadership aware of precisely this threat months earlier, but he was ignored. In particular, Zatko had informed Agrawal about this threat while Agrawal served as Twitter's Chief Technology Officer.

222. Third, the Zatko Complaint describes serious intellectual property violations that give rise to significant undisclosed intellectual property liability. Specifically, according to the Zatko Complaint, Twitter's machine learning processes are premised on intellectual property of which Twitter has no ownership.

223. Zatko points out that Twitter's senior leadership has been aware for years that the company does not hold the appropriate licenses for intellectual property used in building certain of Twitter's machine learning models. Despite this awareness, Twitter has apparently done nothing to either acquire the necessary licenses or build the machine learning models based off licenses they do possess.

224. Machine learning is the process by which an algorithm is fed certain historical data in order to more accurately predict future outcomes. For example, if an algorithm is designed to classify a tweet as "spam" or "not spam," machine learning is the process by which data is fed to that algorithm to help improve its identification of spam accounts. While the algorithm may initially only have a low

94

chance of making a correct determination, by relying on machine learning processes the algorithm improves its selection results with each set of data it analyzes.

225. Twitter, at bottom, is a company that offers a product built on its proprietary code. If some of that code involves machine learning algorithms that are built with data sets or software that Twitter had no right to use, then every second of Twitters' operation is a violation of the rights of the underlying intellectual property holders. The potential liability here is enormous. First, as Zatko identifies, if the relevant holders of intellectual property were to discover Twitter's improper use, they could seek injunctive relief. This could shut down essential Twitter functions, or the entire platform, for the duration of such litigation. Even if those holders did not seek injunctive relief, they could file suit seeking enormous damages because their intellectual property is repeatedly being infringed, and Twitter may be deriving substantial revenues from its infringement.

226. Before Zatko joined Twitter the FTC had inquired into these machine learning models. Rather than truthfully answer the FTC and acknowledge that certain of the company's models were infringing on intellectual property, Twitter's executives apparently only directed the FTC towards the models that would not reveal any intellectual property infringement.

95

227. This ongoing misuse of intellectual property and potential resulting liability is not disclosed in Twitter's SEC filings.

228. Last, Zatko describes how the Indian government had forced Twitter to hire government agents. These agents had "direct unsupervised access to the company's systems and user data" that would allow them to both collect sensitive user information and to manipulate the platform. This demand, as well as Twitter's acquiescence, was never disclosed to the Musk Parties or in Twitter's SEC filings.

229. Soon after joining Twitter Zatko made a presentation to Twitter's executive leadership regarding his initial assessment of the company's security and compliance deficiencies. While some executives were extremely troubled by what Zatko reported, Agrawal, then the Twitter Chief Technology Officer, became defensive and pushed back on Zatko's assessments. Zatko was subsequently instructed to not present his written report to the Twitter board.

230. Zatko eventually was able to bring his concerns to the attention of the Risk Committee of Twitter's board. But, in doing so, Zatko learned that Twitter's leadership, including Agrawal, were providing misleading information to this Committee, or withholding information altogether. Specifically, Zatko alleges that Agrawal expressly instructed Zatko to provide misleading information to this Committee at a December 9, 2021 meeting. These materials included misleading

96

information regarding: (1) the security of Twitter's employee's computers; (2) Twitter's compliance with the Consent Order; and (3) the frequency of security incidents at Twitter. Zatko refused, and he prevented the misleading materials from being shared by others.

231. According to Zatko, Agrawal pushed back, and false and misleading information was presented to the Risk Committee on December 14, 2021. When Zatko learned that the board had been misled, he raised the issue Agrawal and Twitter's Chief Compliance Officer, including by sending an email on January 4 describing the information Agrawal was pushing Zatko to provide to the Risk Committee as "fraudulent." An investigation was initiated and Zatko was interviewed on January 11, 2022.

232. On January 18, 2022, Zatko alleges that he told the Chief Compliance Officer that he would provide corrected materials to the Risk Committee.

233. Apparently, infuriated by Zatko's refusal to play ball, Agrawal, who had been promoted to CEO two months prior, terminated Zatko on January 19, 2022.

234. Despite his termination, Zatko believed he had an obligation to provide Twitter with complete information about the company's problems. As such, he drafted a report summarizing a subset of the issues he encountered and sent that

97

report to Twitter on February 14, 2022 two days before the release of Twitter's 10-K. Twitter did not include any of the information in Zatko's Complaint in its 10-K.

235.  Zatko subsequently filed his full whistleblower Complaint with the SEC, FTC, and Department of Justice on July 6, 2022.  Defendants did not have any communications with Zatko while he was drafting his Complaint, and only learned of its existence from the Washington Post's reporting.

236.  The public's reaction to Zatko's Complaint was immediate and serious. The day the public learned of the allegations, Twitter's stock fell over 7%.  The next day, on August 24, the Senate Judiciary Committee announced "a full Committee hearing to investigate allegations of widespread security failures at Twitter and foreign state actor interference on Tuesday, September 13 at 10am."  Zatko will testify at the hearing to discuss his allegations.

237.  That same day the data privacy authorities for both Ireland and France confirmed they were investigating the allegations in the Zatko Complaint.  Twitter has previously been fined for violating Ireland's data privacy protection laws.

238.  The revelations in the Zatko Complaint demonstrate that Twitter's representations in Sections 4.5, 4.8, and 4.14 of the Merger Agreement are false, and reveal further misstatements in Twitter's SEC filings in violation of Section 4.6 of the Merger Agreement.

239.    Section 4.5(b) represents that Twitter is in compliance with any "Law" applicable to the company. The Merger Agreement's definition of "Law" includes "orders, judgments or decrees promulgated by any Governmental Authority." This includes the Consent Order and state, federal, and international laws.

240.    Section 4.8 represents that "The Company has disclosed . . . any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." As the executive who signs Twitter's SEC filings, Agrawal has a significant role in Twitter's financial reporting.

241.    Section 4.14(b) represents that Twitter is in compliance with all applicable laws regarding "privacy, data protection" and the collection and use of "personal information" of all of its users. This representation was false.

242.    As described at *supra* 193-229, these representations were false.

243.    Twitter is in material non-compliance with the Consent Order, which is defined as a "Law" in the Merger Agreement for, at least, the following reasons

- While the Consent Order requires Twitter to maintain a security program designed to protect user data, Twitter continues to rely on servers and operating systems that are so out of date that they do not have appropriate security updates and patches installed, nor do they run adequate security software.

- While the Consent Order requires Twitter to monitor the effectiveness of the company's "key controls, systems, and procedures," Twitter still allows 50% of its employees access to the systems housing this data.

99

This means thousands of Twitter employees who are either careless or malicious can give third-parties access to Twitter's most sensitive data. Indeed, this very circumstance occurred with the regard to the 2020 hack. Further, Twitter has not even implemented standard practices like proper code testing and deployment (including not testing on production code) and code reviews to ensure that software is not compromised.

- Twitter's non-compliance with the Consent Order has resulted in a near continuous stream of security incidents. Many of these are caused by identical issues that were specifically identified in the FTC Complaint.

244. Moreover, Twitter's conduct with Zatko's allegations that Twitter granted Indian officials access to user data also constitutes a violation of the law.

245. Twitter's representation at Section 4.8 of the Merger Agreement that Twitter had disclosed "any fraud . . . whether or not material that involves management or other employees who have a significant role in the Company's internal control over financial reporting" was false when made because Agrawal and other unnamed executives were providing false and misleading information to Twitter's board in order to cover up the company's dismal security situation.

246. Section 4.14(b) also represents that Twitter is not conducting its business such that it "infringe[s], misappropriate[s] or otherwise violate[s] any Intellectual Property Rights of any other Person." This representation was false. Instead, algorithms at the heart of Twitter's platform were crafted with data and software that Twitter did not have a license to use. This results in an ongoing violation of the intellectual property rights.

100

247.   In addition, the information revealed in the Zatko Complaint further demonstrates that Twitter's representation in Section 4.6 of the Merger Agreement false.  Specifically, while Twitter represented that no documents it filed with the SEC since January 1, 2022, "contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein . . . not misleading," the Zatko Complaint revealed that Twitter's SEC filings contained untrue statements of material fact, omitted material information required to be disclosed, and/or omitted to state material facts necessary to make the statements therein not misleading by failing to disclose the information contained in the Zatko Complaint.

248.   For example, Twitter's 2021 10-K disclosed that "concerns related to . . . privacy, data protection, safety, [and] cybersecurity" "could potentially negatively affect mDAU growth and engagement" while omitting the significant privacy, data protection, safety, [and] cybersecurity risks Zatko alerted the board of prior to the filing of the 10-K.

249.   Similarly, Twitter represented it "strive[s] to comply with applicable laws and regulations relating to privacy, data protection, and cybersecurity" while failing to disclose that Twitter was ignoring Mr. Zatko's warnings that the company was in violation of privacy, data protection, and cybersecurity laws and regulations.

101

250. The 10-K further discloses that "[w]e focus on improving the experience for people using our products and services, which includes measures to help protect the privacy of people on Twitter." This is false. Twitter instead keeps user data in such manners as to allow access to malicious actors, and ignored measures Zatko identified that would have allowed it to better protect this data.

251. Separately, Twitter discloses that "[t]here may be intellectual property or other rights held by others, including issued or pending patents, that cover significant aspects of our products and services, and we cannot be sure that we are not infringing or violating, and have not infringed or violated, any third-party intellectual property rights or that we will not be held to have done so or be accused of doing so in the future . . . In addition, we may have to seek a license to continue practices found to be in violation of a third-party's rights." This disclosures false implies that Twitter does not have extant intellectual property liabilities.

252. Moreover, Twitter discloses that "[w]e have implemented a disaster recovery program, which allows us to move production to a back-up data center in the event of a catastrophe." This disclosure is false. According to the Zatko Complaint Twitter has no such program, and even minor outages at its data centers would cause Twitter's entire platform to shut down, perhaps indefinitely.

102

253. Twitter also discloses that "[o]ur prioritization of the long-term health of our service may adversely impact our short-term operating results." But, as described by Zatko, Twitter does not prioritize the long-term health of its service. Instead, it does not adequately combat the prevalence of false or spam accounts on the platform, instead focusing on relentless mDAU growth.

## H. Twitter Knowingly, Or At Least Recklessly, Made False Representations

254. Twitter has reported its mDAU count since its 2018 10-K, and consistently represents that genuine human accounts comprise at least 95% of this monetizable population. In reality, as discussed above, preliminary estimates based on only the 30% of mDAU visible in the Twitter Firehose already indicate that one-third of visible accounts and 10% of the mDAU count may be made up of false or spam accounts.

255. Twitter's less-than-5% representation is so far afield from a reasonable false or spam count that it cannot have been the result of a good-faith process. Twitter could only have disclosed that it has 229 million "monetizable" daily active users, with only 5% being comprised of spam accounts, either knowing such a disclosure was false, or being reckless as to the truth given that such a large portion of visible accounts appear to be false or spam accounts. Moreover, Twitter's board had access to spam "prevalence" reports performed by a third-party that

103

demonstrated a materially higher amount of false and spam accounts than 5%, and nearly 9x higher than what Twitter's internal "calculations" showed.

256.    At the very least, Twitter is reckless as to the falsity of its mDAU metric. Twitter represents in its 2021 10-K that its mDAU calculation is based on "reasonable estimates for the applicable period of measurement," that its spam account calculation is based on an "internal review of a sample of accounts," that the company is "continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU" and that "we regularly review and may adjust our processes for calculating our internal metrics to improve their accuracy."

257.    These representations communicate that Twitter has an established process for determining its mDAU count as well as the accounts that must be removed from mDAU because they are non-monetizable false or spam accounts. But, in reality, Twitter employs no such reasoned process. In particular, Twitter knows that it determines the 5% spam representation from a human review of a sample of only 100 accounts each day. It does not perform even the most basic of human-verification processes—such as contacting the sampled accounts to determine if they are real, including by sending an email, text, or even a push notification on Twitter requiring them to enter a CAPTCHA. Twitter does not

remove suspended accounts (which Twitter otherwise does not count as monetizable) from previous mDAU calculations—***even when they are suspended for spam within the same quarter***. And, Twitter does not leverage its learning from suspending accounts into its process for identifying spam accounts, despite its representation to the contrary.

258. Additionally, as Agrawal's text to Musk on April 8, 2022 revealed, even he recognized that Twitter "should be catching" false or spam accounts, *see supra* ¶49. Twitter's reliance upon an unsound process is even more misleading when Twitter has access to data suggesting that its methodology is flawed, and that false or spam accounts may be active on the platform for extensive periods before they are caught. For example, Twitter's own data regarding suspensions, as provided to the Musk Parties, shows that millions of accounts suspended in any given quarter were counted in mDAU in at least one quarter ***preceding*** their suspension. Rather than revisiting its 5% estimates when seeing this data quarter after quarter, Twitter buries its head in the sand.

259. Twitter's failure to critically assess its own systems is even more alarming in light of the news that Twitter is receiving significantly more sign ups per quarter in recent years, despite plateauing revenues. For example, approximately 100 million users signed up between the first quarter of 2021 and the first quarter of

105

2022, but Twitter's revenue actually *declined* from the second quarter of 2021 to the second quarter of 2022. It is likely that much of this increase is due to increased sophistication of false or spam accounts while Twitter allows its processes to stagnate.

260. Further supporting evidence of intent is that Twitter has taken active steps to *remove* anti-spam restrictions. For example, Twitter executives removed restrictions created to combat spam in India, Nigeria, and Indonesia. As Zatko has confirmed, these restrictions had a false positive rate of less than 1 percent thus demonstrating that Twitter knowingly allowed increased spam and false accounts in order to boost mDAU.

261. Twitter and its executives also have a strong motivation and opportunity to guide investors to rely on an easily manipulable metric in evaluating the company, because that metric determines those executives' compensation. Prior to 2020, Twitter's performance-based executive incentive compensation plans were based only on financial metrics like revenue, operating income, and adjusted EBITDA. In 2020, Twitter introduced a cash bonus scheme for its executives in order to offer some increased short-term incentives, but the Company "did not achieve the revenue and profitability expectations set by our compensation

committee", resulting in Twitter only funding 32% of the target of that cash bonus pool.

262.   The following year, in 2021, Twitter "broaden[ed]" its cash executive compensation plan funding metrics to include a target mDAU—a metric that is much easier to manipulate than revenue or income.  At its 2021 Analyst Day, Twitter's executives promptly set a target to grow mDAU to 315 million mDAU by 2023, and began pushing for mDAU growth at all costs.

263.   When Twitter announced its goal of 315 million mDAU, the market was initially skeptical, as reflected by a drop in Twitter's stock price following Analyst Day.  Twitter nevertheless proceeded with making mDAU growth its core focus, and with mDAU included in the executive compensation format, Twitter's 2021 executive cash bonuses were funded at 100%.

264.   In March 2022, a month before Musk agreed to acquire the company, CFO Ned Segal admitted that "we're going to need to accelerate our [m]DAU growth in order to hit this 315 million target."  Having articulated a goal to the investing public—one that directly tied to their compensation—Twitter's executives were motivated to make sure that it met that goal.

265.   Twitter's documents also show Twitter was aware of its negative mDAU engagement trends.  For example, a presentation provided to Twitter's board

of directors prior to the filing of the 2021 10-K disclosed Twitter's declining engagement metrics. Similarly, Twitter's own CEO described the declining engagement metrics as "concerning," demonstrating his knowledge that these facts were material and harmful to Twitter's business and inconsistent with Twitter's public representations. Twitter also had a strong motive to not disclose the imminent mDAU recast. Signing the Merger Agreement mooted the need for an April 28 Q1 earnings call with analysts, on which Twitter would have offered guidance on its Q2 performance. By this time Twitter was far enough into the second quarter that it would have known it was poised to dramatically miss Wall Street's revenue and EBITDA targets, and would have been required to truthfully answer analyst questions regarding these trends. These disclosures would have alerted the Musk Parties that Twitter's value was declining, which could have delayed the acquisition and resulted in a lower acquisition offer. Desiring to lock in the $54.20 price on April 25, Twitter stayed silent, avoided the need for an earnings call, and kept the Musk Parties in the dark about its looming financial difficulties.

266. Outside of Twitter's public disclosures there is little visibility into Twitter's user data, which includes hundreds of millions of daily tweets from hundreds of millions of active accounts. Yet, the behavior of these users is essential to Twitter's advertisers, who only wish to target real human users with ads. Twitter

108

alone possesses the information necessary to determine this population. Yet, as explained above, while it would be most accurate to disclose information regarding the users who actually generate significant revenue, Twitter instead chose to highlight a metric that it knows is not the best predictor of revenue, but can easily report as growing to investors and meet analyst targets.

267. Transitioning users who do not generate any revenue into more active users, or adding new users who will actively use the platform, is no easy task. It requires creating a product that is enjoyable to use for extended periods, rather than one that merely has minimal sign-up barriers—a task that could take years to reach fruition. A company focused on adding these active users would invest substantial resources towards trying to improve Twitter to maximize engagement, such as by effectively targeting spam or false accounts, and would focus its disclosures on these highly active users who drive revenue. But, when the goal is to maximize total users, regardless of activity levels, the incentive is to lower barriers to entry. This allows Twitter to trumpet consistent user growth results to investors even when Twitter knows that such growth is not the best measure of future earnings potential.

268. Consistent with this pattern, Twitter also does not publish the methodology it follows to determine its mDAU count, or how it excludes non-monetizable accounts from that metric. Thus, it is extremely difficult for any third-

party to completely recreate Twitter's mDAU calculations. What Twitter has revealed to the Musk Parties in its disclosures to date indicate that this calculation procedure includes tens of millions of accounts that see no ads.

269. This dynamic gives Twitter near carte blanche to publish whatever user activity metrics it wishes. It is incentivized to report high mDAU numbers to stoke investor interest while having no third-party who is able to check the veracity of its reported figures.

270. Twitter has allegedly misled the market before regarding its userbase. In late 2014 and early 2015, Twitter was experiencing disappointing growth in its daily active user and user engagement metrics. Similar to what happened when Twitter switched from MAU to mDAU in 2018, Twitter allegedly responded to this failure by misleading the market about which metrics it was using and how those metrics were growing. In mid-2015, Twitter changed its leadership, including its CEO, and put out revised disclosures that contradicted its earlier, more optimistic disclosures, leading to a dramatic decline in Twitter's stock price. A securities class action suit was filed, with Twitter's motion to dismiss denied in late 2017. That case settled in September 2021, on the eve of trial, for $809.5 million, making it one of the highest securities class action settlements in history.

271. Twitter also knew the information disclosed in the Zatko Complaint.

110

272. The Zatko Complaint identifies non-compliance with the Consent Order that goes to the heart of Twitter's business. The Consent Order required Twitter to provide copies of the order to all of Twitter's "current and future principals, officers, directors, and managers, and to all current and future employees, agents, and representatives having responsibilities relating to the subject matter of this order." Thus, Twitter's leadership was aware of the obligations imposed by the Consent Order.

273. The 2020 hack led the FTC to investigate Twitter's compliance with the Consent Order. Zatko's Complaint describes how Agrawal was the Twitter executive with ultimate authority for correcting the security vulnerabilities exposed by the hack. Thus, Agrawal would have understood that other parts of Twitter's business were likewise in non-compliance with the Consent Order. Despite this knowledge, Twitter represented to the contrary in Section 4.5.

274. As for intellectual property violations, Zatko notes in his Complaint that Twitter's executives have been aware for years that Twitter's machine learning models relied on unlicensed intellectual property. He further notes that Twitter's executives candidly acknowledged that they misled the FTC regarding this infringement rather than attempt to rectify the underlying problem.

111

275.    Last, Zatko specifically advised Twitter's executives as to his concerns regarding Twitter's privacy and security situation.    In response, these executives, including Agrawal, lied to the Twitter board to cover up Zatko's findings, and eventually terminated Zatko.

## I.    Twitter's Representations Were Material

276.    Given that Twitter directly ties together its revenue and its mDAU, Morgan Stanley's model of Twitter's value used Twitter's mDAU as its starting point, and then built out Twitter's revenues from its mDAU assumptions.    *See supra* ¶51.    Twitter repeatedly emphasizes the importance of mDAU in its SEC filings, mentioning the metric nearly *100 times* in its 2021 10-K alone.

277.    That Morgan Stanley valued Twitter in this way made sense given that Twitter's disclosures and public statements emphasize the importance of its mDAU calculation,  and directly tie the company's revenue growth to mDAU growth.  For example, in Twitter's 2021 annual report, Twitter lists as its first business risk: "If we fail to increase our mDAU . . . our revenue, business and operating results may be harmed."  Because of Twitter's focus on mDAU (and mDAU growth) in its

112

disclosures, nearly all major Wall Street analysts focus on mDAU when assessing Twitter's future financial performance, and ultimately its value.[20]

278. Twitter's mDAU misrepresentations were material because they directly correlate to potential revenue from the Musk Parties' contemplated subscription model. Because Morgan Stanley's model uses the mDAU figure to estimate potential subscription revenue for a future Twitter, overstatements in mDAU caused the Musk Parties to seriously overvalue the Company's earning potential by exaggerating the number of potential subscribers.

279. Highlighting the importance of these metrics, Musk secured a representation in the Merger Agreement that Twitter's SEC disclosures were accurate in all material respects.

280. Had the Musk Parties been aware of the falsity in Twitter's SEC disclosures, and thus in the Merger Agreement, they would not have signed the Merger Agreement.

281. The revelations in the Zatko Complaint were also material.

---

[20] Jefferies Equity Research Report on Twitter dated February 10, 2022 ("Growth in mDAUs ... helps drive top line"; "Base Case . . . TWTR's platform has a highly engaged 200M+ daily user base"); Truist Securities January 10, 2022 Analyst Report ("FY23 revenue and mDAU guide implies growth acceleration"); Deutshe Bank Research March 10, 2022 Analyst Report ("our lower mDAU estimates, drives our FY23 revenue estimate of $7.27bn, modestly below guidance and street expectations of $7.34bn").

113

282. First, information that Twitter was not in compliance with the Consent Order is material. Similar non-compliance recently saw Twitter pay a $150 million fine. Further non-compliance would surely result in a larger penalty. Indeed, Facebook was required to pay a $5 billion penalty to the FTC in 2019 for a failure to properly protect private user data. Moreover, such non-compliance is likely to undermine user confidence in usage of the database and thus compromise the company's business model.

283. Second, Twitter's intellectual property infringement is material. If Twitter's core code is infringing on third party's intellectual property, than those parties can pursue action against Twitter that would either enjoin Twitter's use of such IP, shutting down Twitter's platform, or pursue enormous damages awards. These types of risk are undoubtedly material because they compromise Twitter's continuing viability as a going concern.

284. Third, as Twitter itself discloses "concerns related to . . . privacy, data protection, safety, [and] cybersecurity" "could potentially negatively affect mDAU growth and engagement." Thus, it was material that Twitter was aware of facts on the ground that significantly increased the likelihood of those concerns materializing. It is also material that Twitter's executives, including Agrawal, attempted to cover up Zatko's allegations by lying to Twitter's board.

114

**J.    Twitter Is Reasonably Expected To Experience A Material Adverse Effect**

285.    Independent of Twitter's fraud, since January, Twitter has suffered a Company Material Adverse Effect ("MAE") as defined in Article I of the Merger Agreement.

286.    The Zatko Complaint alleges that Twitter is in ongoing noncompliance with the Consent Order and other relevant laws and that much of Twitter's code infringes on the intellectual property rights of others.  Either of these revelations constitutes an MAE.

287.    The FTC has broad power to fine parties who are in non-compliance with consent decrees as well as to order injunctive relief.  Upon understanding that Twitter continues to violate the Consent Order, even after paying a $150 million fine in May 2022, the FTC is likely to pursue these remedies.  These actions are likely to be disruptive enough to Twitter's business as to cause constitute an MAE.  Other potential regulatory action, including by the Irish and French data protection authorities, could also result in an MAE.

288.    Additionally, the fact that Twitter's core code infringes on intellectual property rights is an MAE.  When the holders of this intellectual property are made aware that their rights are being infringed upon, and that Twitter may be earning billions of dollars from such infringement, then they are likely to bring suit for

115

injunctive relief and enormous damages awards. Such suits are likely to have material, duration impacts on Twitter's business and thus constitute an MAE under the Merger Agreement.

289. The market's reaction to the revelations in the Zatko Complaint confirm this. These allegations, when made public, caused a 7.3% decline in Twitter's stock price, from a close the previous day of $43.01 to a closing price of $39.86. This decline took into account the probability that these allegations were not true, and this decline took place in the context of Twitter claiming it will soon be acquired at a price of $54.20.

290. Separately, as explained above, mDAU is the metric Twitter discloses as most relevant to its present and future success. Following Twitter's lead, investors focus on this metric, and frequently ask detailed questions after each Twitter earnings release about Twitter's mDAU growth.

291. In fact, roughly 29% of Twitter's mDAU see no advertisements and appear to generate no revenue for the company. An additional 41% see almost no advertisements, and appear to generate less than 10% of Twitter's quarterly revenue. A mere 7% of Twitter's most active users appear to generate nearly half of the company's quarterly revenue. Twitter does not disclose these breakdowns to investors. Thus, despite investors' understanding from Twitter that total mDAU is

116

the most important metric to review when determining the company's business prospects, most reported mDAU have little relation to Twitter's revenue.

292.    Revealing to the market that Twitter's main performance metric does not drive the performance of the business, and that Twitter has been focused on growing this number instead of focusing on how to generate more revenue from existing users could result in a dramatic decrease in Twitter's valuation sufficient to constitute a MAE.

293.    Additionally, Twitter's inclusion of false or spam accounts has artificially inflated mDAU. As detailed above, initial analysis indicates that spam and false accounts comprise more than 5% of mDAU and represent a disproportionate percentage of mDAU that see advertisements. Revelations that the spam number has been undercounted would reasonably be expected to cause a material, durationally significant decrease in Twitter's value.

294.    None of the carveouts identified in Article I of the Merger Agreement apply.

295.    Because Twitter has suffered an MAE as defined in Article I of the Merger Agreement, Twitter cannot satisfy the representations and warranties in Sections 4.6, 4.7, and/or 4.9.

117

296.  More specifically, Twitter cannot satisfy its representation and warranty in Section 4.6 that its SEC filings did not contain "any untrue statement of a material fact or omit[] to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, not misleading"; it also cannot satisfy its representation in Section 4.7 that information in the Proxy Statement, as that term is defined in the Merger Agreement, lacks any misstatements or omissions; nor can it satisfy its representation in Section 4.9, which provides generally that between January and April 2022 there was no MAE.

297.  Under Section 7.2(b)(i) Buyers are relieved of their obligation to close if any representation and warranty is untrue at closing, and the result of that causes an MAE.  Under Section 7.2(c) Buyers are relieved of their obligation to close if Twitter has suffered an MAE for any reason.

298.  Twitter's failure to satisfy the representations and warranties in Sections 4.6, 4.7, and/or 4.9 has caused a failure of the condition to closing in Section 7.2(b)(i).  And Twitter has suffered an MAE, causing a failure of the closing condition in Section 7.2(c).  Accordingly, Section 8.1(d)(i) permits Buyers to terminate the Merger Agreement without paying the Termination Fee provided for in Section 8.3.

**K.    Twitter Failed To Disclose Litigation With And Investigations By The Indian Government**

299.    In 2021, India's information technology ministry imposed certain rules allowing the government to probe social media posts, demand identifying information, and prosecute companies that refused to comply.  While Musk is a proponent of free speech, he believes that moderation on Twitter should "hew close to the laws of countries in which Twitter operates."

300.    As a result of India's new rules, recent public reporting suggests that Twitter has faced various investigations by the Indian government, requests to moderate content, and requests to block certain accounts.

301.    India is Twitter's third largest market, and thus any investigation into Twitter that could lead to suspensions or interruptions of service in that market may constitute an MAE.

302.    Twitter did not disclose any such investigations to the Musk Parties, as required by Section 4.11 of the Merger Agreement.

303.    However, on or around July 6, 2022, Twitter launched a legal challenge against India's government in Court, challenging certain demands made by the Indian Government—suggesting that Twitter was under investigation between the signing of the Merger Agreement and the filing of its legal challenge.

119

**L.    Twitter Makes Key Decisions Outside The Ordinary Course Without Consulting The Musk Parties**

304.    Shortly after the Musk Parties' acquisition was announced, three senior Twitter executives announced they were departing the company—the company's Head of Data Science, the Vice President of Twitter Service, and a Vice President of Product Management for Health, Conversation, and Growth.    Additionally, despite knowing that Musk cared deeply about Twitter's product team, Twitter terminated the employment of the company's Revenue Product Lead and GM of Consumer without first consulting him.

305.    The Revenue Product Lead, Bruce Falck, played a central role in Twitter's "Bluebird" product business.    Falck was responsible for Twitter's revenue generation—obviously a critical component of any business—where he was intimately involved in supervising Twitter's advertising partnerships and promotions.

306.    Kayvon Beykpour, the GM of Consumer, was the head of all things consumer-facing for Twitter and took a high profile role on Twitter's investor calls. He was therefore one of the Twitter executives that the Musk Parties believe would have been most intimately involved with how Twitter calculated its mDAU, how it suspended or moderated accounts on its platform, and how it determined that there

120

was always less than 5% spam or false accounts within mDAU on every day of every month of every quarter for all time.

307.    Zatko was terminated by Twitter on January 19, 2022.  As discussed above at *supra* ¶¶ 229-33, Zatko's termination followed his informing Twitter's board about deficiencies in Twitter's data security program, and challenging misrepresentations Agrawal was making to Twitter's board regarding these deficiencies.  On April 15, 2022, Zatko's counsel sent Twitter a letter claiming that Zatko was wrongfully terminated.  Thereafter the parties "negotiat[ed] a severance package" and litigation was never filed.  On June 28, 2022, after the Merger Agreement was signed, Twitter and Zatko signed a Settlement Agreement and General Release.  As part of this agreement, Twitter paid Zatko and his counsel $7.75 million to resolve "claims related in any way to Zatko's employment with the Company, termination of employment, and relationship with the Company . . . ."  Of the $7.75 million total payment, approximately $5 million was paid to Zatko pursuant to a Form W-2.  Settlement Agreement and General Release § 5.  The agreement required Zatko to represent that he had "not filed any lawsuit, complaint with a government agency, or charge against the Company and/or the Releases."

308.    This severance payout thus was intended, in part, to prevent Zatko from making his whistleblower claims public.

121

309. Despite Section 6.1(e) affirmatively requiring Twitter to secure Defendants' consent before providing "any severance or termination payments" to a former employee unless such payment is in the ordinary course and consistent with Twitter's past practices, Twitter never requested such consent before making the $7.75 million severance payment to Zatko.

310. This failure to seek consent deprived Defendants of a core benefit of their bargain. While Twitter had sought to negotiate for a carveout of Section 6.1(e) that would offer freedom to make severance payments without having to seek consent, Defendants rejected those changes and the final Merger Agreement contains no such carveout. Apparently, not satisfied with the terms of the agreement it struck—or perhaps fearful that disclosing the nature of its settlement with Zatko would lead Defendants to ask questions that would reveal the severity of Zatko's allegations against the Company—Twitter neither sought consent nor even provided notice of the Zatko severance package agreement to Defendants.

311. Twitter also instituted a hiring freeze that extended to existing offers and terminated a third of its talent acquisition team. Contrary to what the Complaint implies, Twitter did not give notice nor request consent for these employment decisions. And while Musk believed that Twitter's workforce required right-sizing, he had bargained for a right to have a say in any such action and the ordinary course

provisions required Twitter to seek and obtain the Musk Parties' consent prior to instituting the plan so that Musk could determine whether it was properly targeted at resolving his concerns.

312. Additionally, in July 2022, Twitter determined to challenge the Indian government in a lawsuit rather than follow its instructions pursuant to 2021 Information Technology rules. In the past, Twitter has followed obligations imposed by governments, including going as far as blocking pro-Ukrainian accounts for the Russian government. Accordingly, its decision to challenge the Indian government's decisions is a departure from the ordinary course. And while the Musk Parties support free speech, they believe Twitter should follow the laws of the countries in which they operate. Regardless of how the Musk Parties would have decided to proceed, they bargained for the opportunity to understand the issues in the case, perform their own risk assessment, and have a say on strategy.

313. Twitter held its annual shareholder meeting on May 25, 2022. At that meeting, the shareholders rejected Twitter director Egon Durban's reelection to the board. As such, Durban tendered his resignation to Twitter's Nominating and Corporate Governance Committee. But, that committee did not accept Durban's resignation, and determined to keep him on the board. Twitter did not seek the Musk Parties' consent before rejecting the results of a shareholder vote.

123

314. The matters for which Twitter *did* request consent indicate that Twitter recognized it needed to request consent for these types of major actions. For example, Twitter sought the Musk Parties' consent for a formal retention plan. The Musk Parties withheld their consent because they did not believe, among other things, that the retention plan was sufficiently tailored to retain only top employees and that it would reward mediocre employees with unnecessary bonus payments. Consent to the plan was therefore reasonably withheld.

315. Indeed, Twitter approached the Musk Parties for consent on much more minor issues than those outlined above. On June 21, 2022, Twitter sought consent to engage Matthews South (a financial advisor) to negotiate a settlement of Twitter's accelerated stock purchase agreement, which the Musk Parties approved within days of the request. Similarly, on June 24, 2022, Twitter sought approval for a change to employee benefits regarding reimbursement for out of state travel; again, the Musk Parties provided consent within days. And on July 6, 2022, Twitter sought consent to create a plan to update the platform to allow monetary transfers, a request that the Musk Parties approved within one day.

316. As late as July 7, 2022, the Musk Parties approved a request by Twitter to make changes to their reseller program by switching to direct sales in certain markets. These issues—far more minor than those for which Twitter failed to even

124

seek consent, demonstrate that Twitter knew it should seek consent for major employment decisions. So too, do they lay waste to Twitter's false narrative that Musk has reflexively and unreasonably withheld consent for other actions.

317. Twitter's failure to seek consent for employee departures, its hiring freeze, and its lawsuit against the Indian government constitute material breaches of Section 6.1 of the Merger Agreement. That provision requires Twitter to "use its commercially reasonable efforts to conduct the business of the Company and its Subsidiaries in the ordinary course of business" between the date of the Merger Agreement and closing. If Twitter wishes to take action outside the ordinary course it must first obtain Buyers' consent. But, Musk and Buyers were not given notice of these employment changes or the decision to litigate against the Indian Government and were not asked to provide consent.

## M.    The Musk Parties Met All Of Their Contractual Obligations

318. As set forth above, the Musk Parties have repeatedly approved multiple consent requests by Twitter, thus complying with their obligations under Section 6.1. Contrary to Twitter's assertions, the Musk Parties have not improperly refused to consent to Twitter's (scattershot) requests under the ordinary course covenant, nor have they delayed responding to any of Twitter's requests for consent. Twitter has requested the Musk Parties ' consent under that covenant on six occasions, and the

125

Musk Parties approved four of those requests. In each instance that the Musk Parties provided their consent, such consent was given within a week.

319. The Musk Parties rejected just two requests for consent. Both rejections were proper exercises of the Musk Parties' rights under the Merger Agreement. The first was Twitter's June 14 request to terminate its revolving credit facility. On June 15, 2022, the Musk Parties rejected this request because they felt it was premature to terminate the company's existing revolving credit facility before the new revolving credit facility contemplated by the Musk Parties' new financing commitments had been put in place at the closing of the transaction. The second was Twitter's June 20, 2022 request to initiate an extravagant new employee retention program. On June 22, 2022, the Musk Parties rejected this request because they did not believe spending lavishly to broadly retain employees was consistent with Musk's post-closing plans for Twitter or what appeared to be a looming economic downturn that would put stress on the company's finances and potentially require headcount reductions to control costs.

320. Additionally, the Musk Parties complied with all obligations to obtain financing. Twitter complains that the Musk Parties asked Bob Swan, who the Musk Parties briefly engaged to assist with the transaction, to depart the deal team, but the Musk Parties have no obligation to use any particular professionals in closing the

126

deal. The Musk Parties quickly replaced Swan with Antonio Gracias, and Gracias dove in to the financing as soon as he was brought on. In any event, Twitter's reference to the removal of Swan from the team is a red herring—the Musk Parties' counsel were diligently working on obtaining financing up to the termination. For example, as late as June 27, 2022, the Musk Parties' deal counsel sent comments on the credit agreement back to Morgan Stanley (the lead arranger of credit for the transaction) and its counsel. And the Musk Parties' counsel continued having discussions with Morgan Stanley and its counsel about a perfection certificate, a necessary component of the debt financing for the transaction, right up to the afternoon of July 8, 2022.

## N.    The Musk Parties Properly Terminated The Merger Agreement And Twitter Brought Suit

321.    Due to Twitter's persistent disregard of its contractual obligations, on July 8, 2022, the Musk Parties terminated the Agreement. Until then, as discussed *supra* ¶¶310-12, the Musk Parties had met all their contractual obligations, devoting substantial resources to pursuing the transaction, including financing.

322.    On July 12, 2022, Twitter sued the Musk Parties, challenging not only their termination, but introducing blunderbuss claims regarding the Musk Parties' supposed breach of their obligations to close, consummate financing, provide

127

information, consent to operational changes, refrain from disparagement, and preserve confidentiality, most of which are premature and all of which are meritless.

## COUNT I
### Fraud

323. Defendants/Counterclaim-Plaintiffs hereby incorporate by reference each of the foregoing paragraphs, as if fully set forth herein.

324. Section 4.5 of the Merger agreement represents that "Neither the Company nor any of its Subsidiaries is in default or violation of any Law applicable to the Company, any of its Subsidiaries or by which any of their respective properties or assets are bound . . . ."

325. As described above, ¶¶197-207, 239, Twitter is in material non-compliance with the Consent Order and various state and international data, cyber security, consumer protection, and unfair business practice laws and regulations.

326. Thus the representations in Section 4.5 of the merger Agreement were false or misleading when made.

327. Section 4.6 of the Merger Agreement represents that Twitter's SEC filings have "complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents at the time it was filed" contain "any untrue statement of a material fact or omit[] to

128

state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, not misleading."

328. As described above, ¶¶129-82, 243-49; Twitter's Company SEC Documents contained numerous false and misleading statements and omitted material information for which disclosure was required.

329. Thus the representations in Section 4.6 of the Merger Agreement were false or misleading when made.

330. Section 4.8 of the Merger Agreement represents that "the Company has disclosed . . . any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

331. As described above, ¶¶225-30, 241 Agrawal and other Twitter executives made numerous false and misleading statements to Twitter's board or intentionally did not provide material information for which disclosure was required.

332. Thus the representations in Section 4.8 of the Merger Agreement were false or misleading when made.

333. Section 4.14 of the Merger Agreement represents that "the conduct of the business of the Company and its Subsidiaries as currently conducted does not

129

infringe, misappropriate or otherwise violate any Intellectual Property Rights of any other Person."

334. As described above, ¶¶218-23; 242, Twitter is infringing on the intellectual property rights of third parties.

335. Thus the representations in Section 4.14 of the Merger Agreement were false or misleading when made.

336. Twitter made these representations with knowledge that they were false or misleading, or with reckless disregard for their truth.

337. The representations were made with the intent to induce Defendants/Counterclaim-Plaintiffs into acquiring Twitter at an artificially inflated price.

338. Defendants/Counterclaim-Plaintiffs relied upon these representations in entering into the Merger Agreement.

339. Defendants/Counterclaim-Plaintiffs have been harmed as a result, and now thus seeks rescission of the Merger Agreement.

## Count II
### Violation of the Texas Securities Act
### (Tex. Gov't Code § 4008.052 et. seq)

340. Defendants/Counterclaim-Plaintiffs hereby incorporate by reference each of the foregoing paragraphs, as if fully set forth herein.

130

341. Twitter offered to sell and sold Twitter securities by means of written and/or oral communications which included false or misleading statements of material fact and/or omissions of material fact that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

342. Twitter made the offers to sell to Defendants/Counterclaim-Plaintiffs in Texas by, among other things, negotiating the terms of the Merger Agreement with Counterclaim-Plaintiffs and Mr. Musk while Mr. Musk was located in Texas and sending drafts of the Merger Agreement to Mr. Musk while he was in Texas. In addition, Counterclaim-Plaintiffs entered into the Merger Agreement with Twitter from Texas. Indeed, Twitter was aware that Counter-Claim Plaintiffs were located in Texas as the Merger Agreement explicitly provides that notices to Counterclaim-Plaintiffs be sent to Mr. Musk in Texas. At the time of the Merger Agreement, Defendants/Counterclaim-Plaintiffs did not know the false or misleading statements and omissions.

343. Had Defendants/Counterclaim-Plaintiffs known about the false or misleading statements and omissions, they would not have entered into the Merger Agreement and agreed to purchase the Twitter securities.

344. Twitter's offer and sale violated Tex. Gov't Code § 4008.052.

131

345.  Defendants/Counterclaim-Plaintiffs are therefore entitled to rescind the Merger Agreement pursuant to Tex. Gov't Code § 4008.052.

## COUNT III
### Breach of Contract

346.  Section 6.4 of the Merger Agreement requires Twitter to "furnish promptly" to Defendants/Counterclaim-Plaintiffs and their representatives "all information concerning the business, properties and personnel of the Company and its Subsidiaries as may reasonably be requested in writing, in each case, for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement . . . ."

347.  Section 6.11 of the Merger Agreement requires Twitter to provide information to Buyers to assist them in securing financing.

348.  Defendants/Counterclaim-Plaintiffs made information requests under these provisions on May 19, 2022, May 25, 2022, May 31, 2022, and June 6, 2022, which was for a reasonable business purpose related to the consummation of the transaction and to secure financing.  Twitter did not provide the requested information, relying on a series of extra-contractual justifications. On June 6, Defendants/Counterclaim-Plaintiffs asserted that Twitter was in breach of the Merger Agreement by refusing to provide the information.

132

349.   Twitter did not cure this breach.  Defendants/Counterclaim-Plaintiffs are thus entitled to terminate the Merger Agreement under Section 8.1(d)(i).

**COUNT IV**
**Breach of Contract**

350.   Section 6.1 requires Twitter to "use its commercially reasonable efforts to conduct the business of the Company and its Subsidiaries in the ordinary course of business" between the date of the Merger Agreement and closing.

351.   Twitter breached this provision by undertaking dramatic employment actions without first requesting the consent of Buyers, including but not limited to: terminating key employees, instituting a hiring freeze, refusing orders of the Indian government and subsequently initiating litigation in that country, and firing 30% of its recruiting workforce.

352.   Section 6.1(e) forbids Twitter from making any "severance or termination payments or benefits to any" former employee without first securing Defendants' consent, unless such severance payment is consistent with Twitter's past practices.

353.   Twitter breached this provision by making a $7.75 million severance payment to Zatko on June 28, 2022 without first seeking Defendants' consent.

354.   These breaches cannot be cured.  Defendants/Counterclaim-Plaintiffs are thus entitled to terminate the Merger Agreement under Section 8.1(d)(i).

133

## COUNT V
### Declaratory Judgment

355. Defendants/Counterclaim-Plaintiffs do not have to close the Merger Agreement if Twitter has suffered a MAE between signing and closing.

356. MAE is defined in the Merger Agreement as "any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole."

357. Twitter's failure to comply with the Consent Order and other applicable laws and its infringement of third-party intellectual property rights would breach Section 4.6 of the Merger Agreement because it will result or "would reasonably be expected to result" in a material adverse effect on the business, financial condition, or results of operations of the Company and its Subsidiaries.

358. Additionally, the revelation that Twitter's critical mDAU metric has little relation to the company's current or future value, as well as the revelation that the mDAU count is materially lower than disclosed would breach Section 4.6 of the Merger Agreement because it will result or "would reasonably be expected to result" in a material adverse effect on the business, financial condition, or results of operations of the Company and its Subsidiaries.

134

359. Section 7.2(b) excuses Defendants/Counterclaim-Plaintiffs of the requirement to close if a representation and warranty is untrue, and Twitter has suffered an MAE as a result. If Section 7.2(b)'s closing condition has failed Defendants/Counterclaim Plaintiffs may terminate the Merger Agreement under Section 8.1(d)(i).

360. Defendants/Counterclaim-Plaintiffs seek a declaration that an MAE has occurred under the Merger Agreement, and thus may terminate that agreement.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counterclaim-Plaintiffs respectfully request that the Court enter judgment:

A.    Rescinding the Merger Agreement, or, in the alternative;

B.    Finding that Twitter has breached Sections 6.1, 6.3, and/or 6.11 of the Merger Agreement, leading to the failure of a condition listed in Section 7.2(a), allowing Buyers to terminate under 8.1(d);

C.    A declaration that Twitter has suffered a Company Material Adverse Effect as a result of the falsity and/or breaches of the representations listed at Sections 4.5, 4.6, 4.8, 4.11 and/or 4.14 leading to the failure of a condition listed in Section 7.2(b), allowing Defendants/Counterclaim Plaintiffs to terminate under 8.1(d);

135

D.    An award of compensatory damages in an amount to be proven at trial; and

E.    Granting such other and further relief as the Court deems just and proper.

*    *    *

## ANSWER

Defendants, by and through their undersigned counsel, hereby respond to the Verified Complaint of Plaintiff, as follows:

Defendants deny any allegations made in the unnumbered headings contained in the Complaint. Defendants further deny each and every allegation set forth in the Complaint except for those allegations expressly and specifically admitted below.

## NATURE OF THE ACTION

1.    In April 2022, Elon Musk entered into a binding merger agreement with Twitter, promising to use his best efforts to get the deal done. Now, less than three months later, Musk refuses to honor his obligations to Twitter and its stockholders because the deal he signed no longer serves his personal interests. Having mounted a public spectacle to put Twitter in play, and having proposed and then signed a seller-friendly merger agreement, Musk apparently believes that he — unlike every other party subject to Delaware contract law — is free to change his mind, trash the company, disrupt its operations, destroy stockholder value, and walk away. This repudiation follows a long list of material contractual breaches by Musk that have cast a pall over Twitter and its business. Twitter brings this action to enjoin Musk from further breaches, to compel Musk to fulfill his legal obligations, and to compel consummation of the merger upon satisfaction of the few outstanding conditions.

136

**ANSWER:** Defendants admit that Musk entered into a Merger Agreement with Twitter, and respectfully refer the Court to that agreement for a complete and accurate description of its contents. Answering further, the remainder of Paragraph 1 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 1.

2. Musk, the Chief Executive Officer of Tesla, Inc. and leader of SpaceX and other entities, opened a Twitter account in 2009. His presence on the Twitter platform is ubiquitous. With over 100 million followers, Musk's account is one of the most followed on Twitter, and he has Tweeted more than 18,000 times. He has also suggested he would consider starting his own company to compete with Twitter.

**ANSWER:** Defendants admit that Musk is the Chief Executive Officer of Tesla, Inc., opened a Twitter account in 2009, has over 100 million followers, has tweeted more than 18,000 times, and is one of the most followed on Twitter. Defendants lack knowledge or information sufficient to form a belief as to the allegations that Musk's presence on the Twitter platform "is ubiquitous." Defendants deny the remainder of the allegations in Paragraph 2.

3. On April 25, 2022, Musk, acting through and with his solely-owned entities, Parent and Acquisition Sub, agreed to buy Twitter for $54.20 per share in cash, for a total of about $44 billion.

**ANSWER:** Defendants admit the allegations in Paragraph 3.

4. That price, presented by Musk on a take-it-or-leave-it basis in an unsolicited public offer, represented a 38% premium over Twitter's unaffected share price. The other terms Musk offered and agreed to were, as he touted, "seller friendly." There is no financing contingency and no diligence condition. The deal

137

is backed by airtight debt and equity commitments. Musk has personally committed $33.5 billion.

**ANSWER:** The third and fourth sentences of Paragraph 4 asserts legal conclusions and therefore do not require responses. To the extent Paragraph 4 refers to the Merger Agreement or to other documents, Defendants respectfully refer the Court to those documents for a complete and accurate description of their contents. Defendants otherwise deny the allegations in Paragraph 4, except to admit that the price Defendants offered represented a premium over the Twitter share price.

5.      After the merger agreement was signed, the market fell. As the *Wall Street Journal* reported recently, the value of Musk's stake in Tesla, the anchor of his personal wealth, has declined by more than $100 billion from its November 2021 peak.

**ANSWER:** Paragraph 5 purports to character the contents of a Wall Street Journal article, the contents of which speak for itself. Defendants deny the remaining allegations in Paragraph 5.

6.      So Musk wants out. Rather than bear the cost of the market downturn, as the merger agreement requires, Musk wants to shift it to Twitter's stockholders. This is in keeping with the tactics Musk has deployed against Twitter and its stockholders since earlier this year, when he started amassing an undisclosed stake in the company and continued to grow his position without required notification. It tracks the disdain he has shown for the company that one would have expected Musk, as its would-be steward, to protect. Since signing the merger agreement, Musk has repeatedly disparaged Twitter and the deal, creating business risk for Twitter and downward pressure on its share price.

**ANSWER:** Defendants deny the allegations in Paragraph 6.

138

7.      Musk's exit strategy is a model of hypocrisy.  One of the chief reasons Musk cited on March 31, 2022 for wanting to buy Twitter was to rid it of the "[c]rypto spam" he viewed as a "major blight on the user experience."  Musk said he needed to take the company private because, according to him, purging spam would otherwise be commercially impractical.  In his press release announcing the deal on April 25, 2022, Musk raised a clarion call to "defeat[] the spam bots."  But when the market declined and the fixed-price deal became less attractive, Musk shifted his narrative, suddenly demanding "verification" that spam was *not* a serious problem on Twitter's platform, and claiming a burning need to conduct "diligence" he had expressly forsworn.

**ANSWER:** Defendants admit that Mr. Musk tweeted on April 25, 2022 and refer the Court to that tweet for a complete and accurate description of its contents. Defendants also purport to quote a March 31, 2022 document, the contents of which speak for themselves.  Otherwise, Defendants deny the allegations in Paragraph 7, except to admit that Musk has sought certain information following the signing of the Merger Agreement pursuant to his rights under Section 6 of the Merger Agreement.

8.      Musk's strategy is also a model of bad faith.  While pretending to exercise the narrow right he has under the merger agreement to information for "consummation of the transaction," Musk has been working furiously — albeit fruitlessly — to try to show that the company he promised to buy and not disparage has made material misrepresentations about its business to regulators and investors. He has also asserted, falsely, that consummation of the merger depends on the results of his fishing expedition and his ability to secure debt financing.

**ANSWER:** Defendants deny the allegations in Paragraph 8.

9.      On July 8, 2022, a little over a month after first using bad-faith pursuit of spam-related evidence to assert a baseless claim of breach, Musk gave Twitter notice purporting to terminate the merger agreement.  The notice alleges three grounds for termination: (i) purported breach of information-sharing and

139

cooperation covenants; (ii) supposed "materially inaccurate representations" in the merger agreement that allegedly are "reasonably likely to result in" a Company Material Adverse Effect; and (iii) purported failure to comply with the ordinary course covenant by terminating certain employees, slowing hiring, and failing to retain key personnel.

**ANSWER:** Defendants admit that Musk gave notice to terminate the Merger Agreement on July 8, 2022, and refer the Court to that notice for a complete and accurate description of its contents. Defendants deny the remainder of the allegations in Paragraph 9.

10.     These claims are pretexts and lack any merit. Twitter has abided by its covenants, and no Company Material Adverse Effect has occurred or is reasonably likely to occur. Musk, by contrast, has been acting against this deal since the market started turning, and has breached the merger agreement repeatedly in the process. He has purported to put the deal on "hold" pending satisfaction of imaginary conditions, breached his financing efforts obligations in the process, violated his obligations to treat requests for consent reasonably and to provide information about financing status, violated his non-disparagement obligation, misused confidential information, and otherwise failed to employ required efforts to consummate the acquisition.

**ANSWER:** Paragraph 10 asserts legal conclusions and therefore does not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 10.

11.     Twitter is entitled to specific performance of defendants' obligations under the merger agreement and to secure for Twitter stockholders the benefit of Musk's bargain. Musk and his entities should be enjoined from further breaches, ordered to comply with their obligations to work toward satisfying the few closing conditions, and ordered to close upon satisfaction of those conditions.

140

**ANSWER:** Paragraph 11 asserts legal conclusions and therefore does not require a response. To the extent a response is required, Defendants deny the allegations in Paragraph 11.

## THE PARTIES

12. Plaintiff Twitter, Inc. is a Delaware corporation headquartered in San Francisco, California that owns and operates a global platform for real-time self-expression and conversation.

**ANSWER:** Defendants admit the allegations in Paragraph 12.

13. Defendant Elon R. Musk is a sophisticated entrepreneur who owns approximately 9.6% of Twitter's stock. He is the CEO of Tesla and leads SpaceX, among other entities he founded or co-founded. Musk is referred to in the merger agreement as Equity Investor, and is the President, Secretary, Treasurer, and sole shareholder of both Parent and Acquisition Sub. Musk signed the merger agreement on behalf of both Parent and Acquisition Sub, and agreed to be a party to the agreement in his individual capacity as Equity Investor with respect to several "Specified Provisions." Ex. 1, Preamble.

**ANSWER:** Defendants admit the allegations in Paragraph 13.

14. Defendant X Holdings I, Inc., or Parent, is a Delaware corporation formed on April 19, 2022 solely for the purpose of engaging in, and arranging financing for, the transactions contemplated by the merger agreement.

**ANSWER:** Defendants admit the allegations in Paragraph 14.

15. Defendant X Holdings II, Inc., or Acquisition Sub, is a Delaware corporation and a wholly owned subsidiary of Parent. Acquisition Sub was formed on April 19, 2022 solely for the purpose of engaging in, and arranging financing for, the transactions contemplated by the merger agreement.

**ANSWER:** Defendants admit the allegations in Paragraph 15.

## JURISDICTION

16.    This Court has subject matter jurisdiction under 10 *Del. C.* § 341, 8 *Del. C.* § 111(a), and 6 *Del. C.* § 2708.

**ANSWER:** Paragraph 16 asserts legal conclusions and therefore does not require a response.

17.    Personal jurisdiction over Parent and Acquisition Sub is proper because both are incorporated under the laws of Delaware and consented to jurisdiction by agreeing to "expressly and irrevocably submit[] to the exclusive personal jurisdiction of the Delaware Court of Chancery ... in the event any dispute arises out of [the merger agreement] or the transactions contemplated by [the merger agreement]."  Ex. 1 § 9.10(a).

**ANSWER:** Paragraph 17 asserts legal conclusions and therefore does not require a response.

18.    Personal jurisdiction over Musk is proper pursuant to 10 *Del. C.* § 3104(c)(1) because, among other things, (a) Musk formed Parent and Acquisition Sub, both Delaware corporations wholly owned by Musk, for the sole purpose of acquiring Twitter, a Delaware corporation; and (b) Musk agreed to undertake "reasonable best efforts" to consummate the contemplated transaction, including by causing Parent and Acquisition Sub to deliver a Certificate of Merger to the Delaware Secretary of State.  *Id.* §§ 2.3(a), 6.3(a).

**ANSWER:** Paragraph 18 asserts legal conclusions and therefore does not require responses.

## FACTUAL ALLEGATIONS

### I.    Musk sets his sights on Twitter

19.    Musk is active on Twitter's platform and has expressed a keen interest in the use and inherent potential of the platform.  Starting in January 2022, Musk began purchasing Twitter stock.  By March 14, 2022, he had secretly accumulated a substantial position — about 5% of the company's outstanding shares.  SEC

regulations required that he disclose that position no later than March 24, 2022. Musk failed to disclose, and instead kept amassing Twitter stock with the market none the wiser. By April 1, 2022, Musk had accumulated about 9.1% of the company's outstanding shares, still in secret. Not until April 4, 2022 did Musk finally disclose his holdings, which made him Twitter's largest stockholder. Twitter's stock price jumped 27% upon the disclosure. Between March 24 and April 4, over 112 million Twitter shares traded in ignorance of Musk's mounting ownership.

**ANSWER:** Defendants admit the first sentence of Paragraph 19. Defendants further admit the allegations in Paragraph 19 insofar as the percentages and dates are accurate. The remainder of Paragraph 19 asserts legal conclusions and therefore does not require a response. Defendant deny knowledge as to the knowledge of Twitters' other shareholders. To the extent any response is required, Defendants deny the remaining allegations in Paragraph 19.

20.    Meanwhile, on March 26, 2022, Musk spoke with two Twitter directors, Jack Dorsey and Egon Durban, about the future of social media and the prospect of Musk's joining the Twitter board. Soon after, Musk told Twitter CEO Parag Agrawal and Twitter board chair Bret Taylor that he had in mind three options relative to Twitter: join its board, take the company private, or start a competitor.

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 20, other than that Musk spoke to Jack Dorsey and Egon Durban on March 26, 2022. Defendants admit that Musk had a conversation with Parag Agrawal and Bret Taylor about different options relative to Twitter, but otherwise deny the remainder of the allegations in Paragraph 20.

143

21.    Musk would repeat this statement over the coming days.  His contemplation of building a rival platform to Twitter was not a secret.  On March 26, 2022, he had Tweeted that he was giving "serious thought" to the idea.

**ANSWER:** Defendants deny the allegations in Paragraph 21, other than to the extent it refers to the language in one of Musk's tweets.  Defendants respectfully refer the Court to that tweet for a complete and accurate description of its contents.  Defendants further admit that his tweet was publicly known, but otherwise deny the allegations in Paragraph 21.

22.    In early April, after further discussion among Musk, Agrawal, Taylor, and Twitter director Martha Lane Fox, chair of Twitter's nominating and corporate governance committee, the Twitter board evaluated Musk's candidacy as a director.  Having considered, among other things, Musk's interest in the platform, his technical expertise, and the perspectives he could bring, the board offered Musk the position on April 3.  Musk accepted, the parties signed a letter agreement, and the agreement was announced on April 5.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the allegations regarding what Twitter's board discussed, evaluated, or considered.  Defendants admit that the board offered Musk a position on April 3, that Musk initially accepted and signed an agreement, and that the agreement was announced on April 5.

23.    Not a week later, Musk abruptly changed tack.  On April 9, the day his appointment to the board was to become effective, Musk told Twitter he would not join the board.  Instead, he would offer to buy the company.

144

**ANSWER:** Defendants admit that Musk determined not to join the board on April 9, and that he informed Twitter that he would offer to buy the company. Defendants deny the remainder of the allegations in Paragraph 23.

## II.    Musk offers to buy Twitter

24.    On April 13 — four days after reversing course on the board seat — Musk texted Taylor that he planned to make an offer to acquire all of Twitter. His unsolicited offer, conveyed by letter later that day, was accompanied by a threat:

> I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.

**ANSWER:** Defendants admit that Musk sent Taylor a text on April 13 and that he sent a letter to Twitter that day. Defendants respectfully refer the Court to those documents for a complete and accurate description of their contents. Defendants deny the remainder of the allegations in Paragraph 24.

25.    The following day, on April 14, Musk announced his offer publicly and noted that it was conditioned on customary business due diligence and financing. At a public event the same day, Musk — whose enormous personal wealth exceeds the capital of most public companies — boasted that he could "technically afford" to purchase Twitter outright.

**ANSWER:** Defendants admit the allegations in Paragraph 25 regarding the date on which Musk announced his public offer, and that he stated he could technically

145

afford to purchase Twitter. Defendants lack knowledge or information sufficient

to form a belief as to the "capital of most public companies."

26. Also on April 14, the Twitter board met to discuss Musk's proposal. It established a transactions committee composed of independent directors Taylor, Lane Fox, and Patrick Pichette to evaluate the proposal, oversee negotiations, and explore strategic alternatives. The board was assisted in its review by Goldman Sachs and J.P. Morgan as financial advisors, and Simpson Thacher as independent counsel.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief

as to the allegations in Paragraph 26.

27. Faced with Musk's rapid accumulation of Twitter stock and take-it-or-leave-it offer, and concerned that he might launch a hostile tender offer without notice, the board adopted a customary shareholder rights plan to protect its stockholders from "coercive or otherwise unfair takeover tactics." The board took this action to reduce the likelihood of a takeover without payment of an appropriate control premium and to ensure that the board had sufficient time to make an informed judgment on Musk's or any other offer. Under the rights plan's terms, a single investor or group's acquisition of more than 15% of the company's outstanding common stock without board approval gives other stockholders the opportunity to acquire additional stock at a considerable discount. The plan was adopted and announced on April 15, 2022.

**ANSWER:** Paragraph 27 purports to characterize the terms of the rights plan,

which speaks for itself. Defendants lack knowledge or information sufficient to

form a belief as to the remaining allegations in Paragraph 27, except to admit that

the rights plan was announced on April 15, 2022.

28. The board's concerns proved well-grounded. Musk began making all-too-obvious public references to a hostile tender offer:



**ANSWER:** Defendants admit that Musk published the two quoted tweets, and respectfully refer the Court to those tweets for a complete and accurate description of their contents. Defendants deny the remainder of the allegations in Paragraph 28.

29.    At the same time, Musk worked to strengthen the offer he had made and might make by tender. By April 20, he had personally committed $21 billion in equity financing and lined up $25.5 billion of committed debt financing, with $12.5 billion of that secured by his Tesla stock.

**ANSWER:** Defendants admit that by April 20 Musk had personally committed $21 billion in equity financing, and had arranged for $25.5 billion of debt financing, including $12.5 billion secured by his Tesla stock. Defendants deny the remainder of the allegations in Paragraph 29.

30.    Having obtained these commitments, Musk announced in an April 21, 2022 securities filing that his offer was no longer conditioned on financing or subject to due diligence:

> At the time of delivery, the Proposal was also subject to the completion of financing and business due diligence, but it is no longer subject to financing as a result of the Reporting Person's receipt of the financing commitments ... and is no longer subject to business due diligence.

Musk proclaimed himself prepared to begin negotiations "immediately," and confirmed he was "exploring whether to commence a tender offer."

**ANSWER:** Defendants admit the allegations in Paragraph 30 to the extent they refer to Musk's filings, and respectfully refer the Court to those filings for a complete and accurate description of their contents.

31.    On Saturday, April 23, 2022, Musk asked to speak with Twitter representatives about his offer.  At the direction of the transactions committee, Taylor engaged with Musk, who reiterated that his offer was "best and final" and threatened once again to take it to Twitter's stockholders directly if the board did not engage immediately.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to what the transactions committee directed Taylor to do.  Defendants admit that on April 23, 2022, Musk asked to speak with Twitter representatives about his offer, that Musk spoke to Taylor, and that Musk stated his offer was "best and final."  Defendants deny the remainder of the allegations in Paragraph 31.

32.    The following day, on Sunday, April 24, 2022, Musk tried again to force Twitter's hand.  He delivered a letter to the board repeating that his $54.20 per share offer was "best and final," threatening once more to sell all of his shares if his bid were rejected, and saying he would propose a "seller friendly" merger agreement to be signed before the market opened the next day.  Musk's counsel sent over a draft agreement, reiterated that Musk's offer was not contingent on any due diligence, and underscored that the form of the proposed agreement was "intended to make this easy on all to get to a deal asap."

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to what motivated Twitter's negotiations.  Paragraph 32 purports to characterize the contents of the initial draft of the merger agreement and the final draft of the merger agreement, which speak for themselves.  Defendants deny the remaining

148

allegations in Paragraph 32, except to admit that certain language regarding hiring and firing was removed from the initial draft.

33.    The agreement was negotiated through the night and, in the process, became even more seller-friendly. Among the provisions not contained in Musk's proposal but included at Twitter's insistence were an undertaking by defendants, including Musk, to "take or cause to be taken ... all actions and to do, or cause to be done, all things necessary, proper or advisable" to obtain the financing (already committed) to consummate the transaction, Ex. 1 § 6.10(a); a clear disclaimer of any financing condition to closing, id. § 6.10(f); and a right on Twitter's part to request and promptly receive updates from Musk about his progress in obtaining financing, id. § 6.10(d). These provisions ensured that financing would be no obstacle to closing and that the company would have the right to stay informed of Musk's progress in arranging his financing.

**ANSWER:** Defendants admit the allegations in Paragraph 33 to the extent that the Merger Agreement was negotiated overnight and to the extent that they quote from the Merger Agreement. Paragraph 33 refers to the provisions contained in Musk's proposal and the agreement; Defendants respectfully refer the Court to that proposal and that agreement for a complete and accurate description of their contents. Defendants further aver that the remainder of Paragraph 33 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the remaining allegations set forth in Paragraph 33.

34.    Twitter also negotiated for itself a right to hire and fire employees at all levels, including executives, without having to seek Musk's consent. Musk's initial draft of the merger agreement would have deemed the hiring and firing of an employee at the level of vice president or above a presumptive violation of the ordinary course covenant absent Musk's consent. Twitter successfully struck that provision before signing.

149

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to what motivated Twitter's negotiations. Defendants further aver that the remainder of Paragraph 34 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 34.

35. Twitter further negotiated to narrow the circumstances under which defendants could escape the deal by claiming a "Company Material Adverse Effect." In addition to excluding, for example, market-wide and industry-wide effects and circumstances and declines in stock price and financial performance, the final definition excluded matters relating to or resulting from Musk's identity or communications, "performance" of the agreement, and any matter disclosed by Twitter in its SEC filings other than the "Risk Factors" and "Forward-Looking Statements" sections of those disclosures. *Id.* Art. I.

**ANSWER:** Paragraph 35 asserts legal conclusions and therefore does not require a response. The remainder of Paragraph 35 purports to quote the text of the Merger Agreement, which speaks for itself. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

36. Finally, and critically, Twitter negotiated for itself a robust right to demand specific performance of the agreement's terms that encompassed the right to compel defendants to close the deal, and ensured that Musk personally was bound by that provision (among others). *Id.* § 9.9(a)-(b), Preamble.

**ANSWER:** Paragraph 36 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 36. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

37.    At a board meeting on April 25, 2022, Goldman Sachs and J.P. Morgan each presented their fairness opinions, and the board discussed the agreement. The board ultimately approved the merger agreement and decided to recommend stockholder approval, both because the price was fair to stockholders and because the merger agreement promised a high level of closing certainty. Twitter had taken Musk's claimed "seller friendly" draft agreement and secured other key concessions to make it even more so. Not only were there no financing or diligence conditions, but Musk had already secured debt commitments that together with his personal equity commitment would suffice to fund the purchase.

**ANSWER:** Defendants admit the allegations in Paragraph 37 that there was a board meeting on April 25, 2022 at which Goldman Sachs and J.P. Morgan presented fairness opinions and that Musk had secured certain debt and equity commitments. Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 37 regarding what the board discussed or why the board approved the measures. Defendants deny the remainder of the allegations in Paragraph 37, except to admit that as of April 25, Musk had secured debt and equity commitments.

38.    Twitter had been buffeted by Musk's reversals before. For the benefit of stockholders and employees, the board needed assurance that this agreement would stick. It received that assurance in the terms it was able to negotiate.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 38 regarding what assurance the board believed it needed or received. Defendants deny the remainder of the allegations in Paragraph 38.

## III. The final, agreed-upon deal terms

39.    The terms of the transaction are governed by the merger agreement executed on April 25, 2022.

**ANSWER:** Paragraph 39 asserts legal conclusions and therefore does not require

a response.

40.    Under the agreement, at closing, Acquisition Sub will merge into Twitter, and Twitter will continue as a private corporation owned by Musk through his wholly owned shell companies. Twitter stockholders will receive $54.20 per share in cash, and the company's common stock will be delisted from the New York Stock Exchange.

**ANSWER:** Paragraph 40 purports to characterize the Merger Agreement, the

terms of which speak for themselves.

### A.    Closing Conditions

41.    The conditions to closing are few. The transaction is subject to a majority vote of Twitter's stockholders and to specified regulatory approvals. *Id.* § 7.1. The deal is also conditioned on the non-occurrence of a Company Material Adverse Effect that is continuing at the time of closing. *Id.* § 7.2(c). The agreement contains various representations by Twitter, including that its SEC filings since January 1, 2022, at the time filed or at the time amended or supplemented, are complete and accurate in all material respects, fairly depict the financial condition of the company in all material respects, and were prepared in accordance with GAAP. *Id.* § 4.6. Any inaccuracy in these representations does not excuse closing unless it rises to the level of a Company Material Adverse Effect. *Id.* § 7.2(b).

**ANSWER:** Paragraph 41 asserts legal conclusions and purports to characterize the

Merger Agreement, and therefore does not require a response. To the extent any

response is required, Defendants respectfully refer the Court to the contents of the

Merger Agreement, which speak for themselves.

152

42.    Company Material Adverse Effect is defined as:

> any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole . . . .

*Id.* Art. I. As one would expect with a "seller friendly" merger agreement, the contract identifies numerous changes, events, and circumstances expressly excluded from the determination of whether a Company Material Adverse Effect has occurred:

> [C]hanges, events, effects or circumstances which, directly or indirectly, to the extent they relate to or result from the following shall be excluded from, and not taken into account in, the determination of Company Material Adverse Effect:

> (i) any condition, change, effect or circumstance generally affecting any of the industries or markets in which the Company or its Subsidiaries operate;

> . . .

> (iii) general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets (including changes in interest or currency exchange rates) in the United States or any other country or region in the world;

> . . .

> (iv) the negotiation, execution, announcement, performance, consummation or existence of this Agreement or the transactions contemplated by this Agreement, including (A) by reason of the identity of Elon Musk, Parent or any of their Affiliates or their respective financing sources, or any communication by

153

Parent or any of its Affiliates or their respective financing sources, including regarding their plans or intentions with respect to the conduct of the business of the Company or any of its Subsidiaries and (B) any litigation, claim or legal proceeding threatened or initiated against Parent, Acquisition Sub, the Company or any of their respective Affiliates, officers or directors, in each case, arising out of or relating to the this Agreement or the transactions contemplated by this Agreement, and including the impact of any of the foregoing on any relationships with customers, suppliers, vendors, collaboration partners, employees, unions or regulators;

. . .

(viii) any changes in the market price or trading volume of the Company Common Stock, any failure by the Company or its Subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any changes in credit ratings and any changes in analysts' recommendations or ratings with respect to the Company or any of its Subsidiaries (provided that the facts or occurrences giving rise to or contributing to such changes or failure that are not otherwise excluded from the definition of "Company Material Adverse Effect" may be taken into account in determining whether there has been a Company Material Adverse Effect); and

(ix) any matter disclosed in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements").

*Id.*

154

**ANSWER:** Paragraph 42 purports to quote from the Merger Agreement.

Defendants respectfully refer the Court to that agreement for a complete and

accurate description of its contents.

43. The parties thus agreed that any circumstance affecting the market generally or other social media companies would not excuse defendants from closing. Nor would any circumstance arising from the existence or performance of the agreement, or from any communication by Musk, "including the impact of any of the foregoing" on any of Twitter's relationships with, among others, customers. Likewise, matters that Twitter disclosed in sections of its SEC filings other than the "Risk Factors" and "Forward-Looking Statements" sections cannot constitute a Company Material Adverse Effect. And Twitter's failure to meet financial projections will not excuse closing unless that failure results from an occurrence independently qualifying as a Company Material Adverse Effect (taking into account all of the express exclusions).

**ANSWER:** Paragraph 43 asserts legal conclusions and therefore does not require

a response. Paragraph 43 further purports to quote from the Merger Agreement.

Defendants respectfully refer the Court to that agreement for a complete and

accurate description of its contents.

44. The agreement also makes clear that financing is not a condition to closing:

> Notwithstanding anything contained in this Agreement to the contrary, the Equity Investor, Parent and Acquisition Sub each acknowledge and affirm that it is not a condition to the Closing or to any of its obligations under this Agreement that the Equity Investor, Parent, Acquisition Sub and/or any of their respective Affiliates obtain any financing (including the Debt Financing) for any of the transactions contemplated by this Agreement.

*Id.* § 5.4; *see also id.* § 6.10(f).

155

**ANSWER:** Paragraph 44 asserts legal conclusions and therefore does not require a response. Paragraph 44 purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

45. Nor is there any diligence condition. Indeed, each of Parent and Acquisition Sub represents that it "conducted, to its satisfaction, its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company and its Subsidiaries," and that, in determining to proceed with the merger, each "relied solely on the results of its own independent review and analysis and the covenants, representations and warranties of the Company" in the merger agreement. *Id.* § 5.11. Parent and Acquisition Sub further acknowledge that "neither the Company nor any of its Subsidiaries, nor any other Person, makes or has made or is making any express or implied representation or warranty with respect to the Company or any of its Subsidiaries or their respective business or operations, in each case, other than those expressly given solely by the Company in Article IV," and they represent that in agreeing to the merger they were not relying on "any express or implied representation or warranty, or the accuracy or the completeness of the representations and warranties" in the merger agreement about Twitter and its business and its operations "other than those expressly given solely by the Company in Article IV." *Id.*

**ANSWER:** Paragraph 45 asserts legal conclusions and therefore does not require a response. Paragraph 45 further purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

## B.    Efforts Covenants

46. The agreement requires all parties, including Musk, to use their "reasonable best efforts" to consummate the merger and cause all of the closing conditions to be satisfied. *Id.* § 6.3(a).

156

**ANSWER:** Paragraph 46 asserts legal conclusions and therefore does not require a response. Paragraph 46 further purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

47. Defendants, including Musk, have a "hell-or-high-water" obligation to close on their financing commitments for the transaction. They must:

> take, or cause to be taken, all actions and . . . do, or cause to be done, all things necessary, proper or advisable to arrange, obtain and consummate the Financing at or prior to the Closing on the terms and subject to the conditions set forth in the Financing Commitments (including any "flex" provisions).. . .

*Id.* § 6.10(a). More specifically, Musk and Parent have an unconditional obligation to "take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to obtain the Equity Financing," which includes, among other things, Musk's funding of his personal equity commitment at or before closing. *Id.* § 6.10(e).

**ANSWER:** Paragraph 47 asserts legal conclusions and therefore does not require a response. Paragraph 47 further purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

## C.  Information Sharing

48. The merger agreement requires the parties to share certain information with one another in the run-up to closing.

**ANSWER:** Paragraph 48 asserts legal conclusions and purports to characterize the merger agreement, and therefore does not require a response. To the extent a

157

response is required, Defendants respectfully refer the Court to the Merger Agreement for a complete and accurate description of its contents.

49.    Defendants, including Musk, are required to keep Twitter "reasonably informed on a current basis of the status of [their] efforts to arrange and finalize the Financing" and to "promptly provide and respond to any updates reasonably requested by the Company with respect to the status" of those efforts. *Id.* § 6.10(d)(iv)-(v). For its part, Twitter is required to use its "commercially reasonable best efforts" to assist defendants with arranging financing, but that obligation is qualified: Twitter need not "prepare or provide any financial statements or other financial information" other than the financial information provided to the SEC, nor provide any "other information that is not available to the Company without undue effort or expense." *Id.* § 6.11(a). Moreover, Twitter's obligations under Section 6.11 are its "sole obligation . . . with respect to cooperation in connection with the arrangement of any financing," and Twitter may be considered to have breached the provision only if a failure by Parent to obtain the committed debt financing is "due solely to a deliberate action or omission taken or omitted to be taken by the Company in material breach of its obligations." *Id.*

**ANSWER:** Paragraph 49 asserts legal conclusions and therefore does not require a response. Paragraph 49 further purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

50.    Subject to certain conditions, including entry into a confidentiality agreement, Twitter must provide Parent and its advisors with "reasonable access" to information about its "business, properties and personnel" as defendants "reasonably" request. *Id.* § 6.4. The information requested must be for a "reasonable business purpose *related to the consummation of the transactions contemplated by this Agreement.*" *Id.* (emphasis added). In addition, Twitter can decline a request if in its "reasonable judgment" it determines that compliance would "cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated" or would "violate applicable Law," including privacy laws. *Id.* Parent cannot use the

158

information obtained "for any competitive or other purpose unrelated to the consummation of the transactions contemplated by th[e] Agreement." *Id.* And Parent must use its "reasonable best efforts to minimize any disruption to" Twitter "that may result from requests for access." *Id.*

**ANSWER:** Paragraph 50 asserts legal conclusions and therefore does not require a response. Paragraph 50 further purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

### D.    Ordinary Course Covenant

51.    The agreement contains a seller-friendly ordinary course covenant, requiring Twitter to use no more than "its commercially reasonable efforts" to "conduct the business of the Company and its Subsidiaries in the ordinary course of business" unless, among other things, an action outside the ordinary course is "agreed to in writing by Parent (which consent shall not be unreasonably withheld, delayed or conditioned)." *Id.* § 6.1. There is no requirement of compliance with "past practice." And, as noted, before the agreement was signed, Twitter succeeded in striking from the covenant a requirement to obtain Parent's consent for the hiring and firing of employees.

**ANSWER:** Paragraph 51 asserts legal conclusions and therefore does not require a response. Paragraph 51 purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

### E.    Public Statements and Non-Disparagement

52.    Section 6.8 of the agreement contains standard language requiring each side to consult with the other before issuing certain public statements, as well as negotiated language concerning Musk's ability to Tweet about the merger.

Under the provision, Musk may so Tweet only "so long as such Tweets do not disparage the Company or any of its Representatives." *Id.* § 6.8.

**ANSWER:** Paragraph 52 asserts legal conclusions and therefore does not require a response. Paragraph 52 purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

### F.    Termination

53.    Defendants' ability to terminate the agreement before the presumptive drop-dead date of October 24, 2022 is extremely limited and carefully circumscribed. While there are closing conditions related to the accuracy of Twitter's representations and warranties and to Twitter's compliance with its covenants, there is no right for defendants to terminate unless there is a breach sufficiently significant to cause failure of a closing condition, which, after due notice, is either incapable of being cured or is not cured within 30 days after such notice. *Id.* § 8.1(d). Defendants have no right to terminate, moreover, if any of them are in material breach of their own obligations under the agreement. *Id.*

**ANSWER:** Paragraph 53 asserts legal conclusions and therefore does not require a response. Paragraph 53 purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

### G.    Specific Performance

54.    Twitter may seek specific performance, an injunction, or other equitable relief to enforce any of defendants' obligations under the merger agreement. *Id.* § 9.9(a). It has the specific power to compel Musk to fund the equity financing and close the merger, provided the closing conditions are met (or are capable of being met at the time of closing), the debt financing (which is

already committed) has been or will be funded at the closing, and the company is itself prepared to close. *Id.* § 9.9(b).

**ANSWER:** Paragraph 54 asserts legal conclusions and therefore does not require a response. Paragraph 54 purports to quote from the Merger Agreement. Defendants respectfully refer the Court to that agreement for a complete and accurate description of its contents.

## IV.   The financing structure

55.   At the time of signing, the financing for the transaction had three components: loans to the post-closing Twitter, a personal loan on margin to Musk (against his Tesla stock), and an equity commitment from Musk himself.

**ANSWER:** Paragraph 55 asserts legal conclusions and therefore does not require a response. Defendants respectfully refer the Court to the debt commitment letter and equity commitment letter for a complete and accurate description of their contents.

56.   The loans to Twitter, of up to $13 billion in the aggregate, are promised by Morgan Stanley Senior Funding, Inc. and other lenders in a debt commitment letter dated April 25, 2022. The committed financing comprises a $6.5 billion term loan, a $500 million revolving credit facility, and $6 billion of bridge financing. Although the debt commitment letter requires Musk to assist the lenders in marketing the debt, his failure to do so does not release the lenders from their obligation to fund and the financing is not conditioned on the lenders' ability to market the debt. The lenders' obligation is subject only to the closing of the merger itself and certain other conditions the satisfaction of which lies in defendants' control.

**ANSWER:** Paragraph 56 purports to characterize the terms of the debt commitment letter, which speaks for itself. Defendants respectfully refer the Court

to the debt commitment letter for a complete and accurate description of its

contents.

57.    The margin loan of $12.5 billion to Musk personally was promised by Morgan Stanley Senior Funding, Inc. and other lenders in a margin loan commitment letter also dated April 25, 2022.  The loan was to be secured by $62.5 billion worth of Musk's Tesla stock — about 62 million shares at the time of signing.

**ANSWER:** Paragraph 57 purports to characterize the terms of the margin loan

commitment letter, which speaks for itself.  Defendants respectfully refer the Court

to the margin loan commitment letter for a complete and accurate description of its

contents.

58.    Under an equity commitment letter dated April 20, 2022, Musk also personally agreed to contribute to or otherwise provide to Parent $21 billion of equity capital to be used to fund the purchase price.  Because much of his net worth is tied up in Tesla shares, Musk would need to sell — indeed, has already sold — millions of those shares to fund his equity commitment.

**ANSWER:** Paragraph 58 purports to characterize the equity commitment letter,

which speaks for itself.  Defendants respectfully refer the Court to the equity

commitment letter for a complete and accurate description of its contents.

Defendants otherwise deny the allegations in Paragraph 58, except to admit that

Musk did sell certain of his Tesla stock to finance the acquisition.

59.    The structure of Musk's financing meant that the merger could become significantly more expensive for him if Tesla's stock price were to decline (and significantly less expensive if Tesla's stock price were to rise).  For the equity component, the lower Tesla's stock price was, the more shares of Tesla Musk would need to sell to provide the cash he committed.  For the margin loans, a

substantial decline in Tesla's stock price would require Musk to pledge more shares or cash as collateral to the financing sources.

**ANSWER:** Paragraph 59 also purports to characterize the terms of the margin

loans, which speak for themselves.  As to the remainder of Paragraph 59, to the

extent any response is required, Defendants deny the allegations set forth in

Paragraph 59.

## V.    The market turns

60.    The risk of market decline, which was Musk's alone to bear under the merger agreement, materialized.  Soon after signing, the U.S. capital markets took a turn for the worse.  Within a week after April 25, 2022, the date the merger agreement was executed, Musk elected to sell 9.8 million Tesla shares to finance the merger at prices as low as $822.68 per share, substantially below their pre-Twitter-signing price of $1,005 per share.  He then promptly Tweeted, "No further TSLA sales planned after today."  But the Tesla stock price kept dropping, putting Musk at risk of needing to pledge yet more Tesla shares to consummate his proposed margin loan and to sell still more to fund his equity commitment.

**ANSWER:** Defendants admit the allegations of Paragraph 60 only insofar that

Musk sold 9.8 million Tesla shares at various prices and published a tweet on April

26, 2022.  Defendants respectfully refer the Court to that tweet for a complete and

accurate description of its contents  Paragraph 60 asserts legal conclusions and

therefore does not require a response.  As to the remainder of Paragraph 60, to the

extent any response is required, Defendants deny the remainder of the allegations

in Paragraph 60.

61.    On May 4, 2022, Parent and Musk, faced with needing to pledge more Tesla shares to satisfy the condition that the margin loan not exceed 20% of the

163

value of the pledged stock, decreased the amount of that loan.  On May 24, without notifying Twitter, they dispensed with the loan entirely and agreed in a new equity commitment letter to increase Musk's equity commitment to $33.5 billion.  That letter, which remains operative, gives Twitter third-party beneficiary rights to enforce directly against Musk his equity commitment in accordance with its terms and the terms of the merger agreement.

**ANSWER:** Defendants admit the allegations in Paragraph 61 to the extent that Defendants entered into a new equity commitment letter on May 24, 2022.  Defendants respectfully refer the Court to that letter for a complete and accurate description of its contents.  Defendants deny the remainder of the allegations in Paragraph 61.

62.    Musk remains personally responsible for $33.5 billion of the approximately $44 billion required to complete the transaction.

**ANSWER:** Defendants deny the allegations set forth in Paragraph 62.

## VI.    Musk grasps for an out

63.    Musk wanted an escape.  But the merger agreement left him little room.  With no financing contingency or diligence condition, the agreement gave Musk no out absent a Company Material Adverse Effect or a material covenant breach by Twitter.  Musk had to try to conjure one of those.

**ANSWER:** Paragraph 63 purports to characterize the Merger Agreement, the contents of which speak for themselves.  Defendants otherwise deny the allegations in Paragraph 63.

### A.    False or spam accounts

64.    What Musk alighted upon first was a representation in Twitter's quarterly SEC filings over many consecutive years that based on its internal processes the company estimated "the average of false or spam accounts" on its

platform "represented fewer than 5% of our mDAU during the quarter." "Monetizable Daily Active Usage or Users," or mDAU, is a non-GAAP metric Twitter employs to measure the number of people or organizations that use the Twitter platform. In its filings, Twitter defines mDAU as "people, organizations or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions."

**ANSWER:** Defendants deny the allegations in Paragraph 64, except insofar as they quote from Twitter's SEC filings, which speak for themselves. Defendants respectfully refer the Court to those filings for a complete and accurate description of their contents.

65. In addition to deploying automated and manual processes that suspend on average more than a million suspicious accounts each day, the company undertakes a rigorous, daily process using human reviewers to estimate spam or false accounts remaining on its platform after automated filtering and manual review.

**ANSWER:** Defendants deny the allegations in Paragraph 65 to the extent that Twitter asserts it "undertakes a rigorous, daily process using human reviewers to estimate spam or false accounts remaining on its platform after automated filtering and manual review." Defendants lack knowledge or information sufficient to form a belief as to the remainder of the allegations in Paragraph 65. To the extent any further response is required, Defendants deny the remaining allegations in Paragraph 65.

66. Twitter's SEC disclosures regarding that process and its findings are heavily qualified. As described in the "Note Regarding Key Metrics" section of its filings, Twitter's "calculation of mDAU is not based on any standardized industry

165

methodology," "may differ from estimates published by third parties or from similarly-titled metrics of our competitors," and "may not accurately reflect the actual number of people or organizations using our platform."  As for the estimate of spam or false accounts as a percentage of mDAU, Twitter explains that it is based on "an internal review of a sample of accounts," involves "significant judgment," "may not accurately represent the actual number of [false or spam] accounts," and could be too low.  Twitter has published the same qualified estimate — that fewer than 5% of mDAU are spam or false — for the last three years, and published similar estimates for five years preceding that.

**ANSWER:** Paragraph 66 purports to characterize Twitter's SEC filings, which speak for themselves.  Defendants respectfully refer the Court to those filings for a complete and accurate description of their contents.

67.    Musk was well aware when he signed the merger agreement that spam accounted for some portion of Twitter's mDAU, and well aware of Twitter's qualified disclosures.  Spam was one of the main reasons Musk cited, publicly and privately, for wanting to buy the company.  On April 9, 2022, the day Musk said he wanted to buy Twitter rather than join its board, he texted Taylor that "purging fake users" from the platform had to be done in the context of a private company because he believed it would "make the numbers look terrible."  At a public event on April 14, Musk said eliminating spam bots would be a "top priority" for him in running Twitter.  On April 21, days before the deal was inked, he declared:



Musk echoed that same sentiment in the press release announcing the merger on April 25, stating that upon acquiring Twitter he would prioritize "defeating the spam bots, and authenticating all humans."

**ANSWER:** Defendants admit the allegations in Paragraph 67 only to the extent that Musk was aware that Twitter disclosed that less than 5% of Twitter's mDAU consisted of bots or spam and that he sent a tweet on April 21, which speaks for itself. Defendants refer the Court to that tweet for a complete and accurate description of its contents. Paragraph 67 also refers a text dated April 9, a tweet dated April 21 and a press release dated April 25, the contents of which speak for themselves. Defendants admit that Mr. Musk stated that eliminating spam accounts would be a "top priority." Defendants deny the remainder of the allegations in Paragraph 67.

68.    Yet Musk made his offer without seeking any representation from Twitter regarding its estimates of spam or false accounts. He even sweetened his offer to the Twitter board by expressly withdrawing his prior diligence condition.

**ANSWER:** The allegations in Paragraph 68 refer to the contents of Musk's offers, which speak for themselves. To the extent that any response is required, Defendants deny the allegations in Paragraph 68.

69.    On May 5, 2022, Musk announced that he had raised an additional $7.1 billion of equity commitments for the deal from 19 investors — including $1 billion from Oracle chairman Larry Ellison, $800 million from Sequoia Capital, $400 million from Andreessen Horowitz, and $375 million from a subsidiary of the Qatari sovereign wealth fund. Musk's investors, all sophisticated market participants, made these commitments in the face of Musk's public statements regarding spam accounts, and knowing he had forsworn diligence. Musk made his plans to address spam a key part of his pitch: As Andreessen Horowitz's co-CEO stated in publicly announcing the investment, the firm thought Musk was "perhaps the only person in the world" who could "fix" Twitter's alleged "difficult issue[]" with "bots."

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph 69. Defendants lack knowledge or information sufficient to form a belief as to the allegations in the second sentence of Paragraph 69. Defendants admit that Andreessen Horowitz's co-CEO made a statement and respectfully refer the Court to that statement for a complete and accurate description of its contents. Defendants lack knowledge sufficient to admit or deny the allegations in the second sentence of Paragraph 69. Defendants deny the remainder of the allegations in Paragraph 69.

70. Then, however, as the market (and Tesla's stock price) declined, Musk's advisors began to demand detailed information about Twitter's methods of calculating mDAU and estimating the prevalence of false or spam accounts.

**ANSWER:** Defendants deny the allegations in Paragraph 70, except to admit that Musk's advisors have requested information regarding mDAU and false or spam accounts.

71. Twitter had entered into a confidentiality agreement with Musk to share non-public information in preparation for post-closing transition, and convened an in-person meeting with Musk and his team on May 6, 2022. Among the topics of discussion were mDAU and spam-related subjects. In advance of the meeting, Musk's bankers circulated an agenda with items related to users on the Twitter platform, including: "How do you estimate that fewer than 5% of mDAU are false or spam accounts?" Twitter's representatives addressed that question at the meeting, summarizing the company's process.

**ANSWER:** The first sentence of Paragraph 71 purports to characterize the confidentiality agreement, the contents of which speaks for itself. Defendants

168

admit that Musk attended an in person meeting with certain other individuals on May 6, 2022. Defendants admit the allegations in the second and third sentences of Paragraph 71. Defendants deny the allegations in the last sentence of Paragraph 71.

72.     Following up on or about May 9, Musk's bankers at Morgan Stanley added entries to their diligence tracker requesting user-related information, including a request for "User database containing key metrics including, but not limited to, number of users, number of verified users, number of monthly active users, number of handles, etc."   Neither Musk nor his advisors said what had prompted these requests or identified new information regarding spam or false accounts that had come to light warranting the inquiries. Nothing had changed about Twitter's estimates concerning the prevalence of spam on the platform in the days since signing. Nonetheless, in the spirit of cooperation, Twitter responded on May 12 with data sets and written descriptions of its audience metrics and its process for sampling the prevalence of false or spam accounts.

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph 72. Defendants deny the allegations in the remainder of Paragraph 72, except to admit that Twitter provided certain materials on May 12.

73.     Early on May 13, 2022, in advance of a diligence meeting that had been scheduled to discuss the data Twitter had provided, Musk Tweeted without any advance notice to the company that the "Twitter deal [is] temporarily on hold" until the company showed him proof for its estimate that less than 5% of Twitter accounts are spam or false:



The Reuters story Musk linked to in his Tweet was a report on Twitter's 10-Q filing made on May 2, 2022, and contained the same heavily qualified 5% estimate Twitter had been disclosing in its SEC filings for the past three years. Musk had no basis for asserting that the deal was "on hold" based on this longstanding disclosure. Twitter's deal counsel called Musk's deal counsel. Two hours after the "on hold" Tweet was published, Musk belatedly Tweeted that he was still "committed" to the deal.

**ANSWER:** Defendants admit the allegations in Paragraph 73 that Musk published two tweets on May 13, 2022, and respectfully refer the Court to those tweets and the links within for a complete and accurate description of their contents. Defendants further admit that Twitter's deal counsel called Musk's counsel. The remainder of the allegations in Paragraph 73 assert legal conclusions and therefore do not require a response.

74.    Cognizant of its own obligations under the merger agreement, Twitter proceeded with the May 13 diligence meeting, which lasted for about two hours. During this session, Twitter explained, among other things, that its spam estimation process entails daily sampling for a total set of approximately 9,000 accounts per quarter that are manually reviewed.

170

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 74 regarding whether Twitter was "cognizant" of its obligations.  Defendants admit that a May 13, 2022 diligence meeting took place for approximately two hours during which Twitter explained its daily sampling process.

75.    Later that day, Musk Tweeted publicly a misrepresentation that Twitter's sample size for spam estimates was just 100.



**ANSWER:** Defendants admit the allegations in Paragraph 75 that Musk published two tweets on May 13, 2022, and respectfully refer the Court to those tweets for a complete and accurate description of their contents.  Defendants deny the remainder of the allegations in Paragraph 75.

171

76. The next day, he boasted publicly that he had violated his non-disclosure obligations:



**ANSWER:** Defendants admit the allegations in Paragraph 76 that Musk published a tweet on May 14, 2022, and respectfully refer the Court to that tweet for a complete and accurate description of its contents. Defendants deny the allegations set forth in Paragraph 76.

77. Musk's Tweets on May 13 and 14 violated his obligations under the merger agreement, including the provisions prohibiting public comments not consented to by Twitter, disparagement, misuse of information provided under Section 6.4, requiring best efforts to consummate the merger.

**ANSWER:** Paragraph 77 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 77.

78. On May 16, Agrawal Tweeted that Twitter's 5% estimate is based on "multiple human reviews (in replicate) for thousands of accounts, that are sampled at random, consistently over time, from *accounts we count as mDAUs*." He explained that the company's human review process "uses both public and private data (eg, IP address, phone number, geolocation, client/browser signatures, what the account does when it's active...) to make a determination on each account" — something Twitter also explains in its SEC filings. Agrawal stood by Twitter's estimate, and noted that the company is constantly updating its systems and rules to remove as much spam as possible:

172



**ANSWER:** Paragraph 78 purports to characterize the contents of Agrawal's tweet and Twitter's SEC filings, which speak for themselves. Defendants admit the allegations in Paragraph 78 that Agrawal posted a tweet on May 16, 2022, and respectfully refer the Court to that tweet and Twitter's SEC filings for a complete and accurate description of their contents.

79.    Musk responded with another disparaging Tweet:



**ANSWER:** Defendants admit that Musk tweeted on May 16, 2022 and respectfully refer the Court to that tweet for a complete and accurate description of its contents. The remainder of Paragraph 79 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the remaining allegations in Paragraph 79.

173

80.    As the market continued to fall, Musk persisted in his public and misleading attacks on Twitter's handling and disclosure of spam or false accounts. In another Tweet on May 15, 2022 and a statement at a technology conference on May 16, Musk made the baseless claim that fake users might account for as much as 90% of Twitter's users. Asked whether the "Twitter deal [is] going to get closed," Musk responded that "it really depends on a lot of factors" and posited that Twitter's estimate that spam or false accounts comprised fewer than 5% of mDAU might be "a material adverse misstatement" if "in fact it is four or five times that number, or perhaps ten times that number."

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 80. Defendants admit that Musk made a statement on May 15, 2022, which is partially quoted in Paragraph 18. Defendants respectfully refer the Court to the contents of the tweet for a full and accurate description of the same, as the tweet speaks for itself. Defendants deny any of Mr. Musk's statements were "baseless."

81.    On May 17, 2022, Musk Tweeted, without basis or explanation, that "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher," adding that "[t]his deal cannot move forward" pending further analysis of Twitter's spam estimates. In yet another breach of his non-disparagement obligation and efforts covenants, Musk encouraged the SEC to investigate the accuracy of Twitter's disclosures:



**ANSWER:** Defendants admit the allegations in Paragraph 81 that Musk published a tweet on May 17, 2022, and respectfully refer the Court to that tweet for a complete and accurate description of its contents. The remainder of Paragraph 81 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in the remainder of Paragraph 81.

### B.    Defendants' lawyer letters

82.    Even as Musk was violating his own contractual obligations, Twitter continued to respond cooperatively to his representatives' increasingly unreasonable inquiries. Between May 16 and May 20, the company provided detailed written responses to several information requests.

**ANSWER:** Paragraph 82 asserts legal conclusions regarding Musk's obligations and therefore does not require a response. As to the remainder of the paragraph, Defendants deny the allegations set forth in Paragraph 82, except to admit that the company wrote to Defendants between May 16 and May 20.

83.    On May 20, 2022, Musk's team sent a request for Twitter's "firehose" data — which is essentially a live-feed of data concerning activity (Tweeting, Retweeting, and "liking" Tweets, for example) associated with the public accounts on Twitter's platform. Again, no explanation was offered for how this request furthered a "reasonable business purpose related to the consummation of the transactions contemplated by" the merger agreement, as required by Section 6.4. Nor can the firehose data even be used to accurately estimate the prevalence of spam or false accounts. As Agrawal had explained in his May 16 Tweets, that estimate depends in part on private data not available in the firehose. Conversely, the firehose includes Tweets that Twitter's systems and processes catch and do not count within mDAU for that day.

175

**ANSWER:** Defendants admit the allegations in Paragraph 83 that they requested the firehose data. Paragraph 83 purports to characterize the contents of the May 20, 2022 request, which speaks for itself. To the extent any response is required, Defendants deny the allegations set forth in the second sentence of Paragraph 83. Defendants admit the allegations in Paragraph 83 that the data Twitter provided was not sufficient for Defendants to perform the analysis Twitter knew that Defendants intended to perform. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 83.

84.    On May 21, 2022, Twitter hosted a third diligence session with Musk's team and yet again discussed Twitter's processes for calculating mDAU and estimates of spam or false accounts. Twitter also provided a detailed summary document describing the process the company uses to estimate spam as a percentage of mDAU.

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph 84. Defendants deny the allegations in the second sentence of Paragraph 84.

85.    Defendants responded with increasingly invasive and unreasonable requests. And rather than use "reasonable best efforts to minimize any disruption to the respective business of the Company and its Subsidiaries that may result from requests for access," Ex. 1 § 6.4, defendants repeatedly demanded immediate responses to their access requests. The scope of the requests and the deadlines defendants imposed on their satisfaction were unreasonable, disruptive to the business, and far outside the bounds of Section 6.4.

**ANSWER:** Paragraph 85 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 85.

176

86.    Twitter nonetheless continued to work with Musk to try to respond to the requests. It extended an ongoing offer to engage with Musk and his representatives regarding its calculation of mDAU, and held several more diligence sessions through the end of May. It also provided detailed written responses, including custom reporting, to his escalating requests for information.

**ANSWER:** Defendants admit the allegations that diligence sessions were held in May. Defendants deny the remainder of the allegations in Paragraph 86.

87.    On May 25, 2022, defendants' counsel sent the first of a series of aggressive letters copying their litigation counsel at Quinn Emmanuel. This one falsely asserted that Twitter had "failed to respond to any" of defendants' information requests and insisted that defendants be granted access to the firehose data so Musk could "make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform." Though the letter called Twitter's own spam detection methodologies "lax," it identified no basis for that charge.

**ANSWER:** Defendants admit the allegations in Paragraph 87 that Defendants sent Twitter a letter on May 25, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents. Defendants deny the remainder of the allegations in Paragraph 87.

88.    Nor, again, did defendants explain how fulfillment of the firehose data demand would further consummation of the merger or what basis they had to demand the right to "make an independent assessment" of the prevalence of false or spam accounts on the platform. Even assuming that was a proper purpose, reviewing the full firehose data would not result in an accurate assessment or mimic the rigorous process that Twitter employs by sampling accounts and using public and private data to manually determine whether an account constitutes spam — as Twitter's representatives had already repeatedly explained to Musk's team.

**ANSWER:** The first sentence of Paragraph 88 asserts legal conclusions and therefore does not require a response. To the extent any response is required,

177

Defendants deny the allegations set forth in the first sentence of Paragraph 88.

Defendants admit the allegations set forth in Paragraph 88 that the data Twitter

provided was not sufficient for Defendants to perform the analysis Twitter knew

that Defendants intended to perform.  Defendants deny the remainder of the

allegations in Paragraph 88.

89.    On May 27, 2022, Twitter responded by noting its weeks-long active engagement with Musk's team and explaining that some of defendants' requests sought disclosure of highly sensitive information and data that would be difficult to furnish and would expose Twitter to competitive harm if shared.  After all, Musk had said he would do one of three things with Twitter: sit on its board, buy it, or build a competitor.  He had already accepted and then rejected the first option, and was plotting a pretextual escape from the second.  Musk's third option — building a competitor to Twitter — remained.  Still, Twitter again responded constructively and reiterated its commitment to work with Musk's team to provide reasonable access to requested information.

**ANSWER:** Defendants admit the allegations in Paragraph 89 that Twitter

provided a response on May 27, 2022, and respectfully refer the Court to that

response for a complete and accurate description of its contents.  Defendants lack

knowledge or information sufficient to form a belief as to the allegations in

Paragraph 89 regarding the difficulty and risk of providing certain data.

Defendants deny the remainder of the allegations in Paragraph 89.

90.    On May 31, 2022, defendants lobbed another missive, again falsely asserting that Twitter had "refused" to provide requested data and that the company's spam or false account detection methods were "inadequate."  The letter claimed Musk was willing to implement protocols to protect against "damage or competitive harm to the company."

178

**ANSWER:** Defendants admit the allegations in Paragraph 90 that Defendants sent a letter on May 31, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents.

91. On June 1, 2022, Twitter responded by refuting that it had "refused" provision of data, demonstrating that, to the contrary, it had been working with Musk's team to honor their requests within the bounds of the contract. To help set the protocols Musk had said he was willing to honor, Twitter asked a series of questions directed at how the data would be used and by whom, and how it would be protected.

**ANSWER:** Defendants admit the allegations in Paragraph 91 that Twitter sent a letter on June 1, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents.

92. Defendants' response on June 6, 2022 made no effort to answer those questions or identify data-protection protocols; instead, it accused Twitter of breach and advanced a false narrative that Twitter had been stonewalling Musk's requests. Musk publicly filed the letter, which repeated his baseless and damaging charge that Twitter had "lax" detection methods. He included none of Twitter's correspondence in that filing and omitted all details about the information Twitter *had* provided. He thus continued to present the public with a misleadingly incomplete narrative about his communications with Twitter, with equally misleading implications about the likelihood that the merger would be completed and about Twitter's operations.

**ANSWER:** Defendants admit the allegations in Paragraph 92 that Defendants sent a letter on June 6, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents. The remainder of Paragraph 92 purports to characterize Musk's public filing, the contents of which speak for

179

themselves.  To the extent any response is required, Defendants deny the

remaining allegations set forth in Paragraph 92.

93.    Steadfast in its commitment to consummate the merger, Twitter continued to try to get Musk's team what it demanded while safeguarding its customers' data and harboring very real concerns about how Musk might use the data if he succeeded in escaping the deal.  On or about June 9, 2022, Musk's counsel indicated that granting access to 30 days' worth of historical firehose data would satisfy Musk's request for the firehose data.  So, on June 15, the company gave Musk's team secure access to that raw data — about 49 tebibytes' worth.  It did so even though the merger agreement did not require the sharing of this information.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief

as to the allegations regarding Twitter's commitment in Paragraph 93.  Defendants

admit the allegations in Paragraph 93 that Musk's counsel sent a letter on June 9,

2022, and respectfully refer the Court to that letter for a complete and accurate

description of its contents.  Defendants deny the remainder of the allegations in

Paragraph 93.

94.    Musk's next lawyer letter, dated June 17, 2022, skimmed over this massive data production.  Like the earlier correspondence, the June 17 letter described an alternative reality in which Twitter had failed to cooperate in supplying Musk with information, entirely contrary to the facts, apparently in the belief that repeating a falsehood enough can make it true.  The letter also continued to move the goal posts by adding a new request for "the sample set" and "calculations" Twitter used to estimate that fewer than 5% of its mDAUs are false or spam accounts over the past eight quarters.  Thus, with no basis, defendants sought to audit information Twitter consistently had caveated as an "estimate" requiring "significant judgment" to prepare.

180

**ANSWER:** Defendants admit the allegations in Paragraph 94 that Defendants' counsel sent a letter dated June 17, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents. Defendants deny the remainder of the allegations in Paragraph 94.

95.    The June 17 letter further contained a litigation-style discovery demand for information Musk asserted was needed to investigate "the truthfulness of Twitter's representations to date regarding its active user base, and the veracity of its methodologies for determining that user base." It broadly demanded board materials relating to mDAU and spam, as well as emails, text messages, and other communications about those topics — highly unusual requests in the context of good faith efforts toward completion of any merger transaction, and absurd in the context of this one, which has no diligence condition. Musk propounded these unreasonable requests and touted his contrived narrative about Twitter's methodologies, all without ever identifying a basis for questioning the veracity of Twitter's methodologies or the accuracy of its SEC disclosures.

**ANSWER:** Defendants admit the allegations in Paragraph 95 that Defendants' counsel sent a letter dated June 17, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents. Defendants deny the characterizations of that letter. Defendants further aver that the remainder of Paragraph 95 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the remaining allegations set forth in Paragraph 95.

96.    On June 20, 2022, Twitter set the record straight in a detailed response letter. It noted that the two sides had been working collaboratively to clear regulatory hurdles and "address voluminous data requests" from defendants, that Twitter had "dedicated significant resources" to providing defendants with the data requested, and that Twitter had already provided a wealth of data sweeping far

181

beyond the bounds of what might conceivably be deemed reasonably necessary to consummate the transaction. Twitter noted that Musk, while continuing to accuse Twitter of misrepresenting its spam or false account estimate, had offered not a single fact to support the accusation. And Twitter observed that defendants' "increasingly irrelevant, unsupportable, and voluminous information requests" appeared directed not at consummating the merger but rather the opposite: trying to avoid the merger.

**ANSWER:** Defendants admit the allegations in Paragraph 96 that Twitter's counsel sent a letter dated June 20, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 96.

97.    Nonetheless, in a continuing effort at cooperation, Twitter agreed to provide Musk everything he now demanded regarding the firehose, including access to "100% of Tweets and favoriting activity." Twitter cautioned, as it had so many times before, that this data would not allow Musk to accurately assess the number of spam or false accounts. But on June 21, 2022, it gave defendants' counsel the demanded access.

**ANSWER:** Defendants admit Twitter provided them with certain data on June 21, and that this data was insufficient for Defendants to accurately assess the number of spam or false accounts. Defendants deny the remainder of the allegations in Paragraph 97.

98.    Meanwhile, Agrawal and Twitter CFO Ned Segal had been trying to set up a meeting with Musk to discuss the company's process in estimating the prevalence of spam or false accounts. On June 17, 2022, Segal proposed a discussion with Musk and his team to "cover spam as a % of DAU." Musk responded that he had a conflict at the proposed time. When Agrawal sought to reengage on the matter, Musk agreed to a time on June 21, but then bowed out and asked Agrawal and Segal to speak with his team not about the spam estimation process but "the pro forma financials for the debt."

182

**ANSWER:** Defendants admit that Twitter proposed a meeting with Musk on June 21 and that Musk was unable to attend that meeting. Defendants lack knowledge or information sufficient to form a belief as to the allegations regarding Twitter's executives' state of mind in Paragraph 98.

99.    On June 29, 2022, Musk complained through counsel that Twitter purportedly had "placed an artificial cap on the number of searches" Musk's experts could run on the firehose data, and had failed to respond to certain of the new requests made on June 17. (False again, as explained below.) The June 29 letter notably did not take issue with Twitter's refusal to provide responses to the discovery-like requests for emails, text messages, and other communications in the June 17 letter. But it contained a slew of new demands — several asking Twitter to create more custom reporting.

**ANSWER:** Defendants admit the allegations in Paragraph 99 that Defendants' counsel sent a letter dated June 29, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents. Defendants otherwise deny the allegations in Paragraph 99.

100.    On July 1, 2022, Twitter pointed out just how far beyond the scope of Section 6.4 defendants' requests had strayed. Nonetheless, Twitter noted that it was providing yet more information in response to recent requests and would continue to devote the "time and considerable resources" necessary to respond to outstanding requests. Twitter also explained that it had placed "no artificial throttling of rate limits." In follow-up correspondence, it became clear that the "limit" Musk had bumped up against was not the result of throttling but a default 100,000-per-month limit on the number of *queries* that could be conducted. With his undisclosed team of data reviewers working behind the scenes, Musk had hit that limit within about two weeks. Twitter immediately agreed to, and did, raise the monthly search query limit one hundred-fold, to 10 million — more than 100 times what most paying Twitter customers would get.

183

**ANSWER:** Defendants admit the allegations in Paragraph 100 that Twitter's counsel sent a letter dated July 1, 2022 and follow up correspondence, and respectfully refer the Court to that correspondence for a complete and accurate description of its contents. Defendants lack knowledge or information sufficient to form a belief as to the allegations in the second and third sentences of Paragraph 100. Defendants admit that their reviewers hit the artificially imposed rate limit in approximately two weeks, and that Twitter only raised that limit upon Defendants' request. Defendants lack knowledge or information sufficient to form a belief as to the allegations regarding what most paying Twitter customers would get.

101.   From the outset of this extraordinary post-signing information exchange process, Musk accused Twitter of "lax" methodologies for calculating spam or false accounts. Knowing that his actions risked harm to Twitter and its stockholders, wreaked havoc on the trading price of Twitter's stock, and could have serious consequences for the deal, Musk leveled serious charges, both publicly and through lawyer letters, that Twitter had misled its investors and customers. But Musk exhibited little interest in understanding Twitter's process for estimating spam accounts that went into the company's disclosures. Indeed, in a June 30 conversation with Segal, Musk acknowledged he had not read the detailed summary of Twitter's sampling process provided back in May. Once again, Segal offered to spend time with Musk and review the detailed summary of Twitter's sampling process as the Twitter team had done with Musk's advisors. That meeting never occurred despite multiple attempts by Twitter.

**ANSWER:** Defendants admit that Musk raised questions regarding Twitter's methodologies. To the extent that Paragraph 101 refers to written correspondence, Defendants respectfully refer the Court to such correspondence, which speaks for itself. Defendants deny the remaining allegations set forth in Paragraph 101.

184

102.    From the outset, defendants' information requests were designed to try to tank the deal. Musk's increasingly outlandish requests reflect not a genuine examination of Twitter's processes but a litigation-driven campaign to try to create a record of non-cooperation on Twitter's part. When Twitter nonetheless bent over backwards to address the increasingly burdensome requests, Musk resorted to false assertions that it had not.

**ANSWER:** Defendants deny the allegations in Paragraph 102.

### C.    Financial information

103.    In seeking to manufacture a record of covenant breach, Musk seized not just on Section 6.4 but also on Section 6.11, which obligates Twitter to reasonably cooperate with Parent to facilitate arrangement of debt financing.

**ANSWER:** Paragraph 103 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 103.

104.    Throughout the post-signing period, Twitter's advisors had been working with Musk's representatives to furnish them relevant financial information about the company. These discussions had been productive under the supervision on Musk's side of Bob Swan, a respected Silicon Valley financial professional and former CEO of Intel Corporation. Swan had been in regular contact with Segal, and had been leading defendants' purported effort to consummate the debt financing.

**ANSWER:** Defendants admit the allegations that there were discussions between Twitter and Bob Swan, who was involved with debt financing for Defendants, but Defendants lack knowledge or information sufficient to form a belief as to the remainder of the allegations in Paragraph 104.

105.    Then, in his June 17 lawyer letter, Musk demanded a collection of financial information he claimed was necessary to "better understand the state of

185

Twitter's business and outlook, which is related to his acquisition plans and his financing for the transaction." He demanded a "working, bottoms-up financial model for 2022," budget plans with underlying modeling, and a "working copy" of Goldman Sachs's "valuation model underlying its fairness opinion." This demand is extremely unusual in merger transactions, and neither in conveying the demand nor at any time since have defendants pointed to a request from any lender that would justify it. Notably, Musk's debt financing commitments are not conditioned on receipt of any financial information about Twitter other than that contained in its quarterly SEC filings. Ex. 2 § 1, E-2 (Ex. E) § 6.

**ANSWER:** Defendants admit the allegations in Paragraph 105 that Defendants' counsel sent a letter dated June 17, 2022, and respectfully refer the Court to that letter for a complete and accurate description of its contents. Defendants deny the allegations in the third sentence of Paragraph 105. The last sentence of Paragraph 105 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in the last sentence of Paragraph 105.

106.    Around the same time as the request, on June 21, 2022, Musk falsely represented in a Bloomberg interview that an item requiring resolution "before the transaction can complete" is "will the debt portion of the round come together?" As Musk well knew, financing expressly is *not* a condition to closing under the agreement.

**ANSWER:** Defendants admit that Musk was interviewed by Bloomberg, and respectfully refer the Court to that interview for a complete and accurate description of its contents. The remainder of Paragraph 106 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the remaining allegations set forth in Paragraph 106.

186

107.   Still, intent on facilitating the merger's consummation, Twitter provided Musk with significant supporting detail for its proxy case projections, shared some of its financial plans, and gave him a copy of its bankers' final presentation to Twitter's board.

**ANSWER:** Defendants admit the allegations in Paragraph 107 that Twitter provided certain of its financial information to Defendants. Defendants lack knowledge or information sufficient to form a belief as to the remainder of the allegations in Paragraph 107.

## VII.   Defendants materially breach their obligations to work toward closing and refrain from unreasonable withholding of consent to operational changes

108.   Consummating a merger agreement involves substantial effort and requires a serious deployment of resources by the seller. Defendants thus are subject to contractual obligations requiring them to take actions necessary to close and to allow Twitter to operate as efficiently as possible in the interim. Defendants violated two important obligations of this kind: the duty to work toward finalizing the financing for the closing and the obligation to consider consents reasonably.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 108. The remainder of Paragraph 108 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in the remainder of Paragraph 108.

### A.    Defendants abandon financing-related efforts and breach Section 6.10(d)

109.   Musk's distortive public statements about the deal, and his increasingly aggressive information demands through counsel, raised Twitter's suspicion that he was secretly abandoning efforts to finalize the committed debt

financing in time for a prompt closing.  Section 6.10 requires defendants to take all steps necessary to secure the already-committed financing for the closing.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 109.  The remainder of Paragraph 109 asserts legal conclusions and therefore does not require a response.  To the extent any response is required, Defendants deny the allegations set forth in the remainder of Paragraph 109.

110.    Twitter's concern deepened when, on June 23, 2022, Musk texted Twitter management to say that he had asked Swan "to depart the deal proceedings, as we are not on the same wavelength."  At the same time, Musk said he was "trying to prepare the cash flow projections necessary to secure the debt," and asked for Twitter's "cash flow projections over the next three years" and a comparison of historical projections to actuals — to assist "debt issuers" who "are much more conservative than equity investors."  Customarily, projections are needed well in advance of closing and before approaching ratings agencies, which is a key first step in consummating debt financing.  They are the buyer's, not the seller's, responsibility. *See* Ex. 1 § 6.11.

**ANSWER:**  Defendants admit that Swan withdrew from merger negotiations and that Musk sought certain financial information necessary to securing financing for the merger.  Paragraph 110 purports to characterize a text message, the contents of which speaks for itself.  Defendants deny the remainder of the allegations in Paragraph 110.

111.    Over the ensuing days, Twitter's repeated requests for a contact in lieu of Swan generated no response.  Outreach by Goldman Sachs and J.P. Morgan to Morgan Stanley likewise was met with silence.

188

**ANSWER:** Defendants deny the allegations in the first sentence of Paragraph 111. Defendants lack knowledge or information sufficient to form a belief as to the allegations in the last sentence of Paragraph 111.

112.    Faced with this uncertainty and with Musk's insinuations about his lenders, on June 28 and again on July 6, Twitter exercised its rights under Section 6.10(d) of the merger agreement to formally seek information about the status of Musk's financing.

**ANSWER:** Defendants admit that Twitter sent letters on June 28 and July 6, 2022 and respectfully refer the Court to those letters for their complete and accurate contents. The remainder of Paragraph 112 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the remainder of the allegations set forth in Paragraph 112.

113.    Defendants still have provided no substantive response. Instead, the day after the first of these requests, Musk warned Agrawal and Segal to back off:



**ANSWER:** Paragraph 113 purports to characterize a text message, and Defendants respectfully refer the Court to the full text of the message, which speaks for itself. Defendants deny the remaining allegations in Paragraph 113.

114.    On June 30, 2022, Musk informed Segal that replacement team member (and long-time Musk confidant) Antonio Gracias would be taking over the financing effort that Swan had helmed.  But Gracias never appeared.

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph

114, but deny the characterizations therein.  Defendants deny the allegations in

second sentence of Paragraph 114.

### B.    Musk delays and stymies key operational decisions

115.    Since signing, Twitter has complied in all respects with its obligation under Section 6.1 of the merger agreement to operate the business in the ordinary course.  In an excess of caution, the company has sought Musk's consent even for matters falling well within the zone of commercial reasonableness.  Though Musk has approved some of Twitter's requests, he has been slow to respond to ones that required urgency and has unreasonably withheld his consent to others, in breach of his own obligations under Section 6.1.

**ANSWER:** Paragraph 115 asserts legal conclusions and therefore does not require

a response.  To the extent any response is required, Defendants deny the

allegations set forth in Paragraph 115.

116.    Most notably, Musk has unreasonably withheld consent to two employee retention programs designed to keep selected top talent during a period of intense uncertainty generated in large part by Musk's erratic conduct and public disparagement of the company and its personnel.

**ANSWER:** Paragraph 116 asserts legal conclusions and therefore does not require

a response.  To the extent any response is required, Defendants deny the

allegations set forth in Paragraph 116, except to admit that Musk has denied

consent for an employee retention plan.

190

117.   During negotiation of the merger agreement, Twitter had sought Musk's consent to a broad retention plan.  Musk's team deferred decision on the matter; the plan Twitter proposed was detailed, and time for negotiation was short.  But Musk indicated he was open to further discussion.

**ANSWER:** Defendants admit that Twitter sought consent for a retention plan during negotiation of the Merger Agreement and Musk did not provide such consent.

118.   During a May 6, 2022 post-signing diligence session, Twitter management again broached the subject of retention, and Musk was non-committal.  He suggested the matter be tabled pending further clarity on the expected interval before closing the deal.

**ANSWER:** Defendants admit that Twitter sought consent for a retention plan during negotiation of the Merger Agreement and Musk did not provide such consent.

119.   Over the weeks that followed, Swan discussed with Twitter management a narrower retention plan than the one that had been discussed during the merger agreement negotiations.  Consistent with those discussions, on June 20, 2022, Twitter sent defendants a formal request for consent to two tailored employee retention programs that had been vetted by the board and its compensation committee with the assistance of an outside compensation consultant.

**ANSWER:** Defendants admit that Twitter sought consent for a retention plan during negotiation of the Merger Agreement and Musk did not provide such consent.

120.   Musk initially failed to respond at all to the June 20 consent request.  (It would soon become clear that he had fired Swan.)  After a follow-up request for consent, Musk's counsel stated tersely that "Elon is not supportive of this program

191

and has declined to grant consent for it." Twitter offered to arrange a meeting between Musk and Lane Fox to explain the importance and utility of the proposed program. Musk's counsel repeated that Musk "doesn't believe a retention program is warranted in the current environment," and said Musk was unwilling to consider the advice of compensation consultants, but left open the possibility of speaking with Lane Fox.

**ANSWER:** Paragraph 120 purports to characterize written exchanges, the contents of which speak for themselves. Defendants further admit the allegations in Paragraph 120 that Musk denied consent to the retention plan, and deny the remainder of the allegations in Paragraph 120.

121. On June 28, 2022, following further stonewalling from Musk's counsel, Twitter urged that a discussion would be fruitful. After initially suggesting Musk might be "amenable to a call next week," Musk's counsel replied, "Elon already gave his response but I'll remind him of Martha's request for a call." The call never happened — Musk has continued to duck it — and neither retention program has been implemented due to defendants' unexplained and unreasonable withholding of consent. Employee attrition, meanwhile, has been on the upswing since the signing of the merger agreement.

**ANSWER:** Paragraph 121 purports to characterize written exchanges, the contents of which speak for themselves. Defendants admit no call took place on June 28, 2022. Defendants deny the allegations in the remainder of Paragraph 121, except that Defendants aver they lack knowledge or information sufficient to admit or deny the allegations in the last sentence of Paragraph 121 and as to whether a retention program has been implemented.

122. Defendants have unreasonably withheld consent in other domains as well. On June 14, 2022, Twitter sought consent to terminate Twitter's existing revolving credit facility, noting that no amounts were presently drawn under the

192

facility and that the facility would have to be terminated in connection with the merger's consummation. Maintaining the facility requires Twitter to incur ongoing monthly costs. After initially saying he would consent to the termination, Musk withdrew it the next day without explanation.

**ANSWER:** Paragraph 122 asserts legal conclusions and therefore does not require a response. Paragraph 122 further characterizes written exchanges, the contents of which speak for themselves. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 122, except to admit that Musk has not consented to termination of the revolver and to aver that they lack knowledge or information sufficient to admit or deny the allegations that maintaining the facility requires Twitter to incur ongoing costs.

## VIII. Defendants purport to terminate the merger agreement

123. On July 8, 2022, defendants' counsel sent a letter to Twitter purporting to terminate the merger agreement.

**ANSWER:** Defendants admit that on July 8, 2022, Defendants terminated the Merger Agreement.

124. The notice alleges three grounds for termination: (i) purported breach of the information-sharing and cooperation covenants contained in Sections 6.4 and 6.11; (ii) supposed "materially inaccurate representations" incorporated by reference in the merger agreement that allegedly are "reasonably likely to result in" a Company Material Adverse Effect; and (iii) purported failure to comply with the ordinary course covenant by terminating certain employees, slowing hiring, and failing to retain key personnel. Ex. 3.

**ANSWER:** Defendants admit the allegations in Paragraph 124 that Defendants sent a termination notice, and respectfully refer the Court to that termination notice

193

for a complete and accurate description of its contents.  Defendants otherwise deny

the allegations in Paragraph 124.

125.   These accusations are pretextual and have no merit.

**ANSWER:** Defendants deny the allegations in Paragraph 125.

A.     **Twitter has not breached its information-sharing or cooperation covenants**

126.   Twitter has provided defendants far more information than they are entitled to under the merger agreement.  Section 6.4 serves the narrow purpose of giving Parent reasonable access to information necessary to close the merger.  It does not give defendants a broad right to conduct post-signing due diligence of a kind they specifically forswore pre-signing.  Much less does it give Musk the right to hunt for evidence supporting a bogus misrepresentation theory developed to try to torpedo the deal.

**ANSWER:** Paragraph 126 asserts legal conclusions and therefore does not require

a response.  To the extent any response is required, Defendants deny the

allegations set forth in Paragraph 126.

127.   In any event, Twitter has bent over backwards to provide Musk the information he has requested, including, most notably, the full "firehose" data set that he has been mining for weeks — and has been continuing to mine since purporting to terminate — with the assistance of undisclosed data reviewers.  Twitter has also spent weeks and dedicated considerable resources to compiling information responsive to Musk's numerous other requests for custom reporting of user data.  Musk and his representatives have received extensive data underlying Twitter's process for estimating false or spam accounts as a percentage of mDAU, including the granular monthly reporting identifying each of the sampled accounts by "user id" and the determination as to whether the account was false or spam, along with the calculations supporting Twitter's estimates, going back to January 1, 2021.

194

**ANSWER:** Defendants admit that Twitter provided Defendants with certain information they had requested, including its firehose API. Defendants further admit they have been examining that information. Defendants deny the remainder of the allegations in Paragraph 127, except to admit that Defendants have received certain data.

128. In their termination notice, defendants list categories of information they claim Twitter has withheld. Most of this information does not exist, has already been provided, or is the subject of requests only made recently, in response to which Twitter had been yet again compiling responsive information when it received the termination notice. All of this information sweeps far beyond what is reasonably necessary to close the merger. Defendants also complain about rate and query limits initially accompanying the firehose data. But those limits were part of the customary commercial terms defendants initially requested, and, as defendants acknowledge, Twitter increased the limits immediately upon request before the purported termination.

**ANSWER:** Paragraph 128 purports to characterize the termination notice, which speaks for itself. Defendants deny the remaining the allegations set forth in Paragraph 128, except to admit the rate limits were eventually raised.

129. As to Twitter's cooperation obligation under Section 6.11, the company has again gone well beyond what is required. The point of this provision is to assist Parent in furnishing the lenders and underwriters with information to facilitate syndication of the already-committed financing. Twitter is not obligated to provide financial information not already in existence, or to provide copies of its bankers' valuation models, which are outside the company's control. Parent, not Twitter, is responsible for providing the "prospects, projections and plans for the business and operations of" the company. Ex. 1 § 6.11.

195

**ANSWER:** Paragraph 129 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 129.

130. Even so, in response to the request defendants lodged for the first time on June 17, Twitter made the extraordinary ask of its bankers to give Musk the final board deck they presented in connection with the merger. It furnished Musk with other financial information he requested. It did so even though Musk has cited no demand from any lender — and no reason related to any obligation under any relevant contract — that would support these requests. There has been no breach, and there would be none even if the state of Twitter's cooperation remained the same at the end of the cure period.

**ANSWER:** Paragraph 130 asserts legal conclusions and therefore does not require a response. Defendants aver that they lack knowledge or information sufficient to admit or deny the allegation that Twitter requested certain information of its bankers. Defendants deny the remaining allegations set forth in Paragraph 130.

**B.      Twitter's representations in its SEC filings supply no basis for termination**

131. Nor can defendants show that Twitter has made any representation or collection of representations the inaccuracy of which is "reasonably likely to result in" a Company Material Adverse Effect. They do not even try. Notwithstanding that defendants have received mountains of information regarding Twitter's processes, far beyond what they are entitled to under the merger agreement, their termination notice asserts only that "[p]reliminary analysis by Mr. Musk's advisors" of the vast data set Twitter provided to Musk after signing "causes Mr. Musk to strongly believe" Twitter's reported estimates have been inaccurate. Ex. 3 at 6. Musk's claimed "belie[f]" is of course no proof of misrepresentation, much less of a Company Material Adverse Effect — which can be established only by clearing an extraordinarily high bar that is nowhere in sight here.

196

**ANSWER:** Paragraph 131 characterizes the termination notice, which speaks for itself. Paragraph 131 further asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 131.

### C. Twitter did not breach the ordinary course covenant

132. Having unreasonably withheld consent to programs designed to retain key personnel, Musk now claims that Twitter breached Section 6.1 by terminating some employees and failing to retain others who wished to leave. Like the others, this claim is meritless and contrived.

**ANSWER:** Paragraph 132 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 132, except to admit that Defendants claim that Twitter has breached Section 6.1.

133. While erring on the side of seeking consent, Twitter has continued to operate in the ordinary course respecting routine management decisions, including decisions concerning termination and hiring of individual employees. In early May, Twitter let go of two executives and announced it would be "pausing most hiring and backfills" as positions became vacant. Musk's counsel was notified of those decisions at the time and raised no objection.

**ANSWER:** The first sentence of Paragraph 133 asserts legal conclusions and therefore does not require a response. Defendants admit the allegations in the second sentence of Paragraph 133. Defendants deny the allegations set forth in last sentence of Paragraph 133.

197

134.   Consistent with its hiring slowdown, Twitter announced on July 7, 2022 that it was reducing its recruiting staff — a small segment of Twitter's total employee base — by about 30%.

**ANSWER:** Defendants admit the allegations in Paragraph 134, except that Defendants lack knowledge or information sufficient to form a belief as to the allegations regarding the size of Twitter's employee base in Paragraph 134.

135.   These decisions aligned with Musk's own stated priorities.  Days after signing, on April 28, 2022, Musk texted Twitter's board chair to say his "biggest concern is headcount and expense growth."   In a meeting with Twitter management on May 6, 2022, Musk again asserted that the company's headcount was high and encouraged management to consider ways to cut costs.  Musk repeated these themes in conversations with Agrawal and Segal throughout May and June.  On June 16, Musk held a virtual meeting with Twitter employees. Asked what he was "thinking about layoffs at Twitter," Musk responded that "costs exceed the revenue," "so there would have to be some rationalization of headcount and expenses."   In his final conversation with Segal before purporting to terminate, Musk expressed his concern about Twitter's expenses and asked why Twitter was not considering more aggressive cost cutting.  And, as noted, Musk has refused to approve — or even discuss — Twitter's proposed retention programs for key employees.

**ANSWER:** Defendants admit that Musk has made certain comments regarding Twitter's employees and expenses and that he refused to consent to Twitter's proposed retention program.  Defendants deny the remainder of the allegations in Paragraph 135.

136.   Twitter specifically negotiated for the right to terminate employees, including executives, without first having to obtain Musk's consent.  Musk had notice back in early May of many of the actions about which he now complains for the first time.  He did not object then or at any point prior to his purported termination notice on July 8, because there was no violation.

198

**ANSWER:** Paragraph 136 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 136.

### D. Having materially breached the merger agreement, defendants are contractually barred from terminating

137. The merger agreement provides that if defendants are in material breach of their own obligations under the merger agreement, they cannot exercise any termination right they might otherwise have. Ex. 1 § 8.1(d)(i).

**ANSWER:** Paragraph 137 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 137.

138. As set forth above, defendants materially breached their obligation to use their reasonable best efforts to complete the merger, *id.* § 6.3(a), materially breached the hell-or-high-water covenant requiring them to do all things necessary to consummate and finalize financing, *id.* § 6.10(a), materially breached their obligation to provide Twitter with information regarding the status of debt financing, *id.* § 6.10(d), materially breached their obligation to refrain from unreasonably withholding consent to operational decisions, *id.* § 6.1, materially breached their obligations to seek Twitter consent to public comments about the deal and refrain from disparaging the company or its representatives in Tweets about the merger, *id.* § 6.8, and materially breached their obligation not to misuse confidential information, *id.* § 6.4. They therefore cannot terminate the agreement even assuming they otherwise had such a right.

**ANSWER:** Paragraph 138 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 138.

199

## IX.    After purporting to terminate, Musk keeps violating and confirms his earlier violations

139.    After purporting to terminate the deal, Musk continued to make public statements disparaging Twitter and confirming the pretextual nature of his post-signing conduct.

**ANSWER:** Paragraph 139 asserts legal conclusions and therefore does not require

a response.  To the extent any response is required, Defendants deny the

allegations set forth in Paragraph 139.

140.    In the early morning of July 11 (Eastern time), Musk posted Tweets implying that his data requests were never intended to make progress toward consummating the merger, but rather were part of a plan to force litigation in which Twitter's information would be publicly disclosed:



**ANSWER:** Defendants admit that Musk posted a tweet on July 11 and

respectfully refer the Court to that tweet for a complete and accurate description of

its contents.  Defendants otherwise deny the allegations in Paragraph 140.

200

141.    For Musk, it would seem, Twitter, the interests of its stockholders, the transaction Musk agreed to, and the court process to enforce it all constitute an elaborate joke.

**ANSWER:** Defendants deny the allegations in Paragraph 141.

142.    Musk also, once again, publicly called for the SEC to investigate Twitter's disclosures regarding false and spam accounts:



**ANSWER:** Defendants admit that Musk posted a tweet on July 11 and respectfully refer the Court to that tweet for a complete and accurate description of its contents.  Defendants deny the remainder of the allegations in Paragraph 142.

143.    Musk's conduct simply confirms that he wants to escape the binding contract he freely signed, and to damage Twitter in the process.

**ANSWER:** Defendants deny the allegations in Paragraph 143.

## X.    Twitter faces irreparable harm absent relief

144.    Because of defendants' breaches and the uncertainty they have generated, Twitter faces irreparable harm.  Defendants stipulated in the merger agreement that "irreparable damage for which monetary damages, even if available, would not be an adequate remedy would occur in the event that the parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate this Agreement) in

201

accordance with its specified terms or otherwise breach such provisions." Ex. 1 § 9.9(a).

**ANSWER:** Paragraph 144 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in the first sentence of Paragraph 144. The remainder of Paragraph 144 refers to the contents of the Merger Agreement, which speaks for itself.

145.   The expected closing date for the merger is fast approaching. The lone remaining application for regulatory approval is under consideration and the parties have received no indication of any obstacle on that front. Twitter is prepared to schedule a stockholder vote immediately upon clearance by the SEC of its proxy statement, as early as mid-August. Defendants must close "no later than" two business days after satisfaction of the closing conditions. *Id.* § 2.2.

**ANSWER:** Paragraph 145 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 145.

146.   Defendants' actions in derogation of the deal's consummation, and Musk's repeated disparagement of Twitter and its personnel, create uncertainty and delay that harm Twitter and its stockholders and deprive them of their bargained-for rights. They also expose Twitter to adverse effects on its business operations, employees, and stock price.

**ANSWER:** Defendants deny the allegations set forth in Paragraph 146.

147.   Swift remedial action in the form of specific performance and injunctive relief is warranted.

**ANSWER:** Paragraph 147 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 147.

## CAUSE OF ACTION
### (Breach of Contract — Specific Performance & Injunction)

148. Twitter repeats and incorporates by reference the allegations above.

**ANSWER:** Defendants repeat and incorporate by reference the answers above.

149. The merger agreement is a valid and enforceable contract.

**ANSWER:** Paragraph 149 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 149.

150. Twitter has fully performed all of its obligations under the merger agreement to date, and is ready, willing, and able to continue so performing.

**ANSWER:** Paragraph 150 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 150.

151. Defendants have breached the merger agreement by, among other things, violating Sections 6.1, 6.3, 6.4, 6.8, and 6.10.

**ANSWER:** Paragraph 151 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 151.

203

152.    In Section 9.9(a), each of the parties agreed that, without posting bond or other undertaking, the other parties "shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity."

**ANSWER:** Paragraph 152 asserts legal conclusions and therefore does not require

a response.  To the extent any response is required, Defendants deny the

allegations set forth in Paragraph 152.

153.    In Section 9.9(b), the parties expressly "acknowledged and agreed that the Company shall be entitled to specific performance or other equitable remedy to enforce Parent and Acquisition Sub's obligations to cause the Equity Investor to fund the Equity Financing, or to enforce the Equity Investor's obligation to fund the Equity Financing directly, and to consummate the Closing" if three conditions are met: (i) all of the conditions set forth in Section 7.1 and Section 7.2 have or will be satisfied at the closing; (ii) the debt financing has been funded or will be funded at the closing if the equity financing is funded; and (iii) the company has confirmed that the closing will occur.

**ANSWER:** Paragraph 153 asserts legal conclusions and therefore does not require

a response.  To the extent any response is required, Defendants deny the

allegations set forth in Paragraph 153.

154.    All of the conditions set forth in Sections 7.1 and 7.2 have been satisfied or waived, or are expected to be satisfied or waived at the closing, and the closing will occur if the debt and equity financing are funded, which funding is solely within the control of defendants.

**ANSWER:** Paragraph 154 asserts legal conclusions and therefore does not require

a response.  To the extent any response is required, Defendants deny the

allegations set forth in Paragraph 154.

204

155.   Twitter has suffered and will continue to suffer irreparable harm as a result of defendants' breaches.

**ANSWER:** Paragraph 155 asserts legal conclusions and therefore does not require a response. To the extent any response is required, Defendants deny the allegations set forth in Paragraph 155.

## AFFIRMATIVE DEFENSES

Defendants have insufficient knowledge or information upon which to form a belief as to whether there may be additional affirmative defenses available, and therefore Defendants reserve the right to assert such additional defenses based upon subsequently acquired knowledge or information that becomes available through discovery or otherwise. Defendants state the following affirmative defenses without assuming the burden of proof on such defenses that would otherwise rest on Plaintiff.

### First Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrines of unclean hands and *in pari delicto* due to, among other things, its failure to disclose, and active concealment of, full information to Defendants.

### Second Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the terms of the agreements entered into between Plaintiff and Defendants.

### Third Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to honor its contractual obligations under the Merger Agreement.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, laches, quasi-estoppel, and/or estoppel.

206

## Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because the Merger Agreement was fraudulently induced.

## Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to comply with the implied covenant of good faith and fair dealing.

## Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because of a lack of injury in fact and a lack of causation.

## Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Twitter has suffered no losses and is not entitled (under common law or the Merger Agreement) to recover losses suffered by third parties, including but not limited to its shareholders.

## Ninth Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

WHEREFORE, Defendants respectfully request that this Court: (i) deny any and all relief requested by Plaintiff, (ii) award Defendants their costs and expenses, including reasonable attorneys' fees, incurred in defending this action, and (iii) award such other and further relief as this Court may deem just and proper.

207

OF COUNSEL:

Alex Spiro
Andrew J. Rossman
Christopher D. Kercher
Silpa Maruri
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  100010



DATED:  September 27, 2022

*/s/ Edward B. Micheletti*
Edward B. Micheletti (ID No. 3794)
Lauren N. Rosenello (ID No. 5581)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

*Attorneys for Defendants
and Counterclaim-Plaintiffs
Elon R. Musk, X Holdings I, Inc.,
and X Holdings II, Inc.*

208

# CERTIFICATE OF SERVICE

I, Edward B. Micheletti, hereby certify that on October 4, 2022, a Public Version of Defendants' Verified Second Amended Counterclaims, Answer, and Affirmative Defenses to Plaintiff's Verified Complaint was served electronically via File & Serve*Xpress* upon the following counsel of record:

Peter J. Walsh, Jr. (ID No. 2437)
Kevin R. Shannon (ID No. 3137)
Christopher N. Kelly (ID No. 5717)
Mathew A. Golden (ID No. 6035)
Callan R. Jackson (ID No. 6292)
Justin T. Hymes (ID No. 6671)
POTTER ANDERSON
  & CORROON LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, Delaware  19801
(302) 984-6000

*Attorneys for Plaintiff and
Counterclaim Defendant Twitter, Inc.*

David J. Margules (ID No. 2254)
Elizabeth A. Sloan (ID No. 5045)
Elizabeth S. Fenton (ID No. 5563)
Jessica C. Watt (ID No. 5932)
Brittany M Giusini (ID No. 6034)
BALLARD SPAHR LLP
919 North Market Street, 11th Floor
Wilmington, Delaware  19801
(302) 252-4465

*Attorneys for Plaintiff and
Counterclaim Defendant Twitter, Inc.*

Brad D. Sorrels (ID No. 5233)
Daniyal M. Iqbal (ID No. 6167)
Leah E. León (ID No. 6536)
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
222 Delaware Avenue, Suite 800
Wilmington, Delaware  19801
(302) 304-7600

*Attorneys for Plaintiff and
Counterclaim Defendant Twitter, Inc.*

Jacob R. Kirkham (ID No. 5768)
KOBRE & KIM LLP
600 North King Street, Suite 501
Wilmington, Delaware  19801
(302) 518-6460

*Attorneys for Plaintiff and
Counterclaim Defendant Twitter, Inc.*

Robert A. Weber (ID No. 4013)
Joseph B. Cicero (ID No. 4388)
Elliott Covert (ID No. 6540)
CHIPMAN BROWN CICERO
  & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware  19801
(302) 295-0191

*Attorneys for Defendants and*
*Counterclaim-Plaintiffs*
*Elon R. Musk, X Holdings I, Inc.,*
*and X Holdings II, Inc.*

*/s/  Edward B. Micheletti*
Edward B. Micheletti (ID No. 3794)

2

918903-WILSR01A - MSW