UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| WILLIAM BAKER, | ) CASE NO: 2:22-cv-06525-MCS-E |
| | ) |
| Plaintiff, | )          CIVIL |
| | ) |
| vs. | )   Los Angeles, California |
| | ) |
| TWITTER, INC, ET AL, | )    Monday, May 22, 2023 |
| | ) |
| Defendants. | )   (9:01 a.m. to 10:20 a.m.) |

HEARING RE:

MOTION TO DISMISS CASE DEFENDANTS JACK DORSEY, PARAG AGRAWAL,
NED SEGAL, VIJAYA GADDE, AND KAYVON KEYPOURS [ECF.NO.86]

AND MOTION TO DISMISS CORRECTED AMENDED CLASS ACTION COMPLAINT
BY DEFENDANT TWITTER, INC [ECF.NO.87]

BEFORE THE HONORABLE MARK C. SCARSI,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                (CONTINUED ON PAGE 2)

| | |
|---|---|
| For Plaintiff: | JONATHAN R. HORNE, ESQ.<br>The Rosen Law Firm<br>275 Madison Avenue, 40th Floor<br>New York, NY 10016 |
| Court Reporter: | Recorded; CourtSmart |
| Courtroom Deputy: | Stephen Montes Kerr |
| Transcribed by: | Exceptional Reporting Services, Inc.<br>P.O. Box 8365<br>Corpus Christi, TX 78468<br>361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**          (CONTINUED)T


For Plaintiff:          JONATHAN D. PARK, ESQ.
                        Pomerantz
                        600 Third Avenue
                        20th Floor
                        New York, NY 10016

For Defendants:         SUSAN E. ENGEL, ESQ.
                        SHERIDAN CALDWELL, ESQ.
                        Latham & Watkins
                        555 Eleventh Street NW, Suite 1000
                        Washington, DC 20004

                        GEORGE M. GARVEY, ESQ.
                        Munger Tolles & Olson
                        350 S. Grand Ave., 50th Floor
                        Los Angeles, CA 90071

                        JAIME A. BARTLETT, ESQ.
                        Sidley Austin
                        555 California St., Suite 2000
                        San Francisco, CA 94104

3

**Los Angeles, California; Monday, May 22, 2023; 9:01 a.m.**

**(Call to Order)**

THE CLERK:  Calling Item Number 1, CV 22-6525, *William Baker versus Twitter, Inc., et al.*

Counsel, rise and state your appearances.

MR. HORNE:  Jonathan Horne, Rosen Law Firm, for Plaintiffs.  Good morning, Your Honor.

THE COURT:  Good morning.

MR. PARK:  Jonathan Park of Pomerantz, LLP also for Plaintiffs.  Good morning.

THE COURT:  Good morning.

MS. ENGEL:  Susan Engel from Latham & Watkins for Defendant Twitter.  And I'm here with my colleague, Sheridan Caldwell.

THE COURT:  Good morning.

MS. BARTLETT:  Jaime Bartlett, Sidley Austin, LLP, on behalf of Defendants Agrawal, Gadde, Segal and Baykpour.

THE COURT:  Good morning.

MS. BARTLETT:  Good morning.

MR. GARVEY:  Good morning, Your Honor.  George Garvey of Munger Tolles and Olson on behalf of Defendant Jack Dorsey.

THE COURT:  Good morning.  Okay, good morning, Counsel.  I've got -- excuse me one second.

I've got a number of questions.  I've been through the papers, been through the cases, and I wanted to start if I

4

could with the issue of damages so kind of working backwards.

And so as I understand the caselaw -- and counsel can correct me if I've got it wrong -- but I'm looking at the Second Circuit case, Acticon; looking at the -- Judge Alsup's case, Luna versus Marvell Tech.  It seems to have adopted that reasoning.  And I'm trying to reconcile that with the Supreme Court case, Dura Pharmaceuticals, which was pretty clear in striking down kind of the Ninth Circuit's notion of an inflated stock price being an appropriate -- an appropriate place to start with respect to damages.

And as I understand the law -- and I guess I'll ask if I can get the defendants to weigh in on this first -- but it seems that if the stock price goes down after a disclosure and then goes back up for some other reason unrelated to the corrective action or unrelated to the disclosure, then there could still be damages even if the plaintiff sold the stock for more than he bought it for.  Is that correct?

**MS. ENGEL:**  A couple of points.

**THE COURT:**  And speak from the podium.  It might be easier for the reporter in a minute.

**MS. ENGEL:**  Your Honor, Susan Engel for Defendant Twitter.

I will say we do have a presentation as well and I can get to that later.  This is at the very end of it as Your Honor suggested.

5

The law is, as Your Honor pointed to, from 2005 in the Dura decision, a plaintiff has to have actual economic losses.

The two cases from the Second Circuit and Judge Alsup's decision in Luna both involved circumstances where the plaintiff had not sold and had held the stock for more than the 90-day bounce-back period.

I'm looking for the statutory -- the PSLRA has a statutory provision.  (e).  I'll have to come back to the exact cite.

But it has a statutory provision that provides for a cap on damages.  So if a plaintiff holds for the duration of that period and the period starts on the date of the last corrective disclosure, and it runs forward for 90 days, the average trading price during that 90 days acts -- the difference between the purchase price and the average trading price for 90 days, it acts as a cap on the damages that can be recovered.  And Congress did that in order to make sure that the securities laws don't provide insurance for losses that are unrelated to the fraud.

So in both -- in the Luna case and in the Second Circuit case, those courts said if the stock price goes up months or years later outside the 90 days for reasons unrelated to the fraud, we're not going to count that against the plaintiff and subtract those damages.  It would be inconsistent

6

with Congress' 90-day limit.  This is what we look to for capping damages.

What those cases don't say is you cannot just cap or put a floor on damages but you can create damages and that's answered we think by Dura which says you have to point to actual economic losses.  And the Ninth Circuit decision in Greene (phonetic) -- which they rely on -- predates Dura --

THE COURT:  Yeah Greene is from like 1976?

MS. ENGEL:  It is.  And I think they also have a 2000 decision as well.  But Dura was in 2005 and it overruled the Ninth Circuit's decisions which had said when the stock price -- when a plaintiff purchases at an inflated price, that that alone can be the damages.  "I paid too much for the stock, it was overvalued".

THE COURT:  Right.  And so what Plaintiffs seem to be arguing though is that looking at this sort of 90-day window, right?  So it would start when -- I guess when the disclosure is made and it would end when the stock was sold.  Looking at that average price, that average price was 44-something, was less than what Baker paid and why can't that be a measure of damages?

MS. ENGEL:  Well I mean a couple of things.

In the record there are three different bounce-back prices.  If you look at the certifications that the different lead Plaintiffs -- including both of the firms Pomerantz and

7

Rosen put in -- one said the bounce-back price was 54.20.  One said I believe it was 44.99.  And now, without a citation, in the opposition brief it's 44.20 I believe.  So we're not quite sure how they're calculating it but the bounce-back price should be calculated for 90 days.  So should the bounce-back continue at 54.20 and 54.20 should take up 25 days because the Musk purchase was on day 66?  So we don't know how they get 44.20.

But what we do know from Dura is they have to have actual economic losses.  And when you read the language of the bounce-back provision --

Thank you.  My colleague passed this to me.

-- it's 78U-4E, it was designed to cap damages.  Nothing in that statute suggests that it allows you to create damages by buying your shares at $44, selling them at 54 within the bounce-back 90-day period and then saying, "Oh, but, you know, I can point to a bounce-back price that was a little bit lower so I really didn't make money," because you actually did have a profit.  I don't think Plaintiffs have a case -- and they haven't pointed us to one -- where a plaintiff who sold at a profit within that 90-day window could bring a claim because that's -- there's just no losses, there's a profit.

THE COURT:  So the -- what about the argument that if the gain -- so let's take kind of a hypothetical example.

So let's say you bought a stock at $10, there was a

8

disclosure made, the stock drops to $5 because of that disclosure.  And then subsequently something else happens unrelated to that disclosure and the stock goes up to $15 and you sell at 15.  Are you entitled to -- are you entitled to the difference between the five and the 15 because it was an unrelated occurrence that caused the stock to rise?

**MS. ENGEL:**  I think a couple things.

I think the Second Circuit case on the Luna decision tell us that it matters when all these events happened.  So we're not looking past 90 days, whether it goes up or down.  Like that 90 days gives us a cutoff because you know for easy evidentiary reasons, right?  It's going to get harder and harder to you know a year later as it was in the Luna case -- months and years later I think the court said -- it's going to get harder to determine whether this was related or unrelated.  So we're not going to count it either way up or down.  But if someone buys at 10 and then let's say the stock price falls, something happens, and the corrective disclosure makes the stock price falls to a five, we go 90 days past that five, right?  The bounce-back period starts from the date of the last corrective disclosure.

**THE COURT:**  And the Plaintiffs in their opposition brief essentially said that that -- that period of the 90-day period ends at the sale.  So it begins at the disclosure, ends at the sale, so it doesn't necessarily go for 90 days, it

9

terminates at the sale.  Is that correct?

MS. ENGEL:  No.  I mean the statute says you calculate the average mean trading price for the 90 days.  And then if a particular plaintiff has sold within that window, you still are going to take the average price over the 90-day time.

THE COURT:  Okay.

MS. ENGEL:  Right?

THE COURT:  Now, what about the pleading requirements?  And I know Dura was a little bit ambiguous about whether kind of a heightened pleading standard for pleading these damages is required or not.

But so let's say that the Plaintiffs could or let's say the Plaintiffs' argument is that the stock dropped because of the corrective disclosure but then the stock went back up for other reasons, and so under the Second Circuit case in Luna from the Northern District, they should be able to recover that -- that delta.  Would they have to plead that, plead those, the facts underlying that damage claim in the complaint or is it enough for them just to claim damages?

MS. ENGEL:  I don't think they allege that it went back up for other reasons and that's why they made a profit.

THE COURT:  Right.  But I'm saying if that was their argument, would they have to allege that specifically in the complaint?

MS. ENGEL:  I mean the Ninth Circuit has said that

10

the elements of loss causation must be pled with particularity. So it's on Plaintiff to allege facts showing that they suffered a loss because of the revelation of a fraud and so not because of the revelation of something else.  So yes, I think that's part of their burden under 9(b) to plead facts explaining their loss.

And look, there isn't -- there's not a lot of cases on this question because we don't -- I don't think I've ever had a lead plaintiff who sold at a profit so quickly after the alleged stock drop.

**THE COURT:**  Okay so let me ask you this then.

What is the -- what's the, sort of the legal result if lead Plaintiff can't show damages?

**MS. ENGEL:**  The legal result is the case cannot proceed as a class action.

They have cited cases and we've seen cases where additional plaintiffs are added at -- on an amended complaint. We have not seen the circumstance where additional plaintiffs take the place of the only lead plaintiff.  I think the PSLRA very clearly says the only way a class action can proceed is with a lead plaintiff appointed within the very specific timeframe allowed by the court and this was a drawn out process in the court.  We had competing lead plaintiffs, then we had competing law firms.  The Court held a hearing in December. And there are cases where even if there's only one lead

plaintiff, the courts have said this is not enough of a financial loss, we're not going to allow you to go forward, you don't adequately represent the class and the result is to proceed as an individual claim.

The PSLRA requires that the court consider the plaintiff with the largest financial losses.  Here, we don't even know what the additional plaintiffs' losses are, let alone that they're the largest.

And it also requires that the Court look to whether that plaintiff, who's going to leave the class repre -- can they represent adequately the interests of the entire shareholder class?  We have not gone through that process for any of the new plaintiffs, one of whom their certification is dated November.  So this is someone Plaintiffs' counsel decided not to put up at the hearing in December.  But we're past the time for doing this so I think the result under the statute, the statute doesn't allow a securities claim to go forward as a class action in federal court under the federal securities laws absent a lead plaintiff appointment because the statute is guarding against counsel-driven litigation.

**THE COURT:**  Okay, thanks.  I'm just going to turn to the Plaintiff and I just want to tease out this damages issue and so maybe I'll give you a chance to respond.

**MR. HORNE:**  Good morning, Your Honor.  I know the Court is focused on Dura so I think I'll address that one

12

first.

Dura addressed the practice in the Ninth Circuit that was previous to Dura and it was unrelated to the measure of damages.  The issue was that the Ninth Circuit held that if a plaintiff bought shares in an artificially inflated price, that was the plaintiffs' damages right there and there didn't need to be any intervening cause in order to cause the stock price to fall, there didn't need to be a corrective disclosure that caused the stock price to fall and that you could measure damages that way.  So that was the issue that Dura was concerned with, connecting the economic loss to the misstatements.

Their position is there's no economic loss.  Dura doesn't speak to that, it's not about that, it's about loss causation, not the existence of a loss.

I know the defendants have stated -- does the Court have any questions?

THE COURT:  Well, tell me about Baker's loss.  So I want to just to put some particulars to it, when did he buy, what did he buy it for, and when did he sell?

MR. HORNE:  I'm doing this from memory, Your Honor.

THE COURT:  Well, do you have a copy of the complaint with you?

MR. HORNE:  I do have a copy of the complaint but his PSLRA certification is not attached to that complaint, it was

previously filed.

But from memory he purchased -- I believe during the period after the acquisition was announced -- and I believe the lowest price was something like 47 and change, maybe $48 -- and he tendered his shares in -- so before the Musk acquisition was announced so in the period May through perhaps July or so -- that's when it was trading at that price, 2022 -- and he tendered his shares for 54.20.

**THE COURT:**  So he bought -- let's say he bought for 48 and sold for 54, right?  So how is he damaged?

**MR. HORNE:**  He's damaged because the measure of the damages under Greene and under Dura is -- well actually also under current Model Instructions 18-9 is the difference between the value received and what was paid for it.  And the way you calculate the value received is you look at the price after the corrective disclosure, you look at the price decline.  That's how it's done everywhere.  And when the stock price fell on August 23rd, Mr. Baker made a new investment decision.  He decided look, I'm going to hold onto it, I'm going to take the risk.  If this doesn't go through, I'm going to take the risk that my stock is going to be worthless.  And that paid out for him.  He made money but that's not how the securities laws measure damages.  And the fact that he made money doesn't excuse Defendants' false statements.  It's --

**THE COURT:**  But in Luna and in the Second Circuit

14

case that Luna cites, it seems to say that later gains have to be unrelated to the fraud in order for that to be -- in order for that to be considered in the measure of damages.

And so are you trying to -- are you making an argument like Luna that says okay the stock dropped and then it went back up for unrelated reasons and so he's -- he's entitled to get the full upswing?

MR. HORNE:  That's correct, Your Honor.

THE COURT:  And so what are the unrelated reasons that caused the stock to rise?

MR. HORNE:  The buyout.  The false statements in this case were statements about Twitter's privacy protections, about Twitter's cybersecurity, about Twitter's -- you know, I don't want to go through all the false statements because the Court has read the briefs.  The buyout is not related to Twitter's privacy protections, the buyout is something else entirely and that buyout isn't related as the law considers it.

THE COURT:  But I'm wondering about if it's not all part of the same thing.  So let's take the M -- do people refer to it as MDOW (phonetic) or is there another --

MR. HORNE:  MDOW, Your Honor.

THE COURT:  MDOW.  So let's look at the MDOW issue, right?  Because that seemed to be a big issue at least in what Mr. Musk was asking about and there was a lot of -- there was a lot in the briefing about that.

Essentially, the statement that the Plaintiffs point to is a statement made by the company that MDOW was a better metric than those used by other companies because other companies used metrics that included users that couldn't see ads, essentially.  I'm sort of recapping the statement.  And that seemed to be something that Mr. Musk was concerned with in his negotiations or requests for information, his information about how this MDOW number was calculated.  Ultimately, Mr. Musk decided to go through with the purchase.

And what I'm wondering about is since Baker bought after the announcement of Mr. Musk's purchase, and Mr. Musk's process of purchasing Twitter raised this MDOW issue and then Mr. Musk went through with the sale, it would seem like it's all part of the same issue and not a separate event envisioned by Luna, and in the Second Circuit case which seem to me to envision something that happens sort of something of a different nature and something that occurs after a considerable period of time.

MR. HORNE:  So a couple of things.

First, we're talking about MDOW, we're not talking about privacy.  The privacy thing is --

THE COURT:  But can you answer my question about MDOW and then we'll get --

MR. HORNE:  Yes, yes of course.

THE COURT:  -- privacy (indiscern.)

**MR. HORNE:**  Of course, Your Honor.

The false statements were about MDOW.  And the fact that Elon Musk decided to go through with the purchase is not a confirmation that the statements were false.  It was a confirmation that Mr. Musk decided to go through with the purchase.  There are many reasons why that might have happened.  That's not proper for resolution on the motion to dismiss.

And if I may address the Second Circuit case, that actually all happened within the 90-day window.  The stock price increased during the 90-day window, that's why the District Court dismissed and that's why the Second Circuit reversed the Acticon case.  So --

**THE COURT:**  Okay.  Now let me ask you this.

The 90-day window, the question I asked Counsel, does the 90-day window run for 90 days or does it stop on the sale?

**MR. HORNE:**  I happen to have the text right here and I'm just going to read the relevant part.

"The plaintiffs' damages shall not exceed the difference between the purchase or sale price paid or received as appropriate by the plaintiff for the security in the mean trading price during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."

It's black and white, Your Honor.

**THE COURT:**  So where does the 90 days come in?

**MR. HORNE:**  The 90 days begins on August 24th and it ends on the date of the buyout which I believe is October 28th. And the mean trading price between August 24th and October 28th is $44 and change.

**THE COURT:**  Okay.  Now let me ask you the other question that I asked Counsel.

If let's say I decide that I disagree with your position and that Baker doesn't have damages here, what happens to the case?

**MR. HORNE:**  The Court has just held the PSLRA lead-plaintiff process and the movants are the movants.  These are the people who came forward and said they wanted to be lead plaintiff.  Everyone else decided they didn't want to and so you've got the people who did the diligence.

Now, you have additional lead plaintiffs who have moved forward and want to proceed with the action.  And I don't think there's any question that they suffered dollar damages. And those plaintiffs should be allowed to proceed.

Now, as to Baker's damages, we believe that is a summary judgment issue and he's certainly not alone, Your Honor.

**THE COURT:**  Right but what I'm saying is so I went through the lead-plaintiff process, right?  And we picked

18

Baker.  If the Court decides Baker doesn't have damages then what does the -- what should the Court do with the suit?

MR. HORNE:  The suit should proceed with the additional plaintiffs, Your Honor.  Because everyone who wanted to move to be a lead plaintiff got a chance to do so and didn't.  And so what we have is what we get, Your Honor.

THE COURT:  So are you suggesting that I go back and redo the lead-plaintiff process to select somebody else?

MR. HORNE:  No, Your Honor.  I'm suggesting that that's what we shouldn't do because we've already gone through it, we've just gone through it.

It happens a number of times during litigation that certain plaintiffs, for whatever reason, turn out not to have claims, either they bought during a period that's cut out of the class period or, you know, they lose a corrective disclosure and that's the only corrective disclosure the plaintiff held through.  In that case, courts usually don't order re-noticing because you can't keep doing it throughout litigation whenever something happens.  What usually happens is someone else is substituted in and that would be what would happen here.  I mean these --

THE COURT:  How does that substitution happen?

MR. HORNE:  Well, we could file a motion for -- we believe that naming them in a complaint is sufficient; if not, if it's not sufficient to the Court, we could file a motion for

intervention, a motion for substitution, but that's generally how it happens.  There's no reason to reopen it.

And just to be clear, you know, the Plaintiffs have suffered substantial losses, dollar losses.  I think one of them suffered 7,000, another one suffered 33,000.  So these are people -- these are solid people with an incentive to push this through.

THE COURT:  Okay.  Why did you advocate for Baker to be the lead plaintiff then, as opposed to some of these other folks that have actual money damages -- I mean actual dollar losses?

MR. HORNE:  Well, he was the one who was there, Your Honor.  We had -- if the Court recalls, there were two other movants and the way we measured damages is by funds spent.  And under that measure of damages funds spent, those plaintiffs had significant losses.  The problem was that they didn't hold through any of the pled corrective disclosures, they didn't hold through August 23rd.  And so for that reason the Court found that despite their substantial losses, they were not suitable lead plaintiffs.  And the initial -- the new plaintiffs, their losses didn't match that and so they weren't -- they didn't move forward to be appointed lead plaintiff.

THE COURT:  What about the one plaintiff that was added that where their disclosure was done back in November?  Why wasn't that person added originally?

MR. HORNE:  You mean added in the amended complaint, Your Honor?

THE COURT:  Uh-huh.

MR. HORNE:  We had stated that it was possible that there were some corrective disclosures.  We didn't really take a position either way.  And upon looking at the facts a little more closely, we decided that there was no corrective disclosure at that point and it wasn't worth proceeding with that.  You know, this person was not appointed lead plaintiff.  We had made arguments for that person to be appointed lead plaintiff but ultimately we didn't think there was anything there, Your Honor.

THE COURT:  Okay.  Let me go back to the defendants and to get a response on what Counsel has said with respect to damages -- I'm sorry -- the defendants.

MR. HORNE:  Oh, I'm sorry.  I thought you wanted something from me.

MS. ENGEL:  Thank you, Your Honor.  Can I pull up my slide on this point?

THE COURT:  Sure.

MS. ENGEL:  We had a number of them.  Okay.  And we have given hard copies to all counsel this morning.

And on the question of how the damages were calculated, we've calculated from Docket Entry 38-1 based on his purchase prices.  And he -- we looked at the number of

21

shares and the purchase date and the prices were all 47.80 to 50.95 -- sorry -- 50.97, and it adds up to a little over $69,000 that he paid for the stock.  And he admits now that he sold it all at the end at 54.20 which is a total of about 75,800 which netted him $6,760.

And I think the question about what does the -- what's the bounce-back period, the PSLRA talks about the bounce-back period only as a cap on damages and it has two provisions.  One is an E-1 and it sets a cap based on the trading price during the 90-day period.

Section 2 from which Plaintiffs' counsel read, sets an additional cap.  If you sell prior to the end of that 90-day period, you can't do better, right?  But nothing in these provisions is creating damages.

THE COURT:  Right.  So they're not creating a floor, they're saying this is the most you could recover.

MS. ENGEL:  Yes.  And it fits within the statutory design which is the whole point of these provisions as part of the PSLRA was to prevent a shareholder from getting a windfall through securities litigation.

THE COURT:  Now what about the -- Counsel -- and I confess maybe I didn't read it close enough -- but Counsel indicated that the Second Circuit case that Luna relies on, the person there sold for more than they bought in the 90-day period and they were still entitled to damages.

22

**MS. ENGEL:** That's just that's not correct and the cases are dense but in both of those cases the plaintiff held the stock. I don't think it's clear in Luna whether there was ever a sale okay? But I think it's crystal clear in the decisions that the stock was not sold within the 90-day period and so the question was, you know, can you still offset any price movements after the 90-day period?

The Second Circuit does say on page 39 of its decision -- and I'm reading from the Acticon case:

"If the mean trading price of a security during the 90-day period following the correction is greater than the price at which the plaintiff purchased its stock, then that plaintiff would recover nothing under the PSLRA's limitation on damages."

So again, the Second Circuit is reiterating that this is setting -- this provision is setting a cap.

I also did on the question of pleading, I phoned a friend. And the Dura case makes clear that it's the Plaintiffs' burden to -- we're really talking about proximate causation right? When we're talking about the causes of the stock going up or down. And since Dura, I think all of the circuit courts -- or at least the Ninth Circuit has said that pleading has to be done subject to 9(b).

And then I guess just the last point I'd like to make on this unless Your Honor has questions, is I mean there's just

no question that the alleged corrective disclosures here and the reason for the 5420 are connected because the announcement and the purchase price were public before Mr. Baker bought.  So to divorce those, I think you'd have to -- you couldn't divorce them for any of the MDOW statements.  I think that's clear.

THE COURT:  Well and it seems a little inconsistent right?  Because I think that the -- part of what's alleged to be the corrective disclosure is Mr. Musk's investigation and questions about the MDOW metric being wrong.  And the agreement to go ahead with the purchase seems to indicate or seems to reflect a view of the seriousness of the MDOW metrics issues. Wouldn't that be correct?

MS. ENGEL:  So the view -- the stock drop?

THE COURT:  Well the fact that Musk went through with the sale, right?  Would seem to be relevant to his concern about the MDOW numbers.

MS. ENGEL:  I think that's fair and I know counsel for individual defendants made that argument in their briefing and I think -- look, I mean I think it's -- you know, the up and down movements in the stock price between Mr. Baker's purchases, you know.  I mean if the case ever went forward, you can see how they correlate to shareholders' expectations and markets' expectations about whether the deal would or would not go forward.

THE COURT:  Right.

24

MS. ENGEL:  I don't need to go through my whole slide deck.  I would -- we don't believe that the case should go forward even on an individual basis.  And I think if I could, I would hit -- just hit a couple additional points.

THE COURT:  Well let me -- I've got another area that I wanted to focus --

MS. ENGEL:  Oh, please.

THE COURT:  -- a bit on if I could.

So the MDOW statement that jumps out, at least to the Court in the Plaintiffs' papers, is this statement that -- and I'm paraphrasing it so I might not have it exactly correct -- but something like we believe MDOW is a good statistic to use because unlike what our competitors -- or unlike statistics that our competitors use that include people that don't see ads.  Do you recall that -- that statement?

MS. ENGEL:  So that statement predates the class period and it's not chall --

THE COURT:  I'm sorry, that statement predates --

MS. ENGEL:  That statement is not a challenge statement.  It is all over the Plaintiffs' briefing and it is in the background of the complaint.  Plaintiffs don't challenge that statement as false or misleading.

THE COURT:  Okay.  So you're saying that that statement is not a statement that Plaintiffs are pointing to as being false or misleading.

25

MS. ENGEL:  Correct.

THE COURT:  What I'd like to understand -- and I'll get Plaintiffs' view on that -- but what I'd like to understand is, other statements that the company made or people on behalf of the company made that would put that statement in context. In other words, there were statements that the company made that a certain percentage of MDOW may have been fake users, say.  But are there other statements that put that statement in context?  So let's say that the Court -- let's say that Twitter had made a statement that said, you know, "All M -- all users included in the MDOW statistic are users that saw ads," okay? Let's say it was a clear statement there.  Are there other things that Twitter said that would put that statement in context, meaning are there other things that from which you can incur the message from Twitter was, all MDOW users see ads except of course for the fake accounts?

MS. ENGEL:  Yes.  And I have a slide.  Let's see.  I think Your Honor has hit upon one of Plaintiffs' main arguments is Twitter said MDOW was people who generated revenue and saw ads.  So no, it didn't.  I think every SEC filing that the plaintiffs are challenging, clearly and repeatedly and more than one place in each filing -- defined what an MDOW is.

So I'm looking at one of the 10 cues that's at Exhibit 5 and there's a note regarding key metrics at page 5. And I think all of the note, it's the first three paragraphs

26

are all enormously helpful context for the challenge to MDOW.

I'm not sure what else the company could have said to tell

investors, this is what we mean when we say MDOW.  And we

define MDOW and it's up here on the screen.  I actually

can't -- I can barely read the little font here.  I'll read

from the screen:

   "We define MDOW as people, organizations or other

   accounts, who logged in and were otherwise

   authenticated and accessed Twitter on any given day,"

   right?

   It's a measure of daily users.  And they had to have

accessed Twitter through one of these other sources --

twitter.com or Twitter applications that are able to show ads.

This is a measure of Twitter's audience size, right?  It's not

just a measure of who's engaging.  Right?

   Plaintiffs also point to another metric that they

say, Oh, people were using other metrics and they were

concerned that this measure, this other measure of engagement

was declining.  They cite an email I think at -- I won't guess

as to the date.

   Twitter also said, same page, in its very lengthy

discussion of what MDOW is:  "We review a number of metrics,

including monetizable daily active users."

   It also, throughout the SEC filings, it references

MDOW as a measure of the size of the audience and engagement.

It doesn't say it's the measure of engagement alone, it says, We believe this is the best way to measure our success against our objectives.  We believe it's an opinion statement.

I think the disclosures on page 5 talk about how the company makes subjective judgments and it's inherently challenging to estimate this number given the pulling -- for a variety of reasons but including pulling out the fake and spam accounts.

So we just -- the contradictory facts, I think the Ninth Circuit has said, How do you allege a false statement?  Right?  You can't just say there's general fraud going on, right?  That's -- I think that's the Mechler (phonetic) decision from almost 20 years ago and from the Ninth Circuit.  You have to point to a material, particularized fact that contradicts what was said.

So what Plaintiffs have done here is they've copied and pasted from a whistleblower complaint that was not subject to the heightened pleading requirements of the PSLRA and they've dumped a lot of stuff in their complaint.  And we made a puzzle pleading argument.  And we believe the complaint fails at the threshold before -- before we get into some of this nitty gritty.

Like to write our briefs, I have to say I had my complaint open in three different places and it was very hard to follow the scavenger hunt, you know, to see what is the fact

28

that the plaintiffs are trying to pare with each particular statement.  We don't think it's there on the complaint.

We think the Mendoza case from this district court you know makes clear that the PSLRA requires more than just saying, Here's the statement, here's some facts that were left out of it.  The PSLRA requires that you explain why particular material facts render a statement misleading.

I think a cross-cutting ground for dismissal across all of the categories, whether it's privacy, the security, there's an intellectual property statement, some, you know, arguments that when you said we were very transparent about the public conversation, that was misleading.  All of these different categories fail because there's no allegations of scienter.  I don't think I've ever defended a complaint where there wasn't a section of the complaint that said, Here's our scienter allegations.  So this (inaudible) again, it fits with the puzzle-pleading theme.  Where are the scienter allegations? There are 50 pages.  Plaintiffs don't want us to say they're background.  It looks like background.  Maybe they're factual allegations but there's 50 pages of them on a range of topics because they just copied from the whistleblower and dumped it in but they're not pared to particular statements and they're definitely not pared to, Hey, the guy who made the statement, he knew this particular fact at the time he made the statement and it contradicts what he said.  So there's no scienter

section.

When they do argue about they point back to their background and they say there is scienter allegations but what they're pointing to are group pleading, right?  Twitter executives were told this.  Management were told this.  Zatko heard that years before, there had been a problem and it was raised to the board.  That's just not enough, it falls far short and not just because it's group pleading.

And you know the typical path, stock sales, they're not alleged here.

There are no reliable confidential witnesses.  They point to Mr. Zatko and they say his name so he's not anonymous.  That's, you know, one point.  But Mr. Zatko only started his tenure at Twitter in November of 2020.

The only statement that they challenge in their opposition brief that they offer a theory of falsely for, the only two statements that they look at are a September blog post from 2020 so it's two months before Mr. Zatko started work and it's five months before this February 2021 presentation to quote Twitter executives that Mr. Zatko gave about, "Hey, I've done investigation for two months, I've done a study, I've talked to people, here's the areas where I think you should improve," okay?  So none of the Zatko allegations can possibly be -- create scienter.  They don't go to the mental state of the speaker in September 2020.

30

The only other claim about security that they challenge is a risk disclosure.  I highlighted in green -- or I will say my phone to friend highlighted in green -- the sentences that Plaintiffs don't mention Twitter disclosed.  It experiences cyberattacks of varying degrees on a regular basis.

I think the Ninth Circuit decision in it's a Twitter case -- Weston (phonetic) versus Twitter just last year, makes clear there's no duty of completeness.  And I think the bulk of their arguments, when you go past scienter back into falsity, is a duty of completeness.  You do either didn't disclose, you don't just disparage yourself either but the company didn't disclose these details.  But when those omitted facts about details in the company's securities practices, when those don't contradict what the statements say, there's no falsity.  And as I said, we're stumbling at the scienter stage alone.

I'm happy to stop there unless Your Honor has any more particular questions.

THE COURT:  Why don't we stop there and I'll give the Plaintiffs an opportunity to respond to the arguments.

MS. ENGEL:  Thank you.

THE COURT:  And if you could start out, Counsel, with the MDOW issue.  I may be mistaken.  I had thought that was one of the statements that you were claiming was false, that the MDOW was a good metric because unlike -- because it was different than the metrics of our competitors which include

users that don't see ads.

MR. HORNE:  That's correct, Your Honor, it's not a statement we allege is false.

THE COURT:  Okay.

MR. HORNE:  This is what they're saying when they're introducing it.  So during the class period, when they report MDOW, they refer back to what MDOW is; and MDOW is, unlike our competitors which show include people who don't see ads.  You know, this is what MDOW is.  So whenever they report the numbers, they're implicitly taking in that statement.

Does the Court have any questions?

THE COURT:  Well -- so you're saying that statement was false but it was made implicitly when they reported the numbers.

MR. HORNE:  That's correct, Your Honor, that's what happens when they report numbers.  They're reporting this -- this metric that they previously defined.

So as to the "we are able to show ads," that's quite a way to disclose that one third of these people aren't seeing ads, aren't earning you any revenue.  "We are able to do 'X'" frequently means "We do 'X'."  "We are able to recognize revenue" means "We recognize revenue."  It is completely normal English construction.  And if they're going to use that as their excuse for saying, by the way, don't -- ignore this thing that we said when we introduced it, that's not good enough,

32

Your Honor.

THE COURT:  But let's say -- let's say you know I sign up for Twitter and I create an account and then I just don't ever check it.  You know, it's on my phone but I -- it's not an app that I ever open.  I would be included in the MDOW number, correct?

MR. HORNE:  No.  Because you're not a daily active user.

THE COURT:  Okay, I see.  So it's just -- it's just people that access it on a daily basis.

MR. HORNE:  Yes.

THE COURT:  And why wouldn't a fake account be able to see ads?

MR. HORNE:  Well that's the thing, they don't.  I mean there's a third of people who have a fake account -- I'm sorry.  Let me back up a little bit.

A fake account would be able to see ads as far as their statements say and they would be earning revenue from the fake account.  It would just be a problem for advertisers.

THE COURT:  So yeah, so if I had a fake account, let's say I don't want to use my name and I create a fake account, it's not really -- the fact that it's a fake account doesn't seem to be significant with respect to the ability to show ads, right?

MR. HORNE:  Yes.  But it is significant when you go

EXCEPTIONAL REPORTING SERVICES, INC

to the advertisers and you tell them you ought to pay this much for -- you know, for our ads.

THE COURT:  Let me talk about the complaint a bit.

So I have it here.  And it's a long complaint.  And the issue that I've got with it in general is that it's kind of hard to track the -- you know because we're dealing with a heightened pleading standard here, it would really be helpful if the complaint was more in the lines of, you know, this was the -- this was the bad action, this is who committed the bad action or who knew about the bad action, this is the corrective disclosure that related to the bad action, and this is the damage caused by the corrective disclosure.  You know, kind of those elements together.

In the complaint, everything is really really spread apart.  You know for example, one of the things you say is, "The defendant falsely claimed that only five percent of accounts on Twitter were bots."  And this is in paragraphs 267 and 268.

MR. HORNE:  May I pull up a copy of the complaint?

THE COURT:  Sure.  So on the statement of only five percent of the accounts on Twitter were bots, paragraph 191 you say it's false and then 30 pages later you cite sort of the proof that the statement was made in paragraphs 267 and 268.  Similarly, you say "Defendant Segal falsely told investors that Twitter was very careful to prevent misinformation around an

election."  And you say that's false on page 97 but then you cite the proof of the statement on page 223 which is 43 pages later.  And these -- this sort of the way this pleading is put together makes it very hard to track what whether or not you're ticking all the elements because frankly I mean I read through the complaint but it's an awful chore for the Court and for the defendants to really have a sense as to what you're saying here because it's not -- it's not put together in a logical fashion.

And so I'm wondering whether if the Court did grant leave to amend, would you be able to address that issue?

**MR. HORNE:**  Absolutely, Your Honor.  I do have to warn you it would be a longer complaint.

**THE COURT:**  Well, I'm not sure why it would be a longer complaint but -- but I think that's neither here nor there.  I just think it's kind of hard to -- hard to understand, hard to pick out the specific things.

So talk a little bit about MDOW.  What's the strongest statement you've got with respect to the security issue?

**MR. HORNE:**  We have some by category.

The cybersecurity statement is very strong and the reason it's strong is defendants conflate an attack with an incident or a breach.  I get attacks every day, Your Honor -- every week, Your Honor, I get emails that say "click on this," you know.  That doesn't mean anything.  A breach is when

they're actually getting data out of you.  That means falling for that email and it happens 20 times in 2020 so this isn't a theoretical thing.  This is something that happens every two weeks and so they're warning that they get attacked but we have preventative efforts.  We can't tell you that they're going to be -- we can't promise you they're going to be successful but in the context that means they've been successful so far and that's just not true.

**THE COURT:**  Well, because I'm not sold on this and so I guess just to give you some of my thinking and maybe it'll help the arguments.

Like the MDOW statement struck the Court as maybe something you know there that was objective or definitive enough but now that I understand the argument I'm not sure -- well, I'll go think about that a little bit more.

But with respect to security and misinformation, I'm just not seeing anything definitive from Twitter that says you know, for example, "We -- our system is completely secure," or "We don't have any problems with attacks," or we -- "We will disclose every single one of our disinformation campaigns."  I don't see anything that's that definitive.  And so I'm wondering -- maybe I'm missing something but what's the most definitive?  You know if you -- what's your -- what are your top three of statements that Twitter made that are just, you know, false objectively?

**MR. HORNE:**  I'm happy to go into that.  The standard isn't false, it's misleading.  But I understand the Court's question so I'm going to answer that.

They made some statements about the procedures that they use in order to -- the procedures that they use to protect personal information.  And so some of them -- paragraph 232:

We require specific justification for access.  Access is limited and only granted for valid business reasons; i.e., ensuring an accountholder can get support if they are locked out of their account."

And we have strict principles around who is allowed access to which tools and at what time.

And in reality, all engineers had access to data all the time, personal -- personal information all the time and no one's monitoring them, they don't have to say anything, they can just access it.  So those statements are outright false.  They don't require any justification.  You can just go if you're an engineer which is half the company.

**THE COURT:**  And so again, let's just tease the saddle a little bit.

So access is limited and is only granted for valid business reasons.  So "access is limited" would seem to imply that there is some limitation to access.  And so your claim is that there was no limitation to access.

**MR. HORNE:**  Not for engineers.

THE COURT:  Okay but there was limitations for non-engineers?

MR. HORNE:  We don't know what those limit -- we don't allege one way or another what those limitations were.

THE COURT:  Because looking at the statement I would think that if you said, okay well the engineering team can have access but you know the -- oh, the payroll team can't or the human resources team can't, then this statement would be true because they're saying access is limited.  And --

MR. HORNE:  What they're saying -- I'm sorry, Your Honor.

THE COURT:  No, no, go ahead.

MR. HORNE:  What they're saying is, okay, well there's one limitation.  Any limitation.  Let's say Jim doesn't have access.  Well that's a limitation and therefore the statement is true.

THE COURT:  Right.

MR. HORNE:  The context in which it's made, this is from the September 30th statement.  This is after they've been hacked, they've had an FTC complaint served on them, a draft FTC complaint.  And the reason they were able to be hacked very publicly was that there was too much access and you could just call someone, get their credentials and then, you know, proceed.

THE COURT:  Well I mean the reason why they were

hacked is because somebody fell for -- sort of a phishing scheme, right?

MR. HORNE:  Yeah.  And in the ordinary case, that person wouldn't have access to everything and wouldn't be able to do that but in this case because they had such overbroad access, they were able to just access any account.

THE COURT:  Right.  But like there's gotta be -- so let's say I'm working at Twitter and I'm the engineer in charge of setting up user accounts, that's my group, so I have to have access to all user accounts.  And so let's say I'm the victim of the phishing expedition and I give somebody my credentials because they tell me that -- I don't know, I fall for some scam.  Well that's -- that sequence of events wouldn't necessarily be contrary to the statement, right?

MR. HORNE:  They have to find you, Your Honor.  You know, there's a difference between here's 4,000 people you can send a phishing email to and, okay, I have to find the Honorable Judge Scarsi and send and convince him specifically to click on that phishing link.  The limitation to one or two people or strict limitations to who can have access is how investors would understand it.

THE COURT:  So we've got this statement, the paragraph 232 goes on to say:

          "To further secure our internal tools from potential misuse, we have been strengthening the rigorous

39

checks that team members with access must undergo."

To me, because of the adjectives here, "further secure, strengthening, rigorous," those are all kind of words that are open to interpretation.  I mean it's hard to read this as sort of an objective statement that could possibly be false. I mean I would think in my example if Twitter had said, you know, "Okay, Judge Scarsi, you can't have access anymore because you fell for this phishing scam," that would be strengthening, right?

**MR. HORNE:**  The Court has to look at the statements the way a reasonable investor would look at them.  And in context.  And technically, you could have anything.  It didn't have to be, "You no longer have access."  It could be, "You have to change your password."

**THE COURT:**  Right.  And that's what they did, right? They made everybody change their passwords.

**MR. HORNE:**  A reasonable investor would not think that when you say you've strengthened something in response to an FTC -- in response to a hack, that you made a completely de minimis change that doesn't really change anything.

**THE COURT:**  Okay.  So thanks for pointing out what you have in paragraph 232.

You know, moving on to sort of the other -- sort of the top -- top three, where is the next place you would direct me in the complaint?

MR. HORNE:  The statements about foreign influence, Your Honor.

THE COURT:  In what paragraph?

MR. HORNE:  I apologize.  I'm looking it up.  That is paragraph -- well the most direct one is probably paragraph 230 I believe.  Yeah, 230.  And I'll read the statement to the Court.

"So and over the years we've been very, very transparent about any attempt that we've seen from state actors to manipulate the conversation on Twitter, right?  And we've shared those transparently.  We've been active in detecting them."

And that's not true.  They've concealed one.

And I know the defendants have a materiality argument and it's sort of like, you know, a burglar walks past 35 houses and robs the 36th.  It's still a burglar.  You know, it's material that you did it once.

THE COURT:  And I'm sorry, just digging into the statement.  So when was this statement made?

MR. HORNE:  This statement was made in March 10, 2022.

THE COURT:  Okay so --

MR. HORNE:  On March 10.

THE COURT:  3/10/22.  And your claim is that they didn't disclose a misinformation campaign from -- I forget the

country.

MR. HORNE: India.

THE COURT: But what was that misinformation campaign and when was that?

MR. HORNE: That was a misinformation campaign that they discovered in August 2020 and they made a conscious executive decision not to disclose it in order to gain favor with the Indian government.

THE COURT: Okay so -- right. That was in India then, right?

MR. HORNE: That's correct. It was the portion of the Indian army that's responsible for Kashmir.

THE COURT: That's right. So they made -- so they discovered that -- that misinformation campaign in August of 2020 and then made the statement in March of 2021 that said, "We've been very transparent about any attempt that we've seen from state actors to manipulate the conversation on Twitter."

MR. HORNE: 2022, Your Honor, but yes.

THE COURT: I'm sorry, (indiscern.) gotcha.

Okay. And what's false about this is that essentially the statement is saying, "We've disclosed every attempt by state actors to manipulate the conversation on Twitter" by the use of the word "any," right?

MR. HORNE: Yeah.

THE COURT: And they didn't.

MR. HORNE:  They didn't.

THE COURT:  Okay.  Then give me one -- one more if you can.

MR. HORNE:  There's a similar statement at 240 on the same topic.  They said, you know, We made a promise to disclose any, and then they listed -- well, why don't I just read the statement.

"In 2018, Twitter committed to disclose publicly any -- any state-backed information operations that were reliably identified on the service and to make the full data sets of those operations available for investigation and analysis.  Since this first release over two years ago, Twitter has now disclosed over 35 separate state-backed information operations to nefariously shape and manipulate public opinion online."

Now, if you're saying, "We made a promise to do this and then here's what we've done," there's an implicit statement that we kept our promise which they hadn't.

THE COURT:  Right.  And they didn't keep the promise because of the India issue.

MR. HORNE:  That's correct, Your Honor.

THE COURT:  Okay.  Thank you.

Let me go back to counsel for the defendants and I just want to address this point on the misinformation and why

43

these statements aren't false.

MS. ENGEL:  Thank you, Your Honor.

On these -- on the last couple so I think it's statement 11 in paragraph 230.  Can you tell me the paragraph number of the last one that you were talking about?

THE COURT:  We were looking at 230 and 240.

MS. ENGEL:  240.  Okay.  So I have both of them up here on the screen.

Starting with the argument that I said was the cross-cutting argument, there's no scienter allegations. There's nothing in the complaint suggesting at the time that the couple of individual defendants who spoke, who were answering questions at conferences.  The one question started as a conversation about Russia and Ukraine.  There's no fact in the complaint -- Like forget particularized even --  suggesting that anyone was trying to deceive.

I also think they just -- these statements aren't alleged to be false.  We've been very, very transparent about any attempt that doesn't say, "We have told you every single campaign at the moment we discover it."  In fact, read in context, the remainders of these statements say, "We have to balance privacy concerns with our disclosures about operations".  And I think when you read the complaint there were disputes and debates and discussions within the company about business strategy, business priorities and how you figure

44

out whether someone is or is not a bad actor.  It wasn't an easy conversation and these statements, there's no objective way to determine whether or not they're false but we think they're easily disposed of on scienter grounds.

I think it's also important --

**THE COURT:**  But just to tease that out, doesn't "any" though mean "every" when the statement says, "We've been very very transparent about any attempt," doesn't that mean every attempt?

**MS. ENGEL:**  I don't think it says, "As soon as we discover an attempt, we are definitely going to disclose it immediately".

**THE COURT:**  But this was -- this was several years later, right?

**MS. ENGEL:**  Well I mean I think it's also worth looking at paragraph 155 of the complaint.  That's the entire basis for this allegation and I think we see more of their group pleading.

"In or around August 2020, Twitter -- so the company, no names -- "learned about an operation."

The next sentence on line 26:

"In executive discussions taking place in or around August 2021" -- no names.  No suggestion that the speaker of the statement, months -- I think was this March 2022 or a year later -- no suggestion that the speaker was involved in any of

45

these discussions.  And then how does it get into the complaint?  Hearsay.  "Zatko learned that Twitter -- no names -- "had made the executive decision not to disclose the operation."  Those are not reliable, not particularized facts to show falsity and there's certainly no allegations that the speaker knew any of this discussion, vague discussion, or intended to deceive investors in answering a conversation about a commitment to transparency.  I think when you read all of the statement in context, it's also just not actionable.

And I think the Ninth Circuit last year -- again in that Twitter case that I referenced, it set the standard for what is puffery.  It's not just, you know, speaking positively, right?  It goes to whether a statement is capable of being -- determined to be false or not.  Right?  Where a statement is imprecise and it's non-committal.  "We're very very transparent about any attempt".  Well what does that mean to be very very transparent about any attempt?  Does it mean that if you discover something and it's sensitive, you haven't yet verified it?  There's just no -- there's no allegations that are sufficiently particularized that show that the speaker concealed a fact that would have rendered the statement false.

On the couple security statements if I might just address those quickly?

I think it's important that Plaintiffs leave out from their complaint what I've highlighted in yellow from the

46

September 2020 blog post, okay?  Their argument is that Twitter concealed that engineers had access to user data and this is in Exhibit 6.  We have the September 2020 blog post to the Weber declaration so I guess it's document 88-6.

"We have teams around the world that need to access customer data to provide account services and keep Twitter running.

For example, engineering team members have access. What do they have access to?  I think that's read to refer back to the customer data to build and operate the features that people rely on every day.  That wasn't concealed.

**THE COURT:**  I think I've got enough on this but let me just ask you, I wonder if you can address the core operations doctrine.  Essentially, you know, the Court can infer that critical facts to the core operations of the business are known to the company's key officers.  And it does in fact give the Court the ability to indicate that these folks have knowledge of all of these issues.

**MS. ENGEL:**  Not without additional pleading, right? It is not enough for a plaintiff to come in and say, "This was really important to the company".  You know, otherwise, you know, any claim about ads or revenues would go forward against a company.

The Ninth Circuit and District Courts in this circuit have made that clear.  I think the Lending Club case, Veal

47

versus Lending Club (phonetic) discusses it.  To allege core operations you -- Plaintiff also must allege something more, that there was access by the individual defendants to detailed facts contradicting what was said.  It's not this is an important issue alone, it's this is an important issue, plus access to the facts that contradict what was said.

And I think Plaintiffs point to the Cinemark versus Twitter case and Judge Tigar did rely on core operations but he didn't rely on it alone.  He relied on core operations plus the individual defendants' access to the challenged data in that case.

And I don't think Plaintiffs cite a case where scienter is grounded on, "Oh, this is an important issue, everyone must have known."  I think the Ninth Circuit caselaw is clear that that's not enough.  Just because individual defendants are in high positions and the issue in the case -- which it often is in a securities fraud claim -- is important, that's not enough.  You have to show, here's the information that contradicts what was said and here's how the individual defendants knew about it, and where are the facts that the speaker was trying to deceive investors?  There's just nothing in that complaint.

I would just briefly like to touch on, I mean we are asking for dismissal with prejudice.

This is the third complaint that Mr. Baker has filed

48

and we lay them out here.  And I don't know what it means like that it would get bigger.  I think the -- it was hard to follow it as it is but we think they've had their shot.  We think all sides have put a lot of resources into the case.  We don't think amendment is possible to state a claim.

I think Plaintiffs pointed us to the -- their strongest arguments.  I think the security ones are you know that's clearly not supported in that 2020 blog post based on Zatko working at Twitter months later.

The statements about misinformation, there's just no effort to plead scienter at all and we don't think the statements say what they say.  But so that our position is dismissal with prejudice is warranted.

**THE COURT:**  Thank you.

Okay, last question to the Plaintiff.

I just want to going back to this Indian army issue, take me through in the complaint how it's alleged that the failure or the alleged misstatement that Twitter discloses all of these, and the fact that Twitter did not disclose this one, how does that lead to damages?

**MR. HORNE:**  This is information that was revealed on August 23rd, Your Honor.  It was amongst the mix of information that was revealed by Zatko that day.  And that is information -- it's something typically that is shown through expert discovery.  The experts analyze the information that was

**EXCEPTIONAL REPORTING SERVICES, INC**

49

disclosed that day, determines what's fraud-related and then prices them.

THE COURT:  And just so where in the complaint do you indicate that this information was released on -- you said twenty --

MR. HORNE:  August 23rd, 2022.  And we allege paragraph 292 that an unredact -- a redacted complaint, a redacted version of Mr. Zatko's whistleblower complaint was released that day and that included the Indian army allegations.

THE COURT:  Okay.  So paragraph 292:

"On August 23rd, 2022, an article in the Washington Post publicly reported for the first time Zatko's whistleblower disclosure to the federal government."

That's what you're referring to?

MR. HORNE:  Next sentence:

"The Post published a partially redacted version of Zatko's whistleblower complaint, as well as two internal Twitter documents attached as exhibits thereto."

THE COURT:  Okay and so this is a general statement but how do we know that this includes the Indian army issue?

MR. HORNE:  Those were included in Zatko's -- those were included in Zatko's whistleblower report.

THE COURT:  And I'm saying, where is that alleged in

EXCEPTIONAL REPORTING SERVICES, INC

50

the complaint?

MR. HORNE:  I actually don't -- I don't know if we directly allege that, Your Honor.

THE COURT:  Okay I think I -- thank you for the argument.  I think I've got enough to go back and chew on this.

MR. HORNE:  May we be heard on scienter?  I know the Court hasn't asked us questions about the defendants --

THE COURT:  May be heard, I'm sorry?

MR. HORNE:  On scienter.  I know the Court hasn't asked us questions on Defendants' arguments.

THE COURT:  Okay yeah, I'll give you three minutes on that and then I want to turn to other counsel to see if they want to say anything.

MR. HORNE:  Okay.  The scienter test is you take particularized allegations and you draw inferences from those particularized allegations.  The cases that they're citing are cases where there was nothing done.  There were no allegations about what was known internally.

What we have here are board meetings at which information was discussed.  We have the date of the board meetings, more or less, we have the date of the executive decisions, more or less.  That's -- those are particularized facts and we're asking for inferences from that, including attendance at that board meeting but that's a very different question.  The question is whether you can infer that certain

EXCEPTIONAL REPORTING SERVICES, INC

51

people were at the board meeting.  That's different.

Now as to Zatko's reliability, it was his job to know what cybersecurity issues the board had discussed at prior meetings, what executive decision had been made about foreign influence and what Twitter had told the FTC.  That's literally his job.  And as the Court said in Mattel, witnesses are allowed to get information from reliable sources and this guy's job was to get information from reliable sources.  And so the Court can assume there's no hard and fast of anything not within his personal knowledge doesn't exist.

**THE COURT:**  Thank you, Counsel.

So let me hear from the counsel for the individual defendants, counsel for Mr. Dorsey if they want to add anything.

**MS. BARTLETT:**  Thank you, Your Honor, I'll be brief. I know we've gone long today but I would be remiss if we left today and I didn't just stop for a minute on the MDOW statements.

And the Court had some questions about them and falsity but I want to note that Plaintiffs' attack and they acknowledge this depends entirely on Elon Musk being their source of truth and he can't be their source of truth.  He publicly admitted he was uninformed about MDOW.  He publicly admitted he had a goal of shirking his commitment to a 44 billion dollar acquisition.  And after receiving substantial

52

discovery, in that dispute, he abandoned his unsubstantiated claims and went through with the deal.  So his statements, which are the only things that Plaintiffs put forward regarding the MDOW statements, cannot support either falsity or loss causation.  And so the statements must be dismissed.

And I know we've talked about scienter so I won't focus on that but I just want to pause on loss causation, Your Honor, because Plaintiffs -- maybe in the only place that they've clearly identified some things -- list a series of Mr. Musk's tweets and his -- and two news articles or a news article and an SEC letter as their purported loss causation for the MDOW statements.

But if Your Honor looks at the statements, not one of them corrects any disclosure or speaks to anything about MDOW being the best metric or the preferred metric for the company. Not one of them contradicts the statement that advertisement revenue was being driven -- increase was being driven by MDOW. It's merely a question, how do advertisers know if they're -- what they're getting for their money.  It has no fact, it's a question he poses in a tweet.

There are no corrective disclosures really that the MDOW calculations or failure to remove spam or bots or inclusion of suspended accounts in the calculations.

His threats to cancel the deal are not corrective disclosure and not facts, and primarily the tweets focus on his

53

concern that he didn't have the information he needed which goes straight to the point that they cannot be used as corrective disclosures for these statements.

THE COURT:  Right.  And even if they could, right? We'd have to take it altogether.  So we'd have to take those statements and Musk's decision to go through with the deal as part of the same -- the same body of evidence.

MS. BARTLETT:  Certainly, Your Honor.  And in there the Court would also have to consider that he received discovery in that litigation specifically on the MDOW issue and in fact specifically from one of the people named as defendants in this case's email accounts or accounts.  So Mr. Musk, upon purportedly being informed, moved forward with the deal and closed it, notwithstanding his tweets raising questions again, not about the voracity of the statements or raising any conclusions about the voracity of the MDOW statements, but just saying, "I'm not getting the information I want," and that's all he had to say.

THE COURT:  All right.

MS. BARTLETT:  Thank you, Your Honor.

THE COURT:  Thank you.  Counsel for Mr. Dorsey?

MR. GARVEY:  Thank you, Your Honor.  I have nothing to add to Ms. Bartlett's and Ms. Engel's comments unless the Court has questions.

THE COURT:  I think I'm all set.  Thank you very

54

much.

MR. GARVEY:  Thank you.

THE COURT:  Appreciate that.  Well thank you counsel, appre --

MR. HORNE:  Your Honor, may we be heard briefly on loss causation?

THE COURT:  I think I've got everything I need on that but thank you though.

MS. ENGEL:  Your Honor, can we pass up --

THE COURT:  Yes, please.

MS. ENGEL:  -- our copies of the dec?  Thank you very much.

THE COURT:  Yes, please.  Okay.  Thank you counsel, appreciate it.  We'll get something out soon.

**(Proceeding adjourned at 10:20 a.m.)**

**EXCEPTIONAL REPORTING SERVICES, INC**

55

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    May 24, 2023

             Signed                                      Dated


*TONI HUDSON, TRANSCRIBER*