1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10   WILLIAM BAKER, MOHAMMED              Case No. 2:22-cv-06525-MCS-E
     THASEEN, JILL SLIGAY, LENARD
11   ROQUE, and AMOLKUMAR               **ORDER RE: DEFENDANTS'**
     VAIDYA, Individually and on Behalf  **MOTION TO DISMISS CORRECTED**
12   of All Others Similarly Situated,    **AMENDED COMPLAINT (ECF Nos.**
13                                        **86–87)**

14                  Plaintiffs,

15

16           v.

17   TWITTER, INC., JACK DORSEY,
     NED SEGAL, PARAG AGRAWAL,
18   VIJAYA GADDE, and KAYVON
19   BEYKPOUR,

20                  Defendants.

21

22

23          Defendant Twitter, Inc. moves to dismiss the corrected amended complaint of

24   Lead Plaintiff William Baker et al.  (Twitter Mot., ECF No. 86.)  Separately, Individual

25   Defendants Jack Dorsey, Ned Segal, Parag Agrawal, Wijaya Gadde, and Kayvon

26   Beykpour also move to dismiss Lead Plaintiff's amended complaint.  (Individual Defs.'

27   Mot., ECF No. 87.)  Lead Plaintiff filed a consolidated opposition, (Opp'n, ECF No.

28   101), and Defendants replied, (Twitter Reply, ECF No. 109; Individual Defs.' Reply,

                                         1

ECF No. 110).  The Court heard oral argument on May 22, 2023.  (Mins., ECF No. 113.)

## I.    BACKGROUND

This is a securities fraud case concerning allegedly false and misleading statements made over a two-year period beginning in August 2020.  (Corrected Am. Compl. ("Compl.") ¶ 1, ECF No. 81.)   Individual Defendants are former executives of Twitter.  (*Id.* ¶¶ 32–36.) Over the course of a 110-page complaint, Lead Plaintiff alleges that Defendants made a number of false or misleading statements on a variety of topics ranging from Twitter's security practices to its method of measuring user engagement (known as monetizable Daily Active Users ("mDAU")).  (*Id.* ¶¶ 210–73.)

On December 16, 2022, the Court appointed William Baker as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act ("PSLRA").   (Order Appointing Lead Pl., ECF No. 50.) On March 9, 2023, Lead Plaintiff filed the operative complaint. (Compl.)  Lead Plaintiff brings two causes of action: 1) violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Twitter and the Individual Defendants, (*Id.* ¶¶ 308–13), and 2) violations of Section 20(a) of the Exchange Act against the Individual Defendants, (*id.* ¶¶ 314–17).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Generally, a court must accept the factual

1   allegations in the pleadings as true and view them in the light most favorable to the

2   plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los*

3   *Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true

4   a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting

5   *Twombly*, 550 U.S. at 555).

6   **III.   ANALYSIS**

7        Twitter makes four principal arguments in support of its motion to dismiss: 1) the

8   complaint is an improper "puzzle pleading," (Twitter Mot. 5–6); 2) the complaint does

9   not allege falsity with sufficient particularity, (*id.* at 7–15); 3) the complaint fails to

10  adequately allege scienter, (*id.* at 15–20); and 4) the complaint does not plead loss

11  causation with particularity, (*id.* at 20–22). The Individual Defendants argue: 1) Elon

12  Musk's statements concerning mDAU are insufficient to show falsity, (Individual

13  Defs.' Mot. 5–8), 2) the complaint does not plead loss causation as to the mDAU

14  statements, (*id.* at 8–12), and 3) Lead Plaintiff fails to adequately allege facts supporting

15  Section 20(a) liability against any Individual Defendant, (*id.* at 12–13).

16      **A.    Although the Complaint Is Unduly Burdensome, It Should Not Be**

17              **Dismissed as Puzzle Pleading**

18        Rule 8(a)(2) requires a complaint to contain "'a short and plain statement of the

19  claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair

20  notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550

21  U.S. at 555 (ellipsis in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

22  Rule 8 may be violated when a pleading "says *too little*," or "when a pleading says *too*

23  *much*." *Knapp v. Hogan*, 738 F.3d 1106, 1109 (9th Cir. 2013). A complaint that is too

24  verbose, long, confusing, redundant, irrelevant, or conclusory may be dismissed for

25  failure to comply with Rule 8. *See Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

26  1047, 1058–59 (9th Cir. 2011) (citing cases upholding dismissals for these reasons).

27  The PSLRA requires a securities fraud plaintiff to identify "(1) each statement alleged

28  to have been misleading; (2) the reason or reasons why the statement is misleading; and

3

(3) all facts on which that belief is formed." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000). A complaint is a "puzzle pleading" when it "forces the defendants and/or court to sort out the alleged statements and match them with the corresponding adverse facts in order to solve the puzzle of interpreting Plaintiff's claims." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (internal quotation marks omitted).

Here, the complaint is over 110 pages long and contains more than 70 pages of allegations before the first allegedly false statement is clearly identified. (*See* Compl. ¶¶ 1–204.) Consequently, Lead Plaintiff's "reasons why [a] statement is misleading" are separated by dozens of pages from allegations setting forth the "facts on which that belief is formed." *Meyercord*, 223 F.3d at 1023. To take just two examples, Lead Plaintiff argues that Defendants falsely claimed that "only around 5% of accounts" on Twitter were bots in paragraphs 267 and 268 of the complaint. (Compl. ¶¶ 267–68.) Facts alleging these statements are false are found *30 pages earlier* in paragraph 191. (Opp'n 21; Compl. ¶ 191.) Similarly, in paragraph 223 of the complaint, Lead Plaintiff states that Defendant Segal falsely told investors that Twitter was "very careful [to prevent misinformation] around an election, whether it's in the United States or another part of the world." (Compl. ¶ 223 (emphasis removed).) The purported proof that this statement is false or misleading is located *43 pages earlier* in paragraph 97. (Opp'n 19; Compl. ¶ 97.)

The same issue arises with respect to Lead Plaintiff's allegations supporting Individual Defendants' scienter or their "power or control over the primary violator" with respect to statements they did not personally make. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (internal quotation marks omitted). Scienter allegations require the Court to "look to the complaint as a whole," *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008), but the complaint must still allege facts showing the speaker of a particular challenged statement had reason to know the statement was false or misleading. It is

not in anyone's interest for a plaintiff to identify an allegedly false or misleading statement in paragraph 272 of a complaint while burying facts showing scienter *somewhere* in the preceding 271 paragraphs.

The complaint is also rife with multi-paragraph-long block quotes containing the allegedly false or misleading statements. (*See, e.g.*, Compl ¶¶ 213, 223, 225, 228, 230, 232, 240, 272.) The bulk of these quotes "do little to advance or support [Lead Plaintiff's] claims" and thus "require the court to parse through statements to discover which are false and misleading." *Mendoza v. HF Foods Grp. Inc*., No. 2:20-CV-02929-ODW (JPRx), 2021 WL 3772850, at *12 (C.D. Cal. Aug. 25, 2021) (cleaned up). This practice "wastes judicial resources and undermines the requisite notice for a defendant to respond." *In re New Century*, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008).

Although the complaint is overly burdensome, it need not be dismissed as improper puzzle pleading; Defendants were able to identify the factual basis for Lead Plaintiff's contentions and address the arguments on the merits. However, in future pleadings, the Court ***strongly*** "recommends that plaintiffs be clear and concise in identifying false statements and articulating the factual allegations supporting an inference that the statement is false or misleading." *Patel v. Parnes*, 253 F.R.D. 531, 554 (C.D. Cal. 2008) (internal quotation marks omitted). Following "each allegedly false or misleading statement, the Complaint should identify some facts suggesting that the statement is false or misleading," made with the requisite scienter and/or that Defendants possessed control over the speaker. *Id.* (internal quotation marks omitted). To the greatest extent possible, this information should be contained "in the same paragraph or a paragraph following the statement." *Id.* (cleaned up).

In his opposition and at the hearing on these motions, Lead Plaintiff argued that if these "requirements were implemented, plaintiffs would have to repeat the facts in full after each statement, rather than alleging them just once and then explaining in summary why the statements were false." (Opp'n 14.) The Court is not sure why this would be the case. First, Lead Plaintiff was able to concisely and clearly identify many

1    of the allegedly false statements—and the basis for their falsity—in just a few pages in
2    his opposition brief.  (*See* Opp'n 3–10.)  Additionally, it does not appear that Lead
3    Plaintiff needs to repeat allegations in the complaint, but rather to reorder them.  To the
4    extent Lead Plaintiff offers background information, he need only provide the general
5    mise en scène of the dispute.  The remainder of the complaint can follow a very simple
6    formula: 1) Defendants stated [Statement 1, 2, 3 . . . ]; 2) this is false because . . . ; 3) at
7    the time the statement was made Defendant knew the statement was false because . . . .

8        The PSLRA, Rule 8, and basic common sense call for pleadings that do not
9    require the Court to immediately recall what was alleged in paragraph 97 in order to
10   understand why one bolded sentence in a half-page-long block quote in paragraph 223
11   is false or misleading.  To the extent Lead Plaintiff believes the Court erroneously
12   concludes an allegation is insufficiently supported by facts, Lead Plaintiff is reminded
13   that "[j]udges are not like pigs, hunting for truffles buried in" overlong complaints.
14   *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam).  This Order is
15   months in the making, not due to lack of diligence by the Court or its staff, but due to
16   the unnecessary complexity of the challenged pleading.  Lead Plaintiff is put on notice
17   that in future pleadings, the Court does not intend to waste judicial resources scouring
18   an overlong complaint to determine if an allegation of falsity is adequately supported.

19       **B.    Statements by Peiter Zatko and Elon Musk**

20       Lead Plaintiff argues that the Court should credit facts attributed to Peiter Zatko
21   and Elon Musk.  (Opp'n 11–14.)  Under the PSLRA, "personal sources of information
22   relied upon in a complaint should be described in the complaint with sufficient
23   particularity to support the probability that a person in the position occupied by the
24   source would possess the information alleged."  *In re Daou Sys., Inc. Sec. Litig.*, 411
25   F.3d 1006, 1015 (9th Cir. 2005) (internal quotation marks omitted) (quoting *Nursing
26   Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004)).
27   "So long as plaintiffs reveal with particularity the sources of their information, the
28   complaint will survive under the PSLRA." *Id.*  With respect to Mr. Zatko, Lead Plaintiff

1  points out that "Twitter hired him to head its cybersecurity department, he disclosed his
2  identity, and speaks under penalty of perjury from firsthand knowledge." (Opp'n 12.)
3  Mr. Musk's statements were made in the context of performing due diligence in a multi-
4  billion dollar acquisition, (Compl. ¶ 41), and many of Mr. Musk's allegations were set
5  forth in a verified complaint, (Park Decl. Ex. 1, ECF No. 103-1); *see Schroeder v.*
6  *McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995) (to "verify" a complaint, a plaintiff
7  must swear or affirm "under penalty of perjury that the contents [are] true and correct").
8  Based on these facts, statements attributed to Mr. Zatko and Mr. Musk are sufficiently
9  reliable to support a claim of falsity at the motion to dismiss stage.

10      **C.    Puffery, Non-Actionable Opinion, and the PSLRA Safe Harbor**

11      Twitter identifies 34 statements challenged by Lead Plaintiff in the complaint.[1]
12  (Webber Decl. Ex. 1, ECF No. 88-1.)  Twitter claims:1) that statements 3–18, 30, and
13  33 are non-actionable puffery, (Twitter Mot. 7–8); 2) that statements 4, 8–10, 19–20,
14  22–24, and 30–31 are non-actionable opinion, (*id.* at 8–9); and 3) that statements 2–3,
15  5, 13–14, 16, 20, 25–26, 29, and 34 are protected by the PSLRA's safe harbor for
16  forward looking statements, (*id.* at 9).[2]  (Twitter Mot. 7–9.)

17          *1.    Puffery*

18      "Statements of mere corporate puffery, vague statements of optimism like 'good,'
19  'well-regarded,' or other feel good monikers, are not actionable" under the PSLRA
20  "because professional investors, and most amateur investors as well, know how to
21  devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive*

---

23  [1] Twitter provided a "chart listing in tabular format statements challenged by Plaintiffs."
24  (Webber Decl. ¶ 4.)  For ease of reference, the Court will refer to the challenged
     statements by the number assigned in Exhibit 1 to the Webber Declaration, which is
25  attached as an annex to this Order.  All citations to the challenged statements likewise
26  refer to Exhibit 1 to the Webber Declaration.
27  [2] As discussed above, many of the challenged statements are multi-paragraph long block
     quotes.  The Court assumes that where Lead Plaintiff has included bolded or italicized
28  text, those sections constitute the allegedly false or misleading part of the statement.

*Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (internal quotation marks omitted). A statement is considered "corporate puffery" when it "is so exaggerated or vague that no reasonable investor would rely upon it when considering the total mix of information available." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d at 834 (internal quotation marks omitted). "District courts often resolve whether a statement is puffery when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) . . . ." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990).

As alleged, statements 3–10, 30, and 33 are non-actionable puffery. These statements are quintessential examples of corporate boasting that is not actionable under federal securities laws. (*See, e.g.*, Statement 3 ("[W]e strive to comply with applicable privacy and data protection laws and regulations . . . ."); Statement 4 ("We empower the people who use our service to make informed decisions about the data they share with us."); Statement 5 ("[W]e will continue to advocate for choice with respect to privacy and data protection."); Statement 6 ("Our policies are built primarily around the promotion and protection of three fundamental human rights, freedom of expression, safety, and privacy."); Statement 7 ("[W]e're very careful around an election, whether it's in the United States or another part of the world . . . ."); Statement 8 ("Transparency means we want people to know how we use their data. . . . We want them to have choice on whether we use our—their data or whether we use our algorithms or not."); Statement 9 ("We also feel like we've built up a lot of trust with the people who use our service, whether it's around GDPR or CCPA. When we prompt people and ask them questions, we try to be really thoughtful and transparent and demonstrate the choices that they have."); Statement 10 ("[W]e've worked really hard as long as the company has been around to build trust with the people who use our service."); Statement 30 ("And if content on the platform is rife with spam or misleading information, people won't trust the integrity of the platform. Mitigating these risks is critical for us to create the best experience for our customers, and ultimately critical in supporting our

growth."); Statement 33 ("Our team updates our systems and rules constantly to remove as much spam as possible.").)   These statements concern Twitter's values and commitments, and are couched in terms that give the listener a clear understanding that they are the kind of "'subjective assessments" which "vaguely refer to [Twitter's] prioritization, improvement, and funding of safety procedures." *Barnes v. Edison Int'l*, No. CV 18-09690 CBM, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021) (internal quotation marks omitted), *aff'd*, 2022 WL 822191 (9th Cir. Mar. 18, 2022).   None of these statements "are objectively verifiable and thus qualify as material misstatements" but instead "represent the feel good speak that characterizes non-actionable puffing." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1060 (internal quotation marks omitted).

Statements 11–18 are not puffery.   Statement 11 says, "[W]e've been very, very transparent about any attempt that we've seen from state actors to manipulate the conversation on Twitter . . . [a]nd we've shared those transparently."   Lead Plaintiff persuasively argues that the use of the word "any" when describing attempts by state actors to engage in disinformation campaigns on Twitter clearly implies that Twitter had disclosed *all* attempts.  (Opp'n 15–16.)   The statement is objectively verifiable and could thus qualify as a material misstatement. *Police Ret. Sys. of St. Louis*, 759 F.3d at 1060.

Statement 12 states that Twitter has "strict principles around who is allowed access to which tools and at what time, and require specific justifications for customer data to be accessed."   Lead Plaintiff claims that "(a) almost half of Twitter's employees could access accounts for any reason; (b) Twitter had no way of logging its employees' attempts to access accounts so it would not even know in retrospect who had accessed customer data; and (c) Twitter could not even limit its access to data to those uses customers had consented to."  (Compl. ¶ 233.)   Given the number of employees who allegedly had access and the inability of Twitter to monitor what those employees were accessing, it is possible to conclude that Twitter did not maintain *any* safeguards or require *any* justifications to access user accounts.   Consequently, this statement is

1   potentially false or misleading and therefore not puffery.

2          Statements 13–18 are not puffery because they concern specific and quantifiable

3   actions that Twitter claims to have taken.  (*See* Statement 13 ("[W]e introduced new

4   courses and increased the frequency and availability of existing courses for all

5   employees."); Statement 14 ("Twitter's cross-functional elections team conducted

6   tabletop exercises internally on specific election scenarios."); Statement 15 ("[I]n 2018,

7   we did about 100 privacy reviews; in 2019, we did almost 500 privacy reviews; and in

8   the first 6 months of 2020, we have completed more than 300 privacy reviews.");

9   Statement 16 ("Twitter has now disclosed over 35 separate state-backed information

10  operations designed to nefariously shape and manipulate public opinion online.");

11  Statement 17 (The use of "email addresses and phone numbers provided for account

12  security purposes" for advertising purposes "was addressed as of September 17,

13  2019."); Statement 18 ("[T]he amount of access . . . is substantially lower today.").)

14                 2.     *Non-Actionable Opinion*

15         Twitter claims that Statements 4, 8–10, 19–20, 22–24, and 30–31 are non-

16  actionable opinion.  Because a PSLRA violation "require[s] falsity with respect to a

17  material fact, there are substantial limits in applying" PSLRA liability "to a pure

18  statement of honest opinion."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188–89 (9th Cir.

19  2021) (cleaned up).  However, "a statement of opinion may nonetheless involve a

20  representation of material fact that, if that representation is false or misleading, could

21  be actionable."  *Id.* at 1189.  "First, every statement of opinion explicitly affirms one

22  fact: that the speaker actually holds the stated belief."  *Id.* (internal quotation marks

23  omitted)*.*  "Second, some sentences that begin with opinion words like 'I believe'

24  contain *embedded* statements of fact."  *Id.* (internal quotation marks omitted).  "Third,

25  a reasonable investor may, depending on the circumstances, understand an opinion

26  statement to convey facts about how the speaker has formed the opinion—or, otherwise

27  put, about the speaker's basis for holding that view."  *Id.* (internal quotation marks

28  omitted).  A court may determine whether a statement is non-actionable opinion on a

motion to dismiss.  *See Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).

For the same reasons outlined in Section III.C.1, Statements 4, 8–10, and 30 are non-actionable under the PSLRA.  While in many circumstances the distinction between puffery and opinion may be as clear as the distinction between dusk and twilight, for the purposes of this Order it is sufficient to recognize that neither "business puffery or opinion" is actionable under the PSLRA because neither is sufficient to "induce the reliance of a reasonable investor."  *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 833 (N.D. Cal. 2019) (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)).

Statements 19, 20, and 22 are actionable under the PSLRA because they each suggest the speaker did in fact believe that mDAU was the best—or at least a reasonable—way to measure Twitter's performance.  (*See* Statement 19 ("We believe that mDAU, and its related growth, is the best way to measure our success . . . ."); Statement 20 ("[W]e believe that mDAU, and its related growth, are the best ways to measure our success against our objectives . . . ."); Statement 22 ("[T]hese numbers are based on what we believe to be reasonable estimates for the applicable period of measurement . . . .").)  Lead Plaintiff alleged that "Twitter used UAM to measure user engagement, not mDAU," (Compl. ¶ 253), which if true, could show that the speaker did not actually perceive mDAU to have the utility professed in the statements.

Statements 23–24 are likewise actionable because they suggest the speaker engaged in a good faith estimation of the number of "false or spam accounts" included in Twitter's mDAU calculations.  (*See* Statement 23 ("We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the second quarter of 2020 represented fewer than 5% of our mDAU during the quarter."); Statement 24 ("We estimate that the average of false or spam accounts during the first quarter of 2020 continued to represent fewer than 5% of our mDAU during the

quarter")).)   "[I]f a company declares that 'We believe our conduct is lawful,' a reasonable investor likely expects such an assertion to rest on some *meaningful* legal inquiry." *Tesla, Inc*., 985 F.3d at 1189 (internal quotation marks omitted) (emphasis added).   Because these statements could lead a reasonable investor to believe they "convey facts about how the speaker has formed the opinion," they may be actionable under the PSLRA.   *Id.*

### 3.   *PSLRA Safe Harbor*

"[T]he PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Under the PSLRA, a defendant is not liable for a statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."   15 U.S.C. § 78u–5(c)(1)(A)(*i*).   "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010); *see also Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1134 (S.D. Cal. 2012) ("[B]oilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning." (alteration in original) (internal quotation marks omitted)), *aff'd sub nom. Fresno Cnty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).   "[T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1142.   Similarly, the safe harbor is not "designed to protect [defendants] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Id.*

12

1    Twitter argues that Statements 2–3, 5, 13–14, 16, 20, 25–26, 29 and 34 are
2 protected by the PSLRA's safe harbor, stating "[a]ll of these statements were identified
3 as forward looking and [] accompanied by meaningful cautionary statements." (Twitter
4 Mot. 9 (second alteration in original) (internal quotation marks omitted).)  Defendants
5 bear the burden of showing "their cautionary language was not boilerplate and conveyed
6 substantive information," *Slayton*, 604 F.3d at 772, and Twitter's motion does not
7 specifically identify any cautionary language or explain what, if any, substantive
8 information was conveyed.  (*See generally* Twitter Mot. 9; Twitter Reply 4.)  Because
9 Twitter has not satisfied its burden, the Court cannot conclude the statements are
10 protected by the PSLRA safe harbor.

11    **D.    Falsity**[3]

12    The PSLRA forbids any "untrue statement of a material fact."  15 U.S.C. § 78u–
13 4(b)(1)(A).  "[A] statement is misleading if it would give a reasonable investor the
14 impression of a state of affairs that differs in a material way from the one that actually
15 exists[.]"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)
16 (internal quotation marks omitted).  "The PSLRA has exacting requirements for
17 pleading 'falsity.'"  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070
18 (9th Cir. 2008).  A plaintiff must "specify each statement alleged to have been
19 misleading, the reason or reasons why the statement is misleading, and, if an allegation
20 regarding the statement or omission is made on information and belief, the complaint
21 shall state with particularity all facts on which that belief is formed."  *Id.* at 1061
22 (quoting 15 U.S.C. § 78u–4(b)(1)).  "A litany of alleged false statements,
23 unaccompanied by the pleading of specific facts indicating why those statements were
24 false, does not meet this standard."  *Id.*

25    ———————————

26 [3] In this section, the Court only discusses whether the challenged statements were
27 adequately alleged to be false or misleading.  Whether the speaker had the requisite
28 knowledge of falsity at the time the statement was made is discussed in the following
   section.

13

1           1.    *Statements Concerning Security*

2         Twitter claims that Lead Plaintiff failed to adequately allege Statements 1–2, 12–

3    15, and 18 are false or misleading.  Lead Plaintiff has not adequately alleged that

4    Statements 1 and 2, which concern Twitter's general effort to improve its security

5    protocols, are false or misleading.  (*See* Statement 1 ("These issues may result in the

6    perception that our products and services are not secure . . . .  We cannot provide

7    assurances that our preventative efforts will be successful."); Statement 2 ("We are also

8    taking steps to secure our systems while our investigations are ongoing.").)  Lead

9    Plaintiff alleges these statements are false or misleading because "Twitter was not

10   making *any* efforts to secure its systems."  (Compl. ¶ 215 (emphasis added).)  As an

11   initial matter, the facts upon which Lead Plaintiff bases this contention are unclear.  *See*

12   15 U.S.C. § 78u–4(b)(1).  What is more, Twitter correctly points out in its brief that

13   "[t]he challenged statements do not promise the elimination of security incidents or

14   weak spots."  (Twitter Mot. 10.)  Finally, both come from Twitter's Class Period

15   Reports on Forms 10-K and 10-Q, which specifically disclaim any "assurances that

16   [Twitter's] preventative efforts will be successful." (Statement 1.)  Consequently, it is

17   difficult to see how these statements could be false or misleading when read "fairly and

18   in context."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,

19   575 U.S. 175, 194 (2015).

20        Plaintiff has also failed to adequately allege that statements 13–15 are false or

21   misleading.  Each of these statements also concern Twitter's efforts to keep the site

22   secure.  To the extent Lead Plaintiff believes a specific statement is false, it is similarly

23   unclear where the Complaint "state[s] with particularity all facts on which that belief is

24   formed."  15 U.S.C. § 78u–4(b)(1).  The remainder of the allegations concerning these

25   statements, (*see* Compl. ¶¶ 235, 237, 239), indicate that Lead "Plaintiff takes issue with

26   the methods used by Defendants" to secure their platform, *In re Restoration Robotics,*

27   *Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1258 (N.D. Cal. 2019).  This does not satisfy the

28   pleading requirement because "it is [Lead] Plaintiff's burden to show falsity, not

1   inadequacy." *Id.*

2       Lead Plaintiff has adequately alleged Statements 12 and 18 are false or

3   misleading.  Statement 12 states "[A]ccess is limited and is only granted for valid

4   business reasons (i.e., ensuring an account holder can get support if they are locked out

5   of their account)."  Statement 18 says, "[T]he amount of access, the amount of trust

6   granted to individuals with access to these tools, is substantially lower today."  Plaintiff

7   alleges that "almost half of Twitter's employees could access accounts for any reason"

8   and that "Twitter had no way of logging its employees' attempts to access accounts."

9   (Compl. ¶ 233.)  This claim is supported by information provided by Mr. Zatko.  (*See*

10  *id.* ¶¶ 59, 85.)  Because the statements suggest Twitter took affirmative steps to reduce

11  the number of employees who could access users' accounts in the wake of the July 2020

12  hack, a reasonable investor may have been misled if Twitter was not actually limiting

13  access only for "valid business reasons" or if access was not meaningfully restricted.

14          2.   *Statements Concerning Privacy*

15      Twitter claims that Lead Plaintiff has failed to adequately allege Statements 3–6

16  and 8–10 are false or misleading.  The Court previously concluded these statements are

17  puffery, *see* Section III.C.1, and are therefore not actionable as false or misleading under

18  the PSLRA "because they do not induce the reliance of a reasonable investor,"

19  *Restoration Robotics*, 417 F. Supp. 3d at 1254 (internal quotation marks omitted).

20          3.   *Statements Relating to Misinformation*

21      Twitter claims that Lead Plaintiff has not adequately alleged Statements 7, 11,

22  and 16 are false or misleading.  Statement 7 is non-actionable as both puffery and

23  opinion. *See* Section III.C.1–2.

24      Lead Plaintiff has adequately alleged that Statements 11 and 16, which in essence

25  claim that Twitter would disclose publicly any state-backed information operations, are

26  false or misleading.  As discussed above, use of the word "any" when describing

27  attempts by "state actors to manipulate the conversation on Twitter" implies that Twitter

28  had disclosed *all* attempts. (Statement 11.)  Lead Plaintiff has alleged facts showing

that Twitter failed to disclose at least one foreign influence operation, (Compl. ¶ 156), and has therefore adequately pleaded Statements 11 and 16 are false or misleading.

### 4. *Statement Relating to Intellectual Property*

Statement 34 takes up almost two full pages. (Compl. ¶ 272.) The only bolded section states that Twitter "cannot be sure that we are not infringing or violating, and have not infringed or violated, any third-party intellectual property rights or that we will not be held to have done so or be accused of doing so in the future." (*Id.*) Lead Plaintiff claims this statement is false because Twitter senior leadership had actual knowledge that it lacked "licenses to the data sets and/or software used to build some of the key Machine Learning models used to run the service." (Compl. ¶ 273.) "[R]eading the statement fairly and in context," *Omnicare, Inc*, 575 U.S. at 194, the statement is not false or misleading because it also disclosed Twitter was "involved in a number of intellectual property lawsuits, and" that Twitter "expect[ed] the number of patent and other intellectual property claims" to grow. (*Id.* ¶ 272.) Further, Twitter correctly points out that it had "no obligation to declare itself liable for unproven allegations." (Mot. 13); *see In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d at 836 ("[C]ompanies are not required to engage in 'self-flagellation' by disclosing unproven allegations.").

### 5. *Statements Relating to mDAU*

Twitter argues that Lead Plaintiff has failed to adequately allege that Statements 19–33 are false or misleading. Statements 30 and 33 are non-actionable puffery, and are therefore not false or misleading under the PSLRA. *See* Section III.C.1.

Lead Plaintiff has not alleged facts sufficient to show that Statements 19–20 and 28–29 are false or misleading. Each of these statements reflect a belief that mDAU is the "best" way to measure Twitter's success. Although what constitutes the "best" method is usually a matter of opinion, "every statement of opinion explicitly affirms one fact: that the speaker actually holds the stated belief." *Tesla, Inc.*, 985 F.3d at 1189 (internal quotation marks omitted). The Complaint alleges that Defendant Agrawal expressed concern about the decline in UAM and was told by Twitter's head of data

science that "that other measures of engagement had been 'declining in concert with UAM per mDAU for the engaged user segment for the last 18 months.'" (Compl. ¶ 199.)  The Complaint further alleges that "[d]espite knowledge of these stark trends, Twitter continued to represent that mDAU was the 'best way to measure' engagement." (*Id.*)  Assuming these allegations to be true, they do not support Lead Plaintiff's contention that Twitter considered UAM to be a *better* metric than mDAU.  (Compl. ¶ 253.)  At most, the complaint supports the inference that Twitter relied on other measures of performance *in addition* to mDAU.  Consequently, Lead Plaintiff has not offered facts sufficient to show these statements are false or misleading. *Meyercord*, 223 F.3d at 1023.

Plaintiff has not adequately alleged that Statement 21, which says, "Our advertising revenue growth is primarily driven by increases in mDAU, increases in ad pricing or number of ads shown and increases in our clickthrough rate," is false or misleading.  Lead Plaintiff claims Twitter used UAM to measure engagement, and that "a large and growing proportion of Twitter's mDAU accounts" were never monetized. (Compl. ¶ 253.)  Even if these allegations are true, Lead Plaintiff fails to allege that Twitter's "advertising revenue growth" was driven by increases in metrics other than mDAU.

Plaintiff has not adequately alleged that Statement 22 is false or misleading. Statement 22 says the mDAU "numbers [were] based on what [Twitter] believe[d] to be reasonable estimates for the applicable period of measurement."  Lead Plaintiff alleges it is false or misleading because spam or bot accounts were included in the mDAU, almost one third of mDAU accounts weren't monetized, and the method Twitter used to calculate mDAU was not reliable.  (Compl. ¶ 259.)  Although Lead Plaintiff objects to the methodology for calculating mDAU, the Complaint fails to show why it was *so unreliable* that Twitter did not hold a good faith belief that the mDAU figures were "reasonable estimates for the applicable period of measurement." (Compl. ¶ 254; *see id.* ¶ 259.)

17

Plaintiff has not adequately alleged that Statements 23–24 and 31–32, which attest that false or spam accounts represented less than 5% of Twitter's mDAU, are false or misleading. Lead Plaintiff alleges "(a) Twitter included accounts already identified as spam or bot in its count of mDAU; (b) almost a third of mDAU were not monetized; and (c) the method Twitter employed to calculate mDAU was completely unreliable." (Compl. ¶ 259.) The fact that Twitter included "accounts already identified as spam or bot in its count of mDAU" is self-evident given the statements acknowledge 5% of the mDAU accounts are false or spam. (*See* Statement 23 ("[T]he average of false or spam accounts during the second quarter of 2020 represented fewer than 5% of our mDAU during the quarter."); Statement 24 ("We estimate that the average of false or spam accounts during the first quarter of 2020 continued to represent fewer than 5% of our mDAU during the quarter."); Statement 31 ("[O]nly around 5% of accounts on Twitter are bots."); Statement 32 ("[T]he number of bots, ([is] around 5%, a number Twitter reports quarterly)." (alterations in original)).) None of the remaining claims amount to an allegation "that Defendants inaccurately reported the results of their own statistical analysis." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). Because Lead "Plaintiff's allegations of 'falsity' essentially are disagreements with the statistical methodology adopted" to calculate mDAU, "[t]he allegations are not about false statements." *Id.*

Plaintiff has not alleged that Statements 25 and 26 are false or misleading. Both statements say Twitter was "continually seeking to improve [its] ability to estimate the total number of spam accounts and eliminate them from the calculation of [its] mDAU." (Statements 25–26.) Lead Plaintiff has not alleged facts sufficient to show that Twitter was not taking *any* efforts to improve its estimation of the number of bots or spam accounts. Because a PSLRA plaintiff is required to show "falsity, not inadequacy," *Restoration Robotics*, 417 F. Supp. 3d at 1258, Lead Plaintiff has not adequately alleged these statements are false or misleading.

Lead Plaintiff has adequately alleged that Statement 27 is false or misleading.

18

Statement 27 states, "After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics." Lead Plaintiff alleged that according to Mr. Musk, "the mDAU numbers that Twitter reported each quarter . . . included accounts Twitter determined were fake during the quarter in which such accounts were counted in mDAU." (Compl. ¶ 184.) Because Mr. Musk's statements are sufficient to support a claim of falsity at the motion to dismiss stage, Lead Plaintiff has satisfied his burden of showing this statement is false or misleading.

### E. Scienter

Based on the analysis above, Lead Plaintiff is only able to state a claim under the PSLRA based on Statements 11–12, 16–18, and 27. Accordingly, the Court only considers whether Lead Plaintiff has adequately alleged scienter for these statements. Under the PSLRA, "a plaintiff must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *Metzler*, 540 F.3d at 1066 (quoting 15 U.S.C. § 78u–4(b)(2)) (emphasis in *Metzler*). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). "The strong inference standard unequivocally raised the bar for pleading scienter." *Id.* at 321 (cleaned up). The Ninth Circuit "has not adopted the corporate scienter doctrine." *Nozak v. N. Dynasty Minerals Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020). Consequently, the PSLRA requires plaintiffs "to plead scienter with respect to those individuals who actually made the false statements." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008).

In Statement 11, Defendant Agrawal is alleged to have said, "[W]e've been very, very transparent about any attempt that we've seen from state actors to manipulate the conversation on Twitter, right? And we've shared those transparently. We've been active in detecting them." Lead Plaintiff only alleges that "Twitter had learned that the Indian Army unit responsible for Kashmir was running a brutal influence operation on Twitter" without specifying *who* at Twitter learned this information. (Opp'n 4 (citing

Compl. ¶¶ 155–56).)  "[S]cienter cannot be established based on 'general awareness'
and 'hands-on management style' or by lumping 'management' and 'executives'
together."  *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019).  As
a result, Lead Plaintiff has failed to allege facts showing that Defendant Agrawal knew
this statement was false when it was made.

Statements 12, 16, and 18 were each made at some point during 2020, before the
speaker was allegedly provided information that the statement was false.  At his
February 2021 presentation to Defendants Dorsey and Agrawal, Mr. Zatko informed
attendees that "43% of Twitter's fulltime employees (2,662 in total) had access to its
full production system, including Twitter's full source code, and customer data," and
"that Twitter had no centralized logging of the actions of its employees," meaning that
"Twitter would not know if an employee inappropriately accessed data."  (Compl.
¶¶ 70, 81, 85.)  Defendant Agrawal allegedly made Statement 12 on September 24,
2020, (Compl. ¶ 232), and Statement 18 sometime before September 28, 2020, (*id.*
¶ 244), almost five months before Mr. Zatko's presentation, (*id.* ¶ 232).  Statement 16
was a "blog post co-authored by Katy Minshall, then the Head of Government, Public
Policy and Philanthropy for Twitter UK," and published on November 26, 2022.  (*Id.*
¶ 240.)  Not only did this predate the Zatko presentation, there are no allegations that
Ms. Minshall attended the meeting or received information that anything in the
statement was false or misleading.  Because there is no indication that the speaker of
these statements was aware they were false at the time they were made, Lead Plaintiff
has not adequately alleged scienter.

Statement 17 is attributed to Twitter's Chief Privacy Officer Damien Kieran, who
is not a defendant to this suit.  (Compl. ¶ 242.)  To the extent Twitter is liable for a
statement made by its Chief Privacy Officer, Lead Plaintiff pleads no facts showing that
Mr. Kieran knew or had any reason to believe any aspect of this statement was false or
misleading at the time it was made.  Consequently, there is no inference of scienter, let
alone a "strong" one.  *Metzler*, 540 F.3d at 1066.

Statement 27 states, "After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics." This information was contained in the Class Period Reports on Forms 10-K and 10-Q. Lead Plaintiff alleges that "Defendant Segal conceded during a July 1, 2022, call with Musk that the mDAU figures it reports to investors includes" accounts that "Twitter determined were fake during the quarter in which such accounts were counted in mDAU." (Compl. ¶¶ 184–85.) "Twitter's quarterly report on Form 10-Q for the quarter ended June 30, 2022" was "signed by Defendants Agrawal and Segal, and filed on July 26, 2022." (*Id.* ¶ 206(*i*).) As a result, Lead Plaintiff has adequately alleged that Defendant Segal knew the statement was false or misleading at the time it was made.

The Complaint alleges that Defendant Segal made the representation to Mr. Musk as part of Mr. Musk's April 2022 offer to purchase Twitter. (Compl. ¶¶ 41, 280–81.) Given Defendant adequately alleges that Defendant Segal was aware that fake accounts were being reported as part of the mDAU metric within just a few weeks of the date that Mr. Musk offered to purchase Twitter, Lead Plaintiff has presented a strong inference that the Defendant Segal learned of the practice at or near the time Mr. Musk made his April 2022 offer. As a result, there is a strong inference that Defendant Segal also knew the statement was false or misleading on May 2, 2022, when he signed "Twitter's quarterly report on Form 10-Q for the quarter end[ing] March 30, 2022." (Compl. ¶ 206(h).)

## F.    Control Person Liability

"Under section 20(a), a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *Align Tech., Inc.*, 856 F.3d at 623 (internal quotation marks omitted). Although Lead Plaintiff has alleged one actionable false statement by Defendant Segal, he has failed to adequately allege that any of the other defendants "exercised actual power or control over the

primary violator." *Id.* For this reason, Plaintiff's Section 20(a) claim is dismissed against all Defendants.

### G. Loss Causation

"[L]oss causation is the causal connection between the defendant's material misrepresentation and the plaintiff's loss. A complaint fails to allege loss causation if it does not provide a defendant with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation." *Metzler*, 540 F.3d at 1062 (cleaned up). "Stated in the affirmative, the complaint must allege that the defendant's 'share price fell significantly after the truth became known.'" *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). The only false or misleading statement made with the requisite scienter that Lead Plaintiff has alleged in compliance with the requirements of the PSLRA is Statement 27. As a result, the Court considers whether Lead Plaintiff has adequately alleged Twitter's "share price fell significantly after the truth became known" that Twitter failed to stop counting a fake or spam account as part of its mDAU metric after discovering the account was fake or spam. *Metzler*, 540 F.3d at 1062 (internal quotation marks omitted).

#### 1. *A Plaintiff Is Not Required to Sell Shares at a Loss to State a Claim*

A plaintiff need not suffer a tangible economic loss to bring suit under the PSLRA. Specifically, a plaintiff is not required to "sell their securities after revelation of wrongdoing in order to adequately plead economic loss or loss causation." *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 607 (D.N.J. 2005). Nothing about the Supreme Court's opinion in *Dura Pharmaceuticals* "indicates that the Supreme Court intended to overrule the established precedent permitting holding plaintiffs to maintain actions for securities fraud, [or] to call into question the statutory scheme by creating a sell-to-sue requirement." *Id.* at 612; *see also Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 745 n.11 (N.D. Ill. 2006) (declining to adopt sell-to-sue requirement). Instead, the PSLRA "attempts to make a plaintiff whole by allowing him to recover his out-of-pocket damages, that is, the difference between what

he paid for a security and the uninflated price." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012). Although an "inflated purchase price will not itself constitute or proximately cause the relevant economic loss," *Dura Pharms.*, 544 U.S. at 342, "[t]his holding does not alter or abandon the traditional out-of-pocket measure for damages," *Acticon*, 692 F.3d at 40.

Twitter argues that Lead Plaintiff has not alleged he suffered economic loss because he "sold Twitter stock for more than he bought it." (Twitter Reply 10 (emphasis removed) (quoting Opp'n 31).) Although the question is not entirely settled, this Court adopts the Second Circuit's reasoning set forth in *Acticon*. "[I]t is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons" because "[s]uch a holding would place the plaintiff in a worse position than he would have been absent the fraud." *Acticon*, 692 F.3d at 41. Stated differently, "[i]n the absence of fraud, the plaintiff would have purchased the security at an uninflated price and" therefore would have benefitted to a greater degree "from the unrelated gain in stock price." *Id.* As a result, where a plaintiff has purchased a security at a price inflated due to a defendant's fraud and the price of that security declines because the defendants' fraud has been revealed, the plaintiff may have suffered an economic loss even if he or she later sells that security for a profit.[4]

---

[4] There are several significant issues and unresolved questions that were briefly discussed at the hearing but were not the subject of thorough briefing by either party. For instance, under the PSLRA, a plaintiff's recovery is capped at the difference between his purchase price of the stock and the "mean trading price" of the stock during the 90-day period following the corrective disclosure. 15 U.S.C. § 78u–4(e)(1). As a result, the Court wonders aloud if a lead plaintiff would be able to show an economic loss if the "mean trading price" during this period exceeds the amount he or she paid for the stock. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) ("Thus, if the mean trading price of a security during the 90-day period following the correction is *greater* than the price at which the plaintiff purchased his stock then that plaintiff would recover nothing under the PSLRA's limitation on damages."). Further,

1        2.      *Lead Plaintiff Has Not Adequately Alleged Loss Causation in This*
2                *Case*

3        As a general rule, "loss causation is a matter of proof at trial and not to be decided
4   on a Rule 12(b)(6) motion to dismiss." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,
5   1057 (9th Cir. 2008) (internal quotation marks omitted). "So long as the complaint
6   alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6)
7   dismissal is inappropriate." *Id.* "The burden of pleading loss causation is typically
8   satisfied by allegations that the defendant revealed the truth through corrective
9   disclosures which caused the company's stock price to drop and investors to lose
10  money." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (internal
11  quotation marks omitted).

12       Lead Plaintiff alleges that Mr. Musk published several tweets "suggesting that
13  Twitter's public representations concerning fake or spam accounts (and thus regarding
14  mDAU) were false." (Compl. ¶ 284.) The Complaint does not identify what

15  ─────────────

16

17  if a company is taken private on day 66 of the 90-day period, does the Court measure
18  the stock's "mean trading price" by looking only at the 66 days during which the stock
    was publicly traded, or does it consider the whole 90-day period and assign the value at
19  which the stock was taken private for the remaining 34 days? *See* 15 U.S.C. § 78u–
20  4(e)(3) (defining "mean *trading* price" as the "average of the daily trading price of that
    security, determined as of the *close of the market* each day during the 90-day period"
21  (emphasis added)). If the 90-day mean trading price exceeds a lead plaintiff's purchase
    price under either measure, has he or she suffered a cognizable injury sufficient to
22  confer Article III or prudential standing? If a lead plaintiff lacks standing, would the
23  Court be required to go through the procedures set forth in 15 U.S.C. § 78u–4(a)(3) to
    identify a new lead plaintiff? *See In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117,
24  120 n.5 (S.D.N.Y. 2002) ("A colorable argument can be made that, when the initial lead
25  plaintiff withdrew, a new notice should have been filed and the entire lead plaintiff
    process re-opened."). Would this process be necessary if additional plaintiffs could be
26  added without leave of the Court? *See Hunt v. Bloom Energy Corp.,* No. 19-cv-02935-
27  HSG, 2021 WL 1110260, at *1 (N.D. Cal. Mar. 23, 2021). While significant, these
    questions were not squarely addressed in the parties' briefs, and the Court does not
28  resolve them here.

24

information was shared in these tweets or whether they addressed Twitter's alleged practice of including fake or spam accounts in its mDAU metric. Lead Plaintiff alleges that Mr. Musk also tweeted, "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." (Compl. ¶ 283.) Lead Plaintiff fails to explain how this tweet revealed the truth of any prior statement.

Lead Plaintiff has failed to allege what, if any, "corrective" information was made public, and the Complaint fails to adequately "allege that the defendant's share price fell significantly after the truth became known." *Metzler*, 540 F.3d at 1062 (cleaned up). Because the Complaint does not adequately allege a "causal connection" between Lead Plaintiff's "loss and the misrepresentation," *id.*, Lead Plaintiff has not adequately alleged loss causation.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motions are GRANTED in part and DENIED in part. The corrected amended complaint is dismissed.

Leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The defects in the Complaint appear to be readily curable. Given the Ninth Circuit policy of granting leave to amend with "extreme liberality," *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (internal quotation marks omitted), the Court GRANTS Lead Plaintiff leave to amend. The Court again cautions against refiling a complaint that is unduly burdensome or needlessly complex.

Twitter appears to suggest that Lead Plaintiff improperly added new plaintiffs to this action. (*See* Twitter Mot. 21 ("Plaintiffs attempt to patch this deficiency by adding four new plaintiffs without leave of court.").) "[N]othing in the PSLRA requires court approval for the addition of additional named plaintiffs by the Lead Plaintiff." *Hunt v. Bloom Energy Corp.*, No. 19-cv-02935-HSG, 2021 WL 1110260, at *1 (N.D. Cal. Mar.

23, 2021) (citing *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82–83 (2d Cir. 2004)). Indeed, "Lead Plaintiffs have a responsibility to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims." *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003). Because "striking the" additional plaintiffs "for failure to seek leave" according to the Federal Rules of Civil Procedure "would simply generate a motion for leave, which the Court would [likely] grant under the liberal standard governing such motions," *Hunt*, 2021 WL 1110260, at *2, Lead Plaintiff need not file a motion to add the plaintiffs identified in this complaint if he chooses to file a subsequent complaint pursuant to this Order. That being said, justice is most efficiently served when parties abide by the proper procedures. Going forward, Lead Plaintiff shall file a properly noticed motion or joint stipulation to add **any party** not currently named to this lawsuit or to add any new claim for relief.[5]

Lead Plaintiff may file an amended complaint within 14 days—if he can do so consistent with Federal Rule of Civil Procedure 11(b) and this Order. **Lead Plaintiff shall attach to the amended complaint a "redline" version showing all additions and deletions of material**. (Initial Standing Order § 13, ECF No. 10.) Failure to file a timely amended complaint will waive the right to do so.

**IT IS SO ORDERED.**


Dated: August 25, 2023

*Mark C. Scarsi*
_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

---

[5] "To the extent Defendants believe the inclusion of the new representative plaintiffs" identified in the operative complaint "poses substantive concerns, those can be dealt with later on their merits." *Hunt*, 2021 WL 1110260, at *2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Annex

| Number | Source | Challenged Statement[6] |
|--------|--------|------------------------|
| 1 | **Complaint ¶ 213**<br><br>**Twitter's Class Period Reports on Forms 10-K and 10-Q**[7] | Our products may contain errors or our security measures may be breached, resulting in the exposure of private information. Our products and services may be subject to attacks that degrade or deny the ability of people to access our products and services. These issues may result in the ***perception*** that our products and services are not secure, and people on Twitter and advertisers may curtail or stop using our products and services and our business and operating results could be harmed.<br><br>Our products and services involve the storage and transmission of people's and advertisers' information, and security incidents, including those caused by unintentional errors and those intentionally caused by third parties, may expose us to a risk of loss of this information, litigation, increased security costs and potential liability. We and our third-party service providers experience cyber-attacks of varying degrees on a regular basis. We expect to incur significant costs in an effort to detect and prevent security breaches and other security-related incidents, and we may face increased costs in the event of an actual or perceived security breach or other security-related incident. In particular, the COVID-19 pandemic is increasing the opportunities available to criminals, as more companies and individuals work online, and as such, the risk of a cybersecurity incident potentially occurring is increasing. |

[6] In its Corrected Amended Class Action Complaint for Violations of the Federal Securities Law, filed March 9, 2023 (Dkt. 81, "Complaint" or "Compl."), Plaintiffs include statements with bold and italics, which are replicated here.  Certain of the language quoted in the Complaint were reproduced inaccurately, with selective omission of text (without notation), or with alterations, which this chart also replicates.

[7] As defined in the Complaint, "Class Period Reports" is comprised of: Form 10-Q for the quarter ended June 30, 2020, filed on August 3, 2020 ("Q2 2020 10-Q"), Form 10-Q for the quarter ended Sept. 30, 2020, filed on October 3, 2020 ("Q3 2020 10-Q"), Form 10-K for the year ended Dec. 31, 2020, filed on Feb 17, 2021 ("2020 10-K"), Form 10-Q for quarter ended March 31, 2021, filed on Apr. 30, 2021  ("Q1 2021 10-Q"), Form 10-Q for quarter ended Jun 30, 2021, filed on Jul 27, 2021  ("Q2 2021 10-Q"), Form 10-Q for the quarter ended Sept. 30, 2021, filed on Oct. 27. 2021 ("Q3 2021 10-Q"), Form 10-K for the year ended Dec. 31, 2021, filed on Feb. 16, 2022 ("2021 10-K"), Form 10-Q for the quarter ended Mar. 30, 2022, filed on May 2, 2022 ("Q1 2022 10-Q"), Form 10-Q for the quarter ended Jun 30, 2022 filed on July 26, 2022  ("Q1 2022 10-Q"). Compl. ¶ 206.

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | | *We cannot provide assurances that our preventative efforts will be successful.* |
| 2 | **Complaint ¶ 214**<br><br>**Twitter's Class Period Reports on Forms 10-K and 10-Q** | For example, in July 2020, we became aware of what we believe to be a coordinated social engineering attack by people who successfully targeted one or more of our employees with access to internal systems and tools. The attackers used this access to target a small group of accounts (130) and to gain control of a subset of these accounts and send Tweets from those accounts and access non-public information relating to at least some of those accounts. We are continuing to assess what other malicious activity the attackers may have conducted and the extent to which non-public data related to these accounts was compromised. *We are also taking steps to secure our systems while our investigations are ongoing.* |
| 3 | **Complaint ¶ 216**<br><br>**Twitter's Q2 2020 Form 10-Q** | While *we strive to comply with applicable privacy and data protection laws and regulations*, our privacy policies and other obligations we may have with respect to privacy and data protection, the failure or perceived failure to comply may result, and in some cases has resulted, in inquiries and other proceedings or actions against us by governments, regulators or others. |
| 4 | **Complaint ¶ 218**<br><br>**Nov. 17, 2020 Jack Dorsey Congressional testimony** | Protecting Privacy<br><br>In addition to the principles I have outlined to address content moderation issues in order to better serve consumers, it is also critical to protect the privacy of the people who use online services. We believe privacy is a fundamental human right, not a privilege. *We offer a range of ways for people to control their privacy experience on Twitter*, from offering pseudonymous accounts to letting people control who sees their Tweets to providing a wide array of granular privacy controls. *Our privacy efforts have enabled people around the world using Twitter to protect their own data.* That same philosophy guides how we work to protect the data people share with Twitter. *We empower the people who use our service to make informed decisions about the data they share with us.* We believe individuals should know, and have meaningful control over, what data is being collected about them, how it is used, and when it is shared. We believe that individuals should control the personal data that is shared with companies and provide them with the tools to help them control their data. *Through the account settings on Twitter, we give people* |

| Number | Source | Challenged Statement[6] |
|--------|--------|-------------------------|
| | | *the ability to make a variety of choices about their data privacy, including limiting the data we collect, determining whether they see interest-based advertising*, and controlling how we personalize their experience. In addition, we provide them with the ability to access information about advertisers that have included them in tailored audiences to serve them ads, demographic and interest data about their account from ad partners, and information Twitter has inferred about them. |
| 5 | **Complaint ¶ 220**<br>**Feb. 25, 2021 Analyst Day Presentation** | Finally, because we believe privacy is a fundamental human right, *we will continue to advocate for choice with respect to privacy and data protection*. We support regulatory proposals that enshrine thoughtful, innovative privacy protections into law. *An internet structured around consumers meaningful privacy choices* will always be more open than one built around a business model that depends on accumulated stores of data for their own use. |
| 6 | **Complaint ¶ 221**<br>**Feb. 25, 2021 Analyst Day Presentation** | *Our policies are built primarily around the promotion and protection of three fundamental human rights, freedom of expression, safety, and privacy*. These rights, among others, are enshrined in the Universal Declaration of Human Rights, which is an international document adopted by the U.N. and numerous countries around the world. At times, these fundamental human rights can be in tension with each other. To address this tension, our rules attempt to establish an appropriate balance, *prioritizing safety above all others.* |
| 7 | **Complaint ¶ 223**<br>**Mar. 2, 2021 J.P. Morgan High Yield & Leveraged Finance Conference** | Q: Similar vein, different course perhaps, but there's been a lot of focus on content moderation at Twitter, how to promote healthy conversation. I think we've also talked about that last year. It's ongoing. But can you discuss some of the more recent steps the company has taken?<br><br>A: So we're always working hard to make sure that people can trust the information they see and feel safe being a part of the conversation. That can mean new rules such as what we rolled out yesterday to make sure that people are not getting confused around vaccines for COVID-19. It means that *we're very careful around an election, whether it's in the United States or another part of the world* and making sure that civic integrity is respected and that people aren't confused about whether polling stations are open, whether they can vote by texting, whether somebody has been declared the victor or not in an election. We're labeling |

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | | candidates. We are labeling, when appropriate, tweets to point people to the appropriate context. |
| | | This is a piece of work that we'll be focused on forever that will constantly be evolving based on the world around us. The example I provided around COVID-19 and vaccines, which is just from yesterday just gives you an example of how dynamic we must be as we consider the right policies for the environment in which we play. A year ago, when we were sitting at this conference, it was not clear we needed COVID-19 vaccines -- COVID-19 policies, let alone COVID-19 vaccine policies. |
| 8 | **Complaint ¶ 225** **Mar. 2, 2021 J.P. Morgan High Yield & Leveraged Finance Conference** | Q: True. So kind of tying that in, how do you think about content moderation? How does the company think about content moderation in the context of increased government and regulatory scrutiny? And it's not just Twitter, but similar platforms and even the context of Section 230. I think a lot of people like to bring up for different rules and different geographies that Twitter operates in. <br><br>A: Sure. So the regulatory environment around us continues to be really dynamic as well, whether it's privacy-related issues in Europe or California or conversations around Section 230, which I'm sure will continue throughout this year. We feel like we have a really important and differentiated voice at the table in these conversations. Sometimes, it's just a small group of companies that end up talking in front of Congress about them, and we may have a different point of view where we believe strongly in transparency and choice. So let me double-click on those. ***Transparency means we want people to know how we use their data. We want them to know how we make the decisions that we do, whether they're around policies or how we surface tweets in their time line. We want them to have choice on whether we use our — their data or whether we use our algorithms or not.*** An example on Twitter is if you open your Twitter app right now, and you go to the top right of your home timeline, you can toggle back and forth between a reverse chronological time line and one where we use our algorithm to surface the best tweets first. We first -- we've had that feature in our app for years, but it was buried in your settings until about 1.5 years ago. ***We were so proud to roll it out without really testing much  because we just felt it was the right thing to do: to give people choice and to be transparent about where it was.*** That really is top of mind to us as we think |

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | | about these conversations around the regulatory environment for Internet companies. We don't want to see a regulatory construct that rewards the largest companies who can hire content moderators. We want to see companies be transparent in how they use data and how they use algorithms. We want people to have choice in how the companies do those things. We think that will ultimately end up serving everybody well around the Internet conversation, whether its reviews on newsletters, reviews on products on an e-commerce website or tweets. |
| 9 | **Complaint ¶ 227**<br><br>**Mar. 3, 2021 Morgan Stanley Conference** | So first, it's too early for anyone in the industry, I think to approach IDFA and convey any degree of certainty around how this plays out because the ad platforms, the operating system providers, the advertisers and the people who have the choice of how their data is used, all are going to have to act and respond to these changes before we really know how it shakes out. So this is going to take a while. Secondly, what gives us confidence and enthusiasm as we look ahead is we look at the unique signal that Twitter has, with a growing audience, with better formats and more relevance and the ability to better leverage that signal, much of which isn't tied to a device ID. We feel really good about our ability to leverage that combination.<br><br>***We also feel like we've built up a lot of trust with the people who use our service, whether it's around GDPR or CCPA. When we prompt people and ask them questions, we try to be really thoughtful and transparent and demonstrate the choices that they have. When we ask if we could show them personalized ads, we do the same thing.*** We hope that, that trust that we've built up with people helps us as we look ahead, helping them understand the benefit of giving us the things that we need in order to give them a good experience, whether it's ads or tweets that they're seeing on Twitter. |
| 10 | **Complaint ¶ 228**<br><br>**July 22, 2021 2Q 2021 Earnings Call** | Q: Thanks. Two questions, please. Could you talk about what impact you would expect the Olympics to have on your outlook? What's embedded in there? I know from time to time you have called out events like World Cup contribution. So just talk about what the impact I guess of a crowd, Olympics is likely to be this year?<br><br>And then your commentary about IDFA or the Apple changes. It almost seems like your Alex more muted than what we hear or a little less uncertain than from other |

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | | advertising platforms. Are there particular reasons why you think that the IDFA impact would be more certain would be clearer for you than it would be just give me it's maybe it's your advertiser base or the type of formats. Just any color on that would be helpful. Thanks a lot.<br><br>A: The second part of your question on ATT or IDFA. So far we're pleased with what we've seen, but it's too early to call a long-term trend. I point you to a few different things. *The first is we've worked really hard as long as the company has been around to build trust with the people who use our service. Hopefully, that means that when they're prompted from Twitter, and we give them a really clear explanation of what we're asking. Hopefully, that means they're more likely to accept the prompt from us than it they might be from others.* |
| 11 | **Complaint ¶ 230**<br><br>**Mar. 10, 2022 Morgan Stanley Conference** | Q: I want to talk about Europe a little bit and the unfortunate world the events around Russia and the Ukraine. Can you maybe just talk to us about how we should be thinking of potential impacts to the user growth, the advertising business or engagement on the platform as you sort of navigate through this uncertain time with Russia and Ukraine?<br><br>A: Yes. To talk about this event, I think it's important to take a step back. I think it's moments like this that sort of remind us, all of us who work on Twitter about like the importance of public conversation.<br><br>So our mission is to serve the public conversation. In this moment that reminds why public conversation is important in the world. Why Twitter is important in the world.<br><br>It's such a privilege to see our customers all around the world and how they use our service in this critical time. When things like this happen in the world, people show up on Twitter to find out what's happening. It gives us this opportunity to showcase the value of Twitter to all of these people. But it also has us feel this immense responsibility, right?<br><br>So — and I think it reinforces for me personally sort of the approach we've taken over the years around improving the health of the public conversation to be really proactive and principled around that. |

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | | It gives me pride in our team because back in 2017, on the ad side, we offboarded RT and Sputnik. In 2019, we banned all ads from state-affiliated media organization. Back in 2020, we started labeling and de-amplifying all state-affiliated media entities.<br><br>*So -- and over the years, we've been very, very transparent about any attempt that we've seen from state actors to manipulate the conversation on Twitter, right? And we've shared those transparently. We've been active in detecting them.*<br><br>So really, we've been doing work proactively to be prepared for this moment. And even in the last two weeks, our teams have done a lot of amazing work, right? |
| 12 | **Complaint ¶ 232**<br><br>**Sep. 24, 2020 Twitter Blog Post, "Our continued work to keep Twitter secure"** | We are constantly working to balance how we build products and provide support to people who use Twitter while ensuring the security and privacy of people who use our service. *That means access is limited and is only granted for valid business reasons (i.e., ensuring an account holder can get support if they are locked out of their account).*<br><br> * * * * * <br>*To further secure our internal tools from potential misuse, we have been strengthening the rigorous checks that team members with access must undergo.* This also helps reduce the potential for an unauthorized person to get access to our systems. *We have strict principles around who is allowed access to which tools and at what time, and require specific justifications for customer data to be accessed.*<br><br> * * * * * <br>Similar to how we proactively detect and alert you of suspicious behavior on your account to help you keep it secure, we have internal detection and monitoring tools that help alert us of unusual behavior or possible unauthorized attempts to access our internal tools. *These tools are constantly being improved, even since the July incident, to include things like expanding our detection and response efforts to include suspicious authentication and access activity.* |

| Number | Source | Challenged Statement[6] |
|--------|--------|-------------------------|
| 13 | **Complaint ¶ 234**<br><br>**Sep. 24, 2020 Twitter Blog Post, "Our continued work to keep Twitter secure"** | In addition to requiring Security and Privacy & Data Protection training for all newly hired Twitter employees, we introduced new courses and increased the frequency and availability of existing courses for all employees. For example, we introduced two new mandatory training sessions for people who have access to non-public information. These trainings make clear the dos and don'ts when accessing this information and ensure employees understand how to protect themselves when they are online so they can better avoid becoming phishing targets for attackers. In addition to existing security training courses, we've also enhanced training content on secure coding, threat modeling, privacy impact assessments, and privacy by design so privacy is integrated into everything we design and build by default. |
| 14 | **Complaint ¶ 236**<br><br>**Sep. 24, 2020 Twitter Blog Post, "Our continued work to keep Twitter secure"** | Our teams have also been investing in additional penetration testing and scenario planning to help secure Twitter from a range of possible threats, including in the context of the upcoming 2020 US elections. Specifically, over a five month period from March 1 to August 1, Twitter's cross-functional elections team conducted tabletop exercises internally on specific election scenarios. Some of the topics included: hacks and other security incidents, leaks of hacked materials, platform manipulation activity, foreign interference, coordinated online voter suppression campaigns, and the post election day period. |
| 15 | **Complaint ¶ 238**<br><br>**Sep. 24, 2020 Twitter Blog Post, "Our continued work to keep Twitter secure"** | Finally, we continue to invest in and scale the processes in place to review products for security and privacy concerns before they launch. If a project could have significant privacy impacts, we conduct a detailed impact assessment to make sure we're taking appropriate measures before we launch it. We've significantly increased the number of privacy reviews and impact assessments the past few years. Specifically, in 2018, we did about 100 privacy reviews; in 2019, we did almost 500 privacy reviews; and in the first 6 months of 2020, we have completed more than 300 privacy reviews. |

| Number | Source | Challenged Statement[6] |
|--------|--------|--------------------------|
| | | *Platforms like Twitter have taken a number of important steps to confront this problem, for example - having a dedicated site integrity team and continuous investment in technology to detect, understand and neutralize these campaigns as quickly and robustly as possible* - but technology companies can't do it alone. |
| | | \* \* \* \* \* |
| 16 | Complaint ¶ 240<br><br>Nov. 26, 2020 Twitter Blog Post, "Nation states exerting power online – sharing data can guard against it"[8] | Second, it raises general awareness and increases understanding more widely of the scale and nature of the challenges impacting the integrity of public conversation online. This is why *in 2018, Twitter committed to disclose publicly, any state-backed information operations that were reliably identified on the service, and to make the full datasets of those operations available for investigation and analysis. Since this first release over two years ago, Twitter has now disclosed over 35 separate state-backed information operations designed to nefariously shape and manipulate public opinion online*. Independent analysis of this activity by researchers is a key step toward promoting shared understanding of these threats and to help develop a holistic strategy for addressing them. And third, making this data available keeps platforms like Twitter accountable for their own response to these challenges. The nature of conversations taking place on Twitter is well-documented and, critically, members of the public, governments, and researchers can bring their expertise to bear to develop solutions for a range of online harms. However, as Twitter's CEO, Jack Dorsey has said, there is much more to do when it comes to transparency; and *the team within Twitter who work with researchers are part of that, constantly looking for opportunities to provide new data while balancing privacy considerations*. |
| 17 | Complaint ¶ 242<br><br>May 25, 2022 Twitter Blog Post, "FTC settlement: Our | On May 25, 2022, Twitter reached a settlement with the Federal Trade Commission (FTC) regarding a privacy incident disclosed in 2019 when some email addresses and phone numbers provided for account security purposes may have been inadvertently used for advertising. *This issue* |

---

[8] Plaintiffs allege that this blog post was published on November 26, 2022 (Compl. ¶ 240), but the correct publishing date is November 26, 2020.

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | commitment to protecting your privacy and security" | *was addressed as of September 17, 2019,* and today we want to reiterate the work we'll continue to do to protect the privacy and security of the people who use Twitter.<br><br>Keeping data secure and respecting privacy is something we take extremely seriously, and we have cooperated with the FTC every step of the way. In reaching this settlement, we have paid a $150M USD penalty, and we have aligned with the agency on operational updates and program enhancements to ensure that people's personal data remains secure and their privacy protected. |
| 18 | Complaint ¶ 244<br><br>Sept. 28, 2020, Wired Magazine Article, "How Twitter survived its biggest hack—and plans to stop the next one" | [T]he amount of access, the amount of trust granted to individuals with access to these tools, is substantially lower today. |
| 19 | Complaint ¶ 250<br><br>Twitter's Class Period Reports on Forms 10-K and 10-Q | *We believe that mDAU, and its related growth, is the best way to measure our success against our objectives and to show the size of our audience and engagement.* |
| 20 | Complaint ¶ 251<br><br>Twitter's Q2 2020 Form 10-Q, Q3 2020 Form 10-Q | For example, *we believe that mDAU, and its related growth, are the best ways to measure our success against our objectives and to show the size of our audience and engagement going forward, so we discontinued disclosing monthly active usage after the first quarter of 2019.* |
| 21 | Complaint ¶ 252<br><br>Twitter's Class Period Reports on Forms 10-K and 10-Q | *Our advertising revenue growth is primarily driven by increases in mDAU,* increases in ad pricing or number of ads shown and increases in our clickthrough rate. |
| 22 | Complaint ¶ 254<br><br>Twitter's Class Period Reports on Forms 10-K and 10-Q[9] | The numbers of mDAU presented in this Quarterly Report on Form 10-Q are based on internal company data. While *these numbers are based on what we believe to be reasonable estimates for the applicable period of measurement*, there are inherent challenges in measuring |

[9] According to the Complaint, "the Class Period Reports on Form 10-K said the same thing, while replacing 'Annual Report' for 'Quarterly Report.'" Compl. ¶ 254.

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | | usage and engagement across our large number of total accounts around the world. |
| 23 | **Complaint ¶ 255** <br><br> **Twitter's Q2 2020 Form 10-Q[10]** | *We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the second quarter of 2020 represented fewer than 5% of our mDAU during the quarter.* |
| 24 | **Complaint ¶ 256** <br><br> **Twitter's Q2 2020 Form 10-Q[5]** | *We estimate that the average of false or spam accounts during the first quarter of 2020 continued to represent fewer than 5% of our mDAU during the quarter.* |
| 25 | **Complaint ¶ 257** <br><br> **Twitter's Class Period Reports on Forms 10-K and 10-Q** | *We are continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU,* and have made improvements in our spam detection capabilities that have resulted in the suspension of a large number of spam, malicious automation, and fake accounts. |
| 26 | **Complaint ¶ 258** <br><br> **Twitter's Class Period Reports on Forms 10-K and 10-Q** | *We are continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU*, but we otherwise treat multiple accounts held by a single person or organization as multiple accounts for purposes of calculating our mDAU because we permit people and organizations to have more than one account. |
| 27 | **Complaint ¶ 260** <br><br> **Class Period Reports on Forms 10-K and 10-Q** | *After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics.* |
| 28 | **Complaint ¶ 262** <br><br> **Aug. 11, 2020 Oppenheimer Conference** | So about a year-and-a-half ago, we transitioned to really just talk about monetizable daily active usage, and the reason we did that is that's what we've been tracking internally for a long time as the best way to measure our success in getting people to use Twitter as a daily part of their lives. |
| 29 | **Complaint ¶ 263** | [U]ltimately, we measure our long term success through our ability to grow monetizable daily active usage (mDAU); |

---

[10] According to the Complaint, "Twitter's other Class Period reports on Forms 10-Q and 10-K contained materially identical statements, each referencing the most recently ended quarter." Compl. ¶¶ 255-56.

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | **Feb. 25, 2021 Analyst Day** | there are a variety of metrics that help us gauge whether our product solutions are working, [] in [the] aggregate the best way to measure our success is mDAU. |
| 30 | **Complaint ¶ 265**<br><br>**Feb. 25, 2021 Analyst Day** | Today, we want to give you a bit more insight into that strategy. Our strategy falls into three key areas, what we call Health, Interests and Conversations. Let's talk about each. We believe it is essential for public conversation to be healthy. If people don't feel that their conversations are safe from abuse and harassment, we know they won't feel comfortable participating in the first place. ***And if content on the platform is rife with spam or misleading information, people won't trust the integrity of the platform. Mitigating these risks is critical for us to create the best experience for our customers, and ultimately critical in supporting our growth.*** Ensuring a healthy public conversation is also essential for our advertisers, who want to ensure that their brand and activity are not active alongside harassment, vitriol and misleading information. |
| 31 | **Complaint ¶ 267**<br><br>**Sept. 21, 2021 Tweet** | Believe it or not, only around 5% of accounts on Twitter are bots. @yoyoel gives us the real about fake accounts, and how much influence they really have on our conversations. |
| 32 | **Complaint ¶ 268**<br><br>**Sept. 21. 2021 Twitter Blog Post, "Four truths about bots"** | [T]he number of bots, ([is] around 5%, a number Twitter reports quarterly). |
| 33 | **Complaint ¶ 270**<br><br>**May 16, 2022 Parag Agrawal Tweet thread** | a. First, let me state the obvious: spam harms the experience for real people on Twitter, and therefore can harm our business. ***As such, we are strongly incentivized to detect and remove as much spam as we possibly can, every single day.*** Anyone who suggests otherwise is just wrong.<br><br>b. ***Our team updates our systems and rules constantly to remove as much spam as possible***, without inadvertently suspending real people or adding unnecessary friction for real people when they use Twitter: none of us want to solve a captcha ever time we use Twitter. |
| 34 | **Complaint ¶ 272**<br><br>**Twitter's Q2 2020 Form 10-Q, Q3 2020** | Companies in the internet, technology and media industries are subject to litigation based on allegations of infringement, misappropriation or other violations of intellectual property rights. Many companies in these industries, including many of our competitors, have |

| Number | Source | Challenged Statement[6] |
|---|---|---|
| | Form 10-Q, 2020 Form 10-K[11] | substantially larger patent and intellectual property portfolios than we do, which could make us a target for litigation as we may not be able to assert counterclaims against parties that sue us for patent, or other intellectual property infringement. In addition, various "non-practicing entities" that own patents and other intellectual property rights often attempt to assert claims in order to extract value from technology companies. From time to time we receive claims from third parties which allege that we have infringed upon their intellectual property rights. Further, from time to time we may introduce new products, product features and services, including in areas where we currently do not have an offering, which could increase our exposure to patent and other intellectual property claims from competitors and non-practicing entities. In addition, although our standard terms and conditions for our Promoted Products and public APIs do not provide advertisers and platform partners with indemnification for intellectual property claims against them, some of our agreements with advertisers, content partners, platform partners and data partners require us to indemnify them for certain intellectual property claims against them, which could require us to incur considerable costs in defending such claims, and may require us to pay significant damages in the event of an adverse ruling. Such advertisers, content partners, platform partners and data partners may also discontinue use of our products, services and technologies as a result of injunctions or otherwise, which could result in loss of revenue and adversely impact our business.<br><br>We presently are involved in a number of intellectual property lawsuits, and as we face increasing competition and develop new products, we expect the number of patent and other intellectual property claims against us may grow. There may be intellectual property or other rights held by others, including issued or pending patents, that cover significant aspects of our products and services, and *we cannot be sure that we are not infringing or violating, and have not infringed or violated, any third-party intellectual property rights or that we will not be held to have done so or be accused of doing so in the future*. Any claim or |

[11] According to the Complaint, "Twitter's subsequent Class Period Reports contained a statement that was identical other than removing 'we expect' from the first sentence of the second quoted paragraph." Compl. ¶ 272 n.21.

| Number | Source | Challenged Statement[6] |
|--------|--------|-------------------------|
|        |        | litigation alleging that we have infringed or otherwise violated intellectual property or other rights of third parties, with or without merit, and whether or not settled out of court or determined in our favor, could be time-consuming and costly to address and resolve, and could divert the time and attention of our management and technical personnel. Some of our competitors have substantially greater resources than we do and are able to sustain the costs of complex intellectual property litigation to a greater degree and for longer periods of time than we could. The outcome of any litigation is inherently uncertain, and there can be no assurances that favorable final outcomes will be obtained in all cases. In addition, plaintiffs may seek, and we may become subject to, preliminary or provisional rulings in the course of any such litigation, including potential preliminary injunctions requiring us to cease some or all of our operations. We may decide to settle such lawsuits and disputes on terms that are unfavorable to us. Similarly, if any litigation to which we are a party is resolved adversely, we may be subject to an unfavorable judgment that may not be reversed upon appeal. The terms of such a settlement or judgment may require us to cease some or all of our operations or pay substantial amounts to the other party. In addition, we may have to seek a license to continue practices found to be in violation of a third-party's rights. If we are required, or choose to enter into royalty or licensing arrangements, such arrangements may not be available on reasonable terms, or at all, and may significantly increase our operating costs and expenses. As a result, we may also be required to develop or procure alternative non-infringing technology, which could require significant effort and expense or discontinue use of the technology. An unfavorable resolution of the disputes and litigation referred to above would adversely impact our business, financial condition and operating results. |