POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Court-Appointed Lead Plaintiff William Baker, Additional Plaintiff Jill Sligay, and Co-Lead Counsel for the Proposed Class*

[additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM BAKER, JILL SLIGAY, LENARD ROQUE, and AMOLKUMAR VAIDYA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC., JACK DORSEY, NED SEGAL, PARAG AGRAWAL, and DAMIEN KIERAN,<br><br>Defendants. | Case No. 2:22-cv-06525-MCS-E<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>CLASS ACTION<br><br><u>JURY TRIAL DEMANDED</u> |

TABLE OF CONTENTS

I. NATURE OF THE ACTION ..... 1
II. JURISDICTION AND VENUE ..... 6
III. PARTIES ..... 6
A. Plaintiffs ..... 6
B. Defendants ..... 6
C. Relevant Non-Parties ..... 8
IV. DEFENDANTS MISLEAD INVESTORS AS TO TWITTER'S CYBERSECURITY AND SITE INTEGRITY WEAKNESSES ..... 10
A. Statement Set 1: Statements about controlling and logging access made shortly after the July 2020 Hack ..... 10
1. Defendants' Statements ..... 10
2. Defendants' emphasized statements gave the misleading impression that Twitter tightly controlled and monitored access to user data ..... 13
a) Twitter exposes private user information, leading to an FTC decree ..... 13
b) In the Summer of 2020, the FTC Served a Draft Complaint On Twitter Alleging that it Violated the 2011 Consent Order. ..... 15
c) Also in the Summer of 2020, a Teenager Hacks Twitter ..... 15
d) Twitter Hires Zatko as Security/Integrity Lead; He Quickly Identifies Major Problems ..... 16
3. The statements were made with scienter ..... 22

a) Agrawal and Kieran made the September 24, 2020 statements and their scienter can be imputed to Twitter for the July 30 statements ........ 23

b) Agrawal and Kieran made their false statements with scienter. ........ 24

(1) Twitter's response to the hack is evidence of Agrawal and Kieran's scienter ........ 24

(2) Media reports contradicting Defendants' statements support an inference of scienter ........ 25

(3) Agrawal and Kieran had previously been informed that Twitter engineers had access to user data in Board meetings ........ 27

(4) Agrawal's acknowledgement that Twitter had "10 years of unpaid security debts" contradicted his public statements ........ 29

(5) The sheer number of security incidents shows that Agrawal and Kieran either knew or were reckless in not knowing that their statements were false ........ 29

(6) Other facts show Agrawal and Kieran made their statements with scienter ........ 30

B. Statement Set 2: Segal's July 8, 2021 statements about cybersecurity ........ 32

1. Statements ........ 32

2. Segal's statements were false and misleading ........ 33

a) Segal's statements gave the misleading impression that Twitter had addressed the deficiencies which led to the July 2020 Hack. ........ 33

b) Segal's statements were also misleading because Twitter's software was out of date, violating all-but-universal engineering standards and Twitter's own requirements......... 35

3. Segal made his statements with scienter......... 36

a) Segal learned the facts showing his statements were false at the February 2021 meeting......... 36

b) Other facts probative of Segal's scienter......... 37

C. Statement set 3: statements implying that Twitter deleted users' data when they deactivated their accounts......... 38

1. Statements......... 38

2. Defendants' statements were misleading......... 38

a) Defendants' statements gave the impression that Twitter could delete user data......... 38

b) Twitter could not delete user data......... 39

3. Defendants made their statements with scienter......... 40

D. Statement set 4: statements concerning the FTC settlement......... 41

1. Statements......... 41

2. The statements were misleading......... 42

3. The statements were made with scienter......... 42

a) Kieran's internal statements contradicted his external statements......... 42

b) Twitter's attempts to mislead the FTC and users shows the statements were made with scienter......... 44

c) That Zatko warned Defendants in December 2021 and February 2022 that Twitter's cybersecurity problems had continued shows scienter......... 46

d) Twitter continually ran into problems created by its inability to delete user data ..... 46

e) Additional facts establishing the statements were made with scienter ..... 48

E. Statement Set 5: Statements in SEC filings that Twitter does not regularly experience data breaches and incidents ..... 48

1. Statements ..... 48

2. Defendants' statements were misleading ..... 49

a) Defendants' statements gave investors the misleading impression that Twitter had disclosed all data incidents and breaches it was aware of ..... 49

b) Defendants' statements gave the impression that Twitter was not aware of an ongoing breach or incident, though in fact Twitter had Indian and Chinese government spies on its payroll ..... 50

3. Defendants made their statements with scienter ..... 53

F. Statement set 6: statements that Twitter disclosed all influence campaigns ..... 55

1. Statements ..... 55

2. The statements were misleading ..... 58

a) The statements gave the false and misleading impression that Twitter had disclosed all state influence campaigns it knew of. ..... 58

b) Contrary to Defendants statements, Twitter did not disclose all the state-backed influence campaigns it discovered ..... 60

(1) The Department of Defense Campaign ..... 61

(2) The Chinar Corp Campaign ..... 62

3. The statements were made with scienter ........................................ 62
a) The scienter of Twitter's Head of Site Integrity, Yoel Roth, can be imputed to Twitter .................................... 62
b) Roth had actual knowledge of a concealed U.S. Department of Defense influence campaign at the time ........ 63
c) Roth and Agrawal had actual knowledge of the Chinar Corp influence campaign .......................................... 64
d) Twitter disclosed the Chinar Corp influence campaign one day after The Washington Post published Zatko's account ................................................................ 65
e) Defendants knew and concealed that Twitter's platform was incapable of addressing misinformation ........................ 66
V. DEFENDANTS MISLEAD INVESTORS ABOUT MDAU ............................... 69
A. Statement Set 7: Statements Touting mDAU Growth ................................ 69
1. Statements ................................................................................ 70
2. These Statements Were False and Misleading ................................ 73
a) Defendants Represented that mDAU Only Included Users that Saw Ads ........................................................... 73
b) A Material Portion of Accounts Included in mDAU Reported During the Class Period Did Not See Ads or Otherwise Contribute to Revenue ........................................ 76
c) Twitter Included Known and Suspended Bots in mDAU ...... 78
B. Statement Set 8: Statements About the Manner In Which Twitter Determined mDAU ............................................................................ 80
1. Statements ................................................................................ 80
2. Internal Data and Defendant Segal's Admission Establish that These Statements Were False ........................................................ 80

C. Defendants' mDAU-related Misrepresentations Were Made with Scienter ..... 81
a) Defendants' Insistence That mDAU Was Twitter's Most Important Metric Contributes to Scienter ..... 81
b) Defendants Publicly Committed Themselves To An Ambitious mDAU Growth Target, Contributing to Scienter ..... 83
c) Defendants Dorsey and Segal Oversaw the Adoption of mDAU, Contributing to Scienter ..... 83
d) Segal's June 30, 2022 admission that Twitter included bots and spam in mDAU establishes that his Class Period statements were made with scienter ..... 83
e) Beykpour's Scienter Can Be Imputed to Twitter ..... 85
VI. LOSS CAUSATION ..... 85
VII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER ..... 91
A. Defendants' Suppression of Zatko's Attempts to Blow the Whistle Supports Scienter ..... 91
1. Defendants freeze Zatko out for expressing concerns about Twitter's cybersecurity ..... 91
2. Agrawal fires Zatko for blowing the whistle ..... 93
B. Zatko Kept Agrawal Abreast of Deficiencies ..... 96
C. Zatko Becomes a Whistleblower and Other Insiders Corroborate His Account ..... 96
VIII. PRESUMPTION OF RELIANCE ..... 97
IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ..... 99
X. CLASS ACTION ALLEGATIONS ..... 100
XI. COUNTS ..... 102

COUNT I ........................................................................................... 102
(Violations of Section 10(b) of the Exchange Act, and Rule 10b-5 Thereunder, Against Defendants) ........................................................ 102
COUNT II .......................................................................................... 103
(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants) ........................................................................ 103
XII. PRAYER FOR RELIEF ........................................................................ 104
XIII. JURY TRIAL DEMANDED ................................................................ 104

Court-appointed Lead Plaintiff William Baker ("Lead Plaintiff") and additional plaintiffs Jill Sligay, Lenard Roque, and Amolkumar Vaidya ("Additional Plaintiffs", and with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned counsel, hereby bring this Amended Class Action Complaint (the "Complaint") against Twitter, Inc. ("Twitter" or the "Company"), Jack Dorsey, Ned Segal, Damien Kieran, and Parag Agrawal (collectively, "Defendants").

Plaintiffs' claims are brought upon personal knowledge, as to Plaintiffs and Plaintiffs' own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review and analysis of: (1) reports and documents filed by Twitter with the U.S. Securities and Exchange Commission ("SEC"); (2) reports issued by securities analysts concerning Twitter; (3) press releases, news articles, transcripts, and other public statements issued by or about Twitter; (4) an investigation conducted by Plaintiffs' attorneys, including interviews with former employees of Twitter; (5) confirmation of the truth of the allegations made by Twitter's former Head of Security, Peiter "Mudge" Zatko, in a whistleblower disclosure to the Federal government and in testimony to a U.S. Senate committee, through Mr. Zatko's attorneys and documents he submitted; and (6) other publicly-available information concerning Defendants. Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION[1]

1. This is a securities class action asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5

---

[1] Unless otherwise noted, all emphases are added. All facts attributed to Zatko are drawn from his two whistleblower reports, the exhibits thereto, and his oral and written

promulgated thereunder (17 C.F.R. § 240.10b-5), on behalf of all persons and entities who purchased or acquired publicly traded securities of Twitter from July 30, 2020 through August 23, 2022, both dates inclusive (the "Class Period"), and who were damaged thereby.

***Cybersecurity***

2. In July 2020, Twitter was hacked by a teenager. The crude hack drew worldwide media attention because the teenager accessed high-profile accounts, such as those of Elon Musk and Barack Obama, and made deceptive posts from these accounts. In the days following the hack, it was reported that, among other cybersecurity weaknesses at Twitter, there were hundreds or thousands of Twitter employees whose internal access permissions were sufficient to replicate the hack, should any one of the employees' accounts be compromised.

3. Defendants responded quickly to convince the market that Twitter's cybersecurity defenses were sound. Defendants Parag Agrawal and Damien Kieran even told investors that internal "[a]ccess [] is strictly limited and is only granted for valid business reasons" and that access is logged.

4. Yet Defendants' statements were knowingly false: Twitter's defenses were remarkably vulnerable, falling short of basic standards for software development, cybersecurity, and data privacy. In particular, *all* of Twitter's engineers had access to user data, they did not have to provide a reason to access the data, and Twitter did not log their access.

5. Twitter's response to the hack itself proves that Defendants knew their subsequent statements were false. Any other company would have used internal access logs to discover which employee accounts had been hacked. But Twitter deployed a nuclear response—forcing thousands of employees to change their passwords during

---

testimony. These materials are available at https://www.judiciary.senate.gov/meetings/data-security-at-risk-testimony-from-a-twitter-whistleblower.

video calls—because it did not ***have*** any access logs, so it could not identify which employees' credentials were compromised. This was, a cybersecurity expert colorfully stated, what companies do when Chinese government spies have access to the company's most critical files, rather than a creative teenager who made a few phone calls. Agrawal and Kieran spent weeks overseeing Twitter's response to the hack and were aware of the underlying issues regarding employee accounts and the lack of access logs. Further, Twitter's promiscuous access controls had already been repeatedly discussed at Twitter board meetings. A few months ***after*** Agrawal falsely claimed in public that Twitter had fixed its access control issues, he acknowledged internally that Twitter had "ten years of unpaid security debts" because of its decision not to prioritize cybersecurity for years, allowing weaknesses to develop and fester.

6. As a result, during the Class Period hackers continue to overcome Twitter's ramshackle cybersecurity defenses, either stealing or obtaining access to data on a weekly basis. In 2020 alone, Twitter experienced data breaches and access control incidents impacting, according to internal reports, the data of 29,000 employees and contractors and 243 million users (i.e., almost all of them). And even though Defendants knew Twitter had spies for foreign countries on its payroll, Twitter still relied on the honor system to "catch" employees who had deliberately inserted malicious software.

7. After the July 2020 hack, Twitter hired renowned cybersecurity expert Peiter Zatko to whitewash its poor cybersecurity. Yet rather than offer Twitter's board of directors the bland reassurances Defendants expected, Zatko reported, in painstaking detail, the critical deficiencies that Defendants were concealing. "You should be alarmed," Zatko told Defendants.

8. In early January 2022, Agrawal fired Zatko to stop him from disclosing even more of Twitter's cybersecurity failings to its Board. Then, on August 23, 2022, *The Washington Post* reported on and published a whistleblower report Zatko had filed with the Senate Judiciary Committee and various agencies ("**August 23 *Post* Article**") showing

that Defendants' Class Period statements had been false, and causing Twitter's stock price to fall 7.3%, damaging investors.

***State influence campaigns***

9. Because Twitter is a social media platform whose users include a disproportionate number of state officials, activists, dissidents, and journalists, it has significant influence on public discourse. As a result, state actors regularly seek to influence public opinion through Twitter disinformation and propaganda campaigns. Throughout the Class Period, Defendants reiterated to investors that, unlike other social media companies, Twitter disclosed ***any*** state influence campaigns operating on its platform.

10. Yet Defendants' statements were knowingly false. Indeed, mere months before the Class Period, the very Twitter executive in charge of these disclosures, Yoel Roth, had exchanged emails acknowledging that the U.S. Department of Defense was engaged in a deceptive influence campaign. Not only did Twitter not disclose the campaign, it worked with the U.S. Department of Defense to conceal it.

11. This was not the only campaign Twitter concealed. To obtain favor with the Indian government, Twitter deliberately concealed a disinformation campaign run by the Indian army unit responsible for that country's troubling activities in Kashmir.

12. The August 23 *Post* Article stated that Zatko had filed an additional report with, among others, the Senate Select Committee on Intelligence, that disclosed that Twitter had concealed state influence campaigns, contributing to Twitter's stock price decline on August 23, 2022.

***mDAU***

13. In 2019, Twitter introduced a proprietary metric, "monetizable daily active users" ("**mDAU**"), as a measure of its users, the basis of virtually all of Twitter's revenue. In introducing mDAU to investors, Defendants claimed it was not comparable to other companies' similar metrics because those other metrics—unlike mDAU—included users

who were not shown ads. They told investors that mDAU was the single best metric to track Twitter's progress. And, during the Class Period, Twitter reported mDAU growth every quarter.

14. Yet Defendants' statements were false. Many users counted as mDAU did not see any ads or contribute any revenue in any other way to Twitter. The percentage of such users increased substantially during the Class Period, reaching nearly a *third* of mDAU by Q1 2022. Moreover, a material proportion of mDAU consisted of users that Twitter had already determined were bots when they were counted, rising from 2.5% in Q1 2021 to 6.9% in Q1 2022. Thus, the Class Period increase in Twitter's mDAU reflected unmonetized and unmonetizable accounts rather than actual user growth that could drive sustained increases in revenue and profits.

15. In April 2022, Twitter's Board accepted a buyout offer from Elon Musk ("Musk"). Yet the deal quickly soured.

16. On May 13, 2022, before the market opened, Musk tweeted out concerns about Twitter's representations concerning the number of bots counted in mDAU, raising doubts about Defendants' prior statements. Twitter's stock price fell 9.7% that day, falling another 8.2% on the next trading day.

17. On July 7, 2022, the *Washington Post* reported that Musk had stopped engaging in certain discussions relating to the deal. Twitter's stock price fell 5.1%.

18. Then on July 8, 2022, Twitter revealed that the previous day's *Post* article was accurate by publicly filing a letter from Musk terminating the deal and identifying Defendants' misrepresentations concerning the number of bots as one reason. These misrepresentations included that Twitter did not count as mDAU accounts that it had determined were bots. Twitter's stock price plunged 11.3%.

19. Defendants' false statements artificially inflated Twitter's stock price by billions of dollars. Investors who bought its shares during the Class Period were damaged when the truth came out, causing its stock price to lose the artificial inflation.

## II. JURISDICTION AND VENUE

20. The Counts asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Twitter has offices in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' acts alleged herein took place in this Judicial District.

23. In connection with the acts alleged in this complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

24. Court-appointed Lead Plaintiff William Baker, as set forth in the Certification previously filed in this action (ECF No. 28-2), acquired Twitter common stock at artificially inflated prices during the Class Period and was damaged when such artificial inflation was removed.

25. Each of Additional Plaintiffs Jill Sligay, Lenard Roque, and Amolkumar Vaidya, as set forth in their Certifications previously filed in this action (ECF No. 81 at 117-24), acquired Twitter common stock at artificially inflated prices during the Class Period and was damaged when such artificial inflation was removed.

### B. Defendants

26. Defendant Twitter, Inc. n/k/a X Corp., operates a global social media platform—itself called Twitter (during the Class Period)—where users can post and

engage with short-form commentary, called "Tweets." Twitter is accessible to the public, including its registered users, via a mobile application (as may be used, for example, on an iPhone, Android phone, or other smart device) or by visiting Twitter's website (www.twitter.com) on a web browser. Twitter has positioned itself as a modern-day public square—a platform for conversation about virtually any topic. Many academics, journalists, activists, and government officials are active on Twitter. During the Class Period, Twitter's common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "TWTR."

27. Defendant Jack Dorsey co-founded Twitter and served twice as its Chief Executive Officer. The latter stint started before the Class Period and ended November 29, 2021. Dorsey also served as a member of Twitter's Board of Directors from May 2007 through May 25, 2022.

28. Defendant Parag Agrawal served as the Company's CEO from November 29, 2021 until Musk's acquisition of Twitter on or about October 27, 2022, whereupon he was fired for cause. Agrawal worked at Twitter in engineering positions beginning in 2011, including as its Chief Technology Officer from October 2017 to November 2021. Agrawal told the tech industry publication *Wired*, for a September 2020 article, that his responsibilities included "countering the constant streams of mis-, dis-, and malinformation on the platform."

29. Defendant Ned Segal served as the Company's Chief Financial Officer from June 2017 until Musk's acquisition of Twitter, whereupon he was fired for cause. In addition to his job as Twitter CFO, Segal served as its public face. Segal regularly represented the Company by himself on news shows and at analyst conferences. He did not limit his comments to financial topics. Instead, he discussed all of Twitter's operations, including among others cybersecurity, site integrity, and user privacy.

30. Defendant Damien Kieran served as Twitter's Chief Privacy Officer ("CPO"), Vice President, and Deputy General Counsel from November 2020 through

November 2022. He previously served as its Global Data Protection Officer, Legal Director, and Associate General Counsel beginning February 2019, and its Global Litigation Counsel beginning January 2016.

31. Dorsey, Agrawal, Segal, and Kieran are collectively referred to herein as the "Individual Defendants."

32. Twitter and the Individual Defendants are collectively referred to herein as the "Defendants."

**C. Relevant Non-Parties**

33. Peiter Zatko was employed by Twitter as Security Lead, a member of the senior executive team responsible for Information Security, Privacy, Physical Security, Information Technology, and Twitter Service (the corporate division responsible for global content moderation enforcement) from November 16, 2020, until the morning of January 19, 2022, when Defendant Agrawal abruptly terminated him two days before he could complete a whistleblower report. Before joining Twitter, Zatko held senior positions at Google and Stripe, and within the Department of Defense, where he was authorized to access Top Secret/Special Compartmented Information for work on programs in both offensive and defensive cyber operations. Zatko has been formally recognized for his qualifications and achievements by the Central Intelligence Agency, the White House, and the U.S. Army. The Office of the Secretary of Defense bestowed upon him the Exceptional Public Service Award, the highest medal honor available to civilian, non-career officials. On January 6, 2021, after the attack on the Capitol, the incoming Presidential administration offered Zatko the position of Chief Information Security Officer for the United States, which he declined to continue to work at Twitter.

34. At Twitter, Zatko had a wide portfolio, with hundreds of staff and thousands of contractors in chains that reported up to him on topics including:

a. Information Security (protecting the integrity and security of all Twitter systems and data);

b. Privacy (creating, maintaining, and enforcing privacy policies and processes, plus engineering and executing them across all Twitter systems and data, to avoid liability with the FTC and build systems and processes that respect people's data);

c. Corporate Security (protecting the physical security and safety of employees, offices, and data centers);

d. Information Technology (overseeing the internal systems for finance, HR, and internal corporate technologies and communications); and

e. "Twitter Services," the division tasked with operational enforcement of global content moderation at scale, including spam removal processes.

35. As discussed further herein, months after his termination, following extensive correspondence with Twitter, Zatko delivered extensive whistleblower disclosures to the SEC, the FTC, the U.S. Department of Justice ("DOJ"), and Congress, detailing Twitter's extensive cybersecurity failures, cybersecurity breaches and incidents, acquiescence to state influence campaigns, and misrepresentations to shareholders, regulators, and the public.

36. Elon Musk is a Silicon Valley businessman and billionaire. Among other things, he is the CEO of Tesla, Inc. On April 4, 2022, Musk revealed that he had amassed a 9.2% stake in Twitter, making him the largest single shareholder in the Company. The next day, Twitter invited Musk to join its Board of Directors. Musk initially accepted the invitation before changing his mind and deciding, instead, to take the Company private. On April 14, 2022, Musk made an unsolicited offer to purchase Twitter for $54.20 per share of common stock, or approximately $44 billion. On April 25, 2022, Twitter's Board unanimously resolved to accept Musk's offer, subject to shareholder approval. Musk completed the acquisition after litigation.

37. Yoel Roth served as Twitter's Director, Head of Site Integrity from July 2018 through May 2022, and its Senior Director, Head of Trust & Safety from May 2022 through November 2022.

38. Kayvon Beykpour joined Twitter in 2015 when Twitter acquired Periscope, a company he founded. Beykpour led the Periscope team after its acquisition, and then became Head of Product in July 2018. In December 2021, Beykpour was promoted to General Manager, Consumer, where he oversaw the Product, Engineering, Design, Research, and Customer Service and Operations teams. On May 12, 2022, Agrawal announced that Beykpour was leaving the Company.

## IV. DEFENDANTS MISLEAD INVESTORS AS TO TWITTER'S CYBERSECURITY AND SITE INTEGRITY WEAKNESSES.

### A. Statement Set 1: Statements about controlling and logging access made shortly after the July 2020 Hack

#### 1. *Statements*[2]

39. On July 30, 2020, Twitter published an update on its investigation of the July 2020 Hack on its official blog. The post, titled "*An update on our security incident*," provided:

> The social engineering that occurred on July 15, 2020, targeted a small number of employees through a phone spear phishing attack. A successful attack required the attackers to obtain access to both our internal network as well as ***specific employee credentials that granted them access to our internal support tools.*** Not all of the employees that were initially targeted had permissions to use account management tools, but the attackers used their credentials to access our internal systems and gain information about our processes. This knowledge then enabled them to target additional employees

---

[2] While this Complaint quotes certain of Defendants' statements for context or to establish scienter, Plaintiffs only allege that statements contained in subsections titled "Statements" are actionable.

> who did have access to our account support tools. Using the credentials of employees with access to these tools, the attackers targeted 130 Twitter accounts, ultimately Tweeting from 45, accessing the DM inbox of 36, and downloading the Twitter Data of 7.
>
> There has been concern following this incident around our tools and levels of employee access. To run our business, we have teams around the world that help with account support. Our teams use proprietary tools to help with a variety of support issues as well as to review content [] and respond to reports. ***Access to these tools is strictly limited and is only granted for valid business reasons.*** We have zero tolerance for misuse of credentials or tools, ***actively monitor for misuse, regularly audit permissions, and take immediate action if anyone accesses account information without a valid business reason.*** While these tools, controls, and processes are constantly being updated and improved, we are taking a hard look at how we can make them even more sophisticated.

40. On September 24, 2020, Defendants Agrawal and Kieran published a post on Twitter's website making similar claims.[3] The post, titled *Our continued work to keep Twitter secure*, provided:

> We are constantly working to balance how we build products and provide support to people who use Twitter while ensuring the security and privacy of people who use our service. ***That means access is limited and is only granted for valid business reasons (i.e., ensuring an account holder can get support if they are locked out of their account).***

[3] *See* https://blog.twitter.com/en_us/topics/company/2020/our-continued-work-to-keep-twitter-secure.

* * * * *

***To further secure our internal tools from potential misuse, we have been strengthening the rigorous checks that team members with access must undergo.*** This also helps reduce the potential for an unauthorized person to get access to our systems. ***We have strict principles around who is allowed access to which tools and at what time, and require specific justifications for customer data to be accessed.***

* * * * *

Similar to how we proactively detect and alert you of suspicious behavior on your account to help you keep it secure, we have internal detection and monitoring tools that help alert us of unusual behavior or possible unauthorized attempts to access our internal tools. ***These tools are constantly being improved, even since the July incident, to include things like expanding our detection and response efforts to include suspicious authentication and access activity***.

41. In addition, Agrawal told *Wired* for a September 24, 2020 article:

But one of the first things Twitter realized in the immediate aftermath was that too many people had too much access to too many things. "***It's more about how much trust you're putting in each individual, and in how many people do you have broad-based trust,***" Agrawal says. "***The amount of access, the amount of trust granted to individuals with access to these tools, is substantially lower today.***"

### 2. *Defendants' emphasized statements gave the misleading impression that Twitter tightly controlled and monitored access to user data.*

#### a) *Twitter exposes private user information, leading to an FTC decree.*

42. Since its 2006 launch, Twitter has collected extensive private information about its users, including: log-in credentials, names, contact information (including phone numbers and current and former email addresses), names and contact information for users' contacts, private messages, ad-trackers, Internet Protocol ("IP") addresses and associated geolocations, browsers and devices used to log in, and each user's ring of friends.

43. In 2011, after several incidents in which hackers overcame Twitter's cybersecurity defenses, the FTC filed a complaint against it for failing to protect non-public consumer information.[4] The complaint alleged that, from 2006 to 2009, far too many Twitter employees—far more than permitted by proper cybersecurity policies—could exercise administrative control (referred to internally as "God Mode") over Twitter's internal systems and user data. A user in God Mode can post, edit, and delete tweets from any user account, and access internal data concerning any user. These included Twitter employees who did not need such widespread access to perform their job functions. The number of individuals with this administrative control was far above industry and security standards. Thus, unauthorized access to any one of an excessively large number of Twitter employee accounts could compromise Twitter's entire platform.

44. Twitter entered into a consent order in March 2011 ("**FTC Consent Order**"), which has been continuously in effect since then and is scheduled to terminate on March 2, 2031.[5] The FTC Consent Order required that Twitter "establish and implement, and

---

[4] *See* https://www.ftc.gov/sites/default/files/documents/cases/2011/03/110311twittercmpt.pdf.

[5] *See* https://www.ftc.gov/sites/default/files/documents/cases/2011/03/110311twitterdo.pdf.

thereafter maintain a comprehensive information security program that is reasonably designed to protect the security, privacy, confidentiality, and integrity of nonpublic consumer information." Since March 2011, Twitter has been required to, at a minimum:

a. develop and maintain a system for training and managing employees in proper cybersecurity;
b. design information systems that would (among other) implement adequate "information processing, storage, transmission, and disposal"; and
c. develop a system to prevent, detect, and respond to various forms of attacks.

45. The plan must "contain [] safeguards appropriate to [Twitter's] size and complexity, the nature and scope of [its] activities, and the sensitivity of the nonpublic consumer information."

46. Twitter also agreed not to misrepresent "the security, privacy, confidentiality, or integrity of any nonpublic consumer information." The order identified two specific types of misrepresentations: those concerning its ability to "(a) prevent unauthorized access to nonpublic consumer information; or (b) honor the privacy choices exercised by users."

47. When Defendant Dorsey began his second stint as Twitter's CEO in 2015, Agrawal became one of his trusted lieutenants. Agrawal was promoted to CTO in 2017. As CTO, Agrawal's job was to rebuild Twitter's technical infrastructure, which had been haphazardly cobbled together over the years. Twitter's poor infrastructure led to engineering problems and prevented the Company from introducing new products and services as quickly as it wanted.[6]

48. In the years since the FTC Consent Order, Twitter has grown substantially, from 138 million monthly active users in 2012 to 450 million in 2022, and from $317 million in revenue in 2012 to over $5 billion in 2021.

---

[6] *See* Mike Isaac, et al., *Who is Parag Agrawal, Twitter's New C.E.O.?*, THE NEW YORK TIMES, Nov. 29, 2021 (available at https://www.nytimes.com/2021/11/29/technology/parag-agrawal-twitter.html).

49. Yet, as Twitter grew, so did the severity of the sanctions it can expect if the FTC determines that it violated the FTC Consent Order. For comparison, in 2012, Facebook entered into a consent order with the FTC concerning its privacy promises to consumers that imposed similar obligations as Twitter's FTC Consent Order. When the FTC found in 2020 that Facebook had violated the order, it imposed a $5 billion fine.

b) *In the Summer of 2020, the FTC Served a Draft Complaint On Twitter Alleging that it Violated the 2011 Consent Order.*

50. On July 28, 2020, the FTC served Twitter with a draft complaint alleging that it had violated the 2011 Consent Order ("**Draft FTC Complaint**"). The FTC charged that from 2013 to 2019, Twitter misused user phone number and email address data for targeted advertising even though Twitter solicited, and users provided, this information for safety and security purposes only (e.g., for dual-factor authentication of user log-in attempts).

51. On August 3, 2020, Twitter disclosed the Draft FTC Complaint, and stated that it estimated the range of probable loss from the matter to be $150-$250 million.

c) *Also in the Summer of 2020, a Teenager Hacks Twitter.*

52. In July 2020, a seventeen-year-old recent high school graduate and his friends took over the Twitter accounts of, among other public figures, former President Barack Obama, Joseph Biden, Jeff Bezos, Bill Gates, and Musk ("**July 2020 Hack**"). The hackers then tweeted from the accounts urging followers to send Bitcoin cryptocurrency to a digital wallet the hackers controlled.

53. The July 2020 Hack was rudimentary: the teenagers just called some Twitter employees and, pretending to be Twitter's IT department, asked them for their passwords. A few employees were duped and complied. Because of Twitter's systematic practice of granting employees more access than necessary, those credentials gave the hackers access to "God Mode," letting them tweet from, and access private data concerning, any account they wanted.

54. The hack was one of the most visible successful cyberattacks to date, and it triggered a global security incident, in particular because it involved the account of a former U.S. President and a then-Presidential candidate.

d) *Twitter Hires Zatko as Security/Integrity Lead; He Quickly Identifies Major Problems.*

55. Twitter quickly moved into damage control damage. As part of that campaign, Defendants recruited Zatko. Zatko started work at Twitter on November 16, 2020 as its Security/Integrity Lead. At Twitter's request or at least with its permission, Zatko gave *Reuters* an exclusive interview to announce the hiring. When *Reuters* published an article based on the interview, Dorsey and Agrawal each tweeted it out from their personal account.

56. Upon joining Twitter, Zatko spent two months performing an in-depth evaluation of these areas, interviewing about 40 employees, from members of the executive team to engineers to salespeople. Zatko attended engineering meetings, reviewed internal technical documents, and directly evaluated some of Twitter's key computer systems and servers.

57. Zatko's reports, all highly-experienced experts who were intimately familiar with Twitter's cybersecurity posture and the FTC Consent Order, told Zatko unequivocally that Twitter had never been in compliance with the FTC Consent Order, and was not on track to ever achieve full compliance.

58. Having concluded his investigation, Zatko delivered a presentation to Twitter's senior executive team in February 2021 ("**February 2021 Presentation**") to prepare for the announcement of Q1 2021 results executives would deliver to the Board about a week later. According to Zatko, Defendants Agrawal and Dorsey were in attendance. Zatko also stated that many other executives were in attendance, and while he did not specifically mention Defendants Segal and Kieran, based on their titles (CFO and

CPO), and Segal's and Kieran's previous attendance at board meetings (*see* ¶¶106, 134, below), they would have attended as well.

59. Zatko began the presentation ominously. According to his prepared notes, Zatko stated in his introduction that: "You should be alarmed. It doesn't need to be this bad."

60. The specific deficiencies Zatko raised included that:

a. All engineers had access to Twitter's live production environment, including user data. Twitter did not require any justification to access data and did not log access. Twitter did not have a separate testing environment, and instead all engineers worked in the production environment with live data. *See* ¶¶61-63, 68, 78, 97, 124(a), below.

b. Twitter had no visibility on 90% of its employees' devices. This meant, for example, that Twitter did not know whether employees installed spyware or malware, deliberately or accidentally. *See* ¶¶ 131-32, 136, below.

c. Twitter's software was dangerously out of date. *See* ¶¶ 124(b), 129-30, 136, below.

d. Twitter routinely experienced access control-related cybersecurity incidents and breaches. *See* ¶¶ 111-12, 124(c), 127, below.

61. These deficiencies showed Defendants' statements were false. ***First***, Defendants' statement that "a successful attack required the attackers to obtain access to [] ***specific employee*** credentials that granted them access to our internal tools" gave the misleading impression that the number of employees with such access was relatively small and that the attackers had to hunt for them. In fact, all of Twitter's engineers (thousands of employees) had access to credentials that hackers could use to obtain user data or control user accounts. Thus, the hackers did not need to find "specific" employees, any one of thousands would do.

62. ***Second***, Twitter did not require a "specific" justification or "valid business reason" for employees to access data, and it did not monitor or audit access. As more fully set forth in the scienter subsection for these statements, *see* ¶¶ 89-94 and 102-108, below, Twitter engineers had unfettered access to all user data and their access to data was not logged. For example, Zatko was told by head of engineering Michael Montano, on January 6, 2021, just a few months after Agrawal's statements that "[t]here were no logs, nobody knew where data lived or whether it was critical, and all engineers had some form of critical access to the production environment."

63. As Zatko told attendees at the February 2021 Presentation, there was "no centralized logging across engineering." Zatko would later testify in response to a question from the Senate Judiciary Committee that Twitter would have no way of knowing if an employee inappropriately accessed user data:

> If a Twitter employee had access to main systems and inappropriately accessed user data, would Twitter have any way to know that this occurred, what data was accessed, or what was ultimately done with that data?
>
> ANSWER: ***In general no***. There was insufficient logging (and/or insufficient monitoring of logs), a lack of awareness of data, and inappropriate access control. While there may be certain situations where Twitter could know these things they were the exception rather than the norm. I feel confident in this response because of multiple times where it was necessary to understand what had happened on certain systems, or who had accessed or created particular data and I was repeatedly informed that it was unknown and that there were no ways to figure out the answer to such questions.

64. Thus, Twitter did not require any justification or valid business reason to access user data. Nor did it log such access.

65. The following statements in this subsection were false or misleading for the same reasons:

a. Twitter "actively monitor[s] for misuse, regularly audit permissions, and take immediate action if anyone accesses account information without a valid reason." Twitter did not monitor access and could not take immediate action because it did not know whether anyone accessed account information or their reason for doing so.

b. "[W]e have been strengthening the rigorous checks that team members with access must undergo." There were no checks; all engineers, including new hires, had plenary access.

66. Moreover, Twitter could not restrict access because, remarkably, it did not have a separate software testing environment.

67. As a rule, software companies maintain a "quality assurance" platform, a sort of sandbox where new code and application updates can be safely integrated and tested without any impact on the live "production" systems environment, the platform used by customers.

68. Yet as Zatko explained at the February 2021 Meeting, Twitter did not have a quality assurance platform. Instead, Twitter's engineers worked directly in Twitter's production environment with live customer data. The practice is almost unheard of at modern technology companies." Twitter's failure to do this caused repeated problems, and violated the FTC Consent Order which called for Twitter to employ industry standards.

69. ***Third***, Agrawal's statement that "[t]he amount of access, the amount of trust granted to individuals with access to these tools, is substantially lower today" gave the misleading impression that after the July 2020 Hack, Twitter had meaningfully improved access controls such that a relatively limited number of employees had access to user data.

70. The July 2020 Hack drew worldwide attention. For example, *The New York Times*, *Reuters*, CNN, and *Bloomberg* published investigative news articles about the hack based on information from current and former Twitter employees and internal documents.

71. In a July 23, 2020 article, *Reuters* reported that the number of Twitter "employees and contractors [who] had access to internal tools that could change user account settings and hand control to others" was "more than a thousand." If investors credited the *Reuters* article's claims, when Agrawal stated that Twitter had ***tightened*** access, reasonable investors would believe that there were substantially ***fewer*** than 1,000 employees with access, even though in truth there were more: all engineers (more than 2,500 as of February 2021) had access to user data. Moreover, because Twitter did not have a separate testing environment, it necessarily granted access to all engineers.

72. Moreover, on January 24, 2023, *The Washington Post* reported on a second Twitter whistleblower's complaint that had been filed in October 2022. This second whistleblower reported that God Mode was accessible to all engineers and Twitter has "no ability to control who logs into it."

73. The whistleblower reported that while the Company had changed God Mode's name to "Privileged Mode," it had done almost nothing to prevent engineers from accessing it. All engineers needed to do was change a line of code from FALSE to TRUE. The only warning Twitter offered—a comment stating THINK BEFORE YOU DO THIS—would likely attract hackers, not repel them. Further, according to the whistleblower, "Twitter does not have the capability to log which, if any, engineers use or abuse God Mode." According to the *Post*, the second whistleblower's complaint included screenshots showing the relevant code. The whistleblower also disclosed that this problem had existed continuously since the time of July 2020 Hack.

74. Further, the second whistleblower complaint included screenshots of Twitter employees discussing how easy it was to use that hack. After discussing one method of hacking, another engineer responded there was an easier way. "It's one of those scenarios

where no one has tried to break into the car through the sunroof because the window is cracked and the keys are in the visor lol."

75. Like Zatko, the second whistleblower accused Twitter of securities fraud. "They put in writing to the public and regulators that they had closed all the loopholes," the new whistleblower said. "That's a lie."

76. The *Post* corroborated this second whistleblower's story, citing a former employee who stated that Twitter knew of the "God Mode" problem and was in the process of developing improvements when the employee left the Company in late 2022.

77. In addition to being affirmatively false, Defendants' misstatements about access controls also gave the materially misleading impression that Twitter's access limitations, logging, and control met applicable standards. Yet the August 23 *Post* Article quoted Tony Sager, former chief operating officer at the cyber-defense wing of the National Security Agency, Information Assurance division, as saying that "[i]t's ***near-incredible*** that for something of that scale there would not be a development test environment separate from production and there would not be a more controlled source-code management process." As Sager explained, "***[a]lmost any attack scenario*** is fair game and probably easily executed." The article also quoted a former U.S. Chief Information Security Officer as saying that "[a] best practice is that you should only be authorized to see and access what you need to do your job, and nothing else." But, as the former official explained, Twitter did not come close to meeting the practice and its failure posed material risks: "***If half the company has access to and can make configuration changes to the production environment, that exposes the company and its customers to significant risk.***"

78. Zatko, Twitter's own head of security, told Defendants the same thing. Zatko was fired even as he was preparing a whistleblower memo for the Board. He completed the memo and submitted it to Twitter's Board. In the memo ("**February 2022 Memo**"), whose substance is alleged below at ¶124, Zatko told Twitter's Board that "[m]ore than

half of Twitter employees have access to Twitter's production environment – ***unheard of in a company the age and importance of Twitter***, where nearly all employees have access to systems or data they should not." Rather, as Zatko also stated in the February 2022 Memo, "***[m]ost companies work to restrict access to production systems to only a small handful of people*** because production systems contain extremely sensitive data and issues in production directly impact customers. ***Engineers at other companies*** do their work in testing and staging environments, strongly isolated from the crown jewels of production systems that provide the actual running service." Zatko added that "Twitter is ***where Google was prior to 2005-2007***, when they identified and addressed the key issue of removing broad employee access to their production environment."

79. Indeed, the lack of a separate testing environment was so uncommon that it caused job applicants to question whether they wanted to work at Twitter. One candidate for Vice President of Information Technology considered withdrawing his application because Twitter's lack of basic cybersecurity hygiene presaged major headaches.

3. *The statements were made with scienter*

80. Defendants Agrawal and Kieran and, through them, Twitter, knew the statements were false when they made them.

81. Twitter's apparent overreaction to the July 2020 Hack shows that Agrawal and Kieran knew Twitter did not log access and did not limit access to Twitter's production environment. Twitter used a nuclear option to respond to what was no more than a teenager with a phone. As cybersecurity professionals noted, other companies would have used access logs to identify which employee accounts had been compromised. Twitter did not do that because it did not log access. Agrawal and Kieran oversaw Twitter's response to the hack and thus knew that Twitter did not log access and did not limit access to the production environment.

82. The specific statements of Agrawal and Kieran were intended to reassure investors in the face of critical news reporting. They were thus false exculpatory statements probative of scienter.

83. According to both contemporaneous media accounts and Zatko's later communications to Twitter executives, Twitter's board was repeatedly warned about overpermissive access at Board meetings predating Agrawal and Kieran's statements. As CTO, Agrawal would have attended these meetings, as confirmed by Twitter board meeting agendas that were publicly filed listing him as a regular attendee.

84. Twitter experienced data breaches or other cybersecurity incidents nearly weekly in 2020. It also kept meticulous records of these incidents which were available to Agrawal and Kieran. It is absurd to suggest that Agrawal and Kieran would not have consulted these records in the course of responding to the July 2020 Hack.

85. Agrawal stated internally, ***after*** his false external statements reassuring investors about cybersecurity, that "Twitter has 10 years of unpaid security bills."

86. Finally, Agrawal and Kieran's responsibilities show that they would have known their statements were false. At the time of the statements, Agrawal and Kieran were, respectively, Twitter's Chief Technology Officer and its Global Data Protection Officer. Agrawal headed Twitter's response to the July 2020 Hack, and Kieran was his second-in-command. Agrawal had joined Twitter in 2011 as a software engineer.

a) *Agrawal and Kieran made the September 24, 2020 statements and their scienter can be imputed to Twitter for the July 30 statements*

87. The September 24, 2020 post was by Defendants Agrawal and Kieran, and Agrawal was the speaker of the statements attributed to him in the September 24, 2020 *Wired* article. In addition, Agrawal and Kieran approved the issuance of, and/or furnished information used in, Twitter's July 30, 2020 blog post, which was not attributed to any specific individual, so their scienter can be imputed to Twitter for those statements:

a. As Chief Technology Officer for a company without a Chief Information Security Officer, Agrawal was responsible for heading any response to hacks, including supplying the information that would be communicated externally;

b. As then-Global Data Protection Officer, Kieran's responsibility also included responding to hacks;

c. The September 24, 2020 *Wired* article identified "Agrawal and his team" as the Twitter employees responsible for devising strategies to respond to the hack. The article quoted Agrawal and Kieran at length, so it was plainly based on on-the-record conversations with the two and other Twitter employees;

d. Agrawal and Kieran later made the same statements in the September 24, 2020 blog post they published under their own names, in some cases word for word. That Agrawal and Kieran used the same language in the September 24, 2020 blog post suggests they drafted the July 30, 2020 blog post.

88. Because Agrawal and Kieran knew the statements were false, so did Twitter.

b) *Agrawal and Kieran made their false statements with scienter.*

(1) Twitter's response to the hack is evidence of Agrawal and Kieran's scienter

89. On September 24, 2020, *Wired* published a story describing how Agrawal led Twitter's internal response to the hack. Agrawal and his team blocked all verified accounts from tweeting for several hours. They then cut off Twitter employees' access to Twitter's systems. To regain access, employees had to manually change their password while on a video conference with their supervisor. For about a month, Twitter paused hiring and shut down many basic operations. Overall, Twitter spent 6,000 person-hours addressing the hack.

90. Industry professionals were baffled at Twitter's seemingly disproportionate response. *Wired* quoted the former Facebook chief security officer, Alex Stamos, as saying that "[t]hese are the kinds of steps you take if you have the [Chinese] Ministry of State

Security inside your Active Directory." According to Stamos, "it would have been much better for Twitter to just ***analyze its logs*** and shut down the accounts causing all the trouble."

91. Twitter ***did not*** take a measured approach because it ***could not***: Twitter did not log access to its data, so it did not have any logs to analyze. It could not selectively "shut down the accounts causing all the trouble."

92. The September 24, 2020 *Wired* article stated that "Agrawal and his team" were in charge of weighing options and deciding on a response to the July 2020 Hack. Thus, Agrawal headed the response. The article shows that Kieran was also on Agrawal's response team, quoting him as saying "[w]e had to assume everyone was untrustworthy."

93. As the executives ultimately responsible for Twitter's response, Agrawal and Kieran were the ones who decided that Twitter could not follow the moderate approach of analyzing logs and cutting off problematic accounts.

94. Thus, that Agrawal and Kieran ultimately decided on a drastic response shows that they personally knew Twitter could not log access.

(2) Media reports contradicting Defendants' statements support an inference of scienter

95. In the July 2020 Hack's wake, journalists employed by *Reuters*, CNN, *The New York Times*, and *Bloomberg* raised questions about Twitter's cybersecurity. For example, in a July 23, 2020 article citing two former employees, *Reuters* reported that as of some point in early 2020, "more than a thousand" employees and contractors had "access to internal tools that could change user account settings and hand control to others." *Reuters* quoted former AT&T chief security officer Edward Amoroso as saying "[t]hat sounds like there are too many people with access." In a July 17, 2020 article citing former employees, CNN likewise reported that "hundreds" of employees had access to data. Experts cited in a July 16, 2020 *New York Times* article "questioned why Twitter did not have better safeguards to monitor suspicious activity on employee accounts"

mentioning in particular that "[m]any companies have systems that alert them if an employee is getting into sensitive data, or changing passwords and emails on accounts multiple times within a short period[.]"

96. In a July 27, 2020 article based on interviews with four former Twitter employees and more than six other people close to Twitter, *Bloomberg News* reported that customer service contractors regularly used their access to snoop on former lovers and celebrities, among others. The representatives could easily access personal information by issuing a service ticket for an account. The representatives would then take charge of the ticket, giving them access to the account holder's personal information. According to the article, there were so few consequences that the representatives made this practice a game.

97. Michael Montano, Twitter's head of engineering, knew that Twitter could not log access, which he readily volunteered to Zatko on January 6, 2021. During the January 6, 2021 Capitol attack, Zatko asked Montano, "how do we seal the production environment?" Among other things, anyone with access to politicians' user accounts could issue inflammatory tweets, either encouraging the attackers to engage in further violence or sowing chaos about where legitimate authority lay. Zatko then learned that Twitter could not log its employees' activities. According to Zatko, he learned from Montano that "***it was impossible to protect the production environment***" because "***[a]ll engineers had access***." Furthermore, "***[t]here was no logging of who went into the environment or what they did.***" When Zatko asked what could be done to protect the integrity and stability of the service from a rogue or disgruntled engineer during this heightened period of risk, he learned it was "***basically nothing***" because "[t]here were ***no logs***, nobody knew where data lived or whether it was critical, and ***all engineers had some form of critical access to the production environment.***"

98. If Agrawal and Kieran did not determine whether the claims made in the *Reuters*, *The New York Times*, *Bloomberg*, and CNN articles were true before they made their statements, they were reckless. If they did, and asked Montano whether Twitter

logged access, they would have received the same response as Zatko: no. Either way, Agrawal and Kieran made their statements with scienter.

99. Moreover, Twitter had spent thousands of person-hours to address the hack. Agrawal and his team, including Kieran, would have spent days, if not weeks, examining the cause of and potential remedies to the hack. In this time, Agrawal and Kieran would have learned the basic facts, if they did not know them already, that all engineers had access to user data, that Twitter did not log or audit access, and that Twitter had no separate production environment.

100. Given the circumstances, it was especially important for Agrawal and Kieran to get it right. They were making disclosures about Twitter's cybersecurity soon after a widely-publicized cybersecurity incident. They knew their detailed statements would receive close scrutiny. The July 30 and September 24 blog posts drew worldwide attention, including articles written by *The Washington Post*, *Bloomberg*, and even *The Daily Mail*.

101. Moreover, their public statements disputed revelations in *The New York Times*, *Bloomberg*, *Reuters*, and CNN articles. Their statements concerning access addressed the claims that (a) Twitter employees used personal user data without suffering consequences, (b) more than a thousand employees had access to plenary user data, and (c) Twitter could not log employee access. Defendants' statements denying accusations that had been leveled against Twitter were false exculpatory statements and support the inference that Defendants knew their statements were false.

(3) Agrawal and Kieran had previously been informed that Twitter engineers had access to user data in Board meetings\

102. The July 27, 2020 *Bloomberg* article alleged that Dorsey and Twitter's Board were warned about excessively permissive access "almost annually" between 2015 and 2019, but plans to address the deficiencies were deferred or shelved.

103. Zatko's February 2021 Presentation alleged above at ¶¶ 58-64 (*see also* ¶¶ 66-68, 130-31, and 136), attended by Agrawal and likely attended by Kieran, mentioned

specific deficiencies in Twitter's cybersecurity. Zatko provided exacting details. For instance, he told attendees that there were precisely 2,662 full-time employees with access to its full production system, including Twitter's full source code, and customer data. But his notes for the presentation show that he was not the first to tell them of the problem of Twitter's wildly overbroad access, but rather, that it "***ha[d] been raised to the board*** before (perhaps without stats)." Thus, two independent sources—Zatko and *Bloomberg*—each report that Twitter's board was repeatedly warned of overbroad access before February 2021.

104. Defendants would have known of the problem (all engineers had access, access was not logged, and Twitter had not separate testing environment) even if Zatko had been the first to tell them the precise number of Twitter employees with such access.

105. Agrawal attended and/or would have been informed of the contents of the Board meetings. According to Board materials publicly filed in the acquisition-related litigation between Twitter and Musk, Agrawal regularly attended Board meetings, where he represented Twitter's "technology" division. Agrawal attended Board meetings held on May 21, 2020, September 24, 2020, and December 13, 2020,[7] as well as the February 2021 meeting at which Zatko delivered his stark findings. Moreover, Agrawal had been Twitter's CTO since 2017 and because of his position, it would be expected that he would present directly to the Board.

106. Kieran would also have attended and/or been informed of discussions at the Board meetings and/or presented them himself. He served as Global Data Protection Officer from February 2018 through November 2020. Overseeing Twitter's users' data protection was his job. Like Agrawal, Kieran attended Board meetings held on May 21, 2020, September 24, 2020, and December 13, 2020.

---

[7] Plaintiffs have not found materials that listed attendees for any other Board meetings. Plaintiffs are not aware of any Board meeting that Agrawal, Segal, or Kieran did not attend.

107. Further, as Zatko explained in the February 2021 Meeting attended by Dorsey, Agrawal, and other senior executives, it was not just current employees who posed a problem. Zatko told attendees that in 2020, Twitter employees and contractors collectively had access to Twitter for more than 1,477 and 10,357 days, respectively, after they were terminated or left Twitter.

108. But Twitter already knew that departing employees who maintained access were a security risk. On November 2, 2017, a departing Twitter employee temporarily deactivated then-President Trump's Twitter account. The incident drew worldwide media attention. It could have created a serious incident because the President used his personal Twitter account to make official announcements. This policy weakness was never addressed.

(4) <u>Agrawal's acknowledgement that Twitter had "10 years of unpaid security debts" contradicted his public statements</u>

109. Early in his tenure, Zatko heard Defendant Agrawal tell the executive team that "Twitter has 10 years of unpaid security bills," meaning that Twitter had declined for a decade to invest in security.

110. Zatko's tenure began after September 24. Thus, Agrawal's statement reflected his candid appraisal of Twitter's dangerously lax cybersecurity ***after*** his public statements claiming that Twitter had fixed any cybersecurity vulnerabilities.

(5) <u>The sheer number of security incidents shows that Agrawal and Kieran either knew or were reckless in not knowing that their statements were false</u>

111. Twitter suffered an anomalously high rate of security incidents[8], almost one ***per week***, that were serious enough that they had to be reported to the FTC, the SEC, and/or foreign agencies. Of the 40 incidents occurring in 2020, 20 were outright breaches.

---

[8] A security incident is an incident that forces Twitter to interrupt work and redirect teams to track down the incident. A breach is an incident in which Twitter confirmed that personal data was actually exfiltrated.

Of the breaches, 18 were caused by overbroad access controls. The consequences, which were not disclosed either to customers or investors, were substantial. The 2020 incidents exposed the data of some 243 million Twitter users and 29 thousand employees and contractors.

112. Again, this would not have been news to Agrawal and Kieran. Twitter recorded incidents and breaches when they occurred. They assigned each a SIM number and included other details such as the cause of the hack and the measures taken to address them. When they were investigating the July 2020 Hack, if not before, Agrawal and Kieran would have had to inquire about previous hacking attempts. They would thus have learned before their statements (if they did not know already) that Twitter was regularly hacked and that the root cause was overbroad access. Thus, they knew their statements to the contrary were false.

(6) <u>Other facts show Agrawal and Kieran made their statements with scienter</u>

113. As more fully set forth below, when Zatko attempted to inform Twitter's board of poor cybersecurity practices, Defendants first instructed him not to, then removed him from the process, and finally fired him. Defendants' specific actions are further alleged below at ¶¶ 341-368. Defendants' actions to prevent Zatko from disseminating accurate information to the Board are probative of Defendants' scienter.

114. Agrawal began his career at Twitter in 2011. From 2011 through 2017, he worked for Twitter as an engineer. Thus, he was one of the Twitter employees who had to work with Twitter's source code and live data because he did not have access to a separate production sandbox. Likewise, he would know that he had access to live data, that his access was not monitored, and that he did not have to provide a reason to access data.

115. In 2017, Agrawal was elevated to become Twitter's CTO. In that position, Agrawal supervised hundreds of engineers. All of these engineers had to work with Twitter's source code and live data and all of them had access to live data. If he somehow

did not know already, Agrawal would have been told about Twitter engineers' overbroad access, that their access was not logged or audited, and that Twitter did not have a separate testing environment.

116. From February 2018 through November 2020, Kieran worked as Global Data Protection Officer. Kieran was responsible for protecting user data. Kieran, too, would know about Twitter engineers' overbroad access. It was literally his job to know about it.

117. Moreover, Twitter's cybersecurity weaknesses were simple and obvious. That's what the experts quoted in the August 23 *Post* Article said. That's also what Zatko's own comments provided: in cybersecurity, Twitter was more than a decade behind the times. *See* ¶ 78, above.

118. And according to a presentation Zatko delivered in late 2021, Twitter executives had fretted over engineers' excessive access in connection with opening new Twitter offices. Zatko's notes provide:

> When we expand the business – launch new products – revenue streams, open offices in new countries, etc. We shouldn't be continuously re-exposing large areas of risks we don't need to. . . . . ***For example, opening an office in a new country and putting engineers there shouldn't be as concerning as it is because of the exceptionally broad access all of our engineers have to critical systems and sensitive customer data services.*** (Our peers aren't carrying this repeated exposures [sic] the same way we are)

119. While Zatko delivered his presentation after the statements of Agrawal and Kieran, the presentation shows that Twitter itself fretted over overbroad access and discussed the issue every time Twitter needed to open a foreign office. These discussions would have informed Agrawal and Kieran that Twitter employees had excessive access to data.

**B. Statement Set 2: Segal's July 8, 2021 statements about cybersecurity**

1. *Statements*

120. On July 8, 2021, Defendant Segal appeared on *CNBC Fast Money*. During the interview, Defendant Segal stated in response to a pointed question about hacks:

> **Q**: Interesting. And before we let you go, I want to get your thoughts on cybersecurity. ***I know Twitter has been hacked in the past and you've also had individual high-profile user accounts hacked in the past***. As we see this growing threat of cybersecurity risks, how are you addressing that at the company?
>
> **DEFENDANT SEGAL**: Well, at the highest levels, we're constantly considering and investing and learning ***to make sure that we're developing best practices and applying them. For example, we recently have given people the ability to use a physical key to keep their accounts secure, so even if somebody got their password, even if somebody had their phone number, if they don't have that physical key, that's an example of a way that we're allowing people to secure their accounts that they hadn't been able to do before. But we'll continue to iterate and learn around cybersecurity*** so we can make sure that advertisers, that the people who use our service can continue to trust Twitter to take good care of their information.
>
> **Q:** Certainly a topic that's top of mind for a lot of folks here in Sun Valley.[9]

[9] The interview was held at the invitation-only Allen & Co. Sun Valley Conference for media executives.

2. *Segal's statements were false and misleading*

a) *Segal's statements gave the misleading impression that Twitter had addressed the deficiencies which led to the July 2020 Hack.*

121. Segal was asked about incidents in which Twitter was hacked, the most prominent of which was the July 2020 Hack. In that context, a reasonable investor would have understood Segal to be making representations about, among other things, actions Twitter had undertaken in response to the July 2020 Hack. Segal's reference to "best practices" would have given reasonable investors the impression that Twitter was following roughly the same practices as other social media companies, which would not have been so vulnerable to the July 2020 Hack, or would have been able to contain it without resorting to the drastic methods Twitter employed. Further, because of the context of the question—i.e., asking about what Twitter had done to address incidents like the July 2020 Hack—Segal's claim that Twitter was "continu[ing] to iterate and learn around cybersecurity" would have given a reasonable investor the impression that Twitter had at least addressed the problems which led to the July 2020 Hack.

122. It had not. Twitter was not following best practices and it had not taken action that could prevent the July 2020 Hack, in that, as more fully alleged in ¶¶ 42-79, above, as of February 2021, Twitter (a) did not restrict access to data except as necessary for employees to do their job, (b) did not have a sandbox where engineers could test code before production, and (c) did not track engineers' access to user data.

123. Twitter had not remediated these problems by July 2021. First, in summer of 2021, Twitter made extraordinary efforts in an ultimately unsuccessful attempt to prevent an Indian employee they suspected was an Indian government spy from having plenary access to user data. *See* ¶¶ 193-201, below. These efforts would not have been necessary if Twitter could restrict access as a matter of course. Second, at the end of 2021, Kieran wrote to Twitter's board that "[e]very new employee has access to data they do not need to have access to for the purpose of their role."

124. Moreover, after his firing, Zatko submitted the February 2022 Memo to Twitter's Board, two days before Twitter filed its 2021 10-K. The report reminded the Board that the problems Zatko had identified as early as February 2021 had not gone away. They had worsened:

a. 51% of Twitter's employees now had access to Twitter's full source code and customer data, compared to 46% in February 2021.

b. 68% of Twitter's server operating systems were out of date, in violation of Twitter policy, compared to 53% in February 2021.

c. There were 50 security incidents in 2021, compared to 40 in 2020. 80% of the 2021 incidents were caused by Twitter's long-standing problems of access control and security configuration/bugs.

d. Zatko conservatively estimated based on his review to date of information still available to him that 40% of Twitter's laptops either had updates disabled (30%) or violated other important Twitter security requirements (10%).

125. If these deficiencies were present in February 2021 and Twitter had not remediated them by December 2021, then they also existed in July 2021.

126. As a result, an intruder could easily replicate the July 2020 Hack by obtaining password information from any one of Twitter's thousands of engineers, and Twitter would be forced to shut down employee access entirely and slowly return access over time, as it did with the July 2020 Hack.

127. Moreover, Twitter's defenses in fact did not prevent regular cybersecurity incidents and breaches, which occurred roughly every week on average. As Zatko had reported, Twitter experienced 40 cybersecurity incidents in 2020, of which 20 were breaches, exposing the data of 200 million users and 20,000 employees/contractors.

128. Finally, Zatko's own comments to Segal, including at the February 2021 Presentation, made Segal's statements misleading. Twitter had hired Zatko to head its cybersecurity program. In his February 2021 Presentation on the defects in Twitter's

cybersecurity, Zatko had made clear that Twitter was a soft target for hackers, was far behind other social media companies, and that executives like Segal "***should be alarmed.***" Thus, in Zatko's judgment, which was communicated to Segal, Twitter was a world away from following best practices or iterating to address new threats. Under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015), investors had "cause to complain" that the statement did not "fairly align[] with the information in [Segal's] possession at the time" because Twitter's cybersecurity chief vehemently disagreed.

b) *Segal's statements were also misleading because Twitter's software was out of date, violating all-but-universal engineering standards and Twitter's own requirements*

129. According to the United States Cybersecurity and Infrastructure Security Agency ("CISA"), "[c]ontinued use of [discontinued] software poses consequential risk to your system that can allow an attacker to exploit security vulnerabilities."[10] Accordingly, CISA states that a best practice for software updates is "[d]o not use unsupported [discontinued] software."

130. Yet as Zatko explained at the February 2021 Presentation, even Twitter's servers were not secure. Zatko told the attendees that his initial review indicated that 53% (186,372) of Twitter's data center servers were running out-of-date operating systems. In many cases, the operating system was no longer supported by the vendor. With no vendor supporting the product, it was unlikely that bugs (including those affecting security) would be identified and fixed. Indeed, Twitter's own engineering standards demanded that operating systems be fully up to date.

131. Zatko further explained at the February 2021 Meeting that Twitter did not impose any controls over what software its employees could install on their work systems. Nor could it tell what software these employees actually had installed, because Twitter

[10] https://www.cisa.gov/news-events/news/understanding-patches-and-software-updates

had an "[e]stimated 10% visibility across [its] systems, services, and clients (laptops and phones)." Moreover, Twitter employees could disable security settings and install or modify software to make their jobs more convenient. Employees whose devices were compromised would put Twitter's data at risk when they logged on to its out-of-date servers.

132. In other cases, employees deliberately installed spyware on their work computers at the request of external organizations. According to Zatko, Twitter learned of several such instances because the employees who deliberately installed the patches had a change of heart and self-reported, or by pure chance. But Twitter did not attempt to find more spyware, though logically most employees who deliberately installed malware would not self-report their own malicious acts.

133. That Twitter allowed employees to haphazardly install new programs and turn off automatic updates violated the FTC Consent Order because it fell below industry standards, and was an example of a Twitter practice that did not meet "best practices." Twitter's policy also restricted employees from installing software, including at a minimum spyware, so Twitter acknowledged it was not following "best practices."

3. *Segal made his statements with scienter*

a) *Segal learned the facts showing his statements were false at the February 2021 meeting*

134. As Twitter's CFO, it was part of Segal's job to give presentations to Twitter's Board at Board meetings and to attend Board meetings. He delivered presentations to quarterly Board meetings held on May 21, 2020, September 24, 2020, and December 13, 2020.[11] Thus, Segal would have attended the February 2021 meeting held to prepare for a Board meeting.

---

[11] As with Agrawal and Kieran, the documents filed in *Twitter, Inc. v. Musk, et al.*, C.A. No. 2022-0613-KSJM, listed Segal as an attendee and Plaintiffs are not aware of any meetings that Segal did not attend.

135. At the February 2021 meeting, Zatko told Twitter executives that: (a) Twitter's cybersecurity practices were a decade behind industry standards and were ***not*** improving; (b) every Twitter engineer (2,662 in total) had access to user data; (c) Twitter did not have a separate production environment, such that engineers worked in an environment with live user data; (d) Twitter did not track access to user data; and (e) departing Twitter employees and contractors continued to have access to Twitter's production environment even after they gave notice or learned they were being terminated. These facts showed that Twitter had not made any progress addressing cybersecurity and, in particular, that Twitter had not addressed the deficiencies which allowed the July 2020 Hack. *See* ¶¶ 58-64, 66-68, and 130-31, above.

136. At the February 2021 Presentation, Zatko also stated that Twitter's software and devices were not secure: (a) Twitter only knew what software was installed in 10% of the laptops and phones employees used to access Twitter's network; (b) 53% (186,372) of Twitter's data servers were running out-of-date operating systems, in many cases using software the vendor no longer supported, which violated Twitter's own security policies.

137. Segal thus learned the facts showing his statements were false at the February 2021 Presentation.

b) *Other facts probative of Segal's scienter*

138. Segal's statement is itself evidence of scienter because he states that Twitter "constantly" addresses cybersecurity "at the highest levels," i.e., the C-suite.

139. As more fully set forth below, when Zatko attempted to inform Twitter's board of poor cybersecurity practices, Defendants first instructed him not to, then removed him from the process, and finally fired him. Defendants' specific actions are further alleged below at ¶¶ 341-368. Defendants' actions to prevent Zatko from disseminating accurate information to the Board are probative of Defendants' scienter.

**C. Statement Set 3: statements implying that Twitter deleted users' data when they deactivated their accounts**

1. *Statements*

140. In the September 24, 2020 blog post, Agrawal and Kieran stated, as to privacy, that:

> In addition to existing security training courses, we've also enhanced training content on secure coding, threat modeling, privacy impact assessments, and ***privacy by design so privacy is integrated into everything we design and build by default.***

2. *Defendants' statements were misleading*

a) *Defendants' statements gave the impression that Twitter could delete user data*

141. Defendants' statements gave the misleading impression that, among other things, Twitter deleted user data after users deactivated their account.

142. "Privacy by design" (which Defendants used to describe Twitter's practices) is a technical term, not a catchphrase. It imposes several requirements, one of which is that companies ensure that all data is securely retained as needed and destroyed when no longer needed.[12] A version was enacted in GDPR Article 25, *Data protection by design and by default*, which requires, among other things, that the company "ensur[e] that, by default, only personal data which are necessary for each specific purpose of the processing are processed. That obligation applies to the amount of personal data collected, the extent of their processing, ***the period of their storage*** and their accessibility." Thus, a reasonable investor would have interpreted Defendants' statement to imply that Twitter actually was

[12] Ann Cavoukian, *Privacy by Design*, January 2011 (available at https://www.ipc.on.ca/wp-content/uploads/resources/7foundationalprinciples.pdf). Privacy by designed was adopted at the 32nd International Conference of Data Protection and Privacy Commissioners Jerusalem, Israel 27-29 October, 2010 Resolution on Privacy by Design; https://edps.europa.eu/sites/edp/files/publication/10-10-27_jerusalem_resolutionon_privacybydesign_en.pdf.

implementing Privacy by Design, including its requirement to restrict access to data and delete the data after it is no longer needed.

143. A reasonable investor would find Twitter's professed ability to delete data material because the FTC Consent Order instructed Twitter to develop and maintain systems for "information systems, including network and software design, information processing, storage, transmission, ***and disposal***[.]"

b) *Twitter could not delete user data*

144. Twitter could not delete user data. User data existed in, and was constantly being added to, Twitter's data pools. In 2017, Defendants learned that Twitter kept users' personal information on vast unmanaged data pools, open to all. That year, Twitter was served with a subpoena in connection with the investigation by DOJ Special Counsel Robert Mueller. Twitter initially produced some documents and responded that its production was complete. Soon thereafter, however, Twitter discovered that some responsive documents it believed it had "deleted" still existed in vast, unmanaged, unindexed, data pools.

145. Large unmonitored data pools containing user data are a classic cybersecurity risk: without knowing what data is in a large data pool, a company cannot properly secure the data that must be secured and grant access to data only where such access is necessary. In Summer 2019, a hacker stole data on more than 100 million people that Capital One held in an unmonitored data pool. The bank was fined $80 million by one of its regulators and settled a resulting consumer class action for $190 million, even though there was no evidence that the hacker ever sold the data or did anything with it, or that anyone else had obtained the data from the hacker. Therefore, the discovery that Twitter had large unmonitored data pools was alarming. According to Zatko, this problem was discussed at both executive and board meetings prior to his arrival.

146. Twitter only keeps track of and manages only about 20% of the datasets it creates. Twitter does not monitor, keep track of, or restrict access to the remaining 80%,

consisting of 115,000,000 gigabytes. Without knowing *what* that data is, Twitter could not delete it. Zatko reported Twitter did not prioritize or devote sufficient resources to the problem, and warned executives in the February 2022 Memo that "if this risk becomes publicly known or the subject of a focused investigation while we are still fixing this issue, the risk to Twitter will be significant." However, instead of fixing the issue, Twitter fired Zatko. According to Zatko, searches of these unmonitored data pools have uncovered copious personally identifiable information.

147. Thus, Twitter's infrastructure makes it impossible to apply "privacy by design." Further, the data is vulnerable for the same reason as Capital One's: it is difficult to protect, or restrict access on a need-to-know basis to, something whose contents are unknown.

148. As a result, no amount of "training" could advance Twitter's stated goal that of integrating privacy by design—including the fundamental requirement that Twitter dispose of data when it is no longer useful or to comply with data privacy regulations—into "everything we design and build."

3. *Defendants made their statements with scienter*

149. The Draft FTC Complaint put Agrawal and Kieran on notice that Twitter had vast unmonitored data pools.

150. Twitter disclosed in October 2019 that for six years, it had improperly been using data in marketing campaigns. The FTC Draft Complaint was based on this incident.

151. Twitter did not disclose at the time, or ever, exactly how the misuse had come about.

152. Twitter had obtained personal information from some users solely to enable these users to recover their accounts or for other security purposes, and not for advertising. Twitter had stored a copy of the database in its dark pools, without indicating that the data had been submitted and could only be used for security purposes. But a team of Twitter engineers had stumbled on the data set and used it to help third parties market to the users.

153. As Twitter's CTO, Agrawal would have received the Draft FTC Complaint, and been made aware of the cause of the breach. Kieran would also have known of the Draft FTC Complaint because it was his job to oversee user privacy. Both Agrawal and Kieran would have been made aware of Twitter's vast data pools. Indeed, in a late 2021 document title *Q4 2021 Privacy & Data Protection Report: 2021 Top Risks Review*, whose contents are further alleged in ¶ 160, below, Kieran acknowledged that Twitter had been had been trying to ensure "[d]ata [d]eletion [o]ccurs . . for many years."

154. Thus, they would have known that Twitter maintained vast unmonitored data pools and that the data pools could lead to violations.

155. As more fully set forth below, when Zatko attempted to inform Twitter's board of poor cybersecurity practices, Defendants first instructed him not to, then removed him from the process, and finally fired him. Defendants' specific actions are further alleged below at ¶¶ 341-368. Defendants' actions to prevent Zatko from disseminating accurate information to the Board are probative of Defendants' scienter.

**D. Statement Set 4: statements concerning the FTC settlement**

1. *Statements*

156. On May 25, 2022, Twitter CPO Damien Kieran published a post on Twitter's blog.[13] The post, titled *FTC settlement: Our commitment to protecting your privacy and security*, stated that:

> On May 25, 2022, Twitter reached a settlement with the Federal Trade Commission (FTC) regarding a privacy incident disclosed in 2019 when some email addresses and phone numbers provided for account security purposes may have been inadvertently used for advertising. ***This issue was addressed as of September 17, 2019***, and today we want to reiterate the work we'll continue to do to protect the privacy and security of the people who use Twitter.

---

[13] *See* https://blog.twitter.com/en_us/topics/company/2022/ftc-settlement-twitter.

2. *The statements were misleading*

157. Defendant Kieran's statements gave the misleading impression that Twitter had addressed the problems that led to the FTC Draft Complaint. Twitter had violated the FTC Consent Order because its employees had improperly used customer data for advertising because the dataset appeared in Twitter's vast unmanaged pools. This misconduct arose from Twitter's inability to delete or restrict user data and to limit which employee had access to such data.

158. Yet even as of May 2022, Twitter had not deleted user data from the pools or otherwise ensured that its employees would not inadvertently use data for purposes to which customers had not consented. Indeed, even as Twitter negotiated the fine for the incident which led to the FTC Draft Complaint, Zatko discovered in mid-2021 that Twitter had once again inadvertently used the data customers had provided solely for security purposes in advertising campaigns.

159. Thus, Twitter had not "addressed" the issue. Rather, it was just as likely that employees would inadvertently misuse customer data after September 17, 2019, than before.

3. *The statements were made with scienter*

a) *Kieran's internal statements contradicted his external statements*

160. At the end of 2021, Kieran and Dr. Lea Kissner, Twitter's then-Head of Privacy Engineering, reported to the Board in a document titled *Q4 2021 Privacy & Data Protection Report: 2021 Top Risks Review* that:

> ***Every new employee has access to data they do not need to have access to for the purpose of their role***. Until we have implemented a mature centrally owned and operated system to manage access to data (e.g., entitlements and review, Role Based Access Controls, audits, etc) we are at risk of inappropriate access or use of data. ***Our inability to delete data compounds***

***that risk, as we retain data that we should not have and which is therefore accessible by people who do not need to have access to this data.***

161. Thus, Kieran knew that Twitter was unable to delete data and that employees had access to this data and could misuse it.

162. As to Twitter's ability to delete data and its understanding of the data it had, Kieran wrote:

**Data Deletion**

Over the last two quarters we have seen progress in our deletion efforts. Below shows the percentage of data that is in a good state (i.e., we know what it is, where it is, and are capable of deleting it as needed) against data that has yet to be brought into a good state (i.e., we don't know what it is, what it's used for, and we don't delete it).




Progress is significantly slower than hoped and without consistent sustained prioritization and additional resources, we are not likely to hit our Q4 2022 deadline.

163. As to Twitter's ability to stop the same event which led to the FTC Draft Complaint, Kieran wrote:

> **Ensuring that Emails and Phone Numbers Collected Through Security Flows Are Not Used in Advertising Products**: Technical means are beginning to roll out to ensure that we do not misuse emails and phone numbers. ***Until those are in place, we are still relying on fragile infrastructure and processes to prevent a recurrence of our prior misuse.***

164. This is exactly the misconduct that led to the FTC Draft Complaint. Kieran's internal statements contradict his external reassurances to investors, which he knew were false.

b) *Twitter's attempts to mislead the FTC and users shows the statements were made with scienter*

165. As set forth above, Twitter could not delete user data. *See* ¶¶ 144-48, above.

166. The FTC Consent Order requires that Twitter responsibly maintain user data and delete the data when it was no longer useful. *See* ¶¶ 44-46, above. To ensure compliance, years before Zatko's hiring, the FTC asked Twitter whether the data of users who cancelled their accounts had been deleted. Because Twitter does not know what data it has, it would be lying if it said the data would be deleted. So, instead, it misled the FTC, stating that the accounts were "deactivated," hoping the FTC would not notice the distinction. Internally, Twitter had even calculated the financial penalties it faced as a result of not being able to delete user information: $3 million per month plus 2% of revenues, running from the date of the violation, totaling hundreds of millions of dollars in fines for just this violation.

167. Twitter's counsel admitted to Zatko that Twitter's purpose in making a similar statement to the FTC was to mislead it. Misleading the FTC is plainly not an action that would be taken without senior executives' knowledge.

168. Similarly, Twitter misled users about its capacity to delete data.

169. Before January 1, 2020, Twitter's privacy policy provided:

"We keep Log Data for a maximum of 18 months. If you follow the instructions here [link] (or for Periscope here [link]), your account will be deactivated and then deleted."[14]

170. From January 1, 2020 through the end of the Class Period, Twitter's privacy policy provided:[15]

> You control the personal data you share with us. You can access or rectify this data at any time. ***You can also deactivate your account.***
>
> * * * * *
>
> We keep Log Data for a maximum of 18 months. If you follow the instructions here [link] (or for Periscope here [link]), ***your account will be deactivated***.
>
> * * * * *
>
> Keep in mind that search engines and other third parties may still retain copies of your public information, like your profile information and public Tweets, ***even after you have deleted the information from our services or deactivated your account.***

171. The removal of the words "and then deleted" without notice or explanation and without amending any of the surrounding language, all of which presumed that data would be deleted, followed by deliberately ambiguous wording, shows that Twitter knew it could not delete data and attempted to mislead investors and users rather than outright lie.

---

[14] https://twitter.com/en/privacy/previous/version_14

[15] *See* Twitter Privacy Policies Version 16, effective June 18, 2020, Version 17, effective August 19, 2021, and Version 18, effective June 10, 2022. All earlier versions of Twitter's privacy policy are available from https://twitter.com/en/privacy/previous/.

c) *That Zatko warned Defendants in December 2021 and February 2022 that Twitter's cybersecurity problems had continued shows scienter*

172. After his firing, Zatko submitted to Twitter's board his February 2022 Memo, which reminded the Board that (a) 51% of Twitter employees had full access to its source code and user data, (b) 68% of Twitter's servers' operating systems were out of date, (c) there were 50 security incidents in 2020, and (d) at least 40% of Twitter's laptops were in critical condition. *See* ¶ 124, above. Zatko quoted Kieran (by title) in the February 2022 Memo as supporting Zatko's point of view, and it related to Kieran's responsibilities, so he would have seen the memo.

d) *Twitter continually ran into problems created by its inability to delete user data*

173. Defendants also knew that Twitter could not delete user data because Twitter kept running into large, costly problems caused by user data collections in its unmonitored data pools—the very reason it could not delete user account

174. On July 28, 2020, Twitter recognized a $150 million accounting reserve in connection with the FTC Draft Complaint suing for misconduct related to Twitter's data pools.

175. In mid-2021, Twitter's product sales team once again saw a data set and, in the absence of any data tracking, just started using it for ad tracking without determining whether the relevant users had consent to the use of their data for advertising purposes or whether such use was otherwise permissible. That is the exact violation identified in the 2020 FTC draft complaint. Other executives shared Zatko's frustration. Upon learning of the violation, a Twitter executive stated "So we only started to address the problem, and then got side tracked and forgot about it? We do that for everything."

176. In December 2021, a critical theretofore unknown vulnerability in a common piece of software called log4j was identified. According to the Department of Homeland

Security's Cyber Safety Review Board,[16] "log4j is a piece of open-source software that developers have integrated into millions of systems. A vulnerability in such a pervasive and ubiquitous piece of software has the ability to impact companies and organizations (including governments) all over the world." By exploiting the log4j vulnerability, hackers can remotely take control of a computer. The Department of Homeland Security's Cybersecurity and Infrastructure Security Director stated that the log4j security flaw was the "most serious" she had seen in her career. Researchers worked non-stop to develop a patch that fixed the vulnerability, which they made available in late December.

177. Because of its unmonitored data pools, Twitter could not assess its exposure to log4j or its remediation efforts. For all Twitter knew, it had not addressed the log4j vulnerability and remained critically exposed. Nor would it be able to prove to the FTC's satisfaction that it had addressed log4j, as Twitter must to avoid hefty fines or even injunctions. Indeed, as Zatko wrote in his whistleblower report, Twitter's response to his enquiries was anything but reassuring:

> The head of the Detection and Remediation Team had told [Zatko] that the lack of visibility across the Twitter system meant that there was no way to determine whether log4j was successfully remediated and that ***upwards of 10,000 instances*** of the vulnerability could still be running and would not be able to be identified. Similarly, multiple teams were reporting ***conflicting internal numbers*** of systems needing remediation or evaluation or that had been fixed.

178. In a January 5, 2022 staff meeting, after Zatko told Agrawal that Twitter had not addressed log4j because Twitter did not have an inventory of possible locations, Agrawal insisted that Zatko not put information on log4j in writing and instead only provide Agrawal with oral updates.

---

[16] *See* https://www.cisa.gov/sites/default/files/publications/CSRB-Report-on-Log4-July-11-2022_508.pdf

179. With the problems Twitter encountered because it did not know what data it ***had***, it is absurd to suggest that Kieran did not know Twitter could not delete such data.

e) *Additional facts establishing the statements were made with scienter*

180. First, at the time he made the statement, Kieran was Twitter's Chief Privacy Officer. Before November 2020, he had been its Global Data Protection Officer. In both these positions, Kieran was responsible for ensuring that user data was protected. It is absurd to suggest that someone in his position would not know basic facts like whether Twitter had addressed the problem which led to the $150 million fine he misleadingly discussed. Moreover, if he made specific statements without checking them against information readily available to him and which he had responsibility to know, Kieran was reckless; if he did inform himself, he knew his statements were false.

181. Second, at a December 9, 2021 full board meeting, Zatko told the Board that Twitter's "inability to delete data" compounded the "risk of inappropriate access or use of data."

182. As set out above, Defendant Kieran attended Twitter Board meetings.

183. Third, the Slack messages Kieran and the Distinguished Privacy Engineer sent during the December 16, 2021 meeting acknowledged that a large number of Twitter employees had access to Twitter's production and user data and that Twitter employees' security software were not "in a good state."

**E. Statement Set 5: Statements in SEC filings that Twitter does not regularly experience data breaches and incidents**

1. *Statements*

184. Twitter's Class Period Reports[17] on Forms 10-K and 10-Q stated:

> Our products may contain errors or our security measures ***may be breached***, resulting in the exposure of private information. Our products and services ***may be subject to attacks that degrade or deny the ability of people to access***

[17] The "**Class Period Reports**" are those listed on Appendix A.

***our products and services***. These issues may result in the perception that our products and services are not secure, and people on Twitter and advertisers may curtail or stop using our products and services and our business and operating results could be harmed.

Our products and services involve the storage and transmission of people's and advertisers' information, and security incidents, including those caused by unintentional errors and those intentionally caused by third parties, may expose us to a risk of loss of this information, litigation, increased security costs and potential liability. We and our third-party service providers experience cyber-attacks of varying degrees on a regular basis. We expect to incur significant ***costs in an effort to detect and prevent security breaches and other security-related incidents, and we may face increased costs in the event of an actual or perceived security breach or other security-related incident***. In particular, the COVID-19 pandemic is increasing the opportunities available to criminals, as more companies and individuals work online, and as such, the risk of a cybersecurity incident potentially occurring is increasing. ***We cannot provide assurances that our preventative efforts will be successful.***

2. *Defendants' statements were misleading*

a) *Defendants' statements gave investors the misleading impression that Twitter had disclosed all data incidents and breaches it was aware of*

185. Defendants' statements gave investors the misleading impression that Twitter was not aware of any undisclosed material breach or cybersecurity-related incident. Defendants acknowledged that Twitter was subject to cyber***attacks*** but claimed that it was making "effort[s] to detect and prevent security breaches and other security-related incidents." As to ***actual*** breaches or incidents, Defendants stated, hypothetically, that

Twitter ***may*** experience them and that it cannot assure investors that its defenses would always be successful. Defendants' statement that Twitter was subject to cyberattacks but that an actual incident or breach was a mere possibility gave investors the misleading impression that Defendants were not aware of regular cybersecurity incidents or breaches.

186. In reality, on average, Twitter was experiencing a breach or other incident approximately once per week. In 2020, Twitter suffered 40 incidents, of which 20 were breaches. In 2021, Twitter suffered 50 incidents. Twitter could provide assurances that its defenses ***could not*** prevent routine breaches.

187. Defendants' statements thus presented a materially incomplete and misleading picture.

b) *Defendants' statements gave the impression that Twitter was not aware of an ongoing breach or incident, though in fact Twitter had Indian and Chinese government spies on its payroll*

188. In November 2019, two former Twitter employees were charged with spying for the government of Saudi Arabia.

189. According to the indictment, these employees obtained and unlawfully passed on to the Kingdom of Saudi Arabia the email addresses, phone numbers, IP addresses, and dates of birth of its critics, information sufficient to locate the dissidents.

190. Public reports linked the disappearances and detention of Saudi activists to the information obtained by the two Twitter employees. For example, Abdulrahman Al Sadhan, who ran a pseudonymous Twitter account critical of the Kingdom, was arrested in 2018 and sentenced to 20 years in prison for his Twitter posts. A *Bloomberg* report linked his arrest, and the disappearance of six others, to information stolen by the two former Twitter employees who spied for the Kingdom of Saudi Arabia.

191. The incident had major repercussions for Twitter. Not only did it harm Twitter's reputation in its primary markets, it has many users who are dissidents in authoritarian or otherwise unfree countries like Saudi Arabia. These users may be

concerned that by providing their personal information to Twitter, they are also providing it to hostile government actors.

192. In 2021, however, Zatko learned that Twitter was once again knowingly employing agents of foreign countries with a record of imprisoning or killing dissidents and giving them plenary access to user data.

193. On or about May 24, 2021, members of an elite Delhi Indian police branch raided Twitter's offices in the middle of the night during a pandemic lockdown. The raid's stated justification—that police wanted to discuss why a tweet by the ruling party had been labeled "manipulated media" with Twitter employees—was implausible on its face because the raid's timing ensured there would be no employees to talk to.

194. Following the raid, the Indian government instructed Twitter to hire two specific individuals as full-time employees. To appease the government, Twitter complied.

195. Twitter easily determined that the employees were spies. One of them was revealed to have a completely fabricated history, which Twitter discovered by running a simple background check. Further, upon hiring, one of the two employees immediately requested copies of any legal documents and strategies Twitter was preparing in a case against the Indian government. These documents and that case had nothing to do with the employee's role.

196. Zatko raised the issue of Twitter's Indian government spies with executives, and told others that, because it involved the sensitive issue of Twitter's relationship with the authorities in a major national market, it required a CEO-level decision as to whether to continue serving the Indian market.

197. On or around July 20, 2021, Defendant Segal asked Zatko to investigate a purportedly suspicious series of tweets. In a July 20, 2021, text message, Zatko reported to Segal that "[i]n a matter of seconds, to evaluate the account you flagged, we intimately knew the individual. Phone numbers, where they lived, other accounts they control, their non-public ring of 'friends', type of phone/computer, … and more." Zatko explained that

the individual was not a threat; rather, the individual had apparently been flagged by a hostile foreign state actor. Zatko explained how foreign governments could exploit Twitter: "Each time we want to expand into a new country, with a physical presence, most countries will see us as an ability to monitor their 'adversaries.'" With an in-country office, "the foreign entity will quickly realize they have the keys to our kingdom." Zatko added that "India is particularly worrisome" because, as Twitter knew, the Indian government was targeting its critics "to silence these people and remove them from the public conversation." Zatko told Segal "[w]e believe the Indian government has already planted a government agent within Twitter." Zatko concluded that "[w]e are handing the keys to a surveillance apparatus that is intending on using our platform against our own mission [s]ilencing and targeting and undermining the public conversation."

198. Additionally, Zatko's prepared notes for a September 23, 2021 Risk Committee meeting included the following: "Every night I go to sleep worrying if India is already using our internal information to identify, target, and kill people expressing opposition to the government." Zatko's notes indicate that he told the Risk Committee that "as long as we are within India's borders [we] are not able to mitigate," and there was a "95% [chance] we have an active [Indian government agent] insider."

199. But the issue was repeatedly tabled and never addressed, with one executive stating as to the second spy "if we already have one insider threat from the Indian government why does it matter if we have more?"

200. Even Twitter's in-country personnel who were not active government agents were security risks. During the Class Period, Twitter employed approximately 80 engineers in India who, like all engineers, had default access to Twitter's production environment and user data. Because of Twitter's failure to fix design flaws in its system architecture, it did not and could not restrict the access of these 80 engineers and 2 foreign agents, or monitor their accounts for inappropriate activity.

201. These employees were potential points of failure because they were subject to threats of physical violence. Like many others, India's government turned local Twitter employees into hostages, harassing them and threatening them with jail time. For example, Twitter's India head, Manish Maheshwari, was summoned several times by the police, and repeatedly had his cell phone (which Twitter permits to access large amounts of sensitive Twitter internal information, including user data) confiscated. Twitter was ultimately forced to bring him for an extended stay in the U.S. While he had agreed to provide his cell phone to Twitter for detailed forensic accounting, he deleted all data before doing so.

202. Shortly before Zatko's termination, the FBI told Twitter's Corporate Security team that it had a Chinese government spy on its payroll. Zatko learned of the information because the Corporate Security team worked under his supervision and the information was reported up to him.

203. Defendants never disclosed to investors that (a) Twitter had hired the Indian government's hand-picked representatives, (b) those employees were spies, or (c) the FBI had informed Twitter that it had a Chinese government spy on its payroll.

204. Thus, Twitter had foreign spies on its payroll, gave them unmonitored access to user data, and did not track what they did with that access. In effect, Twitter was in the middle of an active cybersecurity incident until it fired the spies.

3. *Defendants made their statements with scienter*[18]

205. The FTC Consent Order required that Twitter "establish and implement, and thereafter maintain, a comprehensive information security program" that, among other things, "identif[ied] reasonably-foreseeable, material risks, both internal and external, that could result in the unauthorized disclosure, misuse, loss, alteration, destruction, or other compromise of nonpublic consumer information or in unauthorized administrative control

---

[18] Defendant Dorsey signed the Q2-Q3 2020 10-Qs, the 2020 10-K, the Q1-Q3 2021 10-Qs, and the 2021 10-K. Defendant Segal signed all the Class Period Reports. Defendant Agrawal signed the 2021 10-K and the Q1-Q2 2022 10-Qs.

of the Twitter system." To determine whether its system could result in data breaches, Twitter executives would have to know of data breaches and incidents. Accordingly, given the importance of compliance with the FTC Order, and that from the beginning of the Class Period through May 2022 Twitter was negotiating the penalty for its violations thereof, Twitter's highest-level executives would be aware of data breaches and security incidents.

206. The FTC Consent Order also required that Twitter report data breaches and incidents to regulators. There were 40 incidents in 2020, of which 20 were data breaches. Twitter kept track of incidents and breaches using SIM numbers. Agrawal and Kieran, at least, would have had a reason to consult Twitter's archive of breaches before the Class Period as they were addressing the July 2020 Hack.

207. Then, at the February 2021 Presentation attended by every Defendant, Zatko stated that in 2020 Twitter had experienced 40 security incidents of which 20 were data breaches. Thus, in all their subsequent statements,[19] Defendants had actual knowledge that Twitter regularly experienced security incidents and breaches.

208. Moreover, in December 2021, Zatko told Agrawal that a presentation that another Twitter executive proposed to make to the Board was misleading because in 2021, Twitter experienced about 50 security incidents. *See* ¶ 124, above.

209. The February 2022 Memo informed Defendants there were 50 security incidents in 2021, 80% of which were caused by overbroad access controls and security configuration/bugs. Agrawal would have reviewed the February 2022 Memo because Zatko's report was a whistleblower memorandum identifying wrongdoing by Agrawal.

210. As to foreign spies, Zatko told Segal on July 28, 2021 at the latest, and the Risk Committee on September 23, 2021 at the latest, that Twitter had Indian government

[19] The 2020 10-K, signed by Defendants Dorsey and Segal; the Q1, Q2, and Q3 2021 10-Qs, signed by Defendants Dorsey and Segal; the 2021 10-K, signed by Defendant Agrawal, Dorsey, and Segal; the Q1 and Q2 2022 10-Q, signed by Defendants Agrawal and Segal, were all filed after the February 2021 meeting.

spies on its payroll. The FBI, for its part, disclosed to Twitter that it had a Chinese government spy on its payroll in or around the week beginning January 17, 2022.

211. And as Segal stated in a July 8, 2021 interview, Twitter "constantly" addresses cybersecurity "at the highest levels," i.e. at the level of senior executives like Defendants.

### F. Statement Set 6: statements that Twitter disclosed all influence campaigns

#### 1. *Statements*

212. On September 1, 2020, Twitter's "Twitter Safety" account tweeted out an enforcement action it had taken against a Russian influence campaign. The tweet provided, in relevant part:

> Regardless of the low-level impact in this case, governments around the world must stop these practices. They're anti-democratic. ***Attempts to manipulate our service to undermine democracy – by both foreign and domestic actors – will be met with strict enforcement of our policies.***

213. During the Class Period, Twitter published three blog posts highlighting its work to disclose state disinformation campaigns. They are:

a. An October 8, 2020, unattributed blog post titled *Disclosing networks to our state-linked information operations archive*.

b. A February 23, 2021, unattributed blog post titled *Disclosing networks of state-linked information operations*, posted to Twitter's Investor Relations blog.

c. A December 2, 2021 unattributed blog post titled *Disclosing state-linked information operations we've removed*, posted to Twitter's Investor Relations blog.

214. Each of these blog posts prominently displayed hyperlinks to the address https://transparency.twitter.com/en/reports/information-operations.html. That address

was a page titled "Information Operations." It was available through the entirety of the Class Period and, throughout the Class Period, stated:

> In line with our principles of transparency and to improve public understanding of inauthentic influence campaigns, Twitter ***is making publicly available archives of Tweets and media that we believe resulted from state-backed information operations on our service.***
>
> * * * * *
>
> What will you release in the future?
>
> If and when we identify additional attempted information operations on Twitter in the future, our first priority is to enforce our rules and remove accounts engaged in attempts to manipulate the public conversation. Following these enforcements, we carry out thorough investigations of the accounts and individuals involved. ***We only disclose datasets once we have determined attribution, and once all applicable investigations have concluded. We may also release incremental additions to existing datasets if we believe the additional information could materially impact research findings.***
>
> What's included?
>
> ***Platform manipulation that we can reliably attribute to a government or state-backed actor is considered an information operation and is prohibited by the Twitter Rules.***

215. On November 26, 2020, Twitter published a blog post co-authored by Katy Minshall, then the Head of Government, Public Policy and Philanthropy for Twitter UK, which stated:

> ***[I]n 2018, Twitter committed to disclose publicly, any state-backed information operations that were reliably identified on the service, and to make the full datasets of those operations available for investigation and analysis. Since this first release over two years ago, Twitter has now disclosed over 35 separate state-backed information operations designed to nefariously shape and manipulate public opinion online***. Independent analysis of this activity by researchers is a key step toward promoting shared understanding of these threats and to help develop a holistic strategy for addressing them.

216. During a March 10, 2022 Morgan Stanley Conference, Defendant Agrawal responded to an analyst question as follows:

> Q: I want to talk about Europe a little bit and the unfortunate world the events around Russia and the Ukraine. Can you maybe just talk to us about how we should be thinking of potential impacts to the user growth, the advertising business or engagement on the platform as you sort of navigate through this uncertain time with Russia and Ukraine?
>
> * * * * *
>
> ***So—and over the years, we've been very, very transparent about any attempt that we've seen from state actors to manipulate the conversation on Twitter, right? And we've shared those transparently. We've been active in detecting them.***
>
> So really, we've been doing work proactively to be prepared for this moment. And even in the last two weeks, our teams have done a lot of amazing work, right?

2. *The statements were misleading*

a) *The statements gave the false and misleading impression that Twitter had disclosed* ***all*** *state influence campaigns it knew of.*

217. Throughout the Class Period Defendants assured investors that they disclosed all government-backed influence campaigns that they discovered on Twitter.

218. This promise to disclose government-backed influence campaign was part of Twitter's pledge to investors and consumers that the Company uniquely valued transparency.

219. During the Class Period, on Twitter's public website under the heading "Transparency,"[20] Twitter touted its purported long history of disclosing state influence and infiltration attempts:

> ***This fundamental belief in the power of open public conversation inspired Twitter to launch one of the industry's first transparency reports back in 2012.***
>
> ***The original goal of our transparency report was to provide the public with recurring insights into government pressures*** that impacted the public, whether through overt political censorship or by way of compelling account data through information requests.
>
> * * * * *
>
> A lot has changed since 2012. ***It is now more important than ever that we also shine a light on our own practices, including enforcement of the Twitter Rules and our ongoing work to disrupt global state-backed information***

[20] https://transparency.twitter.com/en/about.html.

***operations.*** The public and policy makers want to be better informed about our actions and we recognize these calls for greater transparency.

* * * * *

***Transparency is fundamental to the work we do at Twitter. We are committed to providing meaningful transparency to the public through ongoing improvements and updates to our transparency center.***

220. Twitter's promise that it would disclose all state-backed influence campaigns was touted by Defendants as an important policy and was material to investors. This purported transparency could protect Twitter from user backlash for concealing, and thus enabling, such campaigns.

221. In this context, Defendants' September 1, 2020 statement that Twitter was disclosing a state-backed influence operation even though it had "low-level impact," gave reasonable investors the impression that Twitter would take action against ***any*** "attempts."

222. Statements that Twitter published on its Information Operations page during the Class Period were also misleading:

a. Defendants' statement that "what's included" in Twitter's reporting was "[p]latform manipulation that we can reliably attribute to a government or state-backed actor" did not provide any exceptions, and reasonable investors would have concluded that there were none. Thus, Defendant's statement created the false and misleading impression that Twitter would disclose ***all*** state-backed platform manipulation.

b. Defendants' statements concerning the release "publicly available archives" likewise implies that Twitter is releasing information on all influence campaigns it knows of. Defendants stated that Twitter was publishing its

"archives" and then listed the archives' contents: "Tweets and media that we believe resulted from state linked information operations on our service." Twitter did not include any exceptions.

c. Defendants' statements that "we only disclose datasets once we have determined attribution, and once all applicable investigations have concluded" implies that there are no other unstated obstacles to disclosure. Once Twitter has determined attribution and completed investigations, it will disclose the campaigns.

223. In his March 10, 2022 statement, Agrawal directly said that Twitter had disclosed "any" state influence campaign.

224. As to the November 26, 2020 statement, by stating that Twitter had "committed to disclose publicly[] any state-backed information operations" and then, in the next sentence, reporting the number of such campaigns Twitter had disclosed, Defendants gave the misleading impression that the campaigns Twitter reported were the only ones it had identified.

225. Finally, reasonable investors would have viewed Twitter's Class Period statements in the context of its pre-Class Period claims. Here, for example, in a June 11, 2020 article, *The Washington Post* quoted Twitter as saying that "[i]f we can ***ever*** attribute these behaviors [influence campaigns] to a state-backed information operation, we disclose them to our public archive – the only one of its kind in the industry."

b) *Contrary to Defendants statements, Twitter did not disclose all the state-backed influence campaigns it discovered*

226. At the time of the statements, Twitter was aware of undisclosed state-backed influence campaigns by the U.S. Department of Defense and the Chinar Corp, the Indian Army unit responsible for operations in Kashmir. Twitter did not publicly disclose the campaigns' existence and allowed them to continue after discovering them.

(1) The Department of Defense Campaign

227. According to internal Twitter documents released to reporter Lee Fang in or around December 2022, Twitter was concealing a U.S. government influence campaign throughout and even before the Class Period.[21]

228. In a July 26, 2017 email, a Department of Defense employee emailed Twitter to request that it "whitelist" "accounts we use to amplify certain messages,"[22] a request Twitter granted.[23] The whitelisted accounts would have the privileges of "verified" accounts. For example, they would be immune to bots that flag accounts for spam or abuse or otherwise reduce visibility. But Twitter would not disclose their affiliation with the Department of Defense.

229. The Department of Defense initially told Twitter that the accounts themselves would disclose their connection to the U.S. government. But after Twitter's approval, the affiliations were removed from many accounts. Many pretended to be real people, with fake photos and names.[24] Others pretended to be the Twitter accounts of (non-existent) local media outlets.

230. Twitter learned that the Department of Defense was employing these and other fake accounts to conduct an influence campaign well before the Class Period. In May 2020, Lisa Roman, a Twitter Vice President, emailed a Pentagon official a spreadsheet of accounts Twitter suspected were affiliated with the Department of Defense.[25] The

[21] *See* Lee Fang, *Twitter Aided the Pentagon In Its Covert Online Propaganda Campaign*, THE INTERCEPT, December 20, 2022, (available at https://theintercept.com/2022/12/20/twitter-dod-us-military-accounts/). Whether Twitter ***should*** allow a U.S. influence campaign is wholly separate from whether allowing such a campaign makes Defendants' statements false.

[22] https://www.documentcloud.org/documents/23466698-twitter-centcom

[23] https://theintercept.com/2022/12/20/twitter-dod-us-military-accounts/

[24] *See* Graphika and Stanford Internet Observatory, Cyber Policy Center, *Unheard Voice: Evaluating five years of pro-Western covert influence operations*, Aug. 24, 2022 (available at https://stacks.stanford.edu/file/druid:nj914nx9540/unheard-voice-tt.pdf).

[25] https://www.documentcloud.org/documents/23470053-twitter-dod-accounts-2020

spreadsheet had two tabs. Roman explained that the first "lists those accounts previously provided to us and the second, associated accounts that Twitter has discovered." In the next sentence, Roman clarifies that the accounts "violated [Twitter] rules." According to Fang, many of the accounts in ***both*** tabs were not identified as affiliated with the U.S. government.

(2) The Chinar Corp Campaign

231. In or around August 2020, Twitter executives learned that the Indian Army unit responsible for operations in Kashmir, the Chinar Corp, was running a Twitter influence operation. Zatko learned in executive discussions that Twitter, to gain favor with India's ruling party, had made the executive decision not to disclose the Chinar Corp influence campaign, while disclosing similar campaigns from India's adversary Pakistan.

232. The Chinar Corp influence campaign continued in 2021. In just one incident in 2021, Zatko reported that his team had identified a further 132 accounts created and used by the Chinar Corp to spread misinformation.

3. *The statements were made with scienter*

a) *The scienter of Twitter's Head of Site Integrity, Yoel Roth, can be imputed to Twitter*

233. State misinformation fell within the portfolio Twitter Director, Head of Site Integrity Yoel Roth. Indeed, Roth takes credit on LinkedIn for spearheading the disclosure campaign:

> Built and led Twitter's global Site Integrity team (from 0 to 60 staff globally), responsible for policy development, implementation, and investigations for spam, data privacy and security, information operations, election security, and misinformation.
>
> * * * * *
>
> ***Spearheaded "Project Sunlight," an industry-leading data transparency initiative to disclose comprehensive archives of state-backed information***

***operations disrupted by Twitter, growing to include 52 datasets from more than 25 countries and enabling research by more than 10,000 researchers, journalists and civil society groups worldwide.***

234. Further, Roth published several blog posts in his own name discussing Twitter's efforts to address state misinformation campaigns.[26]

235. Given both his personal and supervisory involvement in the campaign to disclose state influence campaigns, Roth would have personally drafted and/or approved the specific unattributed statements Twitter made in its blog about disclosing state influence campaigns.

236. Thus, because Roth either approved or drafted the three unattributed statements, his scienter can be imputed to Twitter.

237. As to the statement attributed to Minshall, by posting the statement on its blog, Twitter "made" the statements contained therein. Had Twitter decided not to publish the blog post or to request corrections, the statements would not have been published as is. Moreover, as Minshall's employer, Twitter was responsible for the statements she made in the course of her employment. Because Roth was tasked with ultimately overseeing Twitter's program to disclose state influence campaigns, his scienter can be imputed to Twitter.

b) *Roth had actual knowledge of a concealed U.S. Department of Defense influence campaign at the time*

238. In July 2020, the Department of Defense invited Twitter and Facebook to attend a classified briefing concerning the inauthentic accounts it employed in its influence

---

[26] Yoel Roth, *Introducing our crisis misinformation policy*, posted May 19, 2022; Yoel Roth, *Expanding access beyond information operations*, posted December 2, 2021; Yoel Roth, *Updating our approach to misleading information*, posted May 11, 2020; Yoel Roth, *Information operations on Twitter: principles, process, and disclosure*, posted June 13, 2019; Yoel Roth, *Empowering further research of potential information operations*, posted January 31, 2019.

campaign. In a July 6, 2020 email thread, Twitter General Counsel Sean Edgett, deputy General Counsel James Baker, Yoel Roth, and other employees discussed a Department of Defense request to discuss these Defense Department-controlled accounts with Twitter employees who had government security clearances. Roth acknowledged in one email that the discussion would be about "inauthentic activity on our platforms."[27] Roth and other Twitter executives thus knew of the influence campaigns.

239. Yet many of these inauthentic accounts remained up for years thereafter and without disclosure. According to a report from the Stanford Internet Observatory based on data obtained from Twitter, the covert campaign continued until August 2022 and involved almost 300,000 tweets. According to the report:

> The assets identified by Twitter and Meta created fake personas with GAN-generated faces [images created by artificial intelligence], posed as independent media outlets, leveraged memes and short-form videos, attempted to start hashtag campaigns, and launched online petitions: all tactics observed in past operations by other actors.

240. In a September 16, 2022 email, Twitter communications employee Katie Rosborough advised colleagues, including Baker, that *The Washington Post* would publish an article concerning U.S. government social media influence campaigns. Rosborough noted that "[w]e don't think they'll tie it to anything [Zatko]-related or name any Twitter employees."

c) *Roth and Agrawal had actual knowledge of the Chinar Corp influence campaign*

241. As head of the disclosure campaign, Roth would have been told of and/or involved in the August 2020 executive decision not to disclose the Chinar Corp campaign.

---

[27] https://www.documentcloud.org/documents/23466699-twitter-dod-email

Among other things, he would have been in charge of discovering it. He would also have disclosed the campaign, had Twitter not intervened.

242. As to the December 2, 2021 blog post and Agrawal's March 10, 2022 statement, Zatko learned of the Chinar Corp campaign on or soon after August 2, 2021, and then attempted to make Twitter disclose the campaign. As part of his efforts, Zatko wrote in an October 14, 2021 memo to executives:

> 10/14/21 FYSA [For Your Situational Awareness] – my team has just confirmed a further 132 accounts registered by the Chinar Corp this year. Majority caught automatically and suspended – but several slipped through. Engaged in exactly the same behavior. They're clearly unrepentant – ***and absent disclosure it doesn't seem like we have a viable strategy other than perpetual whack-a-mole***.

243. Zatko's October 14, 2021 memo states that the Chinar Corp are engaged in an undisclosed influence operation. But it also presumes that the recipients were already aware of the influence campaign. For example, saying that "my team has confirmed a ***further*** 132 accounts" and that the Chinar Corp are "[e]ngaged in ***exactly the same behavior***" as earlier presumes that the reader already knows about the Chinar Corp's behavior.

244. Accordingly, the Chinar Corp influence campaign was widely known in Twitter's executive circles, further evidence that Roth was aware of the campaign.

245. Additionally, when he made his statements, Agrawal was Twitter's CEO. He would know of the Chinar Corp campaign long before he made the statements, either from Zatko's October 14, 2021 memo or because it was generally known by Twitter executives.

d) *Twitter disclosed the Chinar Corp influence campaign one day after The Washington Post published Zatko's account*

246. Twitter maintains a running list of accounts linked to state influence campaigns, which it shares with partners who produce reports. As to the Chinar Corp,

Twitter released a new dataset to its partners which included 1,198 accounts that tweeted about India and Pakistan. Twitter's partner's report on this dataset[28] suggested that the accounts were part of a campaign by the Chinar Corp.[29] According to the report revealing the China Corp's campaign, one of the accounts' bios claimed it was "Exposing the traitors who call them [sic] #Kashmiri but are working towards destroying #Kashmiriyat....!!!!!" and targeted journalists. According to the report, Twitter provided the dataset on August 24, ***one day*** after Zatko's August 23 whistleblower disclosure, Twitter's prompt disclosure after it was caught corroborates Zatko's claim that it knowingly concealed the Indian state campaign.

e) *Defendants knew and concealed that Twitter's platform was incapable of addressing misinformation*

247. In late 2020 or early 2021, Zatko hired social media disinformation response firm Alethea Group ("**Alethea**") to evaluate Twitter's Site Integrity programs.

248. In or around May or June 2021, Alethea delivered to Zatko a devastating draft report of its findings ("**Alethea Report**"). Among other things, Alethea concluded that Twitter "operate[d] in a constant state of crisis that does not support the company's broader mission of protecting authentic conversation." The report "identified significant gaps in resource allocation" leading to "reactive" policies and actions and an organization that did not "think about emerging threats." Thus, despite being "a global company with a global mission, [Twitter] is not currently set up to deliver globally on trust and safety."

249. The deficiencies the Alethea Report identified included:

a. The tools Twitter employed were "outdated, 'hacked together', or difficult to use" and "lack[ing] in automation and sophisticated tooling";

---

[28] *See* Shelby Grossman et al., *My Heart Belongs to Kashmir: An Analysis of a Pro-Indian Army Covert Influence Operation on Twitter*, Stanford Internet Observatory, go to https://purl.stanford.edu/zs105tw7107 and download 20220921 India takedown filename.

[29] Among other things, the network's tweets were "consistent with the Chinar Corp's objectives, praising the work of the Indian Army in India-occupied Kashmir" and the Chinar Corps' official account was the seventh-most retweeted or mentioned account.

b. Twitter's divisions were "siloed and not clearly defined" and relied on haphazard "personal relationships" between disconnected employees rather than "a formal organizational structure." Site Integrity depended on employees who "have no accountability to Site Integrity" and act only out of "goodwill," with "data sources [] spread across several different systems and requir[ing] largely manual processes to access and analyze." With different teams handling different issues, Twitter was unable to respond effectively when an incident did not correspond clearly to one team's function;

c. Twitter lacked real-time monitoring capability ("one of the most used tools, ClusterDuck, which identifies networks of similar and/or coordinated accounts by country, does not do real-time monitoring and analysis");

d. Twitter implemented rapid policy changes in response to crises without input from the relevant stakeholders; and

e. Twitter did not learn from experience ("Twitter lacks sufficient processes to measure progress and impact, and therefore fails to implement lessons learned from the past").

250. Indeed, Twitter's staff lacked the ability even to operate in many of the languages employed by users on Twitter. "The [Information Operations, IO] team has one staff member with expertise in Russia, one with expertise in Iran, and one with expertise in China, making staffing and coverage, particularly during a crisis, unsustainable."

251. With no native speakers of some of the most important languages, Twitter again and again became a source of dangerous misinformation. Though Japan is Twitter's second largest market, accounting for over 13% of Twitter's 2021 revenues, and with almost as many users as the U.S., Twitter did not have any Japanese speakers on its Site Integrity Team and only one Trust & Safety staff member located in Tokyo.

Disinformation spread on Japanese-language Twitter: the COVID misinformation and even the QAnon conspiracy found a second home there.[30]

252. In one infamous episode of the mid-2010's, Facebook failed to stop its platform being used to facilitate a genocide in Myanmar because, at the time, Facebook lacked Burmese speakers. Three and a half years after Facebook's failure, Twitter had no Burmese speakers, so it could not prevent its platform from spreading misinformation in connection with the February 2021 Myanmar coup.[31]

253. Similarly, Twitter had no Amharic or Oromo speakers, so it allowed its platform to be used in propagandizing forcible displacements and mass murders in the Tigray region in Ethiopia.[32] And, with no Pashto or Dari speakers, Twitter could not intervene as the Taliban used Twitter to spread propaganda that assisted its rapid conquest of Afghanistan in the summer of 2021, leading a group of experts to suggest that the Taliban's takeover was "powered by Twitter."[33]

---

[30] *See Japanese fake news eludes Facebook and Twitter's reach*, NIKKEI ASIA, Dec. 8, 2021 (available at https://asia.nikkei.com/Business/Technology/Japanese-fake-news-eludes-Facebook-and-Twitter-s-reach); *see also* Alex Silverman, *QAnon Is Alive and Well in Japan*, THE DIPLOMAT, Jan. 29, 2021 (available at https://thediplomat.com/2021/01/qanon-is-alive-and-well-in-japan/) (Japan hosts "one of [QAnon's] most active networks outside the U.S." largely because of Twitter).

[31] Fanna Potkin and Wa Lone, "Information Combat": *Inside the Battle For Myanmar's Soul*, REUTERS, November 2, 2021 (available at https://www.reuters.com/world/asia-pacific/information-combat-inside-fight-myanmars-soul-2021-11-01/).

[32] Nwachukwu Egbunike, *What Elon Musk Does Not Get About Twitter and Democracy in Africa*, May 4, 2022, published on the website Just Security (available at https://www.justsecurity.org/81357/what-elon-musk-does-not-get-about-twitter-and-democracy-in-africa/ ("The cesspool of Twitter-enabled disinformation in [Africa] becomes even more complicated in multilingual countries like Ethiopia, with disruptive and destructive fake news silos that are far removed from the limelight."); Tessa Knight and Beth Alexion, In*fluential Ethiopian social media accounts stoke violence along ethnic lines*, Digital Forensic Lab, December 17, 2021 (available at https://medium.com/dfrlab/influential-ethiopian-social-media-accounts-stoke-violence-along-ethnic-lines-6713a1920b02) (documenting examples of genocide incitement posted on Twitter).

[33] Laura Courchesne et al., *Powered by Twitter? The Taliban's Takeover of Afghanistan*, Center for Artificial Intelligence, Data, and Conflict, June 2022 (available at

254. Alethea reported that Twitter's approach was "largely reactive":

> The lack of sufficient resources, tools, and capabilities has forced [Site Integrity] and [Twitter Services] to be reactive and largely limit their focus to threats that affect the United States or English-speaking entities. This has ultimately prevented Twitter from proactive threat detection and mitigation to avoid crises. ***Interviewees described a largely reactive approach to misinformation, disinformation, and spam in which action is taken on content and threats only if it is flagged by reporters or news headlines, partners, or political officials due to the lack of people and sufficient tools to do proactive analysis.***

255. According to Zatko, when senior executives learned of Alethea's conclusions, they tried to bury Alethea's report. Without notifying Zatko, senior Twitter executives directed Alethea to enter into a contract with an outside law firm. This new contract provided that Alethea would first send drafts to the law firm, rather than Zatko. The law firm would "remov[e] factual information that would be especially embarrassing for Twitter, and then return to Alethea Group a 'clean' version to present to Zatko." Even Alethea recognized that the request was facially improper: Zatko testified that Alethea told him "[t]his does not feel right to us what's going on." Confirming Alethea's view, Twitter's counsel told Zatko that, in the latter's words, "this was intended to hide the findings and prevent them from becoming known internally."

## V. DEFENDANTS MISLEAD INVESTORS ABOUT MDAU

### A. Statement Set 7: Statements Touting mDAU Growth

256. During the Class Period, Twitter reported average mDAU every quarter in press releases, earnings calls, and periodic reports on Forms 10-K and 10-Q, creating a materially misleading picture regarding supposed mDAU growth.

---

https://www.tracesofconflict.com/_files/ugd/17ec87_19ecafa8cf1046af8554251bce0aaf6f.pdf).

1. *Statements*

257. Twitter's Q2 2020 10-Q stated:

> In the three months ended June 30, 2020, ***we had 186 million average mDAU, which represents an increase of 34% from the three months ended June 30, 2019. The increase was driven by global conversation around current events and ongoing product improvements.***

258. On October 29, 2020, Twitter published a press release reporting its Q3 2020 results, and stating, under Highlights:

> "We have grown our daily audience by 42 million in the last year as people all around the world come to Twitter to find out about the topics and events they care about most. I'm pleased mDAU ***grew 29% year over year to 187 million, driven by global conversation around current events and product improvements,*** " said Jack Dorsey, Twitter's CEO. "We're helping people find trusted sources of information by better organizing and surfacing the topics and interests that bring people to Twitter."

259. The press release further stated, under "Third Quarter 2020 Operational and Financial Highlights:"

> ***Average mDAU was 187 million for Q3, compared to 145 million in the same period of the previous year and compared to 186 million in the previous quarter.***

260. Twitter's Q3 2020 10-Q stated, under "Overview and Highlights of Quarterly Results:" "Average monetizable daily active usage (mDAU) for the three months ended September 30, 2020 was 187 million, an increase of 29% year over year."

261. On February 9, 2021, Twitter published a shareholder letter reporting its Q4 2020 results, and stating, under Highlights: "Average monetizable DAU (mDAU) reached 192 million, up 27% year over year and up 5 million sequentially, driven by global conversation around current events and ongoing product improvements."

262. Twitter's 2020 10-K stated that "[i]n the three months ended December 31, 2020, we had 192 million average mDAU, which represents an increase of 27% from the three months ended December 31, 2019."

263. On April 29, 2021, Twitter published a press release reporting its second quarter 2021 results and stating:

> "People turn to Twitter to see and talk about what's happening, and we are helping them find their interests more quickly while making it easier to follow and participate in conversations," said Jack Dorsey, Twitter's CEO. "***Average monetizable DAU (mDAU) reached 199 million, up 20% year over year and up 7 million sequentially, driven by ongoing product improvements and global conversation around current events.***"

264. The press release further stated:

> ***Average monetizable daily active users (mDAU) were 199 million for Q1, compared to 166 million in the same period of the previous year and compared to 192 million in the previous quarter.***

265. Twitter's 2021 Q1 10-Q stated that "[i]n the three months ended March 31, 2021, we had 199 million average mDAU, which represents an increase of 20% from the three months ended March 31, 2020."

266. On July 22, 2021, Twitter published a press release reporting its second quarter 2021 results, and stating, under "Third Quarter 2020 Operational and Financial Highlights:"

***Average monetizable daily active users (mDAU) were 206 million for Q2, compared to 186 million in the same period of the previous year and compared to 199 million in the previous quarter.***

267. Twitter's 2021 Q2 10-Q stated that "[i]n the three months ended June 30, 2021, we had 206 million average mDAU, which represents an increase of 11% from the three months ended June 30, 2020."

268. On October 26, 2021, Twitter published a press release reporting its Q3 2021 results, and stating, under "Third Quarter 2021 Operational and Financial Highlights:"

***Average monetizable daily active usage (mDAU) was 211 million for Q3, compared to 187 million in the same period of the previous year and 206 million in the previous quarter.***

269. Twitter's 2021 Q3 10-Q stated that "[i]n the three months ended September 30, 2021, we had 211 million average mDAU, which represents an increase of 13% from the three months ended September 30, 2020."

270. On February 10, 2022, Twitter published a press release reporting its full year 2021 results, and stating, under "Highlights:" "[a]verage monetizable DAU (mDAU)[] reached 217 million, up 13% year over year, driven by product improvements, as well as global conversation around current events." The press release further stated that "**[w]e made meaningful progress in 2021 against our 2023 goals: doubling development velocity by the end of 2023, delivering at least 315 million mDAU in Q4'23, and delivering $7.5 billion or more in revenue for the full year of 2023."** (Emphasis in original.) *See* ¶ 307 regarding mDAU target of 315 million.

271. Twitter's 2021 10-K stated that "In the three months ended December 31, 2021, we had 217 million average mDAU, which represents an increase of 13% from the three months ended December 31, 2020."

272. On April 28, 2022, Twitter published a press release reporting its Q1 2022 results, and stating, under First Quarter 2022 Operational and Financial Highlights:

> ***Average monetizable daily active usage (mDAU)[] was 229.0 million for Q1, up 15.9% compared to Q1 of the prior year.***

273. Twitter's 2022 Q1 10-Q stated that "[i]n the three months ended March 31, 2022, we had 229.0 million average mDAU[], which represents an increase of 15.9% from the three months ended March 31, 2021."

274. On July 22, 2022, Twitter published a press release reporting its Q2 2022 results and filed its Q2 2022 10-Q. These documents, respectively, stated:

> ***Q2 average monetizable daily active usage (mDAU) was 237.8 million, up 16.6% compared to Q2 of the prior year. The increase was driven by ongoing product improvements and global conversation around current events.***
>
> * * * * *
>
> ***In the three months ended June 30, 2022, we had 237.8 million average mDAU[], which represents an increase of 16.6% from the three months ended June 30, 2021.***

2. *These Statements Were False and Misleading.*

a) *Defendants Represented that mDAU Only Included Users Who Saw Ads.*

275. During the Class Period, Defendants regularly emphasized to investors that mDAU was the most important metric to measure Twitter's performance. Defendants' implicit rationale for this intense focus was that, as Twitter explicitly represented when it introduced mDAU in 2019, mDAU only included users that saw ads.

276. On February 7, 2019, Twitter introduced its mDAU metric and announced that it would stop disclosing other measures of user engagement, explaining that:

> We want to provide something valuable to people on Twitter every day, and we believe that monetizable DAU (mDAU), and its related growth, are the best ways to measure our success. Monetizable DAU are Twitter users who log in and access Twitter on any given day through twitter.com or our Twitter applications that are able to show ads. ***Our mDAU are not comparable to current disclosures from other companies, many of whom share a more expansive metric that includes people who are not seeing ads.*** We considered changing our disclosure to be comparable to other companies, but our goal was not to disclose the largest daily active user number we could. We want to align our external stakeholders around one metric that reflects our goal of delivering value to people on Twitter every day and ***monetizing that usage***.

277. Market participants interpreted Twitter's statement to mean exactly what it said. In a February 7, 2019 *Fortune* article, analyst Don Reisinger noted that "the move effectively removes users who are not shown ads and therefore not able to generate revenue for the company."[34] The ad industry, the source of nearly all of Twitter's revenues, shared Reisinger's understanding: a May 2019 *AdExchanger* article reported that "[s]tarting next quarter, Twitter will no longer share its MAU number in favor of its own metric called mDAU, or monetizable daily active users, which reflects how many people actually see ads."[35] Likewise in the financial and news media: an October 24, 2019 Reuters article about Twitter's results for the third quarter of 2019 observed, referring to mDAU, that "[t]he social media platform did manage to record a rise in daily users who see ads on

---

[34] Don Reisinger, *Twitter Shares Tank Despite Big Revenue and Profit Gains*, Fortune, Feb. 7, 2019 (available at https://fortune.com/2019/02/07/twitter-stock-earnings/).

[35] Allison Schiff, *Twitter's 2019 Priorities: Health, Revenue and Trying To Be Less Toxic*, AdExchanger, May 20, 2019 (available at https://www.adexchanger.com/platforms/twitters-2019-priorities-health-revenue-and-trying-to-be-less-toxic/)

the site, beating analyst estimates."[36] That article reminded readers that "Twitter has stopped disclosing its monthly active users [MAU] figures, instead reporting monetizable daily active usage (mDAU), a metric it created to measure users ***exposed on a daily basis to advertising*** through the site or Twitter applications that are able to show ads."

278. During the Class Period, the markets continued to interpret Twitter's reported mDAU figures as a metric of users who actually saw ads and actually generated revenues for Twitter. In February 2021, *Reuters* reported that "[i]n a regulatory filing, Twitter estimated reaching at least 315 million monetizable daily active users (mDAU), *or those who see ads*, by the fourth quarter of 2023."[37] In 2022, *Reuters* again echoed the Company's description, referring to "monetizable daily active users, or users who see advertising."[38] A *CNET* article about Twitter's $809.5 million settlement of a class action alleging that Twitter committed securities fraud in connection with monthly active user ("MAU") reporting stated that "Twitter stopped reporting [MAU] in April 2019 (at last

---

[36] Elizabeth Culliford and Ambhini Aishwarya, *Twitter ad platform suffers tech glitches, hitting revenue; shares tumble*, REUTERS, Oct. 24, 2019 (available at https://www.reuters.com/article/us-twitter-results/twitter-ad-platform-suffers-tech-glitches-hitting-revenue-shares-tumble-idUSKBN1X31C8); Katie Silver, *Twitter shares plunge as ad bugs see profit fall short*, BBC NEWS, Oct. 24, 2019, (available at https://www.bbc.com/news/business-50166520) ("The social media platform did boost the number of daily users who see ads on the site, known as moneti[z]able daily active users (mDAU)"; Nicolas Vega, NEW YORK POST, *Twitter shares soar after first $1 billion quarter*, Feb. 6, 2020 (available at https://nypost.com/2020/02/06/twitter-shares-soar-after-first-1-billion-quarter/) (Twitter's "[e]fforts have increased average monetizable daily active users (mDAU) — meaning users who see ads when they use the platform.").

[37] Sheila Dang, *Twitter sees revenue doubling in 2023, shares hit record high*, REUTERS, Feb. 25, 2021 (available at https://financialpost.com/pmn/business-pmn/twitter-sees-revenue-doubling-in-2023-shares-hit-record-high-2).

[38] Sheila Dang, *Twitter gears up for most ambitious quarter of user growth – internal meeting*, REUTERS, June 7, 2022 (available at https://www.reuters.com/technology/twitter-tells-employees-it-targets-13-million-user-growth-this-quarter-2022-06-07/).

count it reported 330 million). The company now looks at ***daily users who see ads*** as its key metric," referring to mDAU.[39]

279. In the context of Defendants' representation that mDAU only included users who saw ads, which the market reasonably believed, and which Defendants never corrected, Twitter's report of mDAU totals each quarter misleadingly represented that it reflected the number of daily active users that saw ads.

b) *A Material Portion of Accounts Included in mDAU Reported During the Class Period Did Not See Ads or Otherwise Contribute to Revenue*

280. The impression created by Defendants—that users in mDAU saw ads and were monetizable—was false. In truth, Twitter's mDAU included a material and increasing number of users who did not see ads or otherwise contribute to revenues.

281. Twitter's users consisted of four groups stratified by how much Twitter earned from them. As of about Q1 2022, these groups consisted of:

| User group | Group size as a percentage of mDAU[40] | Average revenue per user per quarter | Total revenue per quarter |
|---|---|---|---|
| ***No revenues*** | ***29%*** | ***$0*** | ***$0*** |
| Low revenues | 41% | $1.14 | $107 million |
| Mid revenues | 24% | $9.48 | $512 million |
| High revenues | 7% | $34.65 | $527 million |

[39] Carrie Mihalcik, *Twitter to pay $809.5M to settle 2016 lawsuit over growth projections*, CNET, Sept. 21, 2021 (available at https://www.cnet.com/tech/tech-industry/twitter-to-pay-809-5m-to-settle-2016-lawsuit-over-growth-projections/).

[40] Percentages do not sum to 100% because of rounding.

282. Thus, a material number of Twitter's mDAU did not see any ads at all. That number was 51 million (24.8% of mDAU) in Q2 2021 and, as shown in the above table, grew to 65 million (28.4% of mDAU) by Q1 2022.[41] Furthermore, the number of users in the "no revenue" group increased as a proportion of mDAU during 2021 and 2022. In 2021—which began with Twitter's announcement that it aimed to increase mDAU to 315 million by Q4 2023—more than half of the increase in mDAU consisted of users who generated no revenue.

283. The second group of users, accounting for 41% of mDAU, sees very few ads and generates little revenue for Twitter. Based on internal Twitter data, this second group generated an average of roughly $1.14 per quarter, or a total of $107 million, for Q1 2022.

284. A third group, accounting for 24% of mDAU, generated an average of roughly $9.48 per user per quarter, or a total of $512 million for Q1 2022.

285. The last group, accounting for a mere 7% of mDAU, generated roughly $34.65 per user per quarter on average, or $527 million per quarter for Q1 2022. This group of highly engaged users, rather than mDAU as a whole, was the key to Twitter's revenue, but accounted for ***less than 1%*** of the growth in mDAU in 2021.

286. Moreover, the engagement of this critical group of lucrative, highly-engaged users was declining during the Class Period, and Defendants tracked this decline. Twitter's executives and directors measure engagement by calculating the total number of daily user active minutes ("UAM") and the total number of daily user active minutes per mDAU. Throughout 2021, those figures were, at best, stagnant, and, at worst, declining.

287. Twitter's internal documents reveal that these metrics declined, in large part, due to declines in engagement from Twitter's "most engaged" or "heaviest" users, i.e., the ones who drive a disproportionate amount of Twitter's revenues. On January 25, 2022, Twitter's CEO, Parag Agrawal wrote to Twitter's head of data science—who was

[41] Defendants' Verified Second Amended Counterclaims, Answer, and Affirmative Defenses to Plaintiff's Verified Complaint ("**Musk Counterclaims**"), ¶¶168-79, *Twitter, Inc. v. Musk, et al.* (Del. Ch. Oct. 4, 2022).

responsible for building Twitter's mDAU forecast model—and described the declining UAM figures as "concerning." Twitter's head of data science, Max Schmeiser responded that "the UAM decline is very concerning" and that other measures of engagement, Engaged User Stickiness (mDAU/MAU), and Engaged Retention, had been "declining in concert with UAM per mDAU for the engaged user segment for the last 18 months."[42]

288. As a result, Twitter was reporting progress towards its 315 million mDAU target largely based on users that it did not monetize and would have great difficulty monetizing, even as its appeal to its most lucrative users declined.

c) *Twitter Included Known and Suspended Bots in mDAU*

289. In addition, a significant number of Twitter accounts included in mDAU ***were not*** and simply ***could not*** be monetized, because they were fake or spam accounts that Twitter had already identified and suspended.

290. Fake or spam accounts can engage in a variety of behaviors that could lead them to be counted as mDAU in the ordinary course, for example by logging into Twitter and generating a high volume of tweets, retweets, and replies. But, because they are generally not designed to engage with advertisements and ultimately buy products, fake and spam accounts are of no interest to advertisers and would be unlikely to ever pay for subscription services. Additionally, these fake or spam accounts often engage in disruptive or abusive behavior—for example by mass replying to a user's account or by attempting to scam real users—that make the Twitter platform less appealing to its legitimate users. Thus, such accounts do not present revenue opportunities. To the contrary, they tend to diminish the experience of real users.

291. Understanding that fake and spam accounts would ordinarily be captured in the mDAU metric, but do not represent actually monetizable users, Twitter purports to exclude these accounts from its mDAU calculation. Twitter assured investors that it

[42] Musk Counterclaims ¶ 176; *see also* Ex. D to Letter from E. Micheletti, *Twitter, Inc. v. Musk* (Del. Ch. Sept. 28, 2022).

"performed an internal review of a sample of accounts" and that ***"[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics***."

292. Yet the mDAU figures that Twitter reported each quarter included accounts Twitter determined were fake (and suspended accordingly) ***during the quarter in which such accounts were counted in mDAU***. Thus, for example, if Twitter determined on July 1, 2020, that a given user was a bot—and suspended the user for that reason—that user would still be counted in the mDAU that Twitter disclosed for the quarter ending September 30, 2020. Further, Twitter did not revise or restate mDAU figures to correct the inclusion of such accounts in previously reported mDAU.

293. These accounts were largely spam. Twitter stated throughout the Class Period that "[m]ost of the accounts we suspend are suspended because ***they are spammy, or just plain fake.***"[43]

294. As set forth in greater detail below, *see* ¶¶ 315-16, in the course of acquisition-related discussions with Musk, Twitter admitted that it does ***not*** remove spam accounts from mDAU even after determining they are spam ***and*** suspending them for that reason. Defendant Segal conceded during a June 30, 2022, call with Musk that the mDAU figures it reports to investors include these millions of accounts. Twitter's records indicate that nearly 5 million accounts suspended for being spam during the first quarter of 2021 were included in the mDAU number reported for that quarter, boosting the metric by 2.5%. Moreover, the number of suspended fake or spam accounts included in mDAU increased sharply during the Class Period, reaching 13 million in the fourth quarter of 2021 (representing 6.2% of the 209.3 million mDAU reported for that quarter) and 15 million in the first quarter of 2022 (6.9% of the 214.7 million mDAU reported for that quarter). Because they were suspended, these non-revenue generating accounts did not see ads and

[43] https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts

they were not "monetizable," so it was false and misleading for Twitter to include them as "*monetizable* Daily Active Users."

### B. Statement Set 8: Statements About the Manner In Which Twitter Determined mDAU

#### 1. *Statements*

295. Each of Twitter's Class Period reports on Forms 10-K and 10-Q stated that:

> ***After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics.***

#### 2. *Internal Data and Defendant Segal's Admission Establish that These Statements Were False*

296. This statement—made in all of the Class Period Reports—was false. Twitter's records show that nearly 5 million accounts suspended for being spam during the first quarter of 2021 were included in the mDAU number reported for that quarter, boosting the metric by 2.5%. The number of suspended fake or spam accounts included in mDAU increased sharply during the Class Period, reaching 13 million in Q4 2021 (representing 6.2% of the 209.3 million mDAU reported for that quarter) and 15 million in Q1 2022 (6.9% of the 214.7 million mDAU reported for that quarter). Thus, Twitter did *not* stop counting accounts in mDAU after it determined they were spam, malicious automation, or fake.

297. Indeed, as set forth in greater detail below (*see* ¶¶ 315-16), Defendant Segal conceded during a June 30, 2022, call with Musk that the mDAU figures it reported to investors included these millions of accounts identified as spam, malicious automation, or fake, and suspended accordingly. Thus, Segal admitted that Defendants' statements were false.

### C. Defendants' mDAU-related Misrepresentations Were Made with Scienter

298. Defendants' representations concerning mDAU growth and the supposed removal of bots from mDAU were made with scienter.

a) *Defendants' Insistence That mDAU Was Twitter's Most Important Metric Contributes to Scienter*

299. Prior to 2019, Twitter told investors that its key metric was "MAU," or monthly active users. MAU is a widely accepted and standard metric among social media and other digital product companies. But after three straight quarters of decreasing MAU, Twitter developed a new proprietary "key" metric—monetizable Daily Active Users, or mDAU. Defendants reported the number of mDAU every quarter and, for ten straight quarters, that number grew.

300. Defendants consistently urged investors to focus on mDAU. Each of Twitter's periodic reports on Forms 10-K and 10-Q filed during the Class Period stated that mDAU was the "***best way to measure [Twitter's] success.***"

301. Indeed, Twitter's Q2 2020 10-Q and Q3 2020 10-Q each stated that:

> [W]e believe that mDAU, and its related growth, are the best ways to measure our success against our objectives and to show the size of our audience and engagement going forward, ***so we discontinued disclosing monthly active usage after the first quarter of 2019.***

302. Defendants repeated their message in other venues. During an August 11, 2020 Oppenheimer conference, Defendant Segal, in response to a question seeking more clarity about the number of Twitter users, stated:

> ***So about a year-and-a-half ago, we transitioned to really just talk about monetizable daily active usage, and the reason we did that is that's what***

***we've been tracking internally for a long time as the best way to measure our success in getting people to use Twitter as a daily part of their lives***.

303. At a September 4, 2019 Citi Global Technology Conference, Defendant Segal told analysts that "DAU growth[] . . .is the foundation of any revenue opportunity that we have."[44]

304. On February 25, 2021, at Twitter's "analyst day," Kayvon Beykpour, Twitter's then-Product Lead and the Twitter executive responsible for growing mDAU (*see* ¶¶ 38 and 320), stated: ***"[u]ltimately, we measure our long term success through our ability to grow monetizable daily active usage (mDAU)***," and that while "there are a variety of metrics that help us gauge whether our product solutions are working, [] ***in [the] aggregate the best way to measure our success is mDAU***." When an analyst observed that Twitter's competitors provide additional data points regarding user engagement and sought more information about user engagement on Twitter, Beykpour declined. Instead, he repeated that "***in aggregate the best way to sort of measure whether we're solving customers problems is mDAU which is why we sort of focus on that metric,***" and ***"[t]he most important one [i.e., metric] we look at is mDAU."***

305. Further, Twitter's Class Period Reports stated that: "***Our advertising revenue growth is primarily driven by increases in mDAU***, increases in ad pricing or number of ads shown and increases in our clickthrough rate."

306. Given Defendants' repeated statements about mDAU's primacy, it is absurd to suggest that Defendants simply did not know how mDAU was calculated, including that almost a third of mDAU were unmonetized and that a material portion consisted of accounts Twitter had already determined were fake or spam.

---

[44] After Twitter introduced mDAU, Defendants at times interchangeably referred to mDAU and DAU, particularly in earnings and analyst calls.

b) *Defendants Publicly Committed Themselves To An Ambitious mDAU Growth Target, Contributing to Scienter*

307. Defendants' public commitment to a goal of reaching 315 million mDAU by Q4 2023 contributes to a strong inference of scienter.

308. Defendants further emphasized the importance of mDAU total on February 25, 2021, when they announced "three goals we're holding ourselves accountable to in order to build a company you all believe in as much as we do," the second of which was reaching at least 315 million mDAU by Q4 2023. The purported mDAU growth they reported each quarter represented that Twitter was making steady progress towards that goal.

309. Further, Defendants' public commitment to that goal of reaching 315 million in mDAU gave them a strong motive not to exclude—as they claimed—identified fake, spam, and bot accounts from mDAU.

c) *Defendants Dorsey and Segal Oversaw the Adoption of mDAU, Contributing to Scienter*

310. Defendants Segal and Dorsey were responsible for the decision to develop and adopt mDAU, a proprietary metric exclusive to Twitter, as Twitter's primary "key metric" in 2019. At that time, Defendant Dorsey was CEO and Defendant Segal was CFO, and they introduced and described mDAU to investors as the "key" metric of users that saw ads. Because they invented and introduced mDAU, it is absurd to suggest that Dorsey and Segal did not know how it was measured.

d) *Segal's June 30, 2022 admission that Twitter included bots and spam in mDAU establishes that his Class Period statements were made with scienter*

311. On April 14, 2022, Musk made an offer to buy Twitter for $54.20/share which Twitter's Board accepted on April 25. Three days later, Twitter restated its mDAU for Q4 2020 and each quarter of 2021, acknowledging that it had double counted millions of users.

312. Musk privately requested that Twitter explain to him how it counted bots and spam accounts in mDAU. Twitter attempted to do so in a May 6, 2022 meeting at Twitter's headquarters. Defendant Segal attended in person. Defendant Agrawal joined the meeting remotely.

313. On Monday May 9, 2022, Musk texted the investment banker who was advising him on his acquisition of Twitter:

> An extremely fundamental due diligence item is understanding exactly how Twitter confirms that 95% of their daily active users are both real people and not double-counted. They couldn't answer that on Friday, which is insane… To be super clear, this deal moves forward if it passes due diligence, but obviously not if there are massive gaping issues.

314. Musk made several more requests that Twitter explain how it identified such accounts and justify its count.

315. On June 30, 2022, Defendant Segal admitted during a call with Musk and/or his representatives that the quarterly mDAU that Twitter regularly reported to investors included accounts that Twitter has already determined were fake.

316. On that call, Segal speculated that the approach might be justified because it might be that the suspended accounts were not engaged in false or spam behavior before their suspension. Segal's speculation establishes both that (a) Twitter understood that accounts that are actually engaged in spam or bot behavior never should have been included in mDAU in the first place, and (b) at best, Twitter did not know the reason it had suspended the millions of accounts that Defendants nonetheless recklessly included in mDAU. In truth, Twitter has publicly admitted that "[m]ost of the accounts we suspend are suspended because they are spammy, or just plain fake[.]"[45]

317. Segal's admission raises a strong inference of scienter as to statements made before June 30, 2022. First, he made the misrepresentations in the context of Musk's offer

---

[45] https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts

to purchase Twitter. Musk had been requesting clarifications concerning mDAU since April 28, 2022, or shortly thereafter, and had made his focus on bots known when he submitted his acquisition offer and even earlier. Thus, Segal knew of the statement's falsity on May 2, 2022, when he signed Twitter's 2021 10-Q.

318. Second, Segal's admission makes clear that Twitter had consciously enacted a practice of recognizing bots or spam as mDAU in the quarter in which they were banned. That practice directly contradicted Segal's specific statements to the contrary. Because mDAU was Twitter's most important metric, it is absurd to suggest that Segal did not know of the practice.

e) *Beykpour's Scienter Can Be Imputed to Twitter*

319. The scienter of Kayvon Beykpour, Twitter's then-Product Lead, can be imputed to Twitter.

320. Beykpour was the senior Twitter executive with primary responsibility for growing mDAU. Zatko reported that the senior executive "with primary responsibility for growing mDAU" proposed that Twitter disable one of its most effective anti-spam tool out of concern that it could depress mDAU, despite the tool catching a remarkably small amount (under 1%) of false positives. In an August 23, 2022 article, *The Washington Post* reported that the executive was Beykpour, citing three Twitter employees with knowledge.

321. Given Beykpour's role, he necessarily was involved in providing and checking information concerning mDAU growth for external disclosure. It is absurd to suggest that Beykpour did not know how mDAU was measured because he was the executive tasked with growing it. Thus, Beykpour's scienter can be imputed to Twitter for unattributed statements made in documents that Twitter disseminated to the market.

## VI. LOSS CAUSATION

322. Defendants' false statements artificially inflated the price of Twitter's stock. Beginning in May 2022, a series of revelations dissipated the artificial inflation.

323. During the Class Period, Defendants repeatedly and emphatically represented that mDAU—purportedly Twitter's most important metric—was growing, reflecting real users that were monetized and monetizable, and that Twitter removed bot, fake, and spam accounts (always less than 5% of mDAU, Defendants touted) were removed from mDAU once identified as such.

324. On May 13, 2022, before the market opened, Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Musk's tweet linked to a Reuters article reporting that Twitter, in its Q2 2022 10-Q filed on May 2, 2022, had "estimated . . . that false or spam accounts represented fewer than 5% of its monetizable daily active users during the first quarter."

325. Musk's May 13 decision to put the deal on hold and his communication thereof were the materializations of the risks concealed by Defendants' false statements concerning mDAU. Just a week earlier, on May 6, Musk and Twitter held a call to discuss the proportion of mDAU that were bots. On that call, Twitter was, according to a text Musk sent his banker on May 9, unable to explain how Twitter confirms that 95% of its daily active users are both real people and not double-counted. Twitter may have been unwilling, rather than unable, to explain. Among other things, it was not true that less than 5% of mDAU were fake or double-counted because Twitter continued to count accounts as mDAU even after it had determined the accounts were fake and suspended them. Further, almost a third of mDAU were not monetized. Thus, Musk put the deal on hold when he learned facts suggesting that Defendants' statements may have been false. The ensuing stock price decline results from Defendants' misstatements.

326. Musk's May 13 Tweet was also a partial corrective disclosure that Defendants' statements were false. A reasonable investor would assume (correctly) that Musk had discussed mDAU with Twitter before publicly disclosing that the deal was on hold because Defendants' statements on the subject may have been false. That Twitter

could not provide support for its claim that 95% of mDAU were real and not double-counted suggested to investors that the claim was not true.

327. On May 13, 2022, Twitter's stock price closed at $40.72, down 9.7% ($4.36) from its previous close.

328. Then, on May 16, 2022, the next trading day, the price of Twitter's stock price closed at $37.39, down another 8.18% ($3.33).

329. On July 7, 2022, after close of trading, *The Washington Post* reported that Musk's agreement to acquire Twitter was "in peril." The *Post* reported, based on three anonymous sources with knowledge, that Musk and his team concluded that they could not verify Twitter's claims regarding fake and spam accounts, were prepared to make "a change in direction," and had "stopped engaging in certain discussions around funding" for the acquisition.

330. After the market closed on July 8, 2022, Twitter publicly filed with the SEC a letter it had received from Musk's counsel. The letter showed that the *Post* report was true and that Musk withdrew, in part, because he learned that Defendants' statements had been false. In the letter, Musk's counsel stated that he was cancelling the deal in part because Twitter "appears to have made false and misleading representations upon which Mr. Musk relied when entering into the Merger Agreement[.]"[46] The letter identified one of these misleading representations: Defendants' statement that "[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics." As to that representation, the letter stated that "we understand, based on Twitter's representations during a June 30, 2022 call with us, that Twitter includes accounts that have been suspended—and thus are known to be fake or spam—in its quarterly mDAU count even when it is aware that the suspended accounts were included in mDAU for that quarter."

---

[46] *See* https://www.sec.gov/Archives/edgar/data/1418091/000110465922078413/tm2220599d1_ex99-p.htm.

331. On July 8, 2022, the price of Twitter's stock closed at $36.81, down 5.1% ($1.98) from its previous close. The stock price decline was based on the true report that Musk was cancelling the deal, which was itself caused by Musk's discovery that the specific statements complained of herein were false.

332. The price of Twitter's stock closed down another 11.3% ($4.16), the next trading day, July 11.. The decline is both the materialization of the risk Defendants' false statements concealed and the correction of these false statements.

333. On August 23, 2022, the August 23 *Post* Article publicly reported, for the first time, Zatko's whistleblower disclosures to Congress and federal agencies. The *Post* published a partially redacted version of Zatko's whistleblower complaint as well as two internal Twitter documents attached as exhibits thereto. The *Post* story and the documents revealed that:

a. Twitter kept user personal information in large unmanaged data pools whose contents it did not monitor. Despite its promises, it could not ensure that it deleted users' information after they deleted their account. It had misled the FTC on the subject. Nor could it ensure it had addressed Log4j; up to 10,000 instances could remain. During the Class Period, it had continued to mishandle personal information in advertising campaigns, exactly what led to the 2011 and 2021 FTC settlements. It could not ensure it would not do so again.

b. Twitter's servers' operating systems and employees' devices were out-of-date and/or no longer supported, and potentially compromised.

c. Twitter had no separate testing environment and all its engineers, among others, had plenary access to all its data and source code. Twitter did not log access within its network.

d. In 2020 alone, Twitter experienced 20 data breaches involving the data of more than 20,000 employees/contractors and 200 million users. Twitter also experienced an additional 20 incidents.

e. Twitter knowingly employed Indian government spies. Twitter internally acknowledged that the governments of both India and China are likely using Twitter to crack down on dissidents. Twitter became aware in late 2021 or early 2022 that another foreign intelligence agency had managed to place spies on Twitter's payroll (later revealed to be China). Any spies had access to plenary user data because of Twitter's poor access control and logging. Twitter employees had deliberately installed malware at the request of outside organizations.

f. Twitter was far out of compliance with the FTC Consent Order.

g. Defendants had attempted to prevent Zatko from providing information to the Board, and Agrawal fired him for blowing the whistle after Agrawal conspired to mislead Twitter's Board.

334. The *Post* also published the Alethea Report and disclosed that Defendants had suppressed it internally. The *Post* also included comments by cybersecurity experts expressing astonishment at Twitter's deficiencies, some of which are quoted in ¶ 77, above.

335. Finally, the *Post* reported that Zatko had filed another report with the Senate Select Committee on Intelligence. The report to the Senate Select Committee stated, among other things, that Twitter had knowingly concealed a foreign state influence campaign launched by the government of India. The *Post* cited Senate Select Committee spokeswoman Rachel Cohen as saying that the committee was trying to set up a meeting with Zatko to discuss the complaint in detail.

336. The August 23 *Post* Article also quoted Senate Select Committee on Intelligence Ranking Member Marco Rubio as saying "Twitter has a long track record of

making really bad decisions on everything from censorship to security practices. That's a huge concern given the company's ability to influence the national discourse and global events." An article published by NBC during trading hours on August 23 quoted Senate Select Committee on Intelligence Marco Rubio as saying that "we're treating the complaint with the seriousness it deserves and look forward to learning more."

337. On August 23, 2022, Twitter's stock price closed at $39.86, down 7.3% ($3.15), from its previous close.

338. Twitter investors did not have to wait long to see governments respond. The next day, on August 24, 2022, the Senate Judiciary Committee announced "a full Committee hearing to investigate allegations of widespread security failures at Twitter and foreign state actor interference on Tuesday, September 13 at 10am." That same day, the data privacy authorities for both Ireland and France confirmed they were investigating Zatko's allegations. In connection with Zatko's testimony, the Senate Judiciary Committee made public dozens of internal Twitter documents attached to Zatko's whistleblower report, which confirm the truth of Zatko's claims. In December 2022, *Bloomberg* reported that the FTC had intensified an investigation of Twitter that had begun in Q3 2022, very close in time to Zatko's revelations.

339. Twitter sued Musk to force him to complete the acquisition. After obtaining information and discovery, Musk filed counterclaims against Twitter. In the course of that litigation, internal documents and data from Twitter were made public, which corroborated the corrective disclosures that occurred during the Class Period and provided further evidence that Defendants' Class Period statements were false and misleading.

340. Though Musk completed the buyout, Twitter is still living with the legacies of the violations Zatko revealed—including an ongoing FTC investigation (coming mere months after Twitter and the FTC signed a $150 million settlement) and two investigations by foreign government agencies.

# VII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

## A. Defendants' Suppression of Zatko's Attempts to Blow the Whistle Supports Scienter

### 1. *Defendants freeze Zatko out for expressing concerns about Twitter's cybersecurity*

341. Zatko was hired to oversee Twitter's cybersecurity, the physical security of its offices and employees, and platform health. Yet when he raised alarms about subjects that fell within his job responsibilities, Defendants froze him out. Eventually, in January 2022, Defendants fired him.

342. As set out above (¶¶ 58-64), Zatko delivered to Defendants the February 2021 Presentation that listed Twitter's alarming cybersecurity failings. Defendant Zatko had expected to provide a written report to the Board. Yet Twitter's Head of Legal, Policy, and Trust, told Zatko through a subordinate not to send Twitter's Board a detailed written report, but instead to convey his findings orally and only at a high level of generality.

343. In May 2021, Zatko reported to the Risk Committee that Twitter had only a template Software Development Life Cycle ("**SDLC)** and that it was used on only 8-12% of projects. This was an important deficiency because, among other things, SDLCs ensure that privacy and security are taken into account in software design. The facts Zatko disclosed incensed Board Chair Patrick Pichette, who exclaimed that Twitter executives had told him for years that "the [SDLC] effort was getting closer to being complete." But soon after Zatko's report to the Risk Committee, a Twitter executive called Zatko and stated that the executive and Agrawal were upset with Zatko over the information that he had presented to the Risk Committee.

344. In late 2020 or early 2021, Zatko hired social media disinformation response firm Alethea to evaluate Twitter's Site Integrity programs. In or around May or June 2021, Alethea delivered to Zatko the devastating Alethea Report The substance of the report is further alleged at ¶¶ 249-54, above.

345. As set out above, *see* ¶ 255, senior executives ordered that Alethea run its report by an outside counsel before handing it to Zatko to cut him out of the loop. Because Zatko was Twitter's head of security and reported directly to Twitter CEO Defendant Dorsey, there are very few executives who could countermand his directives.

346. On or around August 13, 2021, Zatko notified Agrawal that the login system for Twitter's engineers was registering, on average, between 1,500 and 3,000 failed logins a day.

347. A failed login is recorded when a person gets his or her username or password wrong when attempting to log in. According to Brien Posey, former CIO for a national chain of hospitals, "[o]ne of the first security best practices Windows administrators learn is to audit failed login attempts."[47] Failed logins can occur when legitimate users forget their password. But they can also be a sign that outsiders are trying to guess passwords to log into Twitter's systems.

348. Twitter employed approximately 4,000 engineers as of the end of 2021. It is questionable that every day one to two thirds of its engineers made a mistake in entering their password. The high number of failed logins was a red flag that hackers may be targeting Twitter.

349. At a minimum, the FTC Consent Order's direction that Twitter "monitor[] the effectiveness of the safeguards' key controls" required that it investigate the logins to determine whether they were hacking attempts.[48]

350. Accordingly, Zatko asked Agrawal to assign someone to diagnose why this was happening and, if it was because of misconduct, fix it. Yet Agrawal never assigned

---

[47] https://www.itprotoday.com/data-security-and-encryption/how-gain-insight-failed-login-attempts-windows#close-modal

[48] *See, e.g.*, Justin Massey and Maxim Brown, *Best practices for monitoring authentication logs* (available at https://www.datadoghq.com/blog/how-to-monitor-authentication-logs/); *see also* Crowdstrike, *Credential Stuffing* (available at https://www.crowdstrike.com/cybersecurity-101/credential-stuffing/).

anyone at all to the project. Agrawal did not even attempt to determine how frequently Twitter would expect to experience failed logins.

351. Similarly, Zatko's requests that Twitter executives act on their concerns about Indian government actions were ignored.

2. *Agrawal fires Zatko for blowing the whistle*

352. On November 29, 2021, Dorsey informed Twitter staff that he was stepping down as CEO, to be replaced by Agrawal.

353. In or about the first week of December 2021, a Twitter employee emailed Zatko a draft PowerPoint presentation and other materials that were to be distributed to the Board of Directors before its December 9 meeting ("**Misleading Materials**"). These materials would then form the basis for the presentation to the Board.

354. Zatko determined that the Misleading Materials contained false and misleading statements about the state of Twitter's information security and privacy.

355. Zatko immediately contacted Defendant Agrawal and other senior staff, seeking to correct the misinformation in the Misleading Materials and/or stop their delivery to the Board.

356. In his communications with Agrawal, Zatko flagged four broad problems, that were improperly omitted or presented in a misleading way:

a. Almost half of Twitter's employees' computers had critical flaws. *See* ¶¶ 124, 130, and 136, above.

b. Even more Twitter employees had plenary access to user data. *See* ¶¶ 61, 68, 78, and 124, above.

c. In 2021, Twitter experienced even more security incidents than in 2020. *See* ¶ 186, above.

d. SDLC (and related processes and compliance) was presented as largely completed, instead of still in the initial planning phases. *See* ¶ 343, above.

357. While those discussions were progressing, and to help provide more focus on privacy and security to Board members, Zatko substituted corrected summaries for the package sent to the full Board before December 9. Zatko told the Board that more details would be provided in the Board Risk Committee meeting on December 16, a week later.

358. In a call with Agrawal on or around December 12, Zatko conveyed his concerns about the upcoming Risk Committee meeting. Zatko told Agrawal that a senior employee in the company intended to present false and misleading materials to board members at Risk Committee meeting on December 16, 2021. Zatko offered to rewrite the Misleading Materials intended for the Risk Committee meeting to ensure they were accurate and complete. Agrawal told Zatko not to correct the information and instead asked for time to look into this issue further.

359. Agrawal called back two days later. He told Zatko that the Misleading Materials as they stood would be presented to the Board Risk Committee on December 16, despite Zatko's informing Agrawal that the statements made therein were materially misleading.

360. On this second call, Zatko again offered to create corrected materials, but Agrawal told Zatko not to do so. Agrawal instructed Zatko to, instead, send the Misleading Materials, unchanged, to the Risk Committee, and then correct the inaccuracies presented to the Risk Committee in real time and without accurate written materials. Agrawal promised that he would personally call the members of the Committee after the fact to help ensure they were not misled by the Misleading Materials, if Zatko so requested.

361. The Risk Committee received the Misleading Materials before the meeting, and the senior Twitter employee conveyed the same misleading information in a verbal briefing during the main part of the meeting on December 16. During the meeting, Twitter's Chief Privacy Officer, Defendant Kieran, and Distinguished Privacy Engineer sent written unprompted Slack messages stating that the presentations' statements concerning access control were "not accurate" because they only referenced one subset of

the problem, which was "wildly different from overall." As to statements concerning how many laptops were secure, they stated that "this is 'how many have endpoint software' not how many are in a good state." Thus, these senior employees echoed Zatko's concerns.

362. Following Agrawal's instructions, Zatko tried to use his 2-minute time slot to correct the misleading information provided. Soon after, Zatko emailed Agrawal to accept his prior offer to personally reach out to the board members to correct any remaining misstatements.

363. Agrawal reneged on his promise, telling Zatko he was "disappointed in him."

364. On January 4, 2022, unable to get Agrawal to meet or talk about the topic, Zatko sent an email to him describing the December 16 meeting as "at worst fraudulent." The email was sent to, among others, Twitter General Counsel Sean Edgett.

365. Following Zatko's reference to "fraud," Twitter's Chief Compliance Officer initiated an internal investigation and interviewed Zatko on January 11, 2022. The compliance team agreed that the information delivered to the Risk Committee at its December 16 meeting was inappropriate and inaccurate and that Zatko should write a report correcting the misrepresentations.

366. On January 18, at 11:16am, following a request from Twitter's Chief Compliance Officer, Zatko confirmed in writing that he planned to provide corrected materials for the Board "by the end of this week" (January 21) as part of the fraud investigation. Less than two hours later, Agrawal emailed Zatko, and surprised him with a request for a telephonic meeting 45 minutes later with himself and Omid Kordestani, Chair of Twitter's Risk Committee.

367. During the meeting, Agrawal falsely stated he had been waiting for over a month for Zatko to produce corrective materials, though he had told Zatko not to produce such materials. When Zatko attempted to correct this false statement, Kordestani interrupted and refused to let Zatko continue.

368. Agrawal then terminated Zatko on the morning of January 19, 2022.

**B. Zatko Kept Agrawal Abreast of Deficiencies.**

369. Zatko kept Defendants abreast of Twitter's cybersecurity deficiencies. Beginning in mid-2021, Zatko initiated bi-weekly one-on-one meetings with Agrawal. Zatko used these meetings to, among other things, flag cybersecurity issues.

**C. Zatko Becomes a Whistleblower and Other Insiders Corroborate His Account.**

370. In June 2022, Twitter paid Zatko $7.75 million to settle his claims of unlawful termination, or more than the total cash compensation it paid to its six named executive officers in 2021.

371. On August 24, the Senate Judiciary Committee announced that it had arranged for Zatko to testify at a hearing that would take place on September 13, just three weeks later. In short order, two more foreign regulators announced that they were investigating Twitter. The FTC also started an investigation, which is ongoing.

372. The August 23 *Post* Article reported that several current and former employees corroborated Zatko's account that "past reports to various privacy regulators were 'misleading at best.'" These employees stated that Twitter "implied that it had destroyed all data on users who asked, but the material had spread so widely inside Twitter's networks, it was impossible to know for sure."

373. On August 23, 2022, Al Sutton, CTO at Snapp Automotive, who had worked at Twitter from August 2020 through February 2021, tweeted that "[i]f you are wondering if the stuff about Twitter security being lapse is just one person complaining, you might be interested to know that, 18 months after being let go from the company, I've not been removed from their employees GitHub commiters group."

374. On July 21, 2022, Restore Privacy reported in a blog post that a hacker was offering a database of 5.4 million Twitter users' emails for sale. Restore Privacy reported that the hackers used a vulnerability that had been exposed in January 2022. On August 5, 2022, Twitter confirmed the hack, admitting that the press report was the first time it

learned that anyone had actually accessed the data. Twitter promised to notify account holders. Then, on January 4, 2023, *The Washington Post* reported that hackers had posted records of 235 million Twitter accounts and the email addresses used to register them on a hacking forum, all obtained from the original hack.

375. On March 24, 2023, following yet another leak (this time, of its source code), Twitter filed a miscellaneous action for the issuance of a subpoena in the U.S. District Court for the Northern District of California. The purpose of the subpoena was to identify the person who had leaked Twitter's source code to the internet. On March 26, 2023, *The New York Times* reported based on discussions with two employees that Twitter "surmised" whoever stole the source code must have left Twitter in the mass firings in late 2022.[49]

376. By seeking a subpoena to identify the leaker and making it clear to the *Times* that Twitter could only guess at the person involved, Twitter confirmed that it still did not log internal access nor even exfiltration of data.

## VIII. PRESUMPTION OF RELIANCE

377. To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. the Company's securities traded in an efficient market;

d. the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's publicly traded securities;

---

[49] Ryan Mac and Kate Conger, *Twitter Says Parts of Its Source Code Were Leaked Online*, THE NEW YORK TIMES, March 26, 2023 (available at https://www.nytimes.com/2023/03/26/technology/twitter-source-code-leak.html).

e. Plaintiffs and other members of the Class purchased Twitter's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

f. Twitter's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

g. as a regulated issuer, Twitter filed periodic public reports with the SEC and the NYSE;

h. Twitter regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

i. Twitter was followed by many securities analysts employed by major brokerage firms, including JPMorgan Chase & Co., Guggenheim Securities, LLC, Wells Fargo & Company, Jefferies LLC, Piper Sandler & Co., JMP Securities LLC, Cowen and Company, LLC, Wedbush Securities, Morgan Stanley & Co. LLC, Barclays Bank PLC, UBS AG, Oppenheimer & Co. Inc., BMO Financial Group, and Deutsche Bank AG, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

378. As a result of the foregoing, the market for Twitter's publicly traded securities promptly digested current information regarding Twitter from publicly available sources and reflected such information in the price of Twitter's publicly traded securities. Under these circumstances, all persons and entities who or which purchased or otherwise acquired Twitter's publicly traded securities during the Class Period suffered similar

injuries through their purchase of Twitter's publicly traded securities at artificially inflated prices and thus, the presumption of reliance applies.

379. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Twitter's publicly traded securities.

380. Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of Twitter's publicly traded securities between the time Defendants misrepresented or failed to disclose material facts, or concealed material risks, and the time the true facts were disclosed, or the time such risks materialized.

381. To the extent that Defendants concealed or improperly failed to disclose material facts regarding Twitter, Plaintiffs and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

382. The protections applicable to forward-looking statements under certain circumstances, including the statutory safe harbor provided by the PSLRA, do not apply to any of the false or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made.

383. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such

statement was approved by an executive officer of Twitter who knew that the statement was untrue or misleading when made.

## X. CLASS ACTION ALLEGATIONS

384. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all persons or entities all persons and entities who purchased or acquired publicly traded securities of Twitter from August 3, 2020 through August 23, 2022, both dates inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Twitter during the Class Period; (iv) any entity in which any Defendant has or had a controlling interest; (v) affiliates of Twitter; and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph, in their capacities as such.

385. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Company's common stock was actively traded on the NYSE, and its other publicly traded securities traded actively. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the Class and that such members are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Twitter or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

386. Plaintiffs' claims are typical of the claims of members of the Class. All members of the Class were similarly affected by Defendants' wrongful conduct as complained of herein.

387. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

388. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether the federal securities laws were violated by Defendants as alleged herein;

b. Whether the statements made to the investing public during the Class Period contained material misrepresentations;

c. Whether Defendants omitted material facts that they had a duty to disclose;

d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e. Whether Defendants acted with the intent to defraud Class members regarding the true value of Twitter's publicly traded securities;

f. Whether the Individual Defendants were controlling persons of Twitter; and

g. Whether and to what extent members of the proposed Class suffered losses due to the acts and omissions alleged herein.

389. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation may make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. COUNTS

### COUNT I

### (Violations of Section 10(b) of the Exchange Act, and Rule 10b-5 Thereunder, Against Defendants)

390. This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, against all Defendants.

391. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the price of Twitter's publicly traded securities; and (iii) cause Plaintiffs and members of the Class to purchase Twitter's publicly traded securities at artificially inflated prices.

392. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

393. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Twitter's publicly traded securities during the Class Period.

394. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Twitter's publicly traded securities, Plaintiffs and other members of the Class purchased Twitter's publicly traded securities at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Twitter's publicly traded securities at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Twitter's publicly traded securities declined precipitously, and Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Twitter's publicly traded securities at artificially inflated prices and the subsequent decline in the price of that security when the truth was disclosed.

395. By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

396. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

397. The Individual Defendants had control over Twitter and made the materially false and misleading statements and omissions on behalf of Twitter within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their leadership positions, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements

were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

398. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

399. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representative, and appointing Plaintiffs' counsel as Counsel for the Class;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including prejudgment and post-judgment interest, as allowed by law;

C. Awarding Plaintiffs and the Class their reasonable attorneys' fees, expert fees, and other costs incurred in this action; and

D. Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: September 15, 2023

Respectfully submitted,

POMERANTZ LLP

By: s/ Jonathan D. Park

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jonathan Horne (*pro hac vice*)
Brian B. Alexander (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
jhorne@rosenlegal.com

*Counsel for Court-Appointed Lead Plaintiff William Baker, Additional Plaintiffs Lenard Roque and Amolkumar Vaidya, and Co-Lead Counsel for the Class*

**POMERANTZ LLP**

Jeremy A. Lieberman (*pro hac vice* forthcoming)
Jonathan D. Park (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
jpark@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (212) 661-8665
jpafiti@pomlaw.com

*Counsel for Court-Appointed Lead Plaintiff William Baker, Additional Plaintiff Jill Sligay, and Co-Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel*

# APPENDIX A

## Twitter's Class Period Reports on Forms 10-Q and 10-K

| Date Filed | Report | Defendant Signatories | Persons Certifying As True Pursuant to the Sarbanes-Oxley Act of 2002 |
|---|---|---|---|
| August 3, 2020 | Report on Form 10-Q for the quarterly period ended June 30, 2020 | Dorsey<br>Segal | Dorsey<br>Segal |
| October 30, 2020 | Report on Form 10-Q for the quarterly period ended September 30, 2020 | Dorsey<br>Segal | Dorsey<br>Segal |
| February 17, 2021 | Report on Form 10-K for the fiscal year ended December 31, 2020 | Dorsey<br>Segal | Dorsey<br>Segal |
| April 30, 2021 | Report on Form 10-Q for the quarterly period ended March 30, 2021 | Dorsey<br>Segal | Dorsey<br>Segal |
| July 27, 2021 | Report on Form 10-Q for the quarterly period ended June 30, 2021 | Dorsey<br>Segal | Dorsey<br>Segal |
| October 27, 2021 | Report on Form 10-Q for the quarterly period ended September 30, 2021 | Dorsey<br>Segal | Dorsey<br>Segal |
| February 16, 2022* | Report on Form 10-K for the fiscal year ended December 31, 2021 | Agrawal<br>Segal<br>Dorsey | Agrawal<br>Segal |
| May 2, 2022* | Report on Form 10-Q for the quarterly period ended March 30, 2022 | Agrawal<br>Segal | Agrawal<br>Segal |
| July 26, 2022* | Report on Form 10-Q for the quarterly period ended June 30, 2022 | Agrawal<br>Segal | Agrawal<br>Segal |

* These three reports were incorporated by reference into the definitive proxy statement on Schedule 14A that Twitter filed on July 26, 2022 ("Proxy Statement"). Thus, the statements contained in those three reports were made anew in the Proxy Statement.