David L. Anderson (SBN 149604)
dlanderson@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

*Attorneys for Defendants Parag Agrawal and Ned Segal*

Additional Counsel on Signature Page

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| WILLIAM BAKER, et al., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC., et al., <br><br> Defendants. | Case No. 2:22-cv-06525-MCS-E <br><br> **DEFENDANTS JACK DORSEY, PARAG AGRAWAL, AND NED SEGAL'S NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT; JOINDER AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> *[Filed concurrently with Declaration of Jaime A. Bartlett; Request for Judicial Notice; and [Proposed] Orders and Defendant Twitter, Inc.'s Notice of Motion and Motion to Dismiss; Memorandum of Points and Authorities; Declaration of Whitney B. Weber; Request for Judicial Notice; and [Proposed] Orders]* <br><br> Judge: Hon. Mark C. Scarsi <br><br> Hearing Date: January 22, 2024 <br> Hearing Time: 9:00 a.m. <br> Location: Courtroom 7C |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Please take notice that on January 22, 2024, at 9:00 a.m., Defendants Jack Dorsey, Parag Agrawal, and Ned Segal (collectively "Individual Defendants") bring for hearing this motion to dismiss, before the Honorable Mark C. Scarsi, First Street Courthouse, Courtroom 7C, 7th Floor, 350 W. 1st Street, Los Angeles, CA 90012. Individual Defendants move to dismiss the claims asserted against them in the Third Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. 130), filed by Plaintiffs William Baker, Jill Sligay, Lenard Roque, and Amolkumar Vaidya (collectively "Plaintiffs") pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(6).

As set forth in the attached joinder and memorandum of points and authorities, the Individual Defendants seek an order that dismisses with prejudice all claims asserted against them for failure to state a claim on which relief may be granted.

This motion is based on this notice of motion and motion, the attached joinder and memorandum of points and authorities, the declaration of Jaime A. Bartlett and accompanying exhibits, the Individual Defendants' request for judicial notice, the notice of motion and motion to dismiss filed by Twitter, Inc. and the memorandum of points and authorities in support thereof (the "Company Brief"), the declaration of Whitney B. Weber and accompanying exhibits, Twitter's request for judicial notice, the entire case files and records of this action, and such further argument as may be presented before or after the hearing on this matter, including through reply briefing.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on November 1, 2023.

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS; JOINDER AND MEMO. OF
P&A - CASE NO. 2:22-cv-06525-MCS-E

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    ALLEGATIONS ............................................................................................ 2

    A.    The Individual Defendants ................................................................. 2

    B.    User Engagement and mDAU ............................................................ 2

    C.    mDAU, Advertising, and Revenue ................................................... 4

    D.    mDAU Statements ............................................................................ 5

    E.    The Market Allegedly Learns the "Truth" About mDAU .................. 6

III.    DISCUSSION ............................................................................................... 7

    A.    Falsity ............................................................................................... 7

        1.    Statement 7 .......................................................................... 7

            a.    Defendants Did Not Represent that mDAU Only Included Users Who Saw Ads ............................... 8

            b.    Twitter Explained to the Market How mDAU Related to Revenue .............................................. 9

            c.    The Market Knew a Percentage of mDAU was Fake or Spam Accounts. .......................................... 10

        2.    Statement 8 .......................................................................... 11

    B.    Scienter ........................................................................................... 13

    C.    Plaintiffs Fail to Adequately Allege Loss Causation ........................ 15

        1.    The alleged corrective disclosures did not correct the alleged misstatements. ............................................. 15

            a.    Two of Plaintiffs' alleged corrective disclosures are unrelated to Statements 7 and 8. .............................................................................. 16

            b.    The third alleged corrective disclosure does not reveal any truth about the percentage of mDAU that are shown ads or generate revenue. ............................................................... 16

        2.    The alleged corrective disclosures are not statements of fact. ................................................................ 17

3.    There were no alleged corrective disclosures regarding mDAU after the 2Q 2022 10-Q............................. 19

4.    It is implausible that the stock drops were caused by the alleged mDAU corrective disclosures because the market did not react when Twitter restated average mDAU.......................................... 19

5.    Plaintiffs cannot plead a "materialization of the risk.".............................................................................. 20

D.    Plaintiffs Fail to Adequately Plead Their Section 20(a) Claim. ............................................................................. 21

IV.    CONCLUSION ................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ......................................................... 16, 17, 18, 19

*Brady v. Delta Energy & Commc'ns, Inc.*,
    2022 WL 3643659 (C.D. Cal. Aug. 5, 2022) ......................................................... 8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
    Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ......................................................... 21

*Jun Shi v. Ampio Pharms., Inc.*,
    2020 WL 5092910 (C.D. Cal. June 19, 2020) ......................................................... 14

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ......................................................... 19, 20

*Metzler Inv. GMBH v. Corinthian Coll., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ......................................................... 15

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ......................................................... 21

*In re Nektar Therapeutics Sec. Litig.*,
    34 F. 4th 828 (9th Cir. 2022) ......................................................... 18, 20

*Nguyen v. Endologix*,
    962 F.3d 405 (9th Cir. 2020) ......................................................... 21

*Oregon Pub. Emp. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ......................................................... 13

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ......................................................... 13

*Prodanova v. H.C Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ......................................................... 13

*Purple Mountain Tr. v. Wells Fargo & Co.*,
    432 F. Supp. 3d 1095 (N.D. Cal. 2020) ......................................................... 21

iii

*In re Questcor Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ......................................................21

*Restoration Robotics, Inc. Sec. Litig.*,
  417 F. Supp. 3d 1242 (N.D. Cal. 2019) ............................................................10

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ...............................................................................7

*Sgarlata v. PayPal Holdings, Inc.*,
  2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) ..................................................21

*Sylebra Capital Partners Master Fund Ltd. v. Everbridge, Inc.*,
  2023 WL 3549506 (C.D. Cal. May 9, 2023).....................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...........................................................................................13

**Statutes & Rules**

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act) ............... 1, 2, 21

15 U.S.C. § 78t(a) (Section 20(a) of the Securities Exchange Act)....................2, 21

15 U.S.C. § 78u-4(b)(1)..........................................................................................7

15 U.S.C. § 78u-4(b)(2)(A) ...................................................................................13

17 C.F.R. 240.10b-5 (SEC Rule 10b-5) ..............................................................1, 2

Fed. R. Civ. P. 9(b).................................................................................................7

# JOINDER AND MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs are now on their Third Amended Complaint ("TAC"), a more than four-hundred paragraph tome that nevertheless fails to adequately plead that any Individual Defendant made a false or misleading statement in violation of Section 10(b) and Rule 10b-5 of the Exchange Act. Indeed, the deficiencies in Plaintiffs' claims are more apparent in their third try than in their first. Twitter's Motion to Dismiss (in which the Individual Defendants join), sets forth the myriad deficiencies in Plaintiffs' allegations concerning TAC Statements 1 through 6. With respect to TAC Statement 7 (¶¶ 262-280) & 8 (¶ 301), which concern mDAU—a metric reporting on monetizable daily active users—Plaintiffs' allegations are inadequate for at least the following reasons:

*First*, Plaintiffs allege no facts supporting their contention that either Statement 7 or Statement 8 was false or misleading. Twitter disclosed what users were counted as mDAU—those who accessed the platform through twitter.com or other applications able to show ads. Twitter disclosed how it calculated the average mDAU and mDAU growth and how those metrics related to revenue. Twitter explained efforts to remove fake accounts from the platform and its mDAU count, and acknowledged that mDAU at any given time included some number of not-yet identified fake accounts.

*Second*, Plaintiffs allege no facts from which scienter can be inferred. Plaintiffs also do not meet the high bar for pleading scienter with their general assertions that mDAU constituted a core operation of Twitter.

*Third*, Plaintiffs once again fail to allege any corrective disclosure demonstrating a loss caused by either Statement 7 or Statement 8. Plaintiffs' alleged corrective disclosures do not reveal a truth purportedly withheld by either statement. And, these alleged corrective disclosures would not have been understood by the

market as disclosing a true fact because they were made by or at the direction of Elon Musk in his attempt to walk away from his commitment to acquire Twitter.

In addition to their failure to plead a viable underlying 10(b) claim against the Individual Defendants, Plaintiffs have failed to adequately plead their 20(a) claim—their conclusory assertion that Individual Defendants exercised control over the statements that they did not themselves make is insufficient under the law.

Plaintiffs' claims under Section 10(b) and Rule 10b-5, and Section 20(a) of the Exchange Act should be dismissed with prejudice for the reasons stated herein and in the Company Brief.

## II.      ALLEGATIONS

### A.      The Individual Defendants

The Individual Defendants are former executives of Twitter. Jack Dorsey co-founded Twitter and twice served as Twitter's CEO, including from before the beginning of the Class Period until November 2021. ¶ 27.[1] Parag Agrawal began working at Twitter as an engineer in 2011, and became Chief Technology Officer in 2017 and then CEO in 2021, after Dorsey's resignation. ¶ 28. Ned Segal served as Twitter's CFO starting in August 2017. ¶ 29.

Dorsey resigned as CEO from Twitter in November 2021. ¶ 27. Agrawal and Segal continued to serve in their roles until October 2022, when Elon Musk acquired Twitter, after which they separated from the company. ¶¶ 28-29.

### B.      User Engagement and mDAU

Twitter is a global platform for public self-expression and conversation in real time. People can access the Twitter platform through multiple user-facing entry points (*e.g.*, via its website twitter.com, or via different applications installed on devices).

---

[1] All cites to "¶" refer to paragraphs in the TAC.

In 2016, Twitter began evaluating user engagement with a daily metric that included only "people, organizations, or other accounts who logged in or were otherwise authenticated and accessed Twitter on any given day through twitter.com or Twitter applications ***that are able to show ads***" (emphasis added). Ex. 4 at 5.[2] Twitter would later describe this as "***monetizable***" daily active users (or mDAU) and contrasted this metric with the metric used pre-2016, which counted users who accessed the platform through entry-points that could not display advertisements (such as via text message links). Ex. A at 1 (emphasis added).

From 2016 to 2019, Twitter publicly reported its percentage growth in mDAU (until 2019, referred to as DAU). Starting in 2019, Twitter additionally disclosed "the absolute number of average mDAU." *Id.* at 3. Twitter disclosed that average mDAU represented the number of mDAU on each day of a period divided by the number of days for that period. *Id.* at 10. During the Class Period, Twitter reported both the absolute number of average mDAU and mDAU growth, and included a consistent explanation for its calculation in each periodic SEC filing. ¶ 262; *see, e.g.*, Ex. 4 at 5.[3] Twitter consistently cautioned:

> ***While these numbers are based on what we believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in measuring usage and engagement across our large number of total accounts around the world.*** Furthermore, our metrics may be impacted by our information quality efforts, which are our overall efforts to reduce malicious activity on the service, inclusive of spam, malicious automation, and fake accounts. For example, there are a number of false or spam accounts in existence on our platform. We have performed an internal review of a sample of accounts and

[2]  Exs. 4 and 13 are attached to the Declaration of Whitney B. Weber in Support of Twitter's Motion to Dismiss the TAC. Ex. A-G are attached to the Declaration of Jaime A. Bartlett in Support of this motion. All exhibits are judicially noticeable for the reasons stated in the Requests for Judicial Notice also filed concurrently with Defendants' motions.

[3]  Ex. 4 is cited in this motion as an example of Twitter's disclosures, which are repeated in each periodic SEC filing during the class period.

estimate that the average of false or spam accounts during the second quarter of 2020 represented fewer than 5% of our mDAU during the quarter. The false or spam accounts for a period represents the average of false or spam accounts in the samples during each monthly analysis period during the quarter. In making this determination, we applied significant judgment, so *our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated. We are continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU*, and have made improvements in our spam detection capabilities that have resulted in the suspension of a large number of spam, malicious automation, and fake accounts. We intend to continue to make such improvements. *After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics.*

*Id.* (emphasis added).

### C.    mDAU, Advertising, and Revenue

Twitter generated revenue primarily through advertising. During the Class Period, Twitter reported its advertising revenue in each periodic SEC filing. Ex. 4 at 30. Twitter also reported on "ad engagement" and "cost per ad engagement" explaining: "Ad engagements with our advertising products are based on the completion of an objective set out by an advertiser such as expanding, Retweeting, liking or replying to a Promoted Tweet . . . We believe changes in ad engagements is one way to measure engagement with our advertising products." *Id.* at 33.

Twitter explained the interplay between mDAU, ad engagement, and revenue:

Our mDAU and their level of engagement with advertising are critical to our success and our long-term financial performance will continue to be significantly determined by our success in increasing the growth rate of our mDAU as well as the number of ad engagements. Our mDAU growth rate has fluctuated over time, and it may slow or decline. To the extent our mDAU growth rate slows or the absolute number of mDAU declines, our revenue growth will become dependent on our ability to increase levels of engagement on Twitter and increase revenue growth from third-party publishers' websites and applications,

data licensing and other offerings. We generate a substantial majority of our revenue based upon engagement with the ads that we display. A number of factors have affected and could potentially negatively affect mDAU growth and engagement.

*Id.* at 46. Twitter also explained that mDAU could increase even while revenue decreased:

> Our advertising revenue growth is primarily driven by increases in mDAU, increases in ad pricing or number of ads shown and increases in our clickthrough rate. Although we experienced increased mDAU and ad engagement growth since the start of the COVID-19 pandemic, we experienced a decline in revenue in the month of March and the second quarter of 2020 compared to the same period in 2019. . . . To date, however, our available advertising inventory has been greater than demand. Our future revenue growth, however, may be limited by available advertising inventory for specific ad types on certain days if we do not increase our mDAU or monetize our larger global audience."

*Id* at 47.

### D.    mDAU Statements

Plaintiffs challenge two types of statements made during the Class Period concerning mDAU:

**Statement 7.** Between July 2020 and July 2022, Twitter reported in its quarterly press releases and periodic SEC filings (a) the average mDAU for the given period and (b) the percentage increase in mDAU compared to the same period in the prior year. ¶¶ 263-280. In two quarters, Twitter stated that the mDAU increase was "driven by ongoing product improvements and global conversation around current events." ¶¶ 276, 280.

Plaintiffs contend that these statements were misleading because they created an "impression" that mDAU only included users who saw ads and generated revenue, (¶¶ 281, 285-286) when instead, Plaintiffs allege, "Twitter's mDAU included a material and increasing number of users who did not see ads or otherwise

contribute to revenues." ¶ 286. Plaintiffs further assert these statements were false or misleading because a "significant number of accounts included in mDAU were . . . fake or spam accounts" that had been suspended and/or could not be monetized. ¶ 295 (emphasis omitted).

*Statement 8*. In each periodic filing during the Class Period, Twitter stated "[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics." ¶ 301 (emphasis omitted).

Plaintiffs contend that these statements were misleading because fake or spam accounts were allegedly included in the average mDAU reported and the number of such accounts included in mDAU increased during the Class Period. ¶ 302.

**E. The Market Allegedly Learns the "Truth" About mDAU**

Plaintiffs allege that the market learned the "truth" regarding Statements 7 and 8 through the following tweets and communications by or about Musk leading up to his attempt to terminate his agreement to acquire Twitter (¶¶ 330-336):

- On May 13, 2022, Musk tweeted that his agreement to acquire Twitter was "on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" (¶ 330);

- A July 7, 2022 *Washington Post* article reporting that Musk's agreement to purchase Twitter was "in peril," based on anonymous sources purportedly with knowledge, who claimed Musk "could not verify Twitter's claims regarding fake and spam accounts" and that he was prepared to make "a change in direction," and had "'stopped engaging in certain discussions around funding' for the acquisition" (¶ 335); and

- Twitter's July 8, 2022 filing with the SEC of a letter from Musk's counsel stating that Musk was terminating the agreement, purportedly in part because Musk had not received sufficient information to independently assess the number of fake or spam accounts on the Twitter platform and that it had purportedly learned that Twitter included

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; JOINDER AND MEMO. OF P&A - CASE NO. 2:22-cv-06525-MSC-E

suspended accounts in its quarterly mDAU calculation. ¶ 336.

## III.   DISCUSSION

### A.   Falsity

Plaintiffs' claims are subject to the heightened pleading requirements of the PSLRA and Rule 9(b). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876-77 (9th Cir. 2012). To plead falsity, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)). Plaintiffs do not meet this standard with respect to either Statement 7 or 8.

### 1.   *Statement 7*

Plaintiffs do not allege that the specific mDAU averages or percentage growth disclosed each quarter were inaccurate as to the number of users who accessed Twitter through twitter.com or Twitter applications that are able to show ads.[4] Plaintiffs also do not allege facts disputing statements in certain quarters that the mDAU increase was "driven by ongoing product improvements and global conversation around current events." Rather, Plaintiffs contend these statements were misleading because they created an "impression" that mDAU only included users who saw ads and generated revenue. ¶ 281, 285-286. This contention is not supported by the allegations or judicially noticeable facts.

---

[4] On April 28, 2022, Twitter restated its mDAU for Q4 2020 and each quarter of 2021, due to inadvertent double-counting of certain users. This mDAU overstatement was immaterial and mDAU still had quarter over quarter growth; Plaintiffs do not allege any corresponding stock drop and do not allege any falsity with respect to Statement 7 based on this restatement. ¶ 317.

a.    Defendants Did Not Represent that mDAU Only
Included Users Who Saw Ads.

None of the challenged statements state that mDAU is a count of users who saw ads. To the contrary, Twitter explicitly defined mDAU in each periodic filing as the daily number of users who accessed the platform via **entry-points** "**that are able to show ads**." Ex. 4 at 5. This definition does not turn on whether or not users saw an ad; the definition turns on how users accessed the platform. The very name of the metric further reinforces that these were users who were "monetizable," not necessarily "monetized." *See Brady v. Delta Energy & Commc'ns, Inc.*, 2022 WL 3643659, at *5-6 (C.D. Cal. Aug. 5, 2022) (inferences of falsity did not "plausibly follow" from allegations).

Plaintiffs' theory that the market suffered a misleading "impression" is directly undermined by Defendants' Class Period disclosures. Necessarily, Plaintiffs look elsewhere—unsuccessfully—to support their attack on Statement 7. Plaintiffs quote a pre-Class Period letter to shareholders (which they do not challenge as false) in which Twitter stated "[o]ur mDAU are not comparable to current disclosures from other companies, many of whom share a more expansive metric that includes people who are not seeing ads." Ex. A at 3. But, Plaintiffs take this one sentence out of context—directly preceding it, Twitter defined mDAU, stating: "Monetizable DAU are Twitter users who log in and access Twitter on any given day through twitter.com or our Twitter applications that are able to show ads." *Id.* And even if this pre-Class Period statement about other companies' metrics did create ambiguity about mDAU in February 2019, it was not repeated in the periodic filings containing the challenged statements and Plaintiffs do not explain how the statements that they actually challenge (as opposed to this statement not at issue) misled investors.

The news articles that Plaintiffs selectively cite also do not support their argument that **Statement 7** created a misleading impression. Most of these articles predate Statement 7 and, thus, cannot be evidence of any impact Statement 7 had on

the market's understanding of mDAU. *See* ¶ 283. In addition, Plaintiffs' select quotes of casual language from a handful of publications does not demonstrate that Statement 7 gave the impression that Plaintiffs today attribute to it. For example, the 2019 *Fortune* Magazine article explains "an mDAU is a user who is accessing its service 'on any given day' and is able to be shown ads." Ex. B. *See also* Ex. C (describing mDAU as a metric created to measure "users [who are] exposed on a daily basis to advertising through the site or Twitter applications that are able to show ads."). In addition, the content of two of the three articles cited from the Class Period shows that those authors were relying on sources other than the Statement 7 disclosures. *See* Ex. D (discusses Twitter's projection for mDAU by Q4 2023); Ex. E (cites an mDAU projection heard during an internal Twitter meeting). For this reason, too, the cited articles are not evidence of any impression created by Statement 7.

b.    <u>Twitter Explained to the Market How mDAU Related to Revenue</u>.

Plaintiffs next allege Statement 7 is false or misleading because mDAU "included a material and increasing number of users who did not see ads or otherwise contribute to revenues." ¶ 286. As addressed directly above, mDAU was not a measure of ad views. It was also not a measure of revenue and Twitter gave the market a lot of other information concerning the relationship between mDAU, advertising, and revenue. Plaintiffs do not allege that the market was misled about any of these other disclosures.

*First*, mDAU was not the only metric that Twitter reported. Twitter reported its ad revenue and further explained: "our advertising revenue growth is primarily driven by increases in mDAU, increases in ad pricing or number of ads shown and increases in our clickthrough rate." Ex. 4 at 47. Twitter also disclosed percentage growth in "ad engagement" and "cost per ad engagement" explaining: "We believe changes in ad engagements is one way to measure engagement with our advertising

products. We believe changes in cost per ad engagement is one way to measure demand." *Id.* at 33.

*Second*, Twitter consistently disclosed that increases in mDAU could *and did* occur at the same time as decreases in revenue. *Id.* at 47 ("Although we experienced increased mDAU and ad engagement growth since the start of the COVID-19 pandemic, we experienced a decline in revenue . . ."). From these disclosures, the market had a clear picture of mDAU as only one component contributing to revenue and would have understood that not all mDAU contributed to revenue.

*Finally*, Plaintiffs' data purporting to show that a small number of users counted in mDAU were responsible for a disproportionate amount of revenue does not support their contention that Twitter's disclosure of average mDAU or mDAU growth were misleading. To the contrary, Plaintiffs' allegations confirm that approximately 70% of users counted in mDAU generated revenue. ¶ 287. And, Plaintiffs' cited data does not establish that the remaining 30% of users counted in mDAU were unable to generate revenue. The very allegation that revenue generated from mDAU fluctuated demonstrates these users were *monetizable*, if Twitter deployed effective strategies to do so over time. Plaintiffs' contention that Twitter was not succeeding in monetizing all of its mDAU is irrelevant to the veracity of its disclosure about the average number of users counted in mDAU and mDAU growth. *See* Dkt. 123 at 18 (quoting *Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1258 (N.D. Cal. 2019)) ("[A] PSLRA plaintiff is required to show 'falsity not inadequacy.'").

          c.     <u>The Market Knew a Percentage of mDAU was Fake or Spam Accounts</u>.

Plaintiffs contend that Statement 7 was misleading because a number of suspended fake or spam accounts were counted in mDAU. But, the market knew this fact, as the Court has already recognized. Dk. 123 at 18. Twitter disclosed: "there are a number of false or spam accounts in existence on our platform" Ex. 4 at 5. It

10

further disclosed its estimate that fake or spam accounts did not exceed 5% of mDAU, how it calculated that estimate, and cautioned "our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated." *Id.* Thus, the market was informed that every disclosure of average mDAU included fake accounts.

### 2. Statement 8

In its prior ruling, this Court found that Plaintiffs had adequately pled falsity for Statement 8. Dkt. 123 at 19. Plaintiffs' expanded allegations in the TAC, however, shed new light on Plaintiffs' mischaracterization of these disclosures and the allegations no longer adequately plead falsity.

Plaintiffs assert that Twitter's statement "[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics" is false based on:

    i.    An allegation that the average mDAU reported in Q1 2021, Q4 2021, and Q1 2022 contained an alleged number of suspended accounts (¶ 300);

    ii.    Mr. Segal's alleged "admission," on June 30, 2022, that the "quarterly mDAU that Twitter regularly reported to investors included accounts that Twitter ha[d] already determined were fake" (¶¶ 321-322); and

    iii.    Mr. Segal's alleged explanation that this approach to average mDAU was justified because suspended accounts may not have engaged in fake or spam behavior before their suspension. *Id.*

Neither the alleged statistics nor purported "admissions" are inconsistent with Statement 8, nor do they demonstrate how it was false or misleading.

Plaintiffs conflate the subject of Statement 8—mDAU—with the "average mDAU" reported to the market. They are not the same: mDAU is a ***daily count*** of

users who accessed the platform via entry-points that were able to show ads. Twitter disclosed that fake accounts accessed the platform, and that it sought to improve its estimates concerning fake accounts and to "eliminate" them from the mDAU count. Ex. 4 at 5. Twitter further explained in Statement 8 that "*after*" an account is suspended "we stop counting it in our mDAU"—in other words, after Twitter suspended an account, it was not included in each subsequent days' count of mDAU.

Statement 8 does not, however, address the metric Twitter actually reported to investors—"average mDAU," which represented "the number of mDAU on each day of such period divided by the number of days for such period." Ex. 4 at 5. Twitter did not state, nor even imply, that when it suspended an account it went back to recount each *prior* day's mDAU before calculating average mDAU for a period. To the contrary, Statement 8 is clearly limited to what Twitter did for suspended accounts prospectively only.

Moreover, while Statement 8 described Twitter's conduct with respect to mDAU, Mr. Segal's purported "admissions" merely reflect the method for calculating average mDAU for each period. Consistent with Twitter's public disclosures, he allegedly stated "that the quarterly mDAU that Twitter regularly reported to investors"—*i.e.*, average mDAU—included some number of fake accounts. ¶ 315. And, consistent with Statement 8, Mr. Segal gave one reason that Twitter did not retroactively recount each day's mDAU—until an account was suspended, Twitter had no basis to conclude the account was fake or engaged in illegitimate behavior. For example, if a legitimate account was hacked and the hackers then used the account for inappropriate behavior, it would be entirely appropriate to include that account in mDAU prior to the hack.[5] Accordingly, Plaintiffs' allegations do not demonstrate that Statement 8 was false or misleading.

---

[5] For these same reasons, these alleged "admissions" do not demonstrate falsity for Statement 7.

**B.     Scienter**

Plaintiffs must plead facts supporting a "strong inference" of scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007); 15 U.S.C. § 78u-4(b)(2)(A). Moreover, where, as here, a plaintiff "seek[s] to hold individuals and a company liable on a securities fraud theory," the plaintiff must "allege scienter with respect to each of the individual defendants." *Oregon Pub. Emp. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). Plaintiffs allege nothing specific to demonstrate scienter for any of the Individual Defendants, with the exception of an inadequate attempt to utilize the "core operations" doctrine against Messrs. Dorsey and Segal. There are only three circumstances under which "core operations" allegations can support a strong inference of an individual defendant's scienter:

> (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the "rare circumstances" when they are not particularized, but "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."

*Prodanova v. H.C Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) (citation omitted). Even at the pleading stage, "[p]roof under this theory is not easy." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Plaintiffs face a high burden of proof, as they "must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations ... or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.*

The core operation allegations with respect to Messrs. Dorsey and Segal fall short of meeting this high standard. Plaintiffs rely on (a) general statements by Mr. Segal and others that mDAU growth was the best metric to measure Twitter's success (¶¶ 305-312); (b) Twitter's stated commitment to growing mDAU (¶¶ 313-315); and (c) Messrs. Dorsey's and Segal's positions as CEO and CFO,

respectively, when Twitter began reporting average mDAU in 2019 (¶ 316).[6] Even taken together, these are the very type of allegations courts regularly reject as conclusory and inadequate to meet the high pleading bar for a core operations theory. *See, e.g.*, *Sylebra Capital Partners Master Fund Ltd. v. Everbridge, Inc.*, 2023 WL 3549506, at *13 (C.D. Cal. May 9, 2023) (allegations insufficient to plead scienter based on core operations); *Jun Shi v. Ampio Pharms., Inc.*, 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020) (core operations insufficient where plaintiffs failed to allege the existence of contemporaneous information within the company that contradicted or undermined defendants' statements at the time made). And these allegations do not come close to detailing involvement of either Defendant in the minutia of the daily mDAU count or average mDAU calculation. Although Plaintiffs argue that "it is absurd to suggest that Dorsey and Segal did not know how it was measured" (*e.g.*, ¶ 316), the law requires more in the form of specific admissions or witness accounts, which Plaintiffs fail to provide.

Moreover, Plaintiffs cannot salvage their core operations theory by relying on Mr. Segal's alleged "admission" about the inclusion of fake accounts in mDAU. ¶¶ 321-323. For the reasons explained above, Mr. Segal's alleged admission was not contrary to Statements 7 or 8. Moreover, it is not an admission that Mr. Segal was involved in the minutia of the mDAU analysis or in creating the alleged false statements during the Class Period.[7] And this alleged admission says nothing about

[6] Plaintiffs' contention that Messrs. Dorsey and Segal "invented" and "oversaw the adoption" of mDAU is an unfounded conclusion reached solely from their job titles and the fact that they spoke about mDAU to the market.

[7] To the extent the Court considers the alleged admissions sufficient to plead Mr. Segal's involvement in the minutia of mDAU, the scienter inference is nevertheless temporally limited, as the Court previously found. Dkt. 123 at 21. The only Statement 8 disclosure implicated was in Twitter's 10-Q for the quarter ended June 30, 2022. The Court should not extend the inference of scienter back in time to any earlier disclosures, including Twitter's 10-Q for the quarter ended March 31, 2022. Although *Plaintiffs* assert that Musk had been requesting clarifications concerning mDAU since April 28, 2022 (¶ 323), Musk's own letter to Twitter, which was filed with the SEC (of which judicial notice can be taken) states that he had been "requesting critical information from Twitter as far back

Mr. Dorsey's knowledge or involvement in mDAU; indeed it occurred seven months after Mr. Dorsey resigned as CEO. Thus, not only does this alleged admission fail to demonstrate the falsity of any mDAU statement, it is also not evidence from which a strong inference of scienter can be inferred.

Finally, Plaintiffs contend that the knowledge of Twitter's Consumer Product Lead—Kayvon Beykpour—can be imputed to Twitter. ¶ 325. Even if scienter on Mr. Beykpour's part could be imputed to Twitter, Plaintiffs do not allege that Mr. Beykpour knew anything demonstrating that either Statements 7 or 8 were false or misleading.

### C.    Plaintiffs Fail to Adequately Allege Loss Causation.

Plaintiffs cite three alleged corrective disclosures in an attempt to show loss causation for the mDAU statements: (1) a May 13, 2022 tweet by Elon Musk; (2) a July 7, 2022 *Washington Post* article quoting Musk insiders; and (3) a July 8, 2022 letter from Musk's lawyers to Twitter, filed with the SEC. ¶¶ 330-336. The Corrected Amended Complaint also contended that all three were corrective disclosures. *See* Dkt. 81 ¶¶ 283, 288, 290. The Court, in analyzing loss causation for what is now Statement 8, correctly found that Plaintiffs had not adequately alleged "what, if any, 'corrective' information was made public" or that Twitter's "share price fell significantly after the truth became known," or any "'causal connection' between" their "loss and the misrepresentation." Dkt. 123 at 25 (quoting *Metzler Inv. GMBH v. Corinthian Coll., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008)). All of these flaws persist; Plaintiffs' loss causation allegations in the TAC are deficient, for at least the following reasons:

### 1.    *The alleged corrective disclosures did not correct the alleged misstatements.*

Plaintiffs cannot plead loss causation by merely alleging a stock decline

as May 9, 2022," which is after the 10-Q was signed on May 2. Ex. F at 2. There is no strong inference that Segal was investigating these issues prior to signing the May 2 10-Q.

following a public disclosure on the general subject of mDAU—they must allege public disclosures that reveal the true information purportedly withheld by the challenged mDAU statements. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). None of Plaintiffs' alleged corrective disclosures satisfy this requirement.

a.     <u>Two of Plaintiffs' alleged corrective disclosures are unrelated to Statements 7 and 8.</u>

The first two alleged corrective disclosures, Musk's May 13, 2022 tweet and the July 7, 2022 *Washington Post* article, are facially incapable of supporting loss causation because they relate only to Musk's pursuit of information about the percentage of fake or spam accounts. ¶ 330 ("On May 13, 2022, before the market opened, Musk tweeted: 'Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users.'"); *see also* ¶ 335; Ex. G. But Plaintiffs abandoned their challenges to Twitter's statements about the percentage of fake or spam accounts in mDAU, after the Court ruled that they had failed to adequately allege that those statements were false or misleading. Dkt. 123 at 18. The May 13 tweet and *Washington Post* article therefore do not even purportedly correct any misstatements that are still at issue in this case. *See id.* at 25 ("Lead Plaintiff fails to explain how [Musk's May 13] tweet revealed the truth of any prior statement.").

b.     <u>The third alleged corrective disclosure does not reveal any truth about the percentage of mDAU that are shown ads or generate revenue.</u>

Plaintiffs' third corrective disclosure, the July 8, 2022 letter from Musk's lawyers to Twitter, is also defective because it does not say anything about the percentage of mDAU that are shown ads or generate revenue, which is the primary basis on which Plaintiffs allege falsity. *See* ¶¶ 281-294. The unverified figures Plaintiffs cite regarding the percentages of mDAU that were shown ads or generated

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS; JOINDER AND MEMO. OF
P&A - CASE NO. 2:22-cv-06525-MSC-E

revenue come from Musk's second amended counterclaims in the merger litigation, which were filed on October 4, 2022, long after the end of the Class Period. ¶ 288 n. 43. Plaintiffs do not assert that these figures were publicly disclosed during the Class Period, nor do they allege any stock drop associated with their disclosure.

### 2.   The alleged corrective disclosures are not statements of fact.

In addition, Plaintiffs have not and cannot plausibly allege that the market would have interpreted the alleged corrective disclosures as facts correcting Twitter's prior disclosures. *In re BofI Holding*, 977 F.3d at 792 ("[T]he relevant question for loss causation purposes is whether the market reasonably *perceived* [the alleged corrective disclosures] as true and acted upon them accordingly.") (emphasis in original). Instead, the market would have understood, as Plaintiffs themselves allege, that all of these statements were made by or at the direction of Musk when trying to back out of his deal to acquire Twitter. ¶¶ 15-18. The market would have also understood that Musk had repeatedly claimed that he did not have sufficient information about mDAU to confirm whether it was accurate. *See, e.g.*, ¶ 335 ("Musk and his team concluded that they *could not verify* Twitter's claims regarding fake and spam accounts.") (emphasis added). And, lastly, the market would have understood that Musk had his own motivations for making the claims he did. In fact, the July 7, 2022 *Washington Post* article, made this point explicitly:

> The spam accounts are not the only reason Musk might try to wriggle out of the deal. Twitter's share price has fallen dramatically since his takeover bid in April, leading to the impression that he is overpaying. And Musk also runs two other major companies, Tesla and SpaceX, along with some start-ups.
>
> . . .
>
> Musk likely grasps the difficulty of backing out at this stage, prompting him to find legal reasons to justify an exit, according to Carl Tobias, law professor at the University of Richmond.
>
> After raising the bot issue, for example, Musk said Twitter's figures could constitute a "material adverse

misstatement," a likely reference to a contractual clause that gives him the ability to back out of the deal in the event of a significant event that fundamentally changes the business.

"I think it's an excuse," Tobias said. "It doesn't seem to me that a court would find that persuasive."

Ex. G.

All of these factors would have led the market to take the alleged corrective disclosures with "a healthy grain of salt" to the extent it considered them at all. *See In re BofI Holding*, 977 F.3d at 797.

A useful analogy can be drawn from the law on short seller reports: A short seller report disclosing that the author has a financial interest in a stock's price decline, and disavowing factual accuracy, is not a plausible corrective disclosure. *Id.*; *In re Nektar Therapeutics Sec. Litig.*, 34 F. 4th 828, 840 (9th Cir. 2022). The same logic applies here. Musk was in the midst of a contractual dispute with Twitter over what information he was entitled to, and whether the failure to provide that information was cause to terminate his agreement to acquire Twitter. ¶¶ 15-18. Musk had personal motivations for speaking about Twitter, which may have included pressuring Twitter to provide more information, trying to justify terminating the acquisition agreement, or trying to renegotiate a better deal. *See* Ex. G ("[F]ocusing on bots plays into Musk's hand, lowering Twitter's stock price and potentially helping him force Twitter to renegotiate the deal at a lower price."). These personal motivations were known to the market, *see id.*, and the market would have taken Musk's statements about Twitter's prior disclosures with "a healthy grain of salt." *In re BofI Holding*, 977 F.3d at 797.

In addition, like the short seller reports at issue in *BofI Holding* and *Nektar Therapeutics*, Musk also disclaimed the accuracy of his own statements by explicitly saying that he did not have the information he needed to reliably analyze Twitter's disclosures. ¶ 335. This too would have made the market take Musk's

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; JOINDER AND MEMO. OF P&A - CASE NO. 2:22-cv-06525-MSC-E

statements with "a healthy grain of salt." *In re BofI Holding*, 977 F.3d at 797.

For all these reasons, the market would not have understood Musk's tweet, the letter from his lawyers, or the news article as factual statements correcting Statements 7 or 8.

### 3.    There were no alleged corrective disclosures regarding mDAU after the 2Q 2022 10-Q.

Statements 7 and 8 made in Twitter's 2Q 2022 10-Q and accompanying press release were made on July 22, 2022 (¶ 280), which was after all of the alleged mDAU corrective disclosures (¶¶ 330, 335, 336). Obviously these statements could not have caused a loss that occurred before they were made. Without any alleged corrective disclosure and corresponding stock drop after the July 22, 2022 alleged misstatements, there can be no loss causation. *See In re BofI Holding*, 977 F.3d at 789.

### 4.    It is implausible that the stock drops were caused by the alleged mDAU corrective disclosures because the market did not react when Twitter restated average mDAU.

Plaintiffs' loss causation argument is also implausible on its face. In order to show loss causation, Plaintiffs must show that the stock drops that occurred after Musk's May 13 tweet, the July 7 *Washington Post* article, and the July 8 SEC letter were "proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), as amended (Sept. 11, 2014).

Here, the alternative reason for the stock drops is obvious and compelling: the market was reacting to new information about whether Musk was going to go through with his purchase of Twitter. The plausibility of Plaintiffs' claim that the stock drops on those days was caused by news about mDAU is undermined by the fact that, just weeks before the first alleged corrective disclosure, on April 28, 2022, Twitter explicitly disclosed inaccuracies in mDAU, and the market did not react. *See*

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; JOINDER AND MEMO. OF P&A - CASE NO. 2:22-cv-06525-MSC-E

¶ 317; Ex. 13. Plaintiffs' claim that, just weeks later, Twitter's stock price dropped significantly because of information *suggesting* that *Musk* thought that Twitter's mDAU calculations *might* be inaccurate does not meet Plaintiffs' burden. *Immersion Corp.*, 762 F.3d at 887 ("[P]laintiff must *plausibly* allege that the defendant's fraud was revealed to the market and caused the resulting losses.") (emphasis altered, internal quotations omitted).

### 5. Plaintiffs cannot plead a "materialization of the risk."

Lastly, to the extent Plaintiffs assert a "materialization of the risk" theory of loss causation (*see* ¶¶ 331, 338), such a theory has not been accepted by the Ninth Circuit. *See Nektar Therapeutics*, 34 F. 4th at 838 n.6. And, in any event, Plaintiffs have not and cannot plead what "risk" was concealed by Statements 7 or 8 or how any of the three events cited by Plaintiffs constituted a "materialization" of that risk.

Plaintiffs claim that Musk's May 13 tweet, which asserted the merger was "on hold," was a materialization of some unspecified risks created by the alleged misstatements because "Musk put the deal on hold when he learned facts suggesting that Defendants' statements may have been false." ¶ 331. But this conclusion is simply not supported by Plaintiffs' own allegations. What Plaintiffs actually allege is that Musk tweeted that the deal was on hold "pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." ¶ 330. Plaintiffs improperly conflate a request for more details (allegation) with a conclusion without the requested details (argument).

Moreover, as discussed above, Plaintiffs no longer challenge Twitter's statements about the percentage of fake or spam accounts in mDAU. Plaintiffs offer no explanation of how Musk's supposed decision to put the merger on hold because of questions about the percentage of fake or spam accounts in mDAU could be a materialization of any risk created by *completely different* statements.

This theory is also nonsensical—Musk eventually went through with the deal to purchase Twitter, so no risks ever actually materialized.

### D.    Plaintiffs Fail to Adequately Plead Their Section 20(a) Claim.

Plaintiffs' Section 20(a) claim against the Individual Defendants fails because the TAC fails to plead an underlying Section 10(b) violation. *Nguyen v. Endologix*, 962 F.3d 405, 419 (9th Cir. 2020).

It also fails because Plaintiffs do not plead facts showing that any of the Individual Defendants "exercised actual power or control over the primary violator" for statements they did not make. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017) (quotation omitted). As they did in their previous complaint, Plaintiffs merely make the conclusory assertion that, by virtue of their positions, Defendants "had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend were false and misleading." ¶ 403. The Court has already ruled that these types of conclusory allegations are insufficient to establish Section 20(a) liability. Dkt. 123 at 21-22; *see also Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1106 (N.D. Cal. 2020); *Sgarlata v. PayPal Holdings, Inc.*, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018).[8]

Plaintiffs' allegations are particularly inadequate with respect to verbal statements made by particular individuals during interviews, presentations, earnings calls, tweets, or conferences. *See, e.g.*, *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007). Moreover, as to Mr. Dorsey, many of the challenged statements were made after he resigned as Twitter's CEO.

---

[8] Indeed, such group pleading by Plaintiffs is also improper and inadequate to plead the underlying Section 10(b) claim as to any Individual Defendant who was not the speaker of the purportedly false statement, and yet another reason Plaintiffs fail to allege any underlying Section 10(b) violation. *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *9 (C.D. Cal. Oct. 1, 2013).

## IV.   CONCLUSION

For the reasons stated in this memorandum and the Company Brief, the Individual Defendants respectfully request that the Court dismiss all claims against them with prejudice.

Respectfully Submitted,

Dated: November 10, 2023

SIDLEY AUSTIN LLP

By */s/ Jaime A. Bartlett*
David L. Anderson (SBN 149604)
dlanderson@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Sheila A.G. Armbrust (SBN 265998)
sarmbrust@sidley.com
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

*Attorneys for Defendants Parag Agrawal and Ned Segal*

Dated: November 10, 2023

MUNGER, TOLLES & OLSON LLP

By */s/ George M. Garvey*
George M. Garvey (SBN 89543)
george.garvey@mto.com

Abraham R. Oved (SBN 335927)
avi.oved@mto.com
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100

*Attorneys for Defendant Jack Dorsey*

## CIVIL L.R. 5-4.3.4(a)(2)(i) ATTESTATION

I, Jaime A. Bartlett, am the ECF user whose ID and password are being used to file DEFENDANTS JACK DORSEY, PARAG AGRAWAL, AND NED SEGAL'S NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT; JOINDER AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF. In compliance with Civil Local Rule 5-4.3.4(2)(i), I hereby attest that counsel for all signatories listed on the signature page have concurred in this filing.

Dated:  November 10, 2023          By:    /s/ *Jaime A. Bartlett*
                                          Jaime A. Bartlett

## CIVIL L.R. 11-6.1 CERTIFICATE OF COMPLIANCE

I, Jaime A. Bartlett, the undersigned, counsel of record for Parag Agrawal and Ned Segal, certifies that this brief contains 6,956 words, which complies with the word limit of L.R. 11-6.1.

Dated:  November 10, 2023          By:    /s/ *Jaime A. Bartlett*
                                          Jaime A. Bartlett