1  LATHAM & WATKINS LLP
   Michele D. Johnson (CA Bar No. 198298)
2   michele.johnson@lw.com
   650 Town Center Drive, 20th Floor
3  Costa Mesa, California 92626-1925
   Telephone: +1.714.540.1235
4
   Whitney B. Weber (CA Bar No. 281160)
5   whitney.weber@lw.com
   505 Montgomery Street, Suite 2000
6  San Francisco, California 94111-6538
   Telephone: +1.415.391.0600
7
   Andrew B. Clubok (*Pro Hac Vice*)
8   andrew.clubok@lw.com
   Susan E. Engel (*Pro Hac Vice*)
9   susan.engel@lw.com
   555 Eleventh Street, NW, Suite 1000
10 Washington, D.C. 20004-1304
   Telephone: +1.202.637.3309
11
   *Attorneys for X Corp., successor in interest*
12 *to named defendant Twitter, Inc.*

13

14                    **UNITED STATES DISTRICT COURT**

15                    **CENTRAL DISTRICT OF CALIFORNIA**

16                          **WESTERN DIVISION**

17

| | |
|---|---|
| 18 WILLIAM BAKER, JILL SLIGAY, LENARD ROQUE, and AMOLKUMAR VAIDYA, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:22-cv-06525-MSC-E |
| | **DEFENDANT TWITTER, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| 21              Plaintiffs, | |
| 22         v. | Judge:   Hon. Mark C. Scarsi |
| 23 TWITTER, INC., JACK DORSEY, NED SEGAL, PARAG AGRAWAL, and DAMIEN KIERAN, | Date:    January 22, 2024 Time:    9:00 a.m. Place:   Courtroom 7C |
| 24              Defendants. | *[Supporting Declaration of Whitney B. Weber; Request for Judicial Notice; and [Proposed] Orders concurrently filed herewith]* |

27

28

**NOTICE OF MOTION AND MOTION TO DISMISS, AND JOINDER**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 22, 2024, at 9:00 a.m., or as soon thereafter as the parties may be heard, before the Honorable Mark C. Scarsi, District Judge, United States District Court for the Central District of California, in the First Street Courthouse, Courtroom 7C, 350 W. 1st Street, Los Angeles, CA 90012, Defendant Twitter, Inc. ("Twitter" or the "Company"[1]) will, and hereby does, move to dismiss Plaintiffs William Baker, Jill Sligay, Lenard Roque, and Amolkumar Vaidya's (collectively, "Plaintiffs") Third Amended Class Action Complaint ("TAC," Dkt.130) against Jack Dorsey, Ned Segal, Parag Agrawal, and Damien Kieran (collectively, the "Individual Defendants"), and Twitter (together with the Individual Defendants, "Defendants") pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 12(b)(6) on grounds that the TAC fails to state a claim upon which relief can be granted.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on November 1, 2023, and is based on this Notice of Motion and Motion to Dismiss, the accompanying Memorandum of Points and Authorities, Request for Consideration Under the Incorporation-by-Reference Doctrine or Judicial Notice, the Declaration of Whitney W. Weber and the exhibits thereto ("Exhibit(s)" or "Ex(s)."), the TAC, all pleadings and papers in this action, other evidence that may be presented prior to the Court's decision on this Motion, and any oral argument of counsel.

---

[1] X Corp. is the successor in interest to Twitter, Inc., and the Twitter platform was recently renamed "X." For consistency with Plaintiffs' pleading and other briefing, Defendants will continue to refer to X Corp. and platform as "Twitter."

1  Dated: November 10, 2023

Respectfully submitted,

2

LATHAM & WATKINS LLP

3

By /s/ *Michele D. Johnson*

4  Michele D. Johnson (CA Bar No. 198298)
    michele.johnson@lw.com

5  650 Town Center Drive, 20th Floor
   Costa Mesa, California 92626-1925

6  Telephone: +1.714.540.1235

7  Whitney B. Weber (CA Bar No. 281160)
    whitney.weber@lw.com

8  505 Montgomery Street, Suite 2000
   San Francisco, California 94111-6538

9  Telephone: +1.415.391.0600

10  Andrew B. Clubok (*Pro Hac Vice*)
     andrew.clubok@lw.com

11  Susan E. Engel (*Pro Hac Vice*)
     susan.engel@lw.com

12  555 Eleventh Street, NW, Suite 1000
    Washington, D.C. 20004-1304

13  Telephone: +1.202.637.3309

14  *Attorneys for X Corp., successor in interest
    to named defendant Twitter, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION ................................................................................ 1

4    II.    BACKGROUND ................................................................................ 2

5        A.    Twitter's Cybersecurity Disclosures ................................. 2

6        B.    Twitter's Influence-Campaign Disclosures ....................... 3

7        C.    Zatko Files a "Whistleblower" Report Asserting
8              Cybersecurity Deficiencies ................................................ 4

9        D.    Plaintiffs File, and the Court Dismisses, the CAC ............ 5

     III.    ARGUMENT ..................................................................................... 5
10
11        A.    Plaintiffs Fail to Plead an Actionable Misstatement or
              Omission ............................................................................. 6

12            1.    Set 1 About July 2020 Incident ................................ 6

13            2.    Set 2 About Cybersecurity Practices ....................... 8

14            3.    Set 3 About "Privacy by Design" ............................ 9

15            4.    Set 4 About FTC Settlement .................................. 10

16            5.    Set 5 About Cybersecurity Risks ........................... 11

17            6.    Set 6 About Influence Campaigns .......................... 12

18            7.    Sets 7 and 8 About mDAU ..................................... 14

19        B.    Plaintiffs Still Fail To Plead Scienter ............................. 15

20            1.    Plaintiffs Do Not Plead Scienter Based on Motive ................. 15

21            2.    Plaintiffs Fail to Plead the Individual Defendants
22                  Acted With Deliberate Recklessness ...................... 15

23            3.    Plaintiffs Do Not Allege a Strong Inference of
                  Scienter as to Twitter ............................................. 19

24        C.    Plaintiffs Still Fail to Plead Loss Causation .................... 21

25    IV.    CONCLUSION ............................................................................... 23

26

27

28

1
2

# TABLE OF AUTHORITIES

## CASES

3

**Page(s)**

4
5

*Applestein v. Medivation, Inc.*,
   561 F. App'x 598 (9th Cir. 2014)..................................................................17

6
7

*Barnes v. Edison Int'l*,
   2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir.
   Mar. 18, 2022) ..............................................................................................9

8
9

*Cheng v. Activision Blizzard, Inc.*,
   2023 WL 2136787 (C.D. Cal. Jan. 22, 2023)...............................................8, 20

10
11

*City of Sunrise Firefighters Pension Fund v. Oracle Corp.*,
   2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ...............................................18

12
13

*Gamm v. Sanderson Farms, Inc.*,
   944 F.3d 455 (2d Cir. 2019) .........................................................................13

14
15

*Gammel v. Hewlett-Packard Co.*,
   905 F. Supp. 2d 1052 (C.D. Cal. 2012)..........................................................17

16
17

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ....................................................................19, 20

18
19

*Greenspan v. Qazi*,
   2021 WL 2577526 (N.D. Cal. June 23, 2021) ...........................................10, 12

20

*Habelt v. iRhythm Techs., Inc.*,
   2022 WL 971580 (N.D. Cal. Mar. 31, 2022)..................................................18

21
22

*In re AnaptysBio, Inc.*,
   2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) .............................................18, 19

23
24

*In re BofI Holding, Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020)..........................................................................22

25

*In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ...11

26
27

*In re Facebook, Inc. Sec. Litig.*,
   2023 WL 6857600 (9th Cir. Oct. 18, 2023).....................................................16

28

*In re Intel Corp. Sec. Litig.*,
2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ........................................7, 10, 14

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ...............................................................................22

*In re Northpoint Commcn's Grp., Inc. Sec. Litig.*,
184 F. Supp. 2d 991 (N.D. Cal. 2001).........................................................16, 17

*In re Restoration Robotics, Inc., Sec. Litig.*,
417 F. Supp. 3d 1242 (N.D. Cal. 2019) ........................................................8, 14

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2018).........................................................15, 20

*In re Sona Nanotech, Inc. Sec. Litig.*,
562 F. Supp. 3d 715 (C.D. Cal. 2021).................................................................15

*In re Twitter, Inc. Secs. Litig.*,
506 F. Supp. 3d 867 (N.D. Cal. 2020).................................................................11

*Kain v. ACM Research, Inc.*,
2021 WL 5998396 (N.D. Cal. Dec. 20, 2021) ...............................................7, 11

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 998 (9th Cir. 2018)................................................................................6

*LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*,
2022 WL 2119122 (N.D. Cal. 2022)....................................................................16

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)...............................................................................21

*Lopez v. Ctpartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016)...................................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ..............................................................................................12

*Mendoza v. HF Foods Grp. Inc.*,
2021 WL 3772850 (C.D. Cal. Aug. 25, 2021) ...................................................19

*Metzler Inv. GMBH v. Corinthian Colls., Inc*,
540 F.3d 1049,1062 (9th Cir. 2008)......................................................6, 11, 17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

TWITTER'S NOTICE OF MOTION AND MOTION
TO DISMISS THIRD AM. COMPLAINT
Case No. 2:22-cv-06525-MSC-E

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ...................................................................... 15, 21

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ..................................................................... 5, 6, 22

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) .............................................................*passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................. 5, 15

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 785 (N.D. Cal. 2019) .......................................................... 8, 9

*Weston Family P'ship LLLP v. Twitter, Inc.*,
   29 F.4th (9th Cir. 2022) ................................................................................... 7

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ........................................................... 10, 12, 18

*Xiaojiao Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) .............................................. 7, 8, 11, 12

**STATUTES**

Securities Exchange Act § 10(b) .................................................................... 5

**RULES**

Fed. R. Civ. P. 9(b) ....................................................................................... 5

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3
4
5
6
7
8
9
10
11
12

    In dismissing the Corrected Amended Complaint ("CAC"), the Court recognized that Plaintiffs failed to plead that Defendants made false statements, much less with the requisite intent to deceive resulting in any losses.  Indeed, the Court recognized that Plaintiffs' real complaint appears to be their disagreement "with the methods" Defendants employed to operate Twitter's business.  Dkt.123 ("Op.") at 14.  Plaintiffs do not fix, or even address, the flaws the Court identified. Instead, the TAC reorganizes the same allegations that were in the CAC— challenging many of the same (or substantially similar) statements as before—and regurgitates the same theories the Court already rejected.  Plaintiffs' reorganization only *highlights* Plaintiffs' failure to plead any element of their fraud claim.

13
14
15
16
17
18

    *First*, the TAC does not allege particularized facts that Defendants made a materially false or misleading statement.  To the contrary, the reorganized pleading makes clear that in almost every instance, the reasons Plaintiffs claim Defendants' statements were misleading bear no relationship to the statements themselves.  And for the remaining statements, Plaintiffs' own allegations confirm that Defendants' statements were *true*.

19
20
21
22
23
24

    *Second*, Plaintiffs' allegations come nowhere close to meeting Plaintiffs' "high burden" to plead *facts* giving rise to a cogent and compelling inference that Defendants acted with an intent to deceive.  Plaintiffs still do not identify any motive Defendants had to commit fraud.  And rather than allege particularized facts about what Defendants did know, the TAC is littered with Plaintiffs' speculation about what they "*would have*" or "*might have*" known.[1]

25
26

    *Finally*, the TAC fails to plead loss causation.  Plaintiffs allege that an August 23, 2022 *Washington Post* article linking to a whistleblower complaint "corrected"

27
28

---

[1] All emphases added.

the challenged statements.  But that report had nothing to do with most of the challenged statements—and it certainly did not reveal any prior statement was false.

Ultimately, the TAC suggests that had Plaintiffs been in charge, they might have run Twitter differently.  But Plaintiffs' disagreement with the way in which Defendants operated the business is not fraud.  The TAC should be dismissed, this time with prejudice.

## II.    BACKGROUND

### A.    Twitter's Cybersecurity Disclosures

As before, Plaintiffs challenge several cybersecurity disclosures Twitter made in the wake of a July 2020 phishing attack.  TAC ¶¶2-7.

On July 15, 2020, Twitter disclosed it learned about a "security incident" impacting certain user accounts and promised to provide an update on the incident soon.  Ex.2.  It did so three days later, explaining the attackers targeted certain Twitter employees and used their credentials to access Twitter's internal account-support systems.  *Id*.; Ex.3.  To quickly stop the attack, Twitter revoked employees' access to its network and required them to "change their passwords during video calls."  TAC ¶5; Ex.2.

On July 30, 2020, Twitter further explained the attackers targeted employees with "access to [Twitter's] account support tools."  TAC ¶39.  Those employees had "valid business reasons" for having access—they "help[ed] with account support" and moderated content.  *Id*.  While Twitter was "taking a hard look at" how to make its processes "more sophisticated," *id*., its user-account teams would "be slower to respond to account support needs."  Ex.2.

Twitter updated users again two months later, detailing the "work [it's] doing to protect" user accounts.  Ex.5.  Twitter was "[i]mproving [its] access management processes and authentication systems" to ensure "team members with access" to user data have "valid business reasons" for that access.  *Id*.; TAC ¶40.  Twitter explained, however, that many of its employees *did* need access to user data—*e.g*.,

1    "*engineering team members* have access [to user data] to build and operate" Twitter,

2    while "*[o]ther teams*" have access to "proprietary tools" to provide account support,

3    including to "review content for potential violations of the Twitter Rules and respond

4    to user reports." Ex.5.  Employees later regained access to those tools—but not "all

5    of them, and not always at the level of access they had" before.  Ex.3.

6         The Company also rolled out additional "tools and training" to enhance

7    cybersecurity practices—*e.g.*, employees were provided physical, "phishing-

8    resistant security keys" that would reduce the ability of third-parties to access

9    Twitter's internal systems using employee credentials.  Ex.5; TAC ¶120.  Twitter

10   hired Peiter Zatko as Twitter's Head of Security to advise on other measures.  TAC

11   ¶¶7, 351.

12        But Twitter warned that cybersecurity would "always be ongoing work for

13   us."  Ex.5.  Indeed, Twitter "expect[ed] to incur significant costs" to "prevent

14   security breaches and other security-related incidents"—but could not "provide

15   assurances [its] preventative efforts will be successful." Exs.4, 16.  Just the opposite,

16   Twitter told investors it "experience[s] cyber-attacks of varying degrees on a *regular*

17   *basis*," and periodically reported those "data breaches" to regulators.  *Id*.

18        **B.    Twitter's Influence-Campaign Disclosures**

19        Plaintiffs next challenge statements in which Twitter said it was committed to

20   disclosing certain state-backed misinformation campaigns.  TAC ¶¶9-11.

21        In October 2018, Twitter launched a public "archive of Tweets and media"

22   involved in "inauthentic influence campaigns" it believed "resulted from state linked

23   information operations."  TAC ¶216; Ex.7.  The purpose was to allow the "public,

24   governments, and researchers [to] investigate, learn, and build media literacy

25   capabilities for the future" to "protect public conversation."  Ex.7.  Twitter

26   committed to disclosing "platform manipulation"—*i.e.*, the artificial amplification

27   or suppression of information to "influence elections and other civic

28   conversations"—that Twitter could "reliably attribute to a government or state-

3

backed actor." *Id.*; TAC ¶217.  But deciding when and what to disclose required a "balancing [of] privacy considerations."  Ex.8.  Accordingly, Twitter committed to identify influence campaigns only once (1) it reliably "determined attribution" to a "government or state-backed actor," and (2) "all applicable investigations have concluded."  TAC ¶216.  And Twitter explained this "process takes time," and can take "many months."  Ex.9.

In line with this policy, by December 2, 2021, Twitter published "37 datasets of attributed platform manipulation campaigns."  TAC ¶¶215-217; Ex.10.  That same day, Twitter pointed readers to a post by Yoel Roth and Vijaya Gadde explaining how Twitter would make "future disclosures."  Ex.10 (hyperlinking to Ex.11).  Twitter explained that it had provided only one other update in 2021 because of "technical issues and significant risks to the physical safety of our employees posed by certain disclosures."  Ex.11.  It thus planned to "discontinue [its] fully public dataset releases" because disclosures threatened the "physical safety of [its] employees around the world," and "confident attribution" based on Twitter's own data was not always possible.  Ex.11.  Twitter would instead share a broader set of data with "experts" "studying platform governance issues," including data about "platform manipulation campaigns for which we have not been able to arrive at confident attribution to a state actor, and campaigns where we are unable to provide broad access due to employee safety concerns."  *Id.*  Consistent with that new policy, on August 24, 2022, Twitter disclosed it had shared datasets with consortium members.  TAC ¶252; Exs.11-12.  One of those members reported that one dataset included accounts that tweeted about India and Pakistan, which could not be attributed "to any actor."  Ex.12.

## C.  Zatko Files a "Whistleblower" Report Asserting Cybersecurity Deficiencies

On August 23, 2022, the *Washington Post* reported that Zatko filed a whistleblower complaint alleging Twitter failed to "maintain solid security

1    practices." Ex.18; TAC ¶339. Twitter denied the allegations as "riddled with

2    inaccuracies." Ex.18. And the complaint did not say anything about Twitter's

3    influence campaign disclosures. Ex.21. Twitter's stock price dropped from $43.01

4    to $39.86, but quickly recovered the next day. TAC ¶343; Ex.13. By October 27,

5    2022, Twitter shares were trading at $53.70, and days later, Elon Musk bought

6    Twitter, paying $54.20 per share. Ex.13; TAC ¶¶36, 317.

7        **D.    Plaintiffs File, and the Court Dismisses, the CAC**

8        Plaintiffs' March 9, 2023 CAC alleged that Defendants made misstatements

9    about Twitter's cybersecurity practices, efforts to fight misinformation, and mDAU

10   metric. Dkt.67. But the CAC ignored Twitter's disclosures and failed to meet the

11   PSLRA's heightened pleading requirements. Two months ago, the Court dismissed

12   the CAC. The Court held many statements were not actionable, that nearly all the

13   statements were not false, and that Plaintiffs failed to adequately plead scienter with

14   the exception of one statement, for which Plaintiffs failed to plead loss causation.

15   *See* Op. Plaintiffs then filed their TAC, challenging eight sets of statements about

16   cybersecurity, misinformation, and mDAU, and adding Defendant Kieran in

17   contravention of the Court's order that Plaintiff file a "properly noticed motion" to

18   "add **any party**." *Id.* at 26. The TAC repeats the same theories the Court already

19   rejected—challenging many of the same or nearly identical statements as before,

20   without pleading any new particularized facts in support.

21   **III.    ARGUMENT**

22       A claim for securities fraud under Section 10(b) of the Securities Exchange

23   Act is subject to the "[e]xacting pleading requirements" of ***both*** Rule 9(b) and the

24   PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

25   Plaintiffs must plead each element with particularity. *Or. Pub. Emps. Ret. Fund v.*

26   *Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Falsity requires "specific facts"

27   that show "why the statement is misleading," and scienter demands "particular[]

28   facts giving rise to a *strong inference* that the defendant acted with the required state

1  of mind"—not just that they had "general awareness" of relevant information.

2  Op.13, 19-20.  To plead loss causation, Plaintiffs must plead particular facts that

3  show a "causal connection between the defendant's material misrepresentation and

4  the plaintiff's loss."  *Id.* at 22 (quoting *Metzler Inv. GMBH v. Corinthian Colls., Inc*,

5  540 F.3d 1049, 1062 (9th Cir. 2008)); *Apollo*, 774 F.3d at 605.

6  ## A.  <u>**Plaintiffs Fail to Plead an Actionable Misstatement or Omission**</u>

7  Plaintiffs challenge 30 statements divided into eight statement sets—but fail

8  to allege how any was false when made.  *See Khoja v. Orexigen Therapeutics, Inc*.,

9  899 F.3d 998, 1008 (9th Cir. 2018) (statement must "contradict what the defendant

10  knew at the time").

11  ### 1.  Set 1 About July 2020 Incident

12  Plaintiffs challenge three statements (**Statements 1a-1c**[2]) Twitter made

13  following the 2020 attack—that "specific employee credentials" allowed attackers

14  to "access [Twitter's] internal support tools," that access to account-support tools is

15  "granted for valid business reasons," and that, after the attack, Twitter further

16  reduced employee access to such tools and implemented additional measures to keep

17  "accounts secure."  TAC ¶¶39-41.  Plaintiffs claim the statements "gave the

18  misleading impression that Twitter tightly controlled and monitored access to user

19  data," which allegedly was not true because engineers worked directly in the

20  production environment (*i.e.*, where Twitter developed code for the platform) and

21  "[a]ll engineers had access" to user data through that environment.  *Id.* ¶¶60-79.

22  Plaintiffs' allegations are meritless.

23  The Court previously found that statements about access may have misled

24  investors "if Twitter was not actually limiting access only for 'valid business

25  reasons.'"  Op.15.  But that was because Plaintiffs were conflating—and still do

26  conflate—engineers' access to data through Twitter's production environment with

27  _____

28  [2] Exhibit 1 lists and numbers in tabular format the statements Plaintiffs challenge in
the TAC.

1    other, non-engineer employees' access to account support tools.  CAC ¶232; TAC

2    ¶40 (Statement 1b).  Indeed, Twitter *disclosed* in the challenged September 24, 2020

3    blog that all "engineering team members have access" to user data, and it explained

4    the "valid business reason" why:  to "build and operate the features that people rely

5    on every day" and "keep Twitter running."  Ex.5; TAC ¶40.

6          But engineers' access to the production environment had nothing to do with

7    the attack.  As Twitter explained, the attackers exploited "account support tools" that

8    Twitter's *support teams* used to address user-account issues.  Ex.2; Ex.3 (consumer

9    support and tech service employees targeted); Ex.14 ("employees and contractors"

10   with access to internal tools targeted).  Defendants explained that access to "*these*

11   *tools* is strictly limited" (not that engineers' access to the *production environment*

12   was limited), that Twitter was working to "further secure our *internal tools* from

13   potential misuse," and that after the attack, the number of "individuals with access

14   to *these tools*" is "substantially lower."  TAC ¶¶39-41.  Indeed, that was why Twitter

15   also explained that in the wake of the attack, "[w]e will be slower to respond to

16   users' account support needs."  Ex.2; *see also In re Intel Corp. Sec. Litig.*, 2019 WL

17   1427660, at *11 (N.D. Cal. Mar. 29, 2019) ("relevant context undermines" falsity).

18         Plaintiffs do not dispute the accuracy of these statements.  They do not say,

19   for instance, that Twitter did not reduce the number of *user-support employees* with

20   access to account-support tools.  Instead, Plaintiffs say the statements were

21   misleading because every Twitter engineer had access to the production

22   environment.  *Id*. ¶¶61-65.  But this is "an apples-to-oranges comparison."  *Kain v.*

23   *ACM Research, Inc.*, 2021 WL 5998396, at *1 (N.D. Cal. Dec. 20, 2021).

24   Engineers' access to the production environment "bear[s] no connection" to

25   statements about access to account-support tools.  *Xiaojiao Lu v. Align Tech., Inc*.,

26   417 F. Supp. 3d 1266, 1276-78 (N.D. Cal. 2019); *see Weston Family P'ship LLLP*

27   *v. Twitter, Inc.*, 29 F.4th, 611, 619 & n.5 (9th Cir. 2022) (statements were

28   "uncontradicted by any of the plaintiffs' allegations").

1    The TAC also includes over a dozen pages of allegations purporting to
2    identify other reasons that Statements 1a-1c were "misleading." TAC ¶¶42-79, 121-
3    133. But none of those allegations relate to the challenged statements. For example,
4    Plaintiffs point to an FTC consent order that Twitter entered into nine years *before*
5    the first challenged statement (TAC ¶¶43-51), but they never provide any "nexus"
6    explaining how that order shows any statement was false. *Align*, 417 F. Supp. 3d at
7    1277. Plaintiffs also allege the statements were misleading because "Twitter did not
8    know" if employees' computers had malware, that Twitter's "software was
9    dangerously out of date," that engineers should have developed code using a
10   different "quality assurance platform," and that engineers' activity was insufficiently
11   "logged." TAC ¶¶58-60, 124-136. Again, however, the challenged statements are
12   "entirely unrelated to the [] practices Plaintiffs complain of." *Veal v. LendingClub*
13   *Corp.*, 423 F. Supp. 3d 785, 808 (N.D. Cal. 2019) (dismissing allegations where
14   alleged omitted facts were "not what the[] representations were about"). At most,
15   Plaintiffs' allegations suggest they "'take[] issue with the methods used by
16   Defendants' to secure their platform." Op.14-15 (quoting *In re Restoration*
17   *Robotics, Inc., Sec. Litig.*, 417 F. Supp. 3d 1242, 1258 (N.D. Cal. 2019)). But
18   Plaintiffs have the "burden to show *falsity*, not inadequacy," which they do not
19   satisfy. *Id.*; *see also Cheng v. Activision Blizzard, Inc.*, 2023 WL 2136787, at *7
20   (C.D. Cal. Jan. 22, 2023) ("insufficient facts connecting" problems to "alleged
21   falsity of the statements").

22          **2.     Set 2 About Cybersecurity Practices**

23   Plaintiffs next challenge Segal's July 2021 statement that the Company was
24   "constantly considering and investing and learning" about "best practices" to keep
25   user accounts secure following the July 2020 attack. TAC ¶120 (**Statement 2**).
26   Plaintiffs claim the statement was misleading because "Twitter was not following
27   best practices." *Id.* ¶122. These allegations fail.

28

1    To begin, Segal's statement is precisely the kind of "subjective assessment"
2    about "Twitter's values and commitments" that is not actionable.  Op.8-9; *see also*
3    *Barnes v. Edison Int'l*, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021), *aff'd*,
4    2022 WL 822191 (9th Cir. Mar. 18, 2022).

5    Nor was the statement misleading.  Plaintiffs claim Segal suggested Twitter
6    "addressed the problems which led to the July 2020" incident, but Twitter had not
7    done so because too many engineers had access to its production environment since
8    engineers did not "test code" in a "sandbox" like other social-media companies.
9    TAC ¶¶121-133.  Again, engineer access to the production environment had nothing
10   to do with the July 2020 attack.  *Supra*, III.A.1.  And in any event, Segal's statement
11   was not about who had access to data or where its engineers tested code.  *Compare*
12   TAC ¶120 *with id*. ¶¶121-133; *see LendingClub*, 423 F. Supp. 3d at 807 (statement
13   must "link" to omission); *supra*, III.A.1.  Instead, he said Twitter was "investing,"
14   "learning," and "developing" cybersecurity practices, then described an
15   (undisputed) step Twitter *had* taken following the attack:  "people [were given] the
16   ability to use a physical key to keep their accounts secure."  TAC ¶120.

17   ### 3.    Set 3 About "Privacy by Design"

18   Plaintiffs carve out one sentence from Twitter's September 24, 2020 blog post
19   about its "continued work to keep Twitter secure," in which Twitter said it
20   "enhanced [employee] training" on several topics, including "privacy by design."
21   TAC ¶140 (**Statement 3**).  The Court rejected this challenge in Plaintiffs' CAC
22   because it was "unclear" why Plaintiffs claimed it was false.  Op.14.  So now
23   Plaintiffs allege that "privacy by design" is a "technical term" under European data-
24   protection regulations that required Twitter to "delete[] user data after users
25   deactivated their account."  TAC ¶¶141-142.  Plaintiffs' allegations are nonsense.

26   First, nothing in the blog suggests Twitter used "privacy by design" to
27   reference European data-protection regulations.  Quite the opposite, Twitter
28   hyperlinked the "privacy by design" language to a *different* post about Twitter's

privacy practices.  Ex.5 (hyperlinking Ex.6).  That linked post does not mention European regulations or data deletion—in fact, the post explains "different cultures and groups think about privacy" differently, and Twitter was considering those "different connotations" in developing "privacy and data controls."  Ex.6.  Plaintiffs plead zero facts suggesting that "privacy by design" had the "special or nuanced meaning" that Plaintiffs claim.  *Wochos v. Tesla, Inc*., 985 F.3d 1180, 1193 (9th Cir. 2021).

Second, even crediting Plaintiffs' theory for argument's sake, they still fail to plead a false statement.  TAC ¶148.  At most, Plaintiffs say Twitter had "data pools" that created heightened cybersecurity risks if the pools were hacked.  *Id*. ¶¶144-145. But Plaintiffs do not allege that risk ever materialized.  *Id*. ¶148; *see Intel*, 2019 WL 1427660, at *2 & n.4.  And in any event, there "is no obvious connection between" Twitter's statement that it was enhancing employee privacy training and the heightened cybersecurity risks from data pools.  *See Greenspan v. Qazi*, 2021 WL 2577526, at *8 (N.D. Cal. June 23, 2021).

### 4.    Set 4 About FTC Settlement

**Statement 4** is from a May 2022 blog post announcing Twitter's settlement with the FTC arising out of its use of contact information users provided for security purposes for advertising.  In the announcement, Twitter said "[t]his issue was addressed as of September 17, 2019."  TAC ¶156.  Plaintiffs allege Twitter had not in fact "addressed" the issue because it "had not deleted user data from the [data] pools" by 2022.  *Id*. ¶¶157-158.  These allegations are meritless.

To start, Plaintiffs fail to allege any connection between the FTC's complaint and Twitter's purported "inability to delete" user data.  TAC ¶¶157-158.  The challenged blog links to the FTC's complaint, which says nothing about "unmanaged pools" or an "inability to delete" user data.  *Id.* ¶156; Exs.15, 22.  And Plaintiffs' speculation that data pools made it "likely that employees *would* inadvertently misuse customer data after September 17, 2019" is "not a substitute for *facts*" under

1    the PSLRA.  *Align*, 65 F. Supp. 3d at 852; *see also In re ECOtality, Inc. Sec. Litig.*,

2    2014 WL 4634280, at *11 (N.D. Cal. Sept. 16, 2014) ("Plaintiffs provide no facts

3    whatsoever to corroborate [their] allegation").  The challenged statement also does

4    not say *how* Twitter "addressed" the issue underlying the FTC complaint, let alone

5    that Twitter had done so by deleting user data.  *See In re Twitter, Inc. Secs. Litig.*,

6    506 F. Supp. 3d 867 (N.D. Cal. 2020) (that Twitter "fixed issues related to settings"

7    was distinct from alleged failure to fix software bugs).  Plaintiffs' allegations "are

8    pure speculation."  *Kain*, 2021 WL 59998396, at *2.

9          Moreover, Plaintiffs suggest that Twitter improperly used contact information

10   *after* September 2019 because in "mid-2021" a "sales team ... saw a data set" that it

11   used for "ad tracking."  *Id*. ¶¶157-159, 175.  But Plaintiffs do not plead any facts

12   that the mid-2021 "event" concerned the same issue or data use that Twitter said had

13   been addressed.  Indeed, Plaintiffs fail to allege any specific facts "as to the reasons

14   for" the mid-2021 event—much less whether it was "connected" in any way to the

15   earlier privacy incident.  *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12,

16   32 (S.D.N.Y. 2016); *see also Metzler*, 540 F.3d at 1071 (dismissing where plaintiffs

17   were "unable to connect" theory of falsity back to challenged statements).

18              **5.    Set 5 About Cybersecurity Risks**

19         Plaintiffs continue to challenge Twitter's cybersecurity risk-disclosure

20   warning.   TAC ¶184 (**Statement 5**).   As before, Plaintiffs argue that Twitter

21   suggested the Company was subject to "attacks," but because of its cybersecurity

22   efforts, it had not experienced "actual breaches."  *Id*. ¶185.  The opposite is true.

23         Twitter's disclosures did not suggest that Twitter wasn't "aware of regular

24   cybersecurity incidents or breaches."   *Id*.   Instead, as the Court already found,

25   Twitter told investors it "experience[s] cyber-attacks of *varying degrees* on a *regular

26   basis*," *id.* ¶184, gave an example of such an attack, Ex.4, and "specifically

27   disclaim[ed] any 'assurance that [its] preventative efforts will be successful'" in

28   preventing future incidents.  Op.14.  Twitter likewise told investors it "cannot

1   guarantee that" its "networks have not been breached," and explained it *had* notified
2   regulators of "certain personal data breaches and privacy, cybersecurity, or data
3   protection issues."    Exs.4, 16.    In other words, Twitter "affirmatively
4   acknowledge[d] that [it] *has* experienced" cybersecurity incidents. *See Tesla*, 985
5   F.3d at 1196.

6       Plaintiffs thus change tack, claiming Twitter's risk disclosure was misleading
7   because Twitter "employ[ed] agents of foreign countries" who purportedly had
8   "access to user data." TAC ¶¶188-204. But these allegations "are almost entirely
9   untethered to the actual statements made by Defendants." *Align*, 417 F. Supp. 3d at
10  1277.    Indeed, Plaintiffs do not explain how employing "spies" "directly
11  contradict[ed]" Twitter's disclosure that it "cannot provide assurance that our
12  [cybersecurity] preventative efforts will be successful." TAC ¶184. And "such
13  atypical allegations" about foreign agents "demand a fair showing of the facts about"
14  those "agents" and "their link to the risk disclosure." *Greenspan*, 2021 WL
15  2577526, at *7. Plaintiffs, however, do not allege facts that "spies" partook in
16  "actual breaches or incidents," or how, if so, that rendered the risk disclosures
17  misleading. *See* TAC ¶185. Nor can they: Twitter warned its "security measures
18  may also be breached *due to employee error, malfeasance*, or otherwise." Ex.4.

19          **6.    Set 6 About Influence Campaigns**

20      Plaintiffs next challenge statements about Twitter's commitment to disclose
21  "state-backed information operations."    TAC  ¶¶214-218  (**Statements  6a-6f**).
22  Plaintiffs admit Twitter publicly disclosed over 35 such campaigns, but claim it
23  failed to disclose two others (by the U.S. Department of Defense ("DoD") and
24  Chinar Corp). *Id*. ¶¶217, 228. At the outset, Plaintiffs include zero facts suggesting
25  that the omission of either campaign "significantly altered the 'total mix' of
26  information" available to investors. *See Matrixx Initiatives, Inc. v. Siracusano*, 563
27  U.S. 27, 38 (2011). Regardless, Plaintiffs fail to allege falsity.

28      As to the DoD allegations, Plaintiffs claim DoD was involved in an "influence

1   campaign," because certain Twitter accounts were associated with DoD.  *See* TAC

2   ¶¶229-232.  Twitter did not say, however, that it would disclose all *accounts*

3   associated with state actors.  It said, starting in 2018, it would disclose state-backed

4   "platform manipulation" and "information operation[s]" if certain criteria were met.

5   *Id*. ¶¶216-217.  Plaintiffs also do not plead any "facts describing" what alleged

6   information operations the DoD-associated accounts took part in.  *Gamm v.*

7   *Sanderson Farms, Inc.*, 944 F.3d 455, 464 (2d Cir. 2019); *see* TAC ¶¶229-232.  At

8   most, they say DoD allegedly used "fake accounts to conduct an influence

9   campaign" in *2017*, TAC ¶232—but Twitter only "committed to disclose" publicly

10  "information operations" starting in *2018*, *after* that alleged "campaign" took place.

11  *Id.* ¶¶217, 230.[3]

12       Plaintiffs' Chinar Corp allegations fare even worse.  Plaintiffs claim that

13  Twitter did not "publicly disclose" a Chinar Corp "influence campaign."  TAC

14  ¶¶228, 233.  Plaintiffs thus allege Defendants' statements were misleading

15  because—relying on Agrawal's March 2022 statement, *id*. ¶218—Twitter

16  committed to publicly disclose "any" state-backed campaign. *Id*. ¶225; Op.15-16.

17  But the CAC, like the TAC, misleadingly cherry-picked from Twitter's disclosures

18  *what* Twitter said it would disclose and *when*.

19       Twitter committed in 2018 to disclose "archives of Tweets and media that we

20  believe resulted from state-backed information operations" *only after* (1) it could

21  "reliably" and confidently "attribute" the operation "to a government or state-backed

22  actor"; and (2) "all applicable investigations" into the operation "have concluded."

23  TAC ¶216.  Plaintiffs do not suggest that at the time of any challenged statement,

24  the alleged Chinar Corp campaign met these conditions.  In fact, their allegations

25  suggest the opposite.  Plaintiffs admit that on August 24, 2022, Twitter disclosed a

26

27

28  _____

[3] To the extent that Plaintiffs reference DoD-related communications from 2020,
those communications discuss "shutting down" DOD-related accounts—*not*
engaging in a Class Period "campaign."  Ex.17 (cited in TAC ¶229 n.22).

1    dataset of 1,198 accounts that Tweeted about India and Pakistan.  *Id.* ¶252 n.30.  But

2    even at that date, Twitter could not "attribut[e] this network to any actor," and the

3    "evidence did not allow [its partner] to make any independent attribution."  Ex.12.

4        Plaintiffs' allegations also fail for another reason:  in December 2021, *before*

5    Agrawal's March 2022 statement (**Statement 6f**), Twitter announced that it was

6    "changing [its] approach" to manipulation disclosures."  Ex.11.  Twitter would

7    "discontinue [its] fully public dataset releases," and instead provide data to experts

8    in its "Moderation Research Consortium" who could "independently choose to

9    publish their findings."  *Id*.  Under that new model, Twitter would share data "about

10   platform manipulation campaigns" with researchers even where it had "not been able

11   to arrive at confident attribution to a state actor," or where it had been "unable to

12   provide broad access due to employee safety concerns."  *Id*.  So when Agrawal said

13   three months later that Twitter had been "transparent about any attempt" to

14   manipulate conversation and had "shared those *transparently*," TAC ¶218, that

15   statement had to be read in "context," including by reference to "other statements"

16   Twitter made "on its website" about its transparency efforts.  *Intel*, 2019 WL

17   1427660, at *11.  With that context, Agrawal did not suggest that Twitter had shared

18   *publicly* any campaign—particularly where it was unable to confidently attribute a

19   responsible state actor.  And there is no dispute that Twitter *did* share what Plaintiffs

20   refer to as Chinar Corp data *with researchers*, without attribution.[4]

21        **7.    Sets 7 and 8 About mDAU**

22        Plaintiffs challenge sixteen statements about Twitter's mDAU estimates.  For

23   the reasons explained in Section II.A of Individual Defendants' Motion (which

24

25

---

26   [4] The TAC also includes "scienter" allegations that Twitter did not employ enough
     foreign-language speakers, and had "reactive" policies.  *See* TAC ¶¶257-259.
27   Plaintiffs do not include these as reasons that Statements 6a-6f were false. *Id*. ¶¶228-
     232.  For good reason:  those allegations have nothing to do with the statements and
28   at most, suggest Plaintiffs disagreed with how Twitter ran its business.  Op.14-15
     (citing *Restoration Robotics*, 417 F. Supp. 3d at 1258).

1  Twitter joins), Plaintiffs fail to plead that any mDAU statement was false or
2  misleading.

3        **B.    Plaintiffs Still Fail To Plead Scienter**

4        Plaintiffs fail to allege with particularity that any Defendant acted with the
5  requisite "strong inference" of scienter—*i.e.*, an "intent to deceive, manipulate, or
6  defraud." *Tellabs*, 551 U.S. 308, 319 (2007). The inference must be "cogent" and
7  "at least as compelling as any opposing inference," and the Court must consider
8  "plausible, nonculpable explanations for defendant's conduct." *Id.* at 323-24;
9  Op.19. "Mere negligence—even head-scratching mistakes—does not amount to
10 fraud." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1103 (9th Cir.
11 2021). Plaintiffs' allegations do not meet this high burden.

12        **1.    Plaintiffs Do Not Plead Scienter Based on Motive**

13       A "securities fraud lawsuit requires a showing of intent to defraud investors"
14 and typically requires that Plaintiffs "plead a plausible motive for the allegedly
15 fraudulent action." *Id.* at 1103. Usually, "a financial motive for securities fraud will
16 be clear." *Id.* at 1107. But Plaintiffs' TAC—like the CAC—does not allege
17 Defendants had any "clear financial incentive" to make "false or misleading
18 statements." *Id.* Indeed, Plaintiffs do not claim Defendants "sought to profit" from
19 the alleged fraud at all. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020);
20 *see also In re Sona Nanotech, Inc. Sec. Litig.*, 562 F. Supp. 3d 715, 728 (C.D. Cal.
21 2021). Plaintiffs' lack of such motive allegations "supports an inference of *no*
22 scienter." *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1101 (N.D. Cal.
23 2018).

24        **2.    Plaintiffs Fail to Plead the Individual Defendants Acted
25             With Deliberate Recklessness**

26       With no "plausible motive," it is "much less likely that [Plaintiffs] can show
27 a strong inference of scienter"—*i.e.*, "compelling and particularized facts showing
28 fraudulent intent or deliberate recklessness." *Prodanova*, 993 F.3d at 1108; *see*

1   *LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*, 2022 WL 2119122, at \*4 (N.D.

2   Cal. 2022) ("plausible motive generally is required to plead scienter"). This is a high

3   bar, and Plaintiffs come nowhere close to meeting it.

4           ***Generic Allegations About What Executives "Would Have" Known.***

5   "Instead of alleging concrete facts," the TAC "pursues an extended chain of

6   inferences" about what the Individual Defendants "would have" done and what they

7   "would, therefore" have known. *In re Northpoint Commcn's Grp., Inc. Sec. Litig.*,

8   184 F. Supp. 2d 991, 1005 (N.D. Cal. 2001); *see also In re Facebook, Inc. Sec. Litig.*,

9   2023 WL 6857600, at \*12 (9th Cir. Oct. 18, 2023). Plaintiffs allege, for example:

10          • After the July 2020 attack, "Agrawal and Kieran *would have* learned"

11            that "all engineers had access to user data" and engineers' access wasn't

12            "logged," TAC ¶99;

13          • Defendants "Segal and Kieran, *based on their titles*" "*would have*

14            *attended*," or "*likely* attended" a February 2021 Zatko presentation and

15            thus "would have" learned "employees had excessive access to data,"

16            *id*. ¶¶58, 103, 119, 134;

17          • Agrawal "*would have* attended" Board meetings or "*would have been*

18            *informed* of the contents of the Board meetings" where "overpermissive

19            access" to data was discussed, *id*. ¶¶83, 105;

20          • Agrawal and Kieran "*would have* had to inquire about previous hacking

21            attempts," and "*would thus have* learned ... that Twitter was regularly

22            hacked," *id*. ¶¶112, 208;

23          • Agrawal and Kieran "*would have received* [a] Draft FTC Complaint"

24            and thus "*would have known*" about "unmonitored data pools" that

25            "could lead to violations," *id*. ¶¶153-154;

26          • Agrawal and Kieran "*would have seen*" or "reviewed" Zatko's

27            February 2022 memo opining that Twitter's cybersecurity practices

28            were deficient, *id*. ¶¶172, 211;

- Agrawal "*would know* of the Chinar Corp campaign" because "it was *generally known by Twitter executives*" or because Zatko purportedly wrote an October memo to unnamed "executives," *id*. ¶¶248-251; and

- All Individual Defendants "*would have known* their statements were false" because of their job "responsibilities," *id*. ¶¶28, 47, 85-86, 106, 116, 134, 153, 172, 180, 312, 316.

Plaintiffs' "inferential leaps" are not particularized facts. *Northpoint*, 184 F. Supp. 2d at 1005. It is not enough to plead Individuals' "general awareness of day-to-day workings of the company's business," *Metzler*, 540 F.3d at 1068—and allegations that "defendants must have known" their statements were false "due to their positions" "does not rise to the required strong inference" of scienter. *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 601 (9th Cir. 2014); *see also* Op.20. Instead, Plaintiffs must plead *facts* that the Individuals had "detailed and contemporaneous knowledge" of information that contradicted their statements. *Prodanova*, 993 F.3d at 1109; *see also Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1078 (C.D. Cal. 2012). This failure alone warrants dismissal.[5]

Nor do any of Plaintiffs' remaining allegations support a "strong inference" of scienter, individually or in combination.

***Zatko's Cybersecurity Reports.*** Plaintiffs allege that Zatko's February 2021 presentation and February 2022 memo support an inference of scienter for Sets 1, 2, and 5. TAC ¶¶58-64, 103-107, 134-136, 209. But Plaintiffs do not adequately allege Kieran (**Statement 1b**) or Segal (**Statement 2**) actually attended that presentation. *See supra* p.16.

And as to Agrawal and Dorsey, Plaintiffs' allegations again fail. As the Court already explained, neither Zatko's February *2021* presentation nor his February *2022* memo supports an inference that Agrawal or Dorsey knew their earlier August,

---

[5] With respect to Segal, there are no other allegations even attempting to plead his scienter for Statements 2 or 5.

1    September, or October *2020* statements "were false at the time they were made."

2    Op.20; *see also* TAC ¶¶40-41 (**Statements 1b-1c**); *id.* ¶184 (**Statement 5**); Dkt.126

3    at 114.  (And, in any event, Zatko's allegations about "engineer access" *track*

4    Agrawal's September 2020 statements.  *Supra*, III.A.1.)

5         Nor does Zatko's presentation or memo provide a strong inference of scienter

6    for the later risk-disclosure statement (**Statement 5**).  As an initial matter, Plaintiffs

7    do not plead any facts suggesting Agrawal or Dorsey "ever accepted" Zatko's views.

8    *Tesla*, 985 F.3d at 1194.  Nor do Plaintiffs allege facts suggesting either Individual

9    "knew" their subsequent disclosures were "inconsistent" with the "facts" Zatko

10   presented.  *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *11 (S.D. Cal. Sept. 20,

11   2021).  Just the opposite, Plaintiffs allege Zatko said "Twitter routinely experienced"

12   "cybersecurity incidents and breaches," TAC ¶¶60, 209, 211—which *matches*

13   Defendants' disclosure that Twitter "experience[s] cyber-attacks of varying degrees

14   on a *regular basis*."  *Habelt v. iRhythm Techs., Inc.*, 2022 WL 971580, at *20 (N.D.

15   Cal. Mar. 31, 2022) (no scienter for statements "consistent with [] express warnings

16   to investors").

17        ***FTC Complaint.***  Plaintiffs allege Agrawal and Kieran's September 24, 2020

18   "privacy by design" statement (**Statement 3**) and Kieran's May 25, 2022 "privacy

19   incident" statement (**Statement 4**) were made with scienter because Agrawal and

20   Kieran would have read a draft FTC complaint, and would know that Twitter had

21   "unmonitored data pools." TAC ¶¶149-154, 160-183.  These "would have" known

22   allegations do not "allege with particularity that each Individual Defendant knew"

23   facts contradicting their public statements.  *City of Sunrise Firefighters Pension*

24   *Fund v. Oracle Corp.*, 2019 WL 6877195, at *22 (N.D. Cal. Dec. 17, 2019); *supra*

25   pp.16-17.  The FTC complaint says nothing about "data pools" or data deletion.  *See*

26   *supra*, III.A.3-4; Ex.22.[6]   Without allegations that the complaint alerted either

27

28   [6] Plaintiffs' other scattershot scienter allegations—about Twitter's supposed lies to the FTC, the 2022 Zatko Memo, and log4j issues, *id.* ¶¶165-183—are unrelated to

1    Individual to the use of data pools, or how that meant they "knew" facts "contrary

2    to [their] public statements," Plaintiffs cannot plead scienter. *AnaptysBio*, 2021 WL

3    4267413, at *11.

4        ***Zatko's October 2021 Memo and Roth's Guest Essay.***  Finally, Plaintiffs

5    contend Agrawal's March 2022 "transparency" statement (**Statement 6f**) was

6    knowingly false because he "knew" of an undisclosed "Chinar Corp influence

7    campaign." TAC ¶¶250-251.  In support, Plaintiffs point to (1) an October 2021

8    Zatko memo to unnamed "executives" stating there were "Chinar Corp" registered

9    accounts on the platform (most of which were "caught" "and suspended"), *id*. ¶248,

10   and (2) a September 2023 Guest Essay by Roth noting that at some point in time, he

11   "wanted to disclose a propaganda campaign operated by a branch of the Indian

12   military." *Id*. ¶243.  But as the Court explained before, Plaintiffs' allegation that

13   "executives" knew about a campaign does not mean that *Agrawal* did.  Nor do

14   Plaintiffs plead any facts suggesting Twitter *ever* confidently attributed the China

15   Corp campaign, let alone that Agrawal knew it.  Op.19-20; *see also supra*, III.A.6*;*

16   *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (scienter must

17   be pled on an individual basis).

18
19       **3.**    **Plaintiffs Do Not Allege a Strong Inference of Scienter as to Twitter**

20       Plaintiffs allege that "Twitter was responsible" for the challenged statements

21   and acted with scienter. *See, e.g.*, TAC ¶239.  But the Ninth Circuit "has not adopted

22   the corporate scienter doctrine."   Op.19; *Prodanova*, 993 F.3d at 1108 (a

23   "corporation can only act through its employees").  Instead, "the PSLRA requires

24   plaintiffs "to plead scienter with respect to those individuals who actually made the

25
26
27   the 2019 security issue and have no bearing on Kieran's knowledge.  *Mendoza v.*
     *HF Foods Grp. Inc.*, 2021 WL 3772850, at *8-10 (C.D. Cal. Aug. 25, 2021)
28   (plaintiffs must make "particular factual allegations tying" the defendant to the
     statements).

1    false statements." *Id*. (quoting *Glazer*, 549 F.3d at 745).[7]  Plaintiffs do not do so.

2        For **Statements 1b-c, 2-5, 6f,** and **7-8**, Plaintiffs' allegations against Twitter

3    fail because the statements were made by Individual Defendants, and Plaintiffs do

4    not "allege with sufficient particularity that any of [the Individual Defendants] acted

5    with scienter."  *Prodanova*, 993 F.3d at 1108.  That leaves five "unattributed"

6    statements **(Statements 1a, 6a-6d**) and one statement by Katy Minshall, a Twitter

7    UK employee (**Statement 6e**).  Plaintiffs' allegations fail because they do not

8    adequately allege who actually made the statements, that the speaker acted with

9    scienter, or both.  *See Glazer*, 549 F.3d at 745.

10        For **Statement 1a** (July blog post about the cyberattack), Plaintiffs speculate

11    that "Agrawal and Kieran" would have "approved the issuance of, and/or furnished

12    information used" because of their executive positions and because they spoke about

13    the attack months later.  TAC ¶87.  And Plaintiffs similarly conclude non-Defendant

14    "Roth would have personally drafted" **Statements 6a-6d** (blog posts about influence

15    campaigns) because he published *other* blog posts about influence campaigns and

16    "misinformation fell within" his department.  *See id*. ¶¶235-237.  But as the Ninth

17    Circuit has explained, "conclusory allegation[s]" that executives "'would have' been

18    involved in creating and publishing" statements "because of their positions in the

19    company   and   their   supervisory   authority"   over   relevant   departments   are

20    "insufficient."  *Prodanova*, 993 F.3d at 1112; *see also Solarcity.*, 274 F. Supp. 3d at

21    1007; *supra* III.B.2.

22        Plaintiffs  acknowledge  Katy  Minshall,  a  Twitter  UK  employee,  authored

23    **Statement 6e**, a blog post noting Twitter had "disclosed over 35 separate state-

24    backed information operations."  TAC ¶217.  Plaintiffs still do not allege Minshall

25

---

26    [7] Plaintiffs assert non-Defendant Kayvon Beykpour's scienter can be attributed to
      Twitter for Statements 7-8, TAC ¶325—but they allege Individual Defendants, not
27    Beykpour, made those statements, so Beykpour's "purported scienter cannot be
      imputed" to Twitter.  *See Cheng*, 2023 WL 2136787, at *9 n.5.  And regardless,
28    Plaintiffs do not allege that Beykpour knew anything demonstrating that either
      Statements 7 or 8 were false or misleading.

"received information that anything in [her post] was false and misleading." Op.20; TAC ¶239. So instead, Plaintiffs say Roth was actually responsible for the statement because he oversaw misinformation campaigns. TAC ¶239. But the blog says that *Minshall*, not *Roth*, wrote the statement. *Id*. ¶217. And Plaintiffs' conclusory allegations otherwise do not satisfy the PSLRA's "high burden." *Prodanova*, 993 F.3d at 1111.

Moreover, *even if* Plaintiffs alleged particularized facts that Agrawal, Kieran, or Roth made **Statements 1a** or **6a-6e**, they do not plead those individuals acted with an "intent to deceive, manipulate, or defraud," or with "deliberate recklessness." *Id*. at 1106. Plaintiffs' allegations about Agrawal and Kieran fail for the same reasons described above. As to Roth, Plaintiffs do not plead *any* facts suggesting he did not believe that Twitter's September 2020-December 2021 statements were accurate. TAC ¶¶214-216. At most, Plaintiffs point to a September 2023 essay in which Roth stated Twitter disclosed an Indian "propaganda campaign" a year after it occurred, in part to protect employees from severe retaliation. *Id*. ¶243. But Twitter said it would only disclose influence campaigns once it had confidently attributed them— and the disclosures in August 2022 show that Twitter *still* had not been able to do so. Ex.12. And Plaintiffs tellingly omit from the TAC that Roth had an *attributed* statement in December 2021 where he explained that Twitter was changing its practices because "[c]onfident attribution isn't always possible" and some disclosures posed "significant risks to the physical safety of our employees." Ex.11. Roth's essay thus underscores the truth of Twitter and Roth's prior disclosures.

In short, the "more plausible" inference is that Defendants believed their statements were true at the time they were made. *Nguyen*, 962 F.3d at 419.

## C.    Plaintiffs Still Fail to Plead Loss Causation

Plaintiffs fail to plead loss causation because they cannot identify a corrective disclosure that revealed the "pertinent truth" about a prior misstatement. *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 n.3 (9th Cir. 2014). Plaintiffs say an August

23, 2022 *Washington Post* article publishing a "partially redacted version of Zatko's whistleblower complaint" and "two internal Twitter documents" ("August 23 Disclosures") "revealed" that Statements 1-6 were false. TAC ¶339; Exs.19-21. But that disclosure was not "corrective." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022).

For Sets 1, 2, and 5, Plaintiffs fail to plead a causal connection between any fraud and the August 23 Disclosures because there was no fraud to begin with. *See supra*, III.A-B. As to Sets 3, 4, and 6, Plaintiffs do not plead particularized facts showing that the August 23 Disclosures "exposed the alleged falsity" of any of the challenged statements. *Nektar*, 34 F.4th at 839.

***Privacy By Design (Set 3).*** Twitter's statement that it was enhancing "training" on "privacy by design," TAC ¶140, was not "invalidated" by anything in the August 23 Disclosures. *Apollo*, 774 F.3d at 608. Plaintiffs say the article revealed that Twitter "could not ensure that it deleted users' information after they deleted their account" (TAC ¶339(a))—but that says nothing about whether the Company was enhancing "privacy by design" training. That the Disclosures tangentially "related" to privacy does not satisfy Plaintiffs' obligation to "trace[] their losses 'back to the very facts about which the defendant lied.'" *Nektar*, 34 F.4th at 839 (citation omitted).

***FTC Settlement (Set 4).*** Nor do the August 23 Disclosures reveal any "new" or "corrective" information suggesting that Twitter had not "addressed as of September 17, 2019" the discrete privacy "issue" that led to the May 25, 2022 FTC settlement. TAC ¶156; *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). At most, Plaintiffs assert that the disclosures revealed that Twitter "continued to mishandle personal information in advertising campaigns." TAC ¶339(a). That generic assertion does not reveal any truth concealed by Twitter's statement that it had addressed the specific problems identified in the FTC complaint. *Id.* ¶156.

1     *Influence Campaigns (Set 6).*  Plaintiffs concede the August 23 Disclosures

2 said nothing suggesting Defendants' influence-campaign statements were false.  So

3 Plaintiffs resort to sleight of hand.  They allege "the *Post* reported" on August 23

4 "that Zatko had filed another report with the Senate Select Committee on

5 Intelligence," and *that* report disclosed an Indian "foreign state influence campaign."

6 TAC ¶341.  But Plaintiffs elide that Zatko's report to the Senate Select Committee

7 was ***not public*** on August 23.  *Id*. (referring to "another report").  On August 23, all

8 the market knew was that the Committee was "trying to set up a meeting" and was

9 "look[ing] forward to learning more." *Id.* ¶¶341-342.  Plaintiffs cannot conjure loss

10 causation by conflating distinct disclosures made at different times.

11 **IV.    CONCLUSION**

12     Twitter respectfully requests that the Court dismiss the TAC with prejudice.

13

14 Dated:  November 10, 2023            Respectfully submitted,

15                               LATHAM & WATKINS LLP

16                               By */s/ Michele D. Johnson*

17                               Michele D. Johnson (CA Bar No. 198298)
      michele.johnson@lw.com

18                               650 Town Center Drive, 20th Floor
                              Costa Mesa, California 92626-1925

19                               Telephone: +1.714.540.1235

20                               Whitney B. Weber (CA Bar No. 281160)
      whitney.weber@lw.com

21                               505 Montgomery Street, Suite 2000
                              San Francisco, California 94111-6538

22                               Telephone: +1.415.391.0600

23                               Andrew B. Clubok (*Pro Hac Vice*)
      andrew.clubok@lw.com

24                               Susan E. Engel (*Pro Hac Vice*)
      susan.engel@lw.com

25                               555 Eleventh Street, NW, Suite 1000
                              Washington, D.C. 20004-1304

26                               Telephone: +1.202.637.3309

27                               *Attorneys for X Corp., successor in interest*

28                               *to named defendant Twitter, Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendant Twitter, Inc. ("Twitter"), certifies that this brief contains 6,994 words, which complies with the word limit of L.R. 11-6.1.

Dated:  November 10, 2023          /s/ *Michele D. Johnson*
                                      Michele D. Johnson