POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Court-Appointed Lead Plaintiff*
*William Baker, Additional Plaintiff*
*Jill Sligay, and Co-Lead Counsel*
*for the Proposed Class*

[additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| WILLIAM BAKER, JILL SLIGAY, LENARD ROQUE, and AMOLKUMAR VAIDYA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC., JACK DORSEY, NED SEGAL, PARAG AGRAWAL, and DAMIEN KIERAN,<br><br>Defendants. | Case No. 2:22-cv-06525-MCS-E<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO TWITTER, INC.'S MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS (DKT. 139)**<br><br>Judge:    Mark C. Scarsi<br>Date:     January 22, 2024<br>Time:    9:00 a.m.<br>Place:    Courtroom 7C |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................................1

II.   STANDARD.......................................................................................................2

III.  ARGUMENT......................................................................................................3

    A.    Statements About Access to User Data (Statement Set 1) Are Actionable Because All Twitter Engineers Had Plenary Access and Agrawal and Kieran Knew It .....................................................................3

        1.    Falsity...............................................................................................3

            a.    The Court already found falsity sufficiently alleged.................3

            b.    Defendants' Challenge Fails Once Again ................................3

        2.    Scienter............................................................................................5

    B.    Segal's Statement that Twitter Followed Cybersecurity Best Practices (Statement 2) After Its Cybersecurity Chief Told Him Precisely the Opposite Is Actionable ..................................................................8

        1.    Falsity...............................................................................................8

        2.    Scienter............................................................................................9

    C.    Defendants' Statement About Privacy By Design (Statement 3) Was False Because Twitter Violated Its Key Tenets ...........................................10

        1.    Falsity.............................................................................................10

        2.    Scienter..........................................................................................11

    D.    Kieran's Statement Implying that Twitter Securely Maintained Its Data (Statement 4) Is Actionable Because Kieran Told Twitter's Board the Opposite......................................................................................11

        1.    Falsity and scienter.......................................................................11

    E.    Twitter's Statements That It Does Not Experience Data Breaches and Incidents (Statement Set 5) Are Actionable Because They Occurred Weekly.......................................................................................12

        1.    Falsity.............................................................................................12

        2.    Scienter..........................................................................................14

    F.    The Statements that Twitter Disclosed All Influence Campaigns (Statement Set 6) Are Actionable Because Twitter Concealed Two..........14

i

1. Falsity ................................................................................................14

    a. The Court already found falsity ..............................................14

    b. Twitter's arguments fail on the merits....................................15

2. Scienter..............................................................................................17

G. Scienter Arguments that Apply to Multiple Statement Sets. .......................18

    1. Imputation .........................................................................................18

    2. Motive ...............................................................................................19

H. The TAC Sufficiently Alleges Loss Causation..........................................21

IV. CONCLUSION.................................................................................................22

ii

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Barnes v. Edison Int'l*,
2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191
(9th Cir. Mar. 18, 2022)......................................................................................9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................2

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
527 F. Supp. 3d 1151 (N.D. Cal. 2021)........................................................8, 20

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ...................................................................4, 5, 6, 7

*Gammel v. Hewlett-Packard Co.*,
2013 WL 1947525 (C.D. Cal. May 8, 2013)............................................8, 19, 20

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ..........................................................................2, 3

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ..........................................................................19

*Greenspan v. Qazi*,
2021 WL 2577526 (N.D. Cal. June 23, 2021)..............................................13, 14

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022) ....................16

*In re Bofl Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ..........................................................................21

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019)...............................................................9

*In re: EZCorp, Inc. Sec. Litig*,
181 F. Supp. 3d 197 (S.D.N.Y. 2016) .................................................................9

iii

*In re Facebook, Inc. Sec. Litig.*,
    84 F.4th 844 (9th Cir. 2023) ...............................................................2, 8, 12, 13

*In re Flowers Foods, Inc. Sec. Litig.*,
    2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)..................................................20

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
    2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ...................................................18

*In re Mattel Sec. Litig*,
    2021 WL 1259405 (C.D. Cal. Jan. 26, 2021)...................................................21

*In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*,
    221 F. Supp. 2d 1090 (N.D. Cal. 2002)..............................................................8

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ............................................................................18

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ............................................................................8

*In re QuantumScape Sec. Class Action Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022)..............................................................13

*In re SolarWinds Corp. Sec. Litig.*,
    595 F. Supp. 3d 573 (W.D. Tex. 2022), *clarified* 2022 WL 3699429
    (W.D. Tex. Aug. 19, 2022) .................................................................................9

*In re Sona Nanotech, Inc. Sec. Litig.*,
    562 F. Supp. 3d 715 (C.D. Cal. 2021) ..............................................................20

*In re Splunk Inc. Sec. Litig.*,
    592 F. Supp. 3d 919 (N.D. Cal. 2022)..............................................................20

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd*, 29 F.4th 611 (9th Cir. 2022) .......12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ............................................................................18

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
    14 F.4th 141 (2d Cir. 2021) ................................................................................3

iv

*LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*,
2022 WL 2119122 (N.D. Cal. June 13, 2022).....................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...............................................................................................19

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ...............................................................................21

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ...............................................................................20

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...............................................................7, 11, 12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).......................................................................................9, 14

*Prodanova v. H.C. Wainwright & Co., LLC*,
2019 WL 4143301 (C.D. Cal. July 2, 2019).............................................8, 18, 19

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014), *overruled on other grounds*, 856 F.3d 605
(9th Cir. 2017)...........................................................................................*passim*

*S.E.C. v. City of Victorville*,
2018 WL 3201676 (C.D. Cal. Jan. 24, 2018)......................................................18

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
360 F. Supp. 3d 1039 (S.D. Cal. 2019)...........................................................3, 14

*Shash v. Biogen, Inc.*,
84 F.4th 1 (1st Cir. 2023)......................................................................................18

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017).........................................................18, 19

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ...............................................................................10

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008) .................................................................................18

v

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................2, 7

*Victorville. Smallen v. W. Union Co.*,
  950 F.3d 1297 (10th Cir. 2020) .............................................................................18

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) .....................................................................................9

*Weston v. DocuSign, Inc.*,
  2023 WL 3000583 (N.D. Cal. Apr. 18, 2023).........................................................7

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .................................................................10, 13, 14

*Xiaojiao Lu v. Align Tech.*,
  Inc., 417 F. Supp. 3d 1266, 1277 (N.D. Cal. 2019)...............................................13

**Statutes**

15 U.S.C. §78j(b) ...................................................................................................18

vi

## LIST OF DEFINED TERMS

| Term | Definition |
| --- | --- |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **CISO** | Chief Information Security Officer |
| **CTO** | Chief Technology Officer |
| **FAC** | Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. 81) |
| **Ind.Br.** | Defendant Jack Dorsey, Parag Agrawal, and Ned Segal's Notice of Motion and Motion to Dismiss Third Amended Class Action Complaint; Joinder and Memorandum of Points and Authorities In Support Thereof (Dkt. 136) |
| **July 2020 Hack** | Hack of Twitter occurring in July 2020. Referenced in TAC ¶2. |
| **mDAU** | Monetizable Daily Active Users |
| **Opinion** | Order re: Defendants' Motion to Dismiss Corrected Amended Complaint (Dkt. 123) |
| **TAC** | Third Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. 130) |
| **Tw.Br.** | Defendant Twitter, Inc.'s Notice of Motion and Motion to Dismiss Third Amended Class Action Complaint; Memorandum of Points and Authorities In Support (Dkt. 139) |

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS    Case No. 2:22-cv-06525-MCS-E

## I.    INTRODUCTION

After falling prey to a headline-grabbing hack *and* recording a $150 million accounting charge for an unrelated incident in which it misused user data ***in the same month***—July 2020—Twitter needed to prove that it could handle cybersecurity. So Twitter CTO Parag Agrawal and then-Data Protection Officer Damien Kieran publicly stated that it now restricted and monitored access to user data, and required that employees show they needed access before receiving it (Statement Set 1)[1].

The Court has already held that Plaintiffs sufficiently alleged the statements' falsity because all Twitter engineers, nearly half its employees, had unrestricted and unlogged access to user data. The TAC addresses the Court's dismissal for lack of scienter by pleading, among other new facts, that Agrawal and Kieran led Twitter's response to the July 2020 Hack. Thus, they knew the severity of the problem when they made their false statements. Faced with a crisis capable of repetition, with the world's eyes upon them, and responding to media reports alleging that Twitter gave employees overbroad and unmonitored access, the inference of scienter is at least as plausible as any competing inference. *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014), *overruled on other grounds*, 856 F.3d 605 (9th Cir. 2017).

The TAC now alleges scienter for other statements whose falsity the Court found sufficiently alleged. In May 2022, Kieran told investors Twitter had stopped misusing users' personal information in 2019 (Statement 4), but he told Twitter's Board the opposite in 2021. Though Twitter stated that it had disclosed all state influence campaigns (Statement Set 6), the head of that disclosure program, Yoel Roth, wrote an op-ed admitting that he knew facts contradicting the statements when Twitter made them.

---

[1] Citations to "Op." and "¶_" are to pages of the Court's prior opinion (Dkt.123) and the TAC, respectively. This Opposition adopts the statement numbers from Ex. 1 to Twitter's motion to dismiss the TAC (Dkt. 140-1). Unless otherwise noted, ***all emphases are added and citations omitted***. Citations to numbered "Ex._" are to exhibits to the Declaration of Whitney B. Weber. (Dkt. 140).

1

The TAC also alleges new false statements. Ned Segal said that Twitter followed cybersecurity "best practices" (Statement 2) after Twitter's cybersecurity chief Peiter Zatko told him he "should be alarmed" by their backwardness. Though Twitter implied its employees followed "privacy by design", a technical term (Statement 3), Twitter's network could not protect or delete user data, its key requirements.

Finally, the Court dismissed Twitter's SEC cybersecurity disclosures on falsity (Statement 5), but thereafter the Ninth Circuit found that a substantially identical statement misled investors under similar circumstances. *In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 858-59 (9th Cir. 2023).

Twitter's unreliable brief misstates the Opinion and the TAC throughout, starting with its first sentence falsely denying that the Opinion found falsity sufficiently alleged for some statements. The Court should deny Twitter's motion to dismiss.

## II.    STANDARD

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), draws all reasonable inferences in Plaintiffs' favor, and upholds the complaint if it states a plausible claim. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).

Twitter challenges three elements of Plaintiffs' Section 10(b) claim, that it (1) made a misstatement or omission of material fact ("falsity") (2) with scienter (3) causing Plaintiffs' losses.

Statements are misleading if they "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Scienter may be pled by alleging knowingly false statements or "deliberate [] recklessness." *Forescout*, 63 F.4th at 765. Complaints allege scienter by pleading facts that holistically give rise to an inference of scienter as plausible as any non-culpable inference. *Tellabs*, 551 U.S. at 314.

2

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS    Case No. 2:22-cv-06525-MCS-E

## III.   ARGUMENT

### A.   Statements About Access to User Data (Statement Set 1) Are Actionable Because All Twitter Engineers Had Plenary Access and Agrawal and Kieran Knew It

#### 1.   Falsity

##### a)   The Court already found falsity sufficiently alleged

The Court held that the FAC sufficiently alleged falsity for some of Twitter's statements about limits on employee access. Op.15:2-13. The TAC repeats the FAC's allegations. Nothing has changed, so neither should the Court's ruling. *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 360 F. Supp. 3d 1039, 1047 (S.D. Cal. 2019) (reiterating ruling because plaintiffs realleged facts).

##### b)   Defendants' Challenge Fails Once Again

Twitter told investors in July 2020 and September 2020 posts that "access [to user data] is limited and is only granted for valid business reasons", and Twitter "require[s] specific justifications for customer data to be accessed" and "actively monitor[s] for misuse." ¶39-40. Agrawal also told *Wired* that "the amount of access, the amount of trust granted to individuals with access to these tools, is substantially lower now." ¶41.

Because Twitter had no separate production environment, engineers had plenary access to user data. ¶60. They were not required to justify their access and it was not logged. *Id.* Thus, "a reasonable investor may have been misled if Twitter was not limiting access only for 'valid business reasons' or if access was not meaningfully restricted.'" Op.15:10-13.

Plaintiffs need only allege facts giving rise to a reasonable inference of falsity. *Forescout*, 63 F.4th at 766. So Plaintiffs need only show *their* interpretation of the alleged misstatements is "***reasonable***", not that it is more plausible than Defendants'. *See id.*; *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021) (sufficient to allege "plausible [] interpretation"; defendants' interpretation "entitled to little weight" on 12(b)(6) motion).

3

Twitter reinterprets its statements without showing that Plaintiffs' reading is unreasonable. Twitter claims it distinguished between customer service representatives, who used tools to access user data, had to provide a justification, and had their access logged, and engineers, who had unfettered and unlogged access that did not rely on tools. Tw.Br. 6-8. To start, Twitter's interpretation makes no sense in context. Granting nearly half of its employees access to user data is, Zatko said, "where Google was prior to 2005-2007." ¶78. The practice also shocked cybersecurity professionals when they found out from Zatko's August 2022 disclosure (not from the September 2020 post). ¶¶77-78. *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) ("The response of investors and analysts [] make clear that [class-period] statements [] were materially false and misleading."). Yet Twitter made its statements in a post titled *Our continued work to keep Twitter secure* touting its "strict" access controls. ¶40. Reasonable investors would not read ambiguous language in the post to directly contradict the post's purpose of bragging that Twitter limits employees' access to user data.

Twitter's interpretation also contradicts the text. Twitter rests its interpretation on five words: "[E]ngineering team members have access" (the post does not say "all", which Twitter's brief gratuitously adds). Tw.Br.7. But the paragraph continues by explaining that representatives also have access. It closes with the "access-is-limited-and-monitored" statement which does not mention engineers, representatives, or tools. Nor does the statement that Twitter requires a "specific justification" in the next paragraph exempt engineers. Reasonable investors would assume the statements covered both engineers and representatives because Twitter did not distinguish between them.

Nor does Twitter's interpretation of the statements from the July 2020 post render Plaintiffs' reading unreasonable. Twitter says the post's second paragraph's reference to tool-using "teams [] that help with account support" refers *only* to representatives. Tw.Br.7. Yet the first paragraph states that "[a] successful attack *required* the attackers to

4

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS       Case No. 2:22-cv-06525-MCS-E

obtain access to [the] tools". ¶39. Either engineers *don't* need tools to access user data, so the first paragraph is false, or they *do*, so the second paragraph is false.

Nor would it matter to a reasonable investor that the July 2020 Hack involved representatives. Twitter's reference to all employees misleadingly implied that it protected user data from all hacks, not just carbon copies. To limit representatives' access while letting engineers' go rampant just creates, as a Twitter engineer said, "scenarios where no one has tried to break into the car through the sunroof because the window is cracked and the keys are in the visor lol." ¶74.

### 2. Scienter

The TAC alleges particularized facts showing that the speakers, Agrawal and Kieran, knew their statements were false. They led Twitter's response to the Hack by cutting off access to every single Twitter employee. ¶¶89, 92. To regain access, employees had to manually change their password while on a video conference with their supervisor. *Id.* This took substantial resources for about a month and harmed Twitter's reputation among users and employees. *Id.* Industry professionals were baffled because the response is what "[you do] if you have the [Chinese spy agency] inside your Active Directory." ¶90. Twitter deployed the nuclear option because it had to: having granted overbroad, unrestricted, and unlogged, access, Twitter could not simply identify the affected accounts and shut them down, the reasonable response. ¶91.

The TAC alleges how Kieran and Agrawal were exposed to additional information showing their statements were false. First, the TAC's allegation that they led the response, absent from the FAC, brings this case entirely within *Reese*. When executives charged with responding to and communicating about a repeatable corporate disaster make specific statements contradicting information they could access, like Agrawal and Kieran, the inference of scienter is strong. 747 F.3d at 570-71. Where the executives "bridge the scienter gap" by referencing the information, as Agrawal and Kieran did by discussing

5

employees' and engineers' access to user data, it is "*far more compelling*" than any innocent explanation. *Id.* at 570, 572, 574-75.

Kieran and Agrawal could easily find information contradicting their statements. Twitter kept meticulous records of previous hacks, most of which related to overbroad access, ¶¶111-12, while Twitter executives readily volunteered internally that all engineers had unrestricted and unlogged access to user data. ¶97.

Or they could learn contradictory facts from the media. After the Hack, multiple outlets reported that Twitter granted overbroad access. ¶¶70-71, 95-96. Even so, Agrawal and Kieran claimed the deficiencies either never existed (*e.g.*, claiming that representatives' access to user data required a specific justification and was logged) or had been fixed (*e.g.*, claiming that access was far more limited than before the Hack). If Agrawal and Kieran spoke without checking the articles' accuracy, they were reckless. If they did check, they knew that the articles were correct and their statements were knowingly false. ¶98.

Employees' overbroad access was discussed at Board meetings Kieran and Agrawal attended. ¶¶102-06. These meetings are just one way Kieran and Agrawal would learn their statements were false, but it is the only one Twitter addresses. And even here, the TAC does not rely solely on their titles, as Twitter claims, but alleges they attended every Board meeting for which Plaintiffs have attendee lists. ¶¶105-06 & n.7, 134 & n.11. The Ninth Circuit recently inferred scienter from the account of an employee who left before the fraud because it showed how the defendant "*would have* behaved and what he *would have* known." *NVIDIA*, 81 F.4th at 939.[2] Kieran and Agrawal's consistent attendance shows they would have attended the meetings discussing information contradicting their statements.

---

[2] The facts contradicting *NVIDIA* defendant Kress's statements were in an operational database she, as CFO, had no reason to consult. 81 F.4th at 923, 940-41.

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS    Case No. 2:22-cv-06525-MCS-E

The core operations inference also establishes scienter. *Reese* explained that in determining whether it is "absurd to suggest" defendants did not know facts contradicting their statements, courts consider the facts' importance to that particular defendant's responsibilities. 747 F.3d at 576. Kieran was a Data Protection Officer and Agrawal a CTO for a company with no CISO. ¶¶87, 115-16. More, Agrawal had been a Twitter engineer for seven years, so he knew from his own experience that engineers had unrestricted and unlogged access to user data. ¶114. And the sheer number of security incidents—in 2020, 40 incidents, of which 20 were breaches, exposed the data of 243 million Twitter users and 29,000 employees/contractors—supports an inference of scienter. ¶¶111-12.

Finally, Defendants subjectively believed their statements were false. Soon after his false statements, Agrawal acknowledged internally that "Twitter has 10 years of unpaid security bills". ¶¶109-10. Kieran acknowledged to Twitter's Board in 2021 that "every new employee has access to data they do not need to have access to for the purpose of their role." ¶160. He added that Twitter had "for many years" attempted to delete data pools that also gave all engineers access to user data. ¶153.

Instead of responding to the TAC's allegations, Twitter chides its use of "would". Yet a complaint survives by raising a strong "***inference*** of scienter." *Tellabs*, 551 U.S. at 325. This includes showing defendants have access to information contradicting their statements and a reason to review it, because they ***would have known*** their statements were false. *E.g. Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show [falsity and scienter] is via contemporaneous reports or data, available to the party, which contradict the statement."); *NVIDIA*, 81 F.4th at 939 (drawing inference from facts showing what defendant "would have" done); *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *21 (N.D. Cal. Apr. 18, 2023) (database that defendants' statements suggested they tracked contained information showing falsity). The TAC shows multitudes of ways Agrawal and Kieran encountered contradictory reports and data: the Hack investigation and response, Board meetings,

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS      Case No. 2:22-cv-06525-MCS-E

previous hack reports, high-level subordinates who knew the statements were false, media reports, job responsibilities, and years of work experience.

There were no such channels in the cases Twitter cites. In *Facebook*, plaintiffs could only speculate about access to information because the speaker was an unnamed spokesperson. 84 F.4th at 863. In *Prodanova v. H.C. Wainwright & Co.*, the plaintiffs had not alleged ***any*** particularized facts and the inference they sought was facially implausible. 993 F.3d 1097, 1109 (9th Cir. 2021). Twitter also cites cases where courts initially granted motions to dismiss but partially denied renewed motions after plaintiffs added allegations about defendants' access to information. *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *18-19, 21 (C.D. Cal. May 8, 2013) ("*HP II*") (added allegations that defendants were personally involved in operations without showing how defendants actually learned statements were false); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1188-89 (N.D. Cal. 2021)("*Oracle II*") (added allegations that defendants knew of public concerns calling statements into question but did not investigate); *In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1098-99 (N.D. Cal. 2002) (added allegations that company engaged in wrongdoing without specifically alleging how defendants learned of it).

**B.    Segal's Statement that Twitter Followed Cybersecurity Best Practices (Statement 2) After Its Cybersecurity Chief Told Him Precisely the Opposite Is Actionable**

*1.    Falsity*

Segal told investors Twitter was "applying" "best practices." ¶120. Even if Twitter followed the specific practice Segal mentioned, Twitter's violations of cybersecurity best practices were legion. They included, among others, granting all engineers unrestricted and unlogged access to user data and lacking a separate production environment. Upon learning of the practices, cybersecurity professionals were shocked; one specifically stated Twitter was violating a "best practice". ¶77.

8

"'[G]eneral statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) ("deep" deal pipeline); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("[E]verything is going fine"). Statements of compliance with "best practices" can mislead investors, *In re: EZCorp, Inc. Sec. Litig*, 181 F. Supp. 3d 197, 206 (S.D.N.Y. 2016), especially when they concern cybersecurity. *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1223, 1227-28 (N.D. Ga. 2019) (cybersecurity "best practices"); *In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 585 (W.D. Tex. 2022) (password "best practices"), *clarified* 2022 WL 3699429 (W.D. Tex. Aug. 19, 2022). So Segal's statement that Twitter "appl[ied]" "best practices" is not puffery and would mislead reasonable investors.

The statement was also misleading because Zatko had vehemently conveyed his disagreement to Segal. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015), the Court held that statements can be misleading if they convey inaccurate facts about their basis, citing as an example "we comply with the law" when the company's lawyer disagrees. *Id.* at 188. Here, Zatko—Twitter's cybersecurity chief—told Segal that he "should be alarmed" by Twitter's deficient cybersecurity. ¶¶59-60. Segal's later declaration that Twitter followed best practices does not "fairly align[] with the information in [his] possession." *Omnicare*, 575 U.S. at 189.[3]

### 2. Scienter

The TAC sufficiently alleges scienter by showing that Segal attended the February 2021 meeting at which Zatko disclosed deficiencies. ¶¶134-137. Segal attended, and delivered presentations at, every Board meeting for which Plaintiffs obtained attended

---

[3] *Barnes v. Edison Int'l*, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir. Mar. 18, 2022), merely found aspirational statements about priorities inactionable.

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS        Case No. 2:22-cv-06525-MCS-E

lists. ¶105 n.7, 134 & n.11. Segal would have attended the February 2021 meeting; he had to prepare for the presentation he would soon deliver to the Board.

### C. Defendants' Statement About Privacy By Design (Statement 3) Was False Because Twitter Violated Its Key Tenets

#### 1. Falsity

Twitter stated that it had "enhanced training content on [] privacy by design." ¶140. The sentence makes no sense unless "privacy by design" is a term of art, which the TAC anyway alleges. ¶142. Reasonable investors assume technical terms take their technical meaning unless defendants say otherwise. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 690 (5th Cir. 2014). So Twitter's statement gave the misleading impression that employees could comply with privacy by design with the right training. ¶140. Yet it requires that companies securely retain user data and delete it when it's no longer useful. ¶142.Twitter could do neither: user data was saved in unmonitored, unindexed pools accessible to all engineers, even after the users cancelled their accounts. ¶¶146-47.

Defendants' argument that investors would not have thought the term refers solely to European Union standards is a strawman. Tw.Br.9-10. The TAC actually alleges investors would have understood it to refer to privacy by design in general. ¶142 & n.12.[4] In *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1193 (9th Cir. 2021), which Twitter cites, the plaintiffs alleged no facts suggesting "manufacturing equipment" was a technical term, let alone that it specifically meant "automated equipment".

Though Twitter argues its noncompliance was immaterial because the data pools containing user data were purportedly not hacked, the FTC Order required deletion on pain of nine- or ten-figure fines. Tw.Br. 10. More, the TAC alleges data in the pools were actually misused by employees, drawing a $150 million fine. ¶¶152, 174. Kieran (one of

---

[4]The Cavoukian article cited in n.12 was removed but is available at https://web.archive.org/web/20230404142801/https://www.ipc.on.ca/wp-content/uploads/resources/7foundationalprinciples.pdf.

the speakers) would later explain to Twitter's Board that, when he made the statements, Twitter was in a multi-year project to develop the capacity to delete user data because its "inability to delete data compounds" the risk of "inappropriate access or use of data." ¶181.

### 2. Scienter

As surrogate CISO and Data Protection Officer, Agrawal and Kieran knew of the data deletion project. ¶153. Kieran's admission to Twitter's Board contradicting his statement implying Twitter followed privacy by design, ¶181, shows his scienter. *Nursing Home*, 380 at 1230.

Both Agrawal and Kieran also knew their statements were false because the FTC told them as much. The Q2 2020 $150 million charge related to Twitter's misuse of user data. ¶¶152, 174. It is absurd to suggest that senior executives responsible for ***protecting user data*** would not have received the FTC Complaint alleging Twitter ***misused user data*** and investigated its cause: unlabeled datasets in Twitter's data pools.

### D. Kieran's Statement Implying that Twitter Securely Maintained Its Data (Statement 4) Is Actionable Because Kieran Told Twitter's Board the Opposite

#### 1. Falsity and scienter

In May 2022, Twitter announced that it reached a settlement with the FTC relating to the $150 million charge. ¶156. In the announcement, Kieran stated that the "issue was addressed as of September 17, 2019." *Id.*

The Court held the FAC sufficiently alleged the statement's falsity. Op.19:9-10. The incident occurred because Twitter kept huge unlabeled, unmanaged pools containing user data. ¶¶152, 157-58. A Twitter employee accessed a dataset and, with no indication that the data was submitted solely for security, misused it for marketing. *Id.* The data pools persisted beyond 2019 and, though Twitter asserts otherwise, Twitter employees once again misused unlabeled data from pools that had been provided for security to advertise to users mid-2021, according to both Zatko and other Twitter executives. *Id.*

11

Twitter's argument that nothing connects the pools to increased risks of misuse ignores that Kieran, the speaker, drew the connection himself. ¶¶160-64. He told Twitter's Board that Twitter had only "fragile infrastructure and processes" "to prevent a recurrence of our prior misuse", namely preventing "emails and phone numbers collected through security flows [from being] used in advertising products." ¶163 (capitalization withdrawn). Kieran said this in 2021, so he knew as of his 2022 statement that the problem had continued past 2019. ¶160. Kieran's contradictory internal and external statements support an inference of scienter. *Nursing Home*, 380 F.3d at 1230.

Twitter also argues that the TAC does not allege what it meant by "addressed". The word plainly conveys, at a minimum, that Twitter had taken steps that would prevent recurrence, which is what the defendant did in the case Twitter cites. *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 883 (N.D. Cal. 2020), *aff'd*, 29 F.4th 611 (9th Cir. 2022).

### E. Twitter's Statements That It Does Not Experience Data Breaches and Incidents (Statement Set 5) Are Actionable Because They Occurred Weekly

#### 1. Falsity

In every Class Period 10-K and 10-Q, Twitter represented that a security breach was a hypothetical risk. ¶184. Twitter stated that its "security measures *may* be breached" and its offerings "*may* be subject to attacks that degrade or deny the ability of people to access [them]." *Id.* Later in the paragraph, Twitter acknowledged that it experienced "cyber-*attacks* of varying degrees on a regular basis," but gave the misleading impression that the risk of a breach was only hypothetical: "[W]e *may* face increased costs *in the event of* an actual or perceived security breach or other security-related incident." *Id.* Yet in 2020, Twitter experienced 40 cybersecurity incidents, including 20 breaches, increasing in 2021 to 50 incidents. ¶186.

After the Court dismissed Statement 5 as not misleading, the Ninth Circuit upheld a similar statement in *Facebook*, 84 F.4th at 854, 858, 862. Facebook's disclosures that "improper access to [] user data [] *could* harm [Facebook's] business and reputation" were

12

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS    Case No. 2:22-cv-06525-MCS-E

misleading because there, as here, improper access had already occurred. *Id*. And Facebook's disclosure that it "could not provide 'absolute security,' that it would continue to be subject to cyberattacks, and that third parties with inadequate data security practices could compromise users' data" was too broad to defuse the danger of misleading investors. *Id*. at 861-62. After *Facebook*, the Court should reconsider its ruling that Twitter's near-identical statement warned investors that breaches had occurred, rather than giving the misleading impression that they had not. Op.14:12-19.

Twitter also overstates the import of its acknowledgement, in other portions of the 10-K, that it disclosed "certain personal data breaches and privacy issues" to the Irish Data Protection Commission and unnamed regulators "from time to time". Tw.Br.12. On a motion to dismiss, Twitter's "technical and narrow" disclosures in different parts of the filings, without reference to frequency or severity, do not render its "more categorical statements [] entirely non-misleading." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 734 (N.D. Cal. 2022). *Wochos*, 985 F.3d at 1196, is inapposite because the defendant disclosed the precise challenge it faced in the very statements at issue and the risk had not materialized.

Statement 5 is also false because Twitter employed foreign spies throughout the Class Period. ¶¶188-204. With unfettered and unlogged access to user data, the spies were an ongoing security incident. ¶204.

The relationship between the statements and falsity allegations was much more attenuated in the cases Twitter cites. *See Xiaojiao Lu v. Align Tech.*, Inc., 417 F. Supp. 3d 1266, 1277 (N.D. Cal. 2019) (plaintiffs alleged without explanation that the same five reasons about defendants' response to competition rendered varied statements about what competitors were doing false); *Greenspan v. Qazi*, 2021 WL 2577526, at *7 (N.D. Cal. June 23, 2021) (alleged conspiracy between Elon Musk and the CIA, the NSA, and drug lords did not render vague general statements misleading). Further, like other cautionary

13

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS    Case No. 2:22-cv-06525-MCS-E

language Twitter cites, its warning of "employee [] malfeasance" is too general to be of any significance.

### 2.    Scienter

Agrawal, Dorsey, and Segal attended the February 2021 meeting where Zatko said that Twitter suffered 40 incidents, including 20 breaches, in 2020. ¶¶58, 209; Section III.B.2. And Zatko told Segal in July 2021 and the Risk Committee in September 2021, at the latest, that Twitter employed Indian government spies. ¶212. In January 2022, before Twitter filed its 2021 10-K and Q1/Q2 2022 10-Qs, the FBI told Twitter it employed a Chinese government spy. *Id.* Defendants knew their statements were false.

Twitter argues that the TAC does not plead Defendants ever accepted Zatko's view, but the case they cite involves projections, *i.e.* opinions about the future. *Wochos*, 985 F.3d at 1194. Defendants were entitled to their own opinions, but not their own facts: Twitter experienced regular hacks. More, under *Omnicare*, 575 U.S. at 189, Twitter could not make assertions about cybersecurity without disclosing that its **cybersecurity chief** disagreed (unlike in *Wochos*, where it was yet-to-be hired suppliers who expressed a contrary opinion, 985 F.3d at 1194). Twitter's other argument conflates "cyber-attacks" with security breaches, but Twitter itself drew the distinction. Twitter "**experience[d]**" cyber-attacks "but **may** face increased costs" if any caused an actual "breach". ¶184.

### F.    The Statements that Twitter Disclosed All Influence Campaigns (Statement Set 6) Are Actionable Because Twitter Concealed Two

#### 1.    Falsity

##### a)    The Court already found falsity

In dismissing the FAC, the Court found that "the use of the word 'any' when describing attempts by state actors to engage in disinformation campaigns on Twitter clearly implies that Twitter had disclosed *all* attempts". Op.9:11-18, 15:24-28. The FAC's allegations sufficed to show falsity for statements 6e and 6f because Twitter concealed an influence operation by the Indian army's Chinar Corp. *Id.* at 15:28-16:2. The TAC repeats

14

these allegations, so the Court should reiterate its holding. *San Diego*, 360 F. Supp. 3d at 1047

The Court's reasoning applies to new Statements 6a-d. In disclosing an influence campaign (Statement 6a), Twitter warned that "[a]ttempts to manipulate our service to undermine democracy – by both foreign and domestic actors – will be met with strict enforcement of our policies". ¶214. Twitter emphasized that the campaign only had "low-level impact", conveying that it would disclose *all* operations. *Id*. Similarly, Statements 6b-6d imply that Twitter is disclosing all information campaigns. ¶¶215-216 ("Twitter is making publicly available archives of Tweets and media that we believe resulted from state-backed information operations on our service."). Twitter nowhere disclosed that it would selectively disclose operations. ¶216.

### b)      *Twitter's arguments fail on the merits*

Twitter's argument that the Chinar Corp campaign did not meet its conditions for disclosure fails. Tw.Br.13. Roth himself admitted in an op-ed that Twitter attributed the campaign to Chinar Corp and should have disclosed it. ¶243. As both Zatko and a Twitter executive quoted in *The Washington Post* admitted, Twitter failed to disclose the Chinar Corp campaign *to court the Indian government*, not because it was unsure who to blame. ¶¶233, 247.

Though Twitter cites a Stanford investigative report's failure to definitively confirm attribution, the report discusses at length why the Chinar Corp is likely responsible. Ex.12. Moreover, Twitter never says it required absolute certainty, and unlike Stanford, it had non-public data to confirm attribution. It is also implausible that an ongoing investigation was preventing disclosure since Twitter did not provide datasets on the Chinar Corp campaign until August 24, 2022, the day after the Zatko report's publication, when it knew it had been caught. ¶252. It would be quite a coincidence if the investigation wrapped up that day.

15

As to the U.S. influence campaign, all Twitter says is that it started in 2017 and Twitter did not promise to publicly disclose all campaigns before 2018. It did. It committed to disclosing "any state-backed information operations *that were reliably identified*", regardless of when they occurred. ¶217. Moreover, the U.S. campaign continued with Twitter's knowledge and cooperation through 2020. ¶¶232, 240. It was an influence operation. It used fake accounts to tout government claims, Twitter claimed that it "violated [its] rules", and Roth wrote that it concerned "inauthentic activity on our platforms." ¶¶231-232, 240.

Twitter relies on extrinsic documents to argue that Statement 6f (Agrawal's unambiguous statement that Twitter had disclosed "any" influence campaign) is not false because in December 2021, it purportedly warned it would stop disclosing some influence operations. Tw.Br.14. It said no such thing. In the document, Twitter acknowledges that in the past, it had experienced threats to employee safety. Ex.11 at 4. It states that "[w]ith these lessons in mind, as well as the emergent risks we see to the physical safety of our employees around the world tied to potential disclosures, we're changing our approach." *Id*. The change? Twitter would stop publicly disclosing *detailed datasets* about influence operations and instead provide them to discrete groups of research organizations. *Id*. Nowhere does Twitter state that it would stop disclosing the operations themselves. Indeed, Twitter simultaneously disclosed *eight* influence operations. *Id.* at 3. Reasonable investors would assume Twitter would continue to disclose the campaigns themselves, because Twitter indicated it was disclosing datasets that imperiled employees.

Even if Twitter was washing its hands of disclosure, it claimed the campaigns would eventually be disclosed when the research organizations published their findings. But Twitter did not share Chinar Corp dataset until the day after the Zatko report's publication. ¶252. Twitter also concealed a U.S. government influence campaign, ¶¶232, 240-241, whose disclosure Twitter does not (and could not) argue would endanger Twitter employees.

16

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS          Case No. 2:22-cv-06525-MCS-E

Finally, Twitter relitigates its argument that the failure to disclose was immaterial. Tw.Br.13. "[R]esolving materiality as a matter of law is generally appropriate only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022). In any case, Twitter provides no new arguments, so the Court should reaffirm its ruling. And the TAC even expands on the FAC, quoting Twitter's own words that "[t]ransparency is fundamental to the work we do []" and "[i]t is now more important than ever that we [] disrupt global state-backed information operations." ¶¶221. Though not themselves actionable, these statements establish that Twitter told reasonable investors statements about influence campaigns were material.

### 2. Scienter

Statements 6a-e were all attributed to Twitter. Roth "personally drafted and/or approved" the statements, so his scienter is imputed to Twitter. Section III.G.1, below. Roth himself admitted that Twitter confirmed attribution of the Chinar Corp campaign, but did not disclose it for other reasons, ¶243, refuting Twitter's argument that it withheld disclosure because it was not confident the Chinar Corp was responsible. Tw.Br.21. Roth also admitted the U.S. campaign concerned "inauthentic activity on our platforms." ¶240. Roth knew Statements 6a-e were false when made.

The Court held the FAC did not allege Agrawal's scienter for Statement 6f for failing to specify who learned about the Chinar Corp operation. Op.19:23-20:5. Roth's admission that executives at Twitter knew the Chinar Corp orchestrated the campaign and that "top-level" executives micromanaged Twitter's Indian operations, with a "unique level of escalation," supports Agrawal's scienter. ¶¶205, 243-244. The TAC cites an example in which Segal personally asked Zatko to investigate whether *individual tweets* violated its policy. ¶197. So "top-level" involvement meant that Twitter's C-suite, including Agrawal, was personally involved in the details of Indian operations.

17

The TAC also newly pleads that in October 2021, Zatko sent a memorandum to Twitter executives stating that the Chinar Corp had again used fake accounts to spread misinformation. It warned that "absent disclosure it doesn't seem like we have a viable strategy other than perpetual whack-a-mole." ¶248. Not only did it warn about the campaign, it stated that "a further 132" accounts engaged in "exactly the same behavior", which makes no sense unless executives already knew what the Chinar Corp was and what it was doing. *Id.*

Moreover, Agrawal's statement's specificity contributes to scienter. *Reese*, 747 F.3d at 572 (factual statement that corrosion was "low and manageable" sufficiently specific to support scienter). So does its strength: according to Agrawal, Twitter had not just disclosed campaigns, it had been "***very***, ***very*** transparent" about "any". ¶218. *Shash v. Biogen, Inc.*, 84 F.4th 1, 14 (1st Cir. 2023) (breadth of statement that "all data" consistent with interpretation supported scienter). More, Agrawal's "assertion that [he was] unaware of an alleged issue [is] directly contradicted by the fact that [he] specifically addressed it in [his] statement". *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017). Excusing Agrawal because he "possibly failed to review important information accessible to [him] runs afoul of the policy objective to discourage deliberate ignorance." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *13 (E.D. Pa. Mar. 25, 2020). "Recklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012).

## G.    Scienter Arguments that Apply to Multiple Statement Sets.

### 1.    Imputation

Courts impute the scienter of, at a minimum, those "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)[.]" *S.E.C. v. City of Victorville*, 2018 WL 3201676, at *4 (C.D. Cal. Jan. 24, 2018).

The Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits, all adopted the exact same standard as *Victorville*. *Smallen v. W. Union Co.*, 950 F.3d 1297, 1313 (10th Cir. 2020)

(citing cases from the Fifth, Seventh, and Eleventh Circuits); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014); *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)(sweeping even more broadly).

Roth "personally drafted and/or approved" the statements about influence campaigns. ¶237. They were made in posts about the program to disclose state influence campaigns that Roth concededly "[s]pearheaded." ¶235. Moreover, unlike Viklund and Silvera in *Prodanova*, Roth was involved in day-to-day communications about the program, writing five articles for Twitter's blog about it. ¶236 n.27. And if Roth's scienter cannot be imputed to Twitter for those statements, then no one's can, so Twitter could lawfully defraud investors through unattributed statements.

Roth's scienter is also imputed to statements made under Minshall's name (Statement 6e). ¶239. Roth led the program about which Minshall was writing, so his authorization was necessary for publication.

Agrawal and Kieran's scienter can be imputed to Twitter for the July 2020 statements (Statement 1a). They led Twitter's response to the hack, and the latter September 2020 article published under their name used the same language. ¶87.

Defendants' cases are inapposite. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008), addressed a different issue: whether all employees' knowledge can be imputed to the company under a collective scienter theory. And *Prodanova* examined the participation of two non-speaking defendants, Viklund and Silvera, and unnamed members of the compliance department, in making the allegedly misleading statements. 993 F.3d 1097, 1108. Had any of them approved, or furnished information for, the statements, the court could have found scienter. *Id.* at 1109-1110.[5]

    2.    *Motive*

---

[5] The district court opinion shows that the plaintiffs alleged only that Viklund and Silvera controlled speakers, not that they made statements themselves. *Prodanova v. H.C. Wainwright & Co., LLC*, 2019 WL 4143301, at *1 (C.D. Cal. July 2, 2019).

19

"The absence of a motive allegation, though relevant, is not dispositive." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). Where a complaint alleges recklessness, courts do not "'draw a negative inference from the absence of stock sales that benefitted the defendant[.]'" *Shenwick*, 282 F. Supp. 3d at 1149.[6] Motives need not take the form of a concrete pecuniary benefit. *HP II*, 2013 WL 1947525, at *21 ("It is far from implausible that a corporate executive who had spent months building excitement and momentum [] might recklessly misrepresent the inability to deliver on those promises."); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 949 & n.9 (N.D. Cal. 2022) (allegations that defendants had "incentive" to deceive investors to boost career meant lack of more particularized "motive" did not detract from scienter). Allegations only cut significantly against scienter if it is implausible that anyone would act deceptively in the circumstances the complaint presents. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (implausible that biotech company would temporarily prop up stock price when FDA approval was impossible); *accord In re Sona Nanotech, Inc. Sec. Litig.*, 562 F. Supp. 3d 715, 727 (C.D. Cal. 2021) (same).

The TAC does not allege that Defendants sold stock. But they had a motive: reassuring the public and investors after a high-profile hack. *Oracle II*, 527 F. Supp. 3d at 1185 (citing *Endologix* and finding motive for defendant to conceal basis of performance to buy time for disclosed strategy to succeed). Defendants also had a motive to falsely make Statement Set 6. Twitter distinguished itself from the competition by purportedly disclosing all influence campaigns but sought to preserve its relationship with the Indian government to maintain access to the Indian market. *HP II*, 2013 WL 1947525 at *21.

Agrawal's treatment of Zatko confirms his scienter. Courts may infer defendants' scienter when they conceal the relevant information from other actors. *In re Flowers*

---

[6] *LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*, 2022 WL 2119122, at *4 (N.D. Cal. June 13, 2022), an outlier, ignores *Matrixx* and incorrectly holds that only specific pecuniary benefits qualify as motives.

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS    Case No. 2:22-cv-06525-MCS-E

*Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *13 (M.D. Ga. Mar. 23, 2018) (allegations that superiors told employee to they would "find another accountant" and to "pipe down" when he expressed concerns supported inference of scienter). Agrawal fired Zatko for attempting to alert the Board to Agrawal's false statements and Twitter misled the FTC. ¶¶166-67, 347-74.

### H.    The TAC Sufficiently Alleges Loss Causation

Defendants concede loss causation for Statement Sets 1, 2, and 5. For Statements 3 (privacy by design) and 4 (FTC Settlement), Defendants incorrectly argue that Zatko's report did not expose the alleged falsity. It revealed that Twitter could not delete users' information, exactly why the privacy-by-design statements were false. ¶¶141-148, 339a. It also revealed that Twitter had continued to keep user data in large unmanaged pools, exactly what Kieran said had been addressed in 2019. ¶¶157-159, 339a, f. Though "a corrective disclosure need not be a mirror image of the[] misstatement," it is here. *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 n.3 (9th Cir. 2020).

Defendants argue that there is no loss causation for Statement Set 6 (influence campaigns) because Zatko's Senate Intelligence Committee report was not published contemporaneously. Tw.Br.23. "Disclosure of the fraud is not a *sine qua non* of loss causation." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). One of the "'infinite variety' of causation theories a plaintiff might allege" is "showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.* at 754.

This case resembles *In re Mattel Sec. Litig*, 2021 WL 1259405 (C.D. Cal. Jan. 26, 2021). Mattel disclosed that it was investigating a whistleblower report, causing its stock price to fall. *Id.* at *11. The report itself set out the fraud, but it was not made public. *Id.* Because the fraud caused the whistleblower report, the Court found loss causation sufficiently alleged. *Id.* at *12.

*The Washington Post* reported on August 23, 2022 that Zatko filed a report with the Intelligence Committee. ¶341. The *Post* also reported that the Committee sought a meeting

with Zatko to discuss the report. ¶¶341-42. During trading hours on August 23, an article quoted the Committee's Ranking Member as saying, "we're treating [Zatko's] complaint with the seriousness it deserves." ¶342. The report alleged that Twitter had knowingly concealed a state influence campaign. ¶341. That day, Twitter's stock price closed at $39.86, down 7.3%. ¶343. Though the market did not know exactly what Zatko had told the Committee, the reference to a non-public report concerning foreign intelligence matters was ominous for a social media company like Twitter, and the market plainly found Zatko credible. And as in *Mattel*, Zatko's report was later corroborated, including by the head of Twitter's foreign influence operation disclosure program. ¶¶240-47. Twitter's failure to disclose influence campaigns led to Zatko's report; news of the report caused Twitter's stock price to drop. The TAC sufficiently alleges loss causation.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Twitter's motion to dismiss. Should the Court grant the motion, even in part, Plaintiffs request leave to amend.

Dated: December 1, 2023                    Respectfully submitted,

By: */s/ Jonathan D. Park*

**THE ROSEN LAW FIRM, P.A.**          **POMERANTZ LLP**

Laurence M. Rosen (SBN 219683)        Jeremy A. Lieberman (*pro hac vice*
355 South Grand Avenue, Suite 2450    forthcoming)
Los Angeles, CA 90071                 Jonathan D. Park (*pro hac vice*)
Telephone: (213) 785-2610             Dolgora Dorzhieva (*pro hac vice*)
Facsimile: (213) 226-4684             600 Third Avenue, 20th Floor
Email: lrosen@rosenlegal.com          New York, New York 10016
                                      Telephone: (212) 661-1100
Jonathan Horne (*pro hac vice*)       Facsimile: (212) 661-8665
Brian B. Alexander (*pro hac vice*)   jalieberman@pomlaw.com
275 Madison Avenue, 40th Floor        jpark@pomlaw.com
New York, New York 10016              ddorzhieva@pomlaw.com
Telephone: (212) 686-1060

Facsimile: (212) 202-3827
jhorne@rosenlegal.com
balexander@rosenlegal.com

*Counsel for Court-Appointed Lead Plaintiff William Baker and Additional Plaintiffs Lenard Roque and Amolkumar Vaidya, and Co-Lead Counsel for the Class*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (212) 661-8665
jpafiti@pomlaw.com

*Counsel for Court-Appointed Lead Plaintiff William Baker, Additional Plaintiff Jill Sligay, and Co-Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel*

23

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this memorandum of points and authorities contains 6,975 words, including headings, footnotes, and quotations but excluding the caption, the signature block, the certification required by L.R. 11-6.2, and any indices and exhibits.

Dated: December 1, 2023                          /s/ *Jonathan D. Park*

                                                 Jonathan D. Park

PLAINTIFFS' MP&A IN OPPOSITION TO TWITTER'S MOTION TO DISMISS          Case No. 2:22-cv-06525-MCS-E