POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Court-Appointed Lead Plaintiff*
*William Baker, Additional Plaintiff*
*Jill Sligay, and Co-Lead Counsel*
*for the Proposed Class*

[additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| WILLIAM BAKER, JILL SLIGAY, LENARD ROQUE, and AMOLKUMAR VAIDYA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC., JACK DORSEY, NED SEGAL, PARAG AGRAWAL, and DAMIEN KIERAN,<br><br>Defendants. | Case No. 2:22-cv-06525-MCS-E<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION OF DEFENDANTS JACK DORSEY, PARAG AGRAWAL, AND NED SEGAL TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT (DKT. 136)**<br><br>Judge:    Hon. Mark C. Scarsi<br>Date:     January 22, 2024<br>Time:     9:00 a.m.<br>Place:    Courtroom 7C |

# **TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................... 1

II. FACTS ..................................................................................................................... 2

    A. In 2019, Twitter Introduces mDAU, Distinguishing it From Metrics that Include Users That Do Not See Ads. ........................................................... 2

    B. During the Class Period, Defendants Misleadingly Highlight mDAU Growth. ....................................................................................................... 3

    C. Elon Musk Agrees to Buy Twitter, then Discovers and Exposes Defendants' Misrepresentations ............................................................................................. 4

III. THE TAC STATES A CLAIM. ............................................................................... 6

    A. Defendants Made Materially False or Misleading Statements Concerning mDAU. ......................................................................................................... 6

        1. Defendants Misrepresented that Twitter "Stop[ped] Counting" Spam and Fake Accounts in mDAU and Related Metrics. ........................... 6

        2. Defendants Misleadingly Touted mDAU That Reflected Millions of Unmonetized and Unmonetizable Accounts. ..................................... 8

    B. THE TAC ADEQUATELY ALLEGES SCIENTER ................................ 11

        1. The Court Already Found A Strong Inference Of Scienter. ............. 11

        2. Defendants Constantly Tracked mDAU as the "best way" To Measure Twitter's Success ............................................................... 12

        3. The Misstatements' Specificity Supports Scienter. ......................... 14

        4. Defendants' Concealment of Information from Musk Supports Scienter. ........................................................................................... 14

        5. Defendants Had A Motive. .............................................................. 15

    C. THE TAC SUFFICIENTLY ALLEGES LOSS CAUSATION. ................ 16

        1. May 13, 2022 ................................................................................... 16

        2. July 8, 2022 ..................................................................................... 17

        3. July 7, 2022 ..................................................................................... 18

        4. Defendants' Short Seller Cases Are Irrelevant ............................... 18

        5. Defendants Cannot Establish That The Entire Stock Price Decline Was Unrelated To Their Fraud ........................................................ 19

i

        6.     Investors Suffered An Economic Loss Resulting From the Fraud...19

    D.     THE CONTROL PERSON CLAIMS ARE ADEQUATELY PLED. .......20

IV.   CONCLUSION...................................................................................................22

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...............................................................................7

*Borteanu v. Nikola Corp.*,
  2023 WL 1472852 (D. Ariz. Feb. 2, 2023) ..........................................................9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017), 20(a)....................................................................20

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  527 F. Supp. 3d 1151 (N.D. Cal. 2021)...............................................................15

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) .....................................................................5, 8, 12

*Gammel v. Hewlett-Packard Co.*,
  2013 WL 1947525 (C.D. Cal. May 8, 2013)..................................................14, 15

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ............................................................................6, 7

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ...........................................................................20

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022) ....................10

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ......................................................20

*In re BofI Holding, Inc. Sec. Litig.*,
  2017 WL 2257980 (S.D. Cal. May 23, 2017) ......................................................21

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) .....................................................16, 17, 18, 19

iii

*In re Facebook, Inc. Sec. Litig.*,
    84 F.4th 844 (9th Cir. 2023) ..............................................................................7, 15

*In re Fibrogen, Inc.*,
    2022 WL 2793032 (N.D. Cal. July 15, 2022) ....................................................14

*In re Flowers Foods, Inc. Sec. Litig.*,
    2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)....................................................14

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...........................................................................15

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005)................................................................20

*In re InfoSonics Corp. Sec. Litig.*,
    2008 WL 11338358 (S.D. Cal. Apr. 28, 2008) ..................................................21

*In re LDK Solar Sec. Litig.*,
    2008 WL 4369987 (N.D. Cal. Sept. 24, 2008)...................................................20

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 1259405 (C.D. Cal. Jan. 26, 2021).........................................16, 18, 19

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    78 F. Supp. 3d 1215 (N.D. Cal. 2015)................................................................20

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ..............................................................................18

*In re Netbank, Inc. Sec. Litig.*,
    2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)......................................................16

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) .............................................................................13

*In re Thoratec Corp. Sec. Litig.*,
    2006 WL 1305226 (N.D. Cal. May 11, 2006).....................................................10

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)...........................................................................................20

iv

*Jun Shi v. Ampio Pharms., Inc.*,
2020 WL 5092910 (C.D. Cal. June 19, 2020) ....................................................12

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .........................................................................9

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ....................................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).....................................................................................14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .....................................................................19

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ..........................................................21

*Mild v. PPG Indus., Inc.*,
2018 WL 6787351 (C.D. Cal. Dec. 21, 2018).....................................................13

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) .........................................................................8

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ..............................................................15, 16, 17

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020)..............................................................10

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) ..................................................................10

*Purple Mountain Tr. v. Wells Fargo & Co.*,
432 F. Supp. 3d 1095 (N.D. Cal. 2020)............................................................20

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .......................................................................13

*Ret. Sys. v. Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012) .............................................................13

v

*Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018)................................................................19

*Roberti v. OSI Sys., Inc.*,
    2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) .....................................................14

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...............................................................................12

*S.E.C. v. City of Victorville*,
    2018 WL 3201676 (C.D. Cal. Jan. 24, 2018) ......................................................13

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
    360 F. Supp. 3d 1039 (S.D. Cal. 2019)..................................................................6

*Sgarlata v. PayPal Holdings, Inc.*,
    2018 WL 6592771 (N.D. Cal. Dec. 13, 2018).....................................................20

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017)...........................................11, 12, 14, 15

*Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*,
    2023 WL 3549506 (C.D. Cal. May 9, 2023) ........................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).............................................................................................10

*Victorville. Smallen v. W. Union Co.*,
    950 F.3d 1297 (10th Cir. 2020) ...........................................................................13

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015).......................................................16

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005)...................................................................9

**Rules**

Fed. R. Civ. P. 12 ...............................................................................................15, 19

**LIST OF DEFINED TERMS**

| Term | Definition |
| --- | --- |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **CISO** | Chief Information Security Officer |
| **CTO** | Chief Technology Officer |
| **FAC** | Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. 81) |
| **Ind.Br.** | Defendant Jack Dorsey, Parag Agrawal, and Ned Segal's Notice of Motion and Motion to Dismiss Third Amended Class Action Complaint; Joinder and Memorandum of Points and Authorities In Support Thereof (Dkt. 136) |
| **July 2020 Hack** | Hack of Twitter occurring in July 2020. Referenced in TAC ¶2. |
| **mDAU** | Monetizable Daily Active Users |
| **Opinion** | Order re: Defendants' Motion to Dismiss Corrected Amended Complaint (Dkt. 123) |
| **TAC** | Third Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. 130) |
| **Tw.Br.** | Defendant Twitter, Inc.'s Notice of Motion and Motion to Dismiss Third Amended Class Action Complaint; Memorandum of Points and Authorities In Support (Dkt. 139) |

vii

PLAINTIFFS' MP&A IN OPPN. TO DORSEY ET AL. MOT. TO DISMISS          Case No. 2:22-cv-06525-MCS-E

## I.   INTRODUCTION[1]

Plaintiffs make particularized allegations showing that for years, Defendants misled investors about one of Twitter's key metrics, monetizable Daily Active Users, or "mDAU". Defendants told investors that the number of fake and bot accounts included in mDAU was minimal and that Twitter removed them when they were discovered. Defendants also told investors that all mDAU saw ads and therefore generated revenues for Twitter. Neither was true.

Addressing concerns about fake and spam accounts, Defendants stated that "[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics" (Statement 8).[2] The Court already held this statement was materially false and misleading and on at least two occasions made with scienter. The TAC supports an inference of scienter throughout the Class Period.

In introducing mDAU, Defendants defined it as users who accessed Twitter through platforms that show ads, which Defendants now maintain conveyed that mDAU includes many users who did not see ads. Yet in the very next sentence, Defendants explained that mDAU was "not comparable" to other companies' metrics "that include[] people who are not seeing ads." The resulting impression was highly misleading. During the Class Period, a large and increasing proportion of mDAU were users who did not see ads and did not generate revenue—from 25% of all users in Q2 2021 to almost 30% by Q1 2022. Defendants' statements concealed that while mDAU was increasing, the

---

[1] Citations to "¶" are to the Third Amended Complaint ("TAC") (Dkt.130). Citations to "Ind.Br." are to the "Individual Defendants'" motion to dismiss (Dkt.136). Citations to "Bartlett Decl." and "Weber Decl." are to the Declarations of Jaime Bartlett (Dkt.138) and Whitney Weber (Dkt.140). Unless otherwise noted, emphases are added and internal quotations and citations are omitted.

[2] Statement 8 was Statement 27 in the prior opinion. Dkt.123 ("Op.") at 18:28-19:5.

1

increase came from low quality users Twitter could not monetize. Scienter is equally clear: mDAU was Twitter's single most important metric. Moreover, by insisting they conveyed that mDAU included users who did not see ads, Defendants admit they knew mDAU included such users.

The TAC addresses the Court's loss causation finding by showing what "corrective information was made public" and "that [Twitter's] share price fell significantly after the truth became known." Op. at 25:7-9. Three disclosures in May and July 2022 revealed that not all mDAU saw ads and that Twitter included suspended fake and spam accounts in the mDAU figures it reported to investors. Indeed, the July 8, 2022 letter from Musk's counsel at Skadden addressed "false and misleading representations" by Defendants, *specifically including Statement 8*.

The TAC states a claim. The Court should deny the motions to dismiss.

## II.    FACTS

### A.    In 2019, Twitter Introduces mDAU, Distinguishing it From Metrics that Include Users That Do Not See Ads.

Twitter generates the vast majority of its revenue from advertising. ¶283. Before 2019, Twitter told investors that its key metric was "MAU," or monthly active users, a widely used metric among social media and other digital product companies. ¶305. After three straight quarters of decreasing MAU, however, Twitter changed tack. *Id*.

In February 2019, Twitter—led at that time by Defendants Dorsey (CEO) and Segal (CFO)—introduced a new, proprietary user engagement metric: mDAU. ¶13. Twitter explained that only users logging in "through twitter.com or our Twitter applications that are able to show ads" were counted in mDAU. ¶282. In the next sentence, Twitter emphasized that mDAU was "not comparable to current disclosures from other companies, many of whom share a more expansive metric that includes people who are *not* seeing ads." *Id*. Defendants told investors this more focused metric was intended "to align our external stakeholders around one metric that reflects our goal of delivering value to people on Twitter every day and monetizing that usage." *Id*.

PLAINTIFFS' MP&A IN OPPN. TO DORSEY ET AL. MOT. TO DISMISS          Case No. 2:22-cv-06525-MCS-E

Defendants emphasized to investors that mDAU was the "***best way***" to evaluate Twitter's performance. ¶306; *see also* ¶¶307-11. Defendant Segal told analysts that "we've been tracking [mDAU] internally for a long time as the best way to measure our success in getting people to use Twitter as a daily part of their lives." ¶308.

## B.   During the Class Period, Defendants Misleadingly Highlight mDAU Growth.

After Twitter unveiled mDAU as its new "key" metric, it reported ten straight quarters of mDAU growth. ¶305. Defendants reported that mDAU grew from 186 million in the second quarter of 2020 to 238 million in the first quarter of 2022—a 28% increase. ¶¶263, 280. This marked steady progress towards Twitter's goal, announced in 2021, of reaching 315 million mDAU by the fourth quarter of 2023. ¶314.

Market participants and the media variously reported that mDAU measures "how many people actually see ads," "daily users who see ads on the site," "users exposed on a daily basis to advertising," "those who see ads," "users who see advertising," and "daily users who see ads." ¶¶283-84.

Yet unbeknownst to investors, but shown by internal Twitter metrics, mDAU included tens of millions of users who did not see ads and were not monetized or monetizable. ¶286. In Q2 2021, 51 million users included in mDAU (24.8%) did not see *any* ads at all. ¶288. That number increased during the Class Period, to 65 million (nearly 29%) in Q1 2022. *Id*. Moreover, Twitter's revenues were heavily dependent on its most engaged users; 7% of users generated nearly half of revenues. ¶291. Yet during the Class Period, more than half the increase in mDAU was users who did not generate revenues, while less than 1% were among the 7% of heavy users. *Id*.

mDAU also included users Twitter had already suspended because Twitter had determined they were spam or bots. Defendants assured investors that "[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics." ¶¶297, 301. In fact, Twitter continued to count suspended accounts in mDAU for the quarter in which they were suspended. ¶298. The

3

number of suspended fake or spam accounts included in mDAU increased during the Class Period, reaching 13 million in Q4 2021 (6.2% of the 209.3 million mDAU reported for that quarter) and 15 million in Q1 2022 (6.9% of 214.7 million). ¶302.

### C.    Elon Musk Agrees to Buy Twitter, then Discovers and Exposes Defendants' Misrepresentations.

On April 14, 2022, Musk made an offer to buy Twitter for $54.20 per share, which Twitter's Board accepted on April 25. ¶317. Three days later, Twitter immaterially restated mDAU for Q4 2020 and each quarter of 2021. ¶¶278, 317.[3]

In response, Musk privately requested that Twitter explain how it counted bots and spam accounts in mDAU. ¶318. Musk and Twitter held a meeting at Twitter's headquarters on May 6, 2022, which Defendant Segal attended in person and Defendant Agrawal attended remotely, but there, Defendants could not or would not answer Musk's questions. ¶¶318-19.

On May 13, 2022, before the market opened, Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." ¶330. Musk linked to a *Reuters* article reporting that Twitter, in its Q2 2022 10-Q filed on May 2, 2022, had "estimated . . . that false or spam accounts represented fewer than 5% of its monetizable daily active users during the first quarter." *Id.* Twitter's stock price closed at $40.72 on May 13, 2022, down 9.7% ($4.36). ¶333.

Musk continued pressing Twitter for information. On a June 30, 2022 call with Musk's team, Defendant Segal admitted that the mDAU that Twitter quarterly reported to investors included accounts that Twitter had already determined were fake and had suspended. ¶300.

---

[3] Twitter restated mDAU from Q4 2020 to Q4 2021 by approximately 1.4 to 1.9 million per quarter. Dkt.88-13 at 34 of 81.

PLAINTIFFS' MP&A IN OPPN. TO DORSEY ET AL. MOT. TO DISMISS    Case No. 2:22-cv-06525-MCS-E

On July 7, 2022, after trading closed, *The Washington Post* reported that Musk's agreement to acquire Twitter was "in peril." ¶335. The *Post* reported that Musk and his team concluded that they could not verify Twitter's claims regarding fake and spam accounts, were prepared to make "a change in direction," and had "stopped engaging in certain discussions around funding" for the acquisition. *Id*. The following day, Twitter's stock price fell 5.1%. 337.

On July 8, 2022, after markets closed, Twitter publicly filed with the SEC a letter it had received from Musk's counsel. ¶336. In the letter, Musk's counsel stated that he was cancelling the deal in part because Twitter "appears to have made false and misleading representations upon which Mr. Musk relied when entering into the Merger Agreement[.]" *Id*. The letter identified Statement 8 ("[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics") as one such statement, disclosing that "we understand, based on Twitter's representations during a June 30, 2022 call with us, that Twitter includes accounts that have been suspended—and thus are known to be fake or spam—in its quarterly mDAU count even when it is aware that the suspended accounts were included in mDAU for that quarter." *Id*. Twitter's stock price fell another 11.3% the next trading day. ¶338.

PLAINTIFFS' MP&A IN OPPN. TO DORSEY ET AL. MOT. TO DISMISS          Case No. 2:22-cv-06525-MCS-E

## III.    THE TAC STATES A CLAIM.

### A.    Defendants Made Materially False or Misleading Statements Concerning mDAU.

Defendants made materially false and misleading statements to the market about Twitter's mDAU metrics. "A statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023). "Falsity is subject to a particularity requirement and the reasonable inference standard of plausibility set out in *Twombly* and *Iqbal*," not the "strong inference" standard applicable to scienter, so "we do not require a 'strong inference of fraud.'" *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).

#### 1.    Defendants Misrepresented that Twitter "Stop[ped] Counting" Spam and Fake Accounts in mDAU and Related Metrics.

Each of Twitter's Forms 10-K and 10-Q filed during the Class Period stated that "***[a]fter we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics.***" ¶301. The Court held that the FAC sufficiently alleged this statement was false because "the mDAU numbers that Twitter reported each quarter . . . included accounts Twitter determined were fake during the quarter in which such accounts were counted in mDAU." Op. at 19:3-5. The TAC repeats the relevant allegations from the FAC, so the Court should reach the same decision. *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 360 F. Supp. 3d 1039, 1047 (S.D. Cal. 2019) ("Because the factual allegations in the FAC are the same as the initial complaint, the Court relies on its reasoning in the prior order.").

Defendants provide no grounds for the Court to reach a different conclusion. First, Defendants pedantically maintain that, technically, "average mDAU" is not the same as "mDAU." Ind.Br. at 11:27-12:8. This fails. "Average mDAU" was *the* mDAU metric reported to investors and was referred to simply as "mDAU." *See, e.g.*, ¶265 ("Average

mDAU was 187 million for Q3") and ¶264 (Dorsey: "I'm pleased mDAU grew . . . to 187 million"). Moreover, the misstatement concerns mDAU *and* "other related metrics." ¶301.

As to "average mDAU," Defendants maintain that reasonable investors would assume that Twitter calculated mDAU daily and then, at the end of the quarter, averaged the numbers, ignoring any information Twitter had learned in the meantime (*e.g.*, that an account is a bot). Ind.Br. at 12:9-11.

But Defendants' interpretation of the statement as not concerning "average mDAU" "is hardly the only—or even the most plausible—one." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008). To include known fake accounts in a metric that measures real accounts is perverse. So, when Defendants said Twitter "stop[ped] counting" accounts after determining they were "spam, malicious automation, or fake," reasonable investors would believe Twitter removed confirmed fake accounts from average mDAU before reporting it. Indeed, Defendant's own exhibits establish that investors believed mDAU was calculated at the end of the quarter. *See* Bartlett Decl., Ex. G at 4 of 4 ("Twitter said that every three months, it takes a sample of the 'Monetizable Average Daily Users . . . .'"). Thus, the TAC sufficiently alleges that Defendants' statements were materially false or misleading under "the reasonable inference standard of plausibility." *Glazer*, 63 F.4th at 767.

Second, Defendants speculate (Ind.Br. at 12:19-24) that reporting average mDAU that included accounts suspended for being fake or spam "*might* be justified because it *might* be that the suspended accounts were not engaged in false or spam behavior before their suspension" (¶322). Defendants' sheer speculation, based on analyses they did not run and information they had not obtained, does not entitle them to victory on a motion to dismiss. Nor does it matter whether the practice about which Segal speculated was "justified" (¶322) or "would be . . . appropriate" (Ind.Br. at 12:23-24). Defendants told investors how Twitter calculated mDAU: it stopped counting accounts in mDAU and

7

related metrics after determining they were fake or spam. The real practice, justifiable or not, "differ[ed] in a material way" from Statement 8. *In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 858 (9th Cir. 2023) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

Moreover, Defendants' argument that the suspended accounts included in mDAU had suddenly ***become*** fake or spammy is implausible. In Q1 2022, for example, ***15 million*** accounts were suspended but included in mDAU. (¶300). The far more plausible inference is that those accounts had been fake or spammy all along.

### 2. Defendants Misleadingly Touted mDAU That Reflected Millions of Unmonetized and Unmonetizable Accounts.

The TAC alleges with particularity that Defendants' misstatements touting mDAU gave investors an "impression of a state of affairs that differs in a material way from the one that actually exists." *NVIDIA*, 81 F.4th at 928.

When introducing mDAU, Defendants told investors that "[m]onetizable DAU are Twitter users who log in and access Twitter on any given day through twitter.com or our Twitter applications that are able to show ads." ¶282. In the next sentence, Defendants told investors mDAU was not like "more expansive metric[s] that ***includes people who are not seeing ads***." *Id*. The "fair and reasonable implication that an investor would derive from" Defendants' statements was that ***all*** users who accessed Twitter through portals that allowed Twitter to show ads ***actually saw ads*** and thus earned Twitter ***actual revenues***. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

Defendants' pre-Class Period statements gave the impression that all mDAU saw ads. So, when Defendants touted mDAU during the Class Period, investors assumed that the number only included users who saw ads. Merely repeating the definition of mDAU would not dissipate the misleading impression because Defendants had already explained that, under that definition, mDAU only included users who saw ads. The TAC cites multiple publications that concluded that all mDAU saw ads. ¶¶283-84.

Yet a material and growing number and proportion of mDAU did not see ads:

8

25% in Q2 2021, 28% by Q1 2022. ¶288. These users drove Twitter's mDAU growth. In 2021, *more than half* of the mDAU increase consisted of users who generated *no revenue*. *Id*. While Twitter touted having 238 million mDAU in Q2 2022, the users who actually saw ads and could have been deemed monetizable was about **65 million lower** than what Twitter represented publicly. *Id*. About half of Twitter's revenues were earned from a mere 16 million users. ¶291.

Defendants offer factual disputes and implausible readings that cannot overcome Plaintiffs' allegations. Defendants claim investors could not have been misled because "the market was informed that every disclosure of average mDAU included fake accounts." Ind.Br. at 11:5-6. But Defendants only said mDAU could include fake accounts Twitter had not detected. Defendants did not disclose that Twitter knowingly included *suspended* fake and spam accounts in mDAU, still less that they accounted for more than 5% of mDAU. Indeed, while Defendants claimed fake and spam accounts accounted for less than 5% of mDAU, just the accounts *suspended* for being fake or spam exceeded that 5% threshold. ¶302. Nor did Defendants inform investors that nearly 30% of mDAU were not monetized or that revenues were driven by a tiny fraction of users whose absolute numbers were barely budging. ¶287-91.

"Once defendants choose to tout positive information to the market, they [were] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018). Defendants implied to investors mDAU included only accounts who saw ads and that Twitter removed accounts from mDAU after determining they were spam. They were duty-bound to disclose the negative information dispelling the misleading impression their statements left. *Khoja*, 899 F.3d at 1009.

That Defendants' initial representation of mDAU predated the Class Period does not insulate them. A class period limits who has standing to bring the action; it does not

9

limit the "universe of actionable conduct," and Defendants' Class Period statements reaffirmed and bolstered the initial representation. *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at \*4–7 (D. Ariz. Feb. 2, 2023); *see also Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966 (N.D. Cal. 2005) ("The fact that the proposed class period begins after the first of the alleged misstatements does not make those earlier statements irrelevant or not actionable."). Defendants told investors at mDAU's inception that it only included users who saw ads. Investors can hardly be blamed if they carried over this understanding into the Class Period

Defendants' misrepresentations were not cleansed by the fact that "mDAU was not the only metric that Twitter reported" (Ind.Br. at 9:23). Defendants attempt to focus on fraud they did not commit, but the securities laws do not let companies lie about key metrics just because they report others. The disclosures on which Defendants now rely merely showed that Twitter did not earn the same amount of revenue from every user. They did not reveal that "not all mDAU contributed to revenue" (Ind.Br. at 10:7-8) or that nearly 30% of mDAU saw no ads and contributed no revenue. Defendants' interpretations of their disclosures are implausible and "did not negate [their] misstatements." *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019); *see also In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at \*4 (N.D. Cal. May 11, 2006) (argument that "disclosures" negated misstatements was is effectively a premature "truth-on-the-market" argument). The TAC establishes a plausible inference that Statement Set 7 was materially false or misleading.

10

### B.    The TAC Adequately Alleges Scienter.

Scienter may be pled by alleging "knowledge of the falsity [or] 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (quoting *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003)). A complaint adequately alleges scienter if, accepting all factual allegations as true and considering them holistically, the inference of scienter is as compelling as any non-culpable inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Individual Defendants' scienter is imputed to Twitter. *See In re Alphabet*, *Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1227 (2022).

### 1.    The Court Already Found A Strong Inference Of Scienter.

The Court has already held that Plaintiffs sufficiently alleged Defendant Segal's scienter for Statement 8 in Twitter's 10-Q's for Q1 and Q2 2022. Defendants offer no reason for the Court to change its mind. Segal "conceded during a June 30, 2022, call with Musk that the mDAU figures it reports to investors include these millions of accounts." ¶300. The TAC "present[s] a strong inference that . . . Segal learned of the practice at or near the time Mr. Musk made his April 2022 offer," and thus "knew the statement was false or misleading on May 2, 2022, when he signed" the Q1 2022 10-Q. Op. at 21:15-19. The TAC alleges Agrawal's scienter by showing he attended the meeting. ¶318. Given his position (CEO) and direct involvement in responding to Musk's inquiries about mDAU, the Court should reach the same conclusion for Agrawal as Segal.

The TAC also establishes that the Musk merger agreement gave both Segal and Agrawal a motive to misstate the truth: as executives and shareholders, they stood to gain millions if Musk completed the merger and acquired all outstanding shares, and thus did not want to derail Musk's acquisition of Twitter, which could have resulted in a lower acquisition price. Weber Decl., Ex. 4 at 065 (equity compensation granted to

11

employees and executives).

### 2.   Defendants Constantly Tracked mDAU as the "best way" To Measure Twitter's Success.

The Court should also find scienter because mDAU was a core operation. The Court is not breaking new ground. In *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1137 (N.D. Cal. 2017), the plaintiffs alleged that Twitter and certain of its officers had misleadingly concealed declining daily active user ("DAU") numbers. *Shenwick* inferred scienter because DAU was "so integral to Twitter's success that it would be absurd to argue" that Twitter's executives were not aware of how it was calculated or how it reflected user engagement. 282 F. Supp. 3d at 1145.

Defendants offer no reason to depart from *Shenwick*. If anything, Plaintiffs' allegations are stronger. In *Shenwick*, DAU was an internal Twitter metric not publicly reported; Twitter focused investors on Monthly Active Users. The *Shenwick* plaintiffs established core operations by alleging facts suggesting that, internally, Twitter looked at DAU and MAU in combination. 282 F. Supp. 3d at 1146. Here, Defendants' own words establish the core operations inference. Defendants repeatedly explained that mDAU "is what we've been tracking for a long time as the best way to measure our success," the "measure" of Twitter's "long term success," and "the best way to measure [Twitter's] success." ¶¶308-10; *see also* Dkt.88-5 at 085 ("mDAU and their level of engagement with advertising are critical to our success . . . ."). Kayvon Beykpour, Twitter's then-Product Lead and the executive responsible for growing mDAU, told analysts that Twitter "focus[ed] on" mDAU and that it was "the most important one we look at." ¶310. Segal even rebuffed an analyst seeking information on other metrics because mDAU was "what **we've been tracking internally** for a long time as the best way to measure our success." ¶308; *see also* ¶¶307, 309-11. That Defendants closely tracked the disputed information supports their scienter. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). It is absurd to suggest that, despite Defendants' focus on mDAU, and directing investors' attention to it, they did not know that a quarter to a third

12

of mDAU earned no revenues, nor that a material portion of mDAU were users Twitter had already suspended because they were fake. Indeed, on the same day the Court dismissed the FAC, the Ninth Circuit found that a defendant's statements to analysts that they monitored a metric is powerful evidence of their scienter if they make false or misleading statements about that metric. *NVIDIA*, 81 F.4th at 940.[4]

The TAC also establishes Twitter's scienter through Beykpour. Courts impute the scienter of, at a minimum, those "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)[.]" *S.E.C. v. City of Victorville*, 2018 WL 3201676, at *4 (C.D. Cal. Jan. 24, 2018). The Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits, all adopted the exact same standard as *Victorville*. *Smallen v. W. Union Co.*, 950 F.3d 1297, 1313 (10th Cir. 2020) (citing cases from the Fifth, Seventh, and Eleventh Circuits*); In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014).

Courts even impute the scienter of non-speaking vice presidents and assistant vice presidents. *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012); *see also Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018) (imputing scienter of controller). Beykpour was the senior executive with primary responsibility for growing mDAU. He plainly "furnish[ed]" mDAU figures

---

[4] *Jun Shi v. Ampio Pharms., Inc.* (cited by Ind.Br. at 14:6-10) supports *Plaintiffs* because the TAC "allege[s] the existence of contemporaneous information within [Twitter] that contradicted or undermined Defendants' public statements at the time Defendants made those statements," 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020), including that a significant portion of "mDAU" (25% in Q2 2021 and more thereafter) did not see any ads, that other metrics revealed declining user engagement, and that Twitter did not remove fake and spam accounts from mDAU even after suspension. Because these allegations are "clearly connected" to Defendants' misstatements, *Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*, 2023 WL 3549506, at *13 (C.D. Cal. May 9, 2023), on which Defendants also rely (Ind.Br. at 14:4-6), is inapposite.

---

13

Twitter reported publicly and the most plausible inference—indeed, the only reasonable inference—is that he knew how mDAU was calculated. *Victorville*, 2018 WL 3201676, at *4. Thus, the TAC alleges his scienter and that it is imputed to Twitter.

### 3.    The Misstatements' Specificity Supports Scienter.

The specificity of Defendants' misstatements supports the inference of scienter. *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (addressing "corrosion rate data specifically, render[ed] it unlikely that [defendant] was not aware of it or the concerning aspects of the company's findings"), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *see also Shenwick*, 282 F. Supp. 3d at 1147 ("An assertion that [d]efendants were unaware of an alleged issue can be directly contradicted by the fact that they specifically addressed it in their statements."); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("[I]nference of scienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements.").

Defendants' specific statements about the number of mDAU, down to the nearest hundred thousand, which they reported every single quarter, showed they knew the details of that metric. And their statements about what Twitter did when it encountered fake accounts or bots belies any claims of ignorance. ¶301.

### 4.    Defendants' Concealment of Information from Musk Supports Scienter.

Courts may infer defendants' scienter when they conceal the relevant information from other actors. *In re Fibrogen, Inc.*, 2022 WL 2793032, at *21 (N.D. Cal. July 15, 2022) (concealing information from FDA probative of scienter); *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *13 (M.D. Ga. Mar. 23, 2018) (inference of scienter bolstered by allegations that superiors told employee they would "find another accountant" and to "pipe down" about concerns). In response to Musk's urgent and repeated requests, Defendants slowly dribbled out information, only partially responded, and delayed disclosures. ¶¶318-22, 331, 336. Their resistance to providing information

14

to Musk contributes to a strong inference of scienter.

### 5.     Defendants Had A Motive.

Defendants had several motives for their mDAU misstatements. Motives need not involve personal financial gain. *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013). As in Twitter's prior case, because Plaintiffs' theory is not that Defendants were motivated to sell stock at a profit, no "negative inference from the absence of stock sales" is warranted. *Shenwick*, 282 F. Supp. 3d at 1149; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) ("The absence of a motive allegation, though relevant, is not dispositive.").

Defendants had other motives. In February 2021, Defendants promised investors Twitter would reach 315 million mDAU by the end of 2023, which they explained would set a foundation for strong revenues. ¶288. Yet mDAU growth predominantly consisted of unmonetized accounts. ¶312. Further, a material and growing portion of mDAU were accounts that Twitter already determined were spam. ¶298. So—not for the first time— Twitter executives "were motivated by an attempt to live up to the overly optimistic promises" of mDAU growth. *Shenwick*, 282 F. Supp. 3d at 1149; *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1185 (N.D. Cal. 2021) (motive to portray strategy as successful contributed to scienter, despite absence of alleged personal financial motive); *Gammel*, 2013 WL 1947525, at *21 ("It is far from implausible that a corporate executive who had spent months building excitement and momentum around important, new technology products might recklessly misrepresent the inability to deliver on those promises."). Indeed, Defendants concealed an Indian government information operation (despite committing to doing so) in furtherance of achieving the 315 million mDAU target. ¶247. That they would go to such lengths to meet their mDAU target is evidence that they would also mislead investors to convince them the target had been met.

15

### C.     The TAC Sufficiently Alleges Loss Causation.

Loss causation involves "no more than the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). A plaintiff "need only show a 'causal connection' between the fraud and the loss." *Id*. There is no "special further requirement in respect to the pleading of proximate causation or economic loss beyond the short and plain statement of the claim." *Facebook*, 84 F.4th at 864 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). Generally, "loss causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

#### 1.     May 13, 2022

Twitter's stock price fell on May 13 not because Musk had questions but because Defendants could or would not answer them. Loss causation is alleged even if the market had "to guess" at the full scope of a problem. *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *12 (C.D. Cal. Jan. 26, 2021); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 788 (9th Cir. 2020). In particular, loss causation may be established by a stock drop following an unexpected auditor resignation. *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015); *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *14 (N.D. Ga. Jan. 29, 2009). The disclosure of an SEC request for information may suffice. *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *16 (N.D. Cal. Mar. 31, 2023).

On May 6, Musk met with Segal and Agrawal to discuss mDAU and bots. ¶331. Segal and Agrawal rebuffed him rather than disclose the adverse facts hidden from investors. These included that up to 29% of mDAU did not earn any revenues and that mDAU included millions of accounts Twitter had suspended as fake or spam. ¶331, 288, 302. Unable to get answers, Musk tweeted on May 13 that the deal was "on hold" until Twitter could satisfy Musk's request. ¶330.

Defendants' inability—or unwillingness—to answer Musk's questions, like a

16

company's inability to answer auditors' questions, establishes loss causation. None of the disclosures would have occurred but for Defendants' fraud. Here, the "Defendants engaged in fraud they did not disclose until" Musk's inquiries "forced" information (including corroboration from Defendant Segal) into the open. *Mattel*, 2021 WL 1259405, at *2 (stock price decline following disclosure of non-public whistleblower letter was corrective disclosure for allegations raised in whistleblower letter). The allegations "trac[e] the loss back to "the very facts about which [Defendants] lied." *First Solar*, 881 F.3d at 753.

### 2.    July 8, 2022

The Court held that Statement 8 was false and misleading and made with scienter, but found loss causation lacking because the FAC did "not identify what information was shared [by Musk] or whether [it] addressed Twitter's alleged practice of including fake or spam accounts in its mDAU metric." Op. at 24:14-25:2. The TAC cures this deficiency, alleging that "[a]fter the market closed on July 8, 2022, Twitter publicly filed with the SEC a letter it had received from Musk's counsel." ¶336. The letter stated that Musk was cancelling the deal in light of "'false and misleading representations[.]'" *Id*. The letter identified Statement 8 as false because "we understand, based on Twitter's representations during a June 30, 2022 call with us, that Twitter includes accounts that have been suspended—and thus are known to be fake or spam—in its quarterly mDAU count even when it is aware that the suspended accounts were included in mDAU for that quarter.'" *Id*. While "a corrective disclosure need not be a mirror image of the prior misstatement," the TAC identifies exactly such a "mirror image." *BofI*, 977 F.3d at 791 n.3.

In addition, as with May 13, the July 8 corrective disclosure resulted from Defendants' unwillingness or inability to disclose facts about mDAU to Musk. The letter singled out Musk's inability to "verify Twitter's representations regarding the number of mDAU" and took issue with "Twitter's process for calculating its mDAU." Ex. F at 3, 6.

17

The letter stated that "Twitter's true mDAU count is a key component . . . , given that approximately 90% of its revenue comes from advertisements." *Id*. at 7. The July 8 disclosure, just like the May 13 disclosure, is caused by Defendants' reluctance to disclose information revealing they had made fraudulent statements, so the TAC sufficiently alleges loss causation.

### 3. July 7, 2022

"Disclosure of the fraud is not a *sine qua non* of loss causation." *First Solar*, 881 F.3d at 753. One of the "'infinite variety' of causation theories a plaintiff might allege" is "showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.* at 754.

On July 7, *The Washington Post* reported that Musk was withdrawing from the Twitter acquisition. On July 8, he revealed his reasons, including that Statement 8 was false and that Twitter had dodged his inquiries. The allegations supporting loss causation for the July 8 disclosure also support loss causation for the July 7 disclosure. The July 7 stock price decline resulted from Musk's discovery of falsity. *See Mattel*, 2021 WL 1259405 at *12 (stock price decline following disclosure of non-public whistleblower letter was corrective disclosure for allegations raised in whistleblower letter).

### 4. Defendants' Short Seller Cases Are Irrelevant.

Defendants make the fact-intensive argument that the corrective disclosures were disregarded by the market because they were made by or at the direction of Musk, whom Defendants analogize to a short seller. Ind.Br. at 17. Citing *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022), Defendants argue that any disclosure from a source with an interest served by the disclosure categorically cannot be considered as a corrective disclosure. *Nektar*, however, is limited at most to situations where "anonymous and self-interested short-sellers [] disavowed any accuracy." 34 F.4th at 840. Courts, including both this Court and the Ninth Circuit, regularly hold that the market can recognize corrective facts from self-interested parties such as whistleblowers.

18

*See, e.g., BofI*, 977 F.3d at 794; *Mattel*, 2021 WL 1259405 at *11-13. That a whistleblower's "motivations for coming forward may not have been entirely pure" does not exclude the inference that the market "perceived [the] allegations as credible and acted upon them on the assumption that they were true." *BofI*, 977 F.3d at 792.

Here, Musk did *not* disclaim the accuracy of his statements. The July 8, 2022 disclosure came in a letter from Musk's counsel at Skadden Arps, was based on due diligence conducted by lawyers (based on Twitter's own documents), and was confirmed by Segal, who admitted that Twitter included suspended accounts in its mDAU count. These facts rendered Musk's accounts sufficiently credible. Nor was the disclosure anonymous: the lawyer who signed the letter and Musk put their names on it. ¶336.

> 5.    *Defendants Cannot Establish That The Entire Stock Price Decline Was Unrelated To Their Fraud.*

Defendants contend that loss causation cannot be established because "on April 28, 2022, Twitter explicitly disclosed inaccuracies in mDAU, and the market did not react." Ind.Br. at 19:27-28. Defendants themselves explain this lack of reaction, characterizing the April 28 announcement as "immaterial" (*Id.* at 7 n.4).

Twitter's stock did fall significantly after the corrective disclosures. "Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage." *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046-47 (N.D. Cal. 2018); see also *Mattel*, 2021 WL 1259405 at *12 ("In any event, conclusively deciding reasons for the market's reaction is premature, and reasonable theories concerning that reaction do not warrant Rule 12 dismissal."). Plaintiffs sufficiently allege that the corrective disclosures "[were] a substantial factor in causing a decline in the security's price." *Mattel*, 2021 WL 1259405 at *11.

> 6.    *Investors Suffered An Economic Loss Resulting From the Fraud.*

Twitter "shareholders suffered an economic loss caused by the misstatements

19

because they purchased their shares at an inflated price and are now unable to recoup the inflationary component in the market," and "[t]hat remains true regardless of whether" Musk successfully terminated the agreement; the stock was depressed nonetheless. *BofI*, 977 F.3d at 793 n.4. The disclosures drove the stock price to $32.65, a **28%** decline from its price before those disclosures. ¶¶333-34, 337-38. These three disclosures, individually and collectively, sufficiently establish loss causation at the pleading stage.[5]

### D. The Control Person Claims Are Adequately Pled.

Plaintiffs' Section 10(b) claim is adequately alleged, so the Section 20(a) claim against Individual Defendants may not be dismissed on that basis. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031 (S.D. Cal. 2005).

Furthermore, the TAC contains particularized factual allegations sufficient to establish 20(a) liability. Control "is an intensely factual question." *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015). "[C]ourts have found general allegations concerning an individual's title and responsibilities . . . sufficient to establish control." *Id.* "[I]t is not necessary to show . . . the exercise of actual power." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).[6]

Here, Defendants Dorsey, Agrawal, and Segal approved and signed Twitter's SEC filings and frequently (as did Defendant Kieran) "spoke on the Company's behalf"

---

[5] The corrective disclosures in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008), did not reveal "widespread financial aid manipulation." Here, the disclosures went to the heart of Defendants' misstatements.

[6] In *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017), 20(a) claims were dismissed because the 10(b) claim was dismissed. *Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1106 (N.D. Cal. 2020), and *Sgarlata v. PayPal Holdings, Inc.*, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018), merely hold specific factual allegations are necessary to establish subordinate control of superiors' statements in written documents.

PLAINTIFFS' MP&A IN OPPN. TO DORSEY ET AL. MOT. TO DISMISS   Case No. 2:22-cv-06525-MCS-E

concerning mDAU, cybersecurity, and/or state influence campaigns. *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *14 (N.D. Cal. Nov. 4, 2020); *see also In re LDK Solar Sec. Litig.*, 2008 WL 4369987, at *8 (N.D. Cal. Sept. 24, 2008) (defendants "made or approved" statements in SEC filings they signed).[7] This is sufficient to establish their "collective exercise of control over" Twitter. *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1193-94 (C.D. Cal. 2007) (upholding Section 20(a) claim against all but the lowest-ranking defendant, who was not alleged to have "caused [the company] to file any misstated financial statements").

Dorsey, Agrawal, and Segal were the principal executive and financial officers of Twitter at the time of the alleged misstatements, and thus had control over lower-ranking officers and employees, such as the Head of Government, Public Policy and Philanthropy for Twitter UK (¶217) and the authors of unattributed posts on Twitter's official blog addressing the July 2020 Hack (¶39) and state-linked information operations (¶¶215-16) and Twitter's official "Twitter Safety" account addressing such operations (¶214).

Section 20(a) liability lies because Individual Defendants also had the power to *correct* misstatements made by others, in earnings calls and elsewhere. *See In re InfoSonics Corp. Sec. Litig.*, 2008 WL 11338358, at *2 n.5 (S.D. Cal. Apr. 28, 2008) (20(a) liability for CFO's failure to correct CEO's misstatements during analyst call); *In*

---

[7] Moreover, 10(b) liability lies because Individual Defendants signed SEC filings (TAC at 53 n.18, TAC at 55 n.20, ¶323), gave interviews (¶¶120, 213, 218, 308-09), authored blog posts(¶¶87, 140), and were quoted in press releases (¶¶264, 269) containing the alleged misstatements, regardless of 20(a) liability. *See LDK*, 2008 WL 4369987, at *8 ("[S]igning of a prospectus or other SEC filing . . . establish[s] that the individual made or approved the allegedly false statement."); *see also Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011) ("[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.").

*re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at \*30 (S.D. Cal. May 23, 2017) (20(a) liability for defendants that had "power to correct" misstatements made during conference calls and press releases).

## IV.  CONCLUSION

Defendants' motions should be denied. Should the Court grant the motions, even in part, Plaintiffs request leave to amend.

Dated: December 1, 2023                                    Respectfully submitted,


                                                           By: */s/ Jonathan D. Park*


**THE ROSEN LAW FIRM, P.A.**                               **POMERANTZ LLP**

Laurence M. Rosen (SBN 219683)         Jeremy A. Lieberman (*pro hac vice*
355 South Grand Avenue, Suite 2450     forthcoming)
Los Angeles, CA 90071                  Jonathan D. Park (*pro hac vice*)
Telephone: (213) 785-2610              Dolgora Dorzhieva (*pro hac vice*)
Facsimile: (213) 226-4684              600 Third Avenue, 20th Floor
Email: lrosen@rosenlegal.com           New York, New York 10016
                                       Telephone: (212) 661-1100
Jonathan Horne (*pro hac vice*)        Facsimile: (212) 661-8665
Brian B. Alexander (*pro hac vice*)    jalieberman@pomlaw.com
275 Madison Avenue, 40th Floor         jpark@pomlaw.com
New York, New York 10016               ddorzhieva@pomlaw.com
Telephone: (212) 686-1060
Facsimile: (212) 202-3827              Jennifer Pafiti (SBN 282790)
jhorne@rosenlegal.com                  1100 Glendon Avenue, 15th Floor
balexander@rosenlegal.com              Los Angeles, California 90024
                                       Telephone: (310) 405-7190
                                       Facsimile: (212) 661-8665
*Counsel for Court-Appointed Lead*     jpafiti@pomlaw.com
*Plaintiff William Baker, Additional*
*Plaintiffs Lenard Roque and Amolkumar*   *Counsel for Court-Appointed Lead*
*Vaidya, and Co-Lead Counsel for the Class*   *Plaintiff William Baker, Additional*
                                              *Plaintiff Jill Sligay, and Co-Lead Counsel*

PLAINTIFFS' MP&A IN OPPN. TO DORSEY ET AL. MOT. TO DISMISS          Case No. 2:22-cv-06525-MCS-E

*for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel*

23

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this memorandum of points and authorities contains 6,998 words, including headings, footnotes, and quotations but excluding the caption, the table of contents, the table of authorities, the signature block, the certification required by L.R. 11-6.2, and any indices and exhibits.

Dated: December 1, 2023                    /s/ *Jonathan D. Park*
                                           Jonathan D. Park

24